UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.  05 CR 727-1 |
| v. | ) | |
| | ) | Judge Amy J. St. Eve |
| CONRAD M. BLACK | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT BLACK'S STATEMENT OF INFORMATION REQUESTED BY THE COURT**

The United States of America, through PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, responds to defendant Conrad Black's submission of financial information requested by the Court as follows: The Court ordered defendant to provide additional information about his finances to determine (1) whether defendant has misrepresented his financial resources to the Court, and (2) whether defendant's available financial resources are such that the Court ought to reconsider his bond. As before, defendant's latest submission raises more questions than it answers. More troubling still, despite ample time and the assistance of experienced lawyers, tax preparers, and financial accountants, defendant Black continues to obfuscate his financial situation and lie about the circumstances surrounding the November 30, 2005 financial affidavit relied upon by the government and this Court in setting Black's bond.

Black and his counsel maintain that this is all a tempest in a teapot and that Black's misrepresentations and omissions have little or nothing to do with his bond in this case. Unfortunately, Black still does not appreciate the fundamental fact that bond is about trust. This defendant's candor, or lack thereof, is highly relevant to this Court's ability to rely on assurances of his presence. Both the government and the Court continue to give Black every opportunity to provide full and accurate information, and Black has squandered every opportunity by lying. This

raises serious questions about defendant's intentions when he promises to appear for trial in this case.

## Black's Lies Regarding Horizon

There is no dispute at this point that Black's November 30, 2005 valuations of his interests in Horizon Publications, Inc. ("Horizon U.S.") and Horizon Operations, Ltd. ("Horizon Canada") were false. As of July 10, 2006, the date of his "Revised Financial Statement," Black's interest in Horizon U.S. was apparently worth "approximately" $10.5 million, not $1.5 million as originally affirmed. As for Horizon Canada, Black's interest was apparently worth approximately $13.6 million (the amount paid to Black when he sold his stake in Horizon Canada in July 2006), not $3 million as originally affirmed.

In his Revised Financial Statement, Black affirmed to this Court that the increased Horizon valuations resulted from recent business developments at Horizon and the improved strength of the Canadian dollar:

> [T]he result of applying the formula multiple of the Horizon shareholders' agreements to improved earnings figures, a year's reduction in the debt of the companies from the application of the retained earnings figures, a year's reduction in the debt of the companies from the application of the retained operating cash flow to debt reduction, and a rise in the Canadian dollar.

7/10/06 Affidavit at 8, §13. This explanation for the huge disparity in values for Black's Horizon investments – the only one ever offered by Black under oath – has, however, evolved over the past 30 days.

For example, at a status hearing on July 12, 2006, in response to questions from this Court about the difference in valuations between the financial affidavit for the Horizon entities, Black's counsel backed away from Black's July 10, 2006 explanation. There was no further mention of the

"reduction in the debt of the companies from the application of the retained earnings figures" or the "rise in the Canadian dollar," instead, Black's counsel insisted that the reason for the discrepancy was because Black did not have access to any financial information about Horizon entities at the time Black executed the November 30, 2005 financial affidavit. Specifically, Black's counsel offered that Black did not have "any financial statements as of that time." 7/12/06 Tr. 9. When the Court inquired, "As of what time?" *Id.* Black's counsel responded, "As of the time he drew this [the financial affidavit] up." *Id.*

Then, in what is surely a harbinger of things to come, Black's counsel attempted to blame Black's business partner, David Radler, for the discrepancy between the two financial affidavits. Black's counsel complained:

> At that particular time [of the November 30, 2005 affidavit], these companies are closed companies, closed corporations. They are owned by a primary stockholder and run by Mr. Radler and his family. *[Black] had no idea what the monies were – what monies existed.*

*Id.* at 10 (emphasis added). Black's counsel later stressed that Radler was the one who "knows exactly what all this [Horizon] is worth," Black was "not entitled to all these figures" regarding the value of Horizon entities. *Id.* at 26.

The excuses for the disparity in the affidavits continued to change over the next several weeks. On July 28, 2006, in response to this Court's order for a further explanation of the valuation of Black's investments in Section 13 of the Revised Financial Statement, Black complained that the "difficulty" he had in preparing the original financial affidavit was because of, *inter alia*, "time was short and the conditions were stressful," his financial affairs were "complex," he did not have "the assistance of his long-time financial accountant," co-defendant Jack Boultbee, he was "locked out of 10 Toronto Street, Toronto, the place where he maintained an office," David Radler controlled

3

the assets of Horizon, and Black could not "consult with Mr. Radler or his representatives about valuation issues." Def. Statement of Information at 2-3. Finally, Black again emphasized that "as a minority shareholder," he had not received "current, verified financial information with respect to the Radler-controlled companies around November 30, 2005." *Id.* at 3. Nor did he "possess information concerning the current prospects or outlook of the companies." *Id.*

Many, if not all of these explanations by Black are false. The truth is that Black had no difficulty obtaining detailed, current financial information about the Horizon entities either before or after November 30, 2005 when it was in his interest to do so. Nor did Black have difficulty providing Horizon information to third parties when it was in his interest to do so. The Horizon financial materials were not locked away in Black's office at 10 Toronto Street; as of no later than September 2005, they were at his home in Canada where he had asked that they be faxed. Black simply decided in November 2005 that he did not want to provide this information to the Court and the government.

For example, in early-May of 2005, shortly after obtaining the $10 million mortgage on his Palm Beach property from Laminar, Black contacted Laminar about the possibility of obtaining additional financing from Laminar for Horizon U.S. and Horizon Canada. Black, from his personal e-mail account, arranged to have detailed financial information from Horizon U.S. and Horizon Canada sent by Roland McBride, the Executive Vice-President and CFO for Horizon, to representatives at Laminar on May 19, 2005. *See* Exhibit A. This information included consolidated balance sheets for Horizon's U.S. and Canadian operations as well as detailed projections for 2006 and 2007. The information represented, *inter alia*, that the consolidated EBITDA for Horizon U.S and Canada was approximately $14 million in 2005 – suggesting a

4

valuation for Horizon of approximately $140 million.[1]

Again, on or about September 1, 2005, Black contacted McBride, and asked that McBride fax to Black a copy of Horizon's most recent financials for the June 30, 2005 quarter. *See* Exhibit C. On the cover page of the September 1, 2005 fax, McBride assured Black that McBride would "forward similar materials [to Black] each quarter." *Id.* These documents were faxed by McBride to Black at his home fax number – saving Black from the trouble of having to get into his office at 10 Toronto Street.

Finally, almost two months later, on or about October 25, 2005, Black requested that McBride respond to detailed financial queries about CBCC's holdings in Horizon Publications, Horizon Operations and Bradford Publishing from a financial analyst at Kerr Financial in Canada. *See* Exhibit D. These inquiries included questions regarding the value of the Horizon debentures Black later refinanced for almost $6 million. *See id.* Furthermore, Black had been receiving detailed shareholder information about the financial condition of the Horizon entities from February 2005 through August 2005. *See* Exhibit J.

Thus, well before he submitted his financial affidavit on November 30, 2005, Black had no difficulty obtaining and providing to others detailed valuations and computations of Horizon's financial condition as well as CBCC's holdings in Horizon. Indeed, this information appeared to be nothing more than a phone call, e-mail or facsimile away.

---

[1]This value uses a market multiple of 10x EBITDA – the same multiplier Black and Radler proposed as fair to the International Board of Directors when Black and Radler purchased properties from International for Horizon. *See* Exhibit B at HLR 005832 (Board advised that Black and Radler interested in purchasing Horizon assets for 10x EBITDA). In light of Black's 24% holdings in Horizon (*see* 7/12/06 Tr. at 10), this yields a value of "approximately" $33.6 million for Black's interest in the Horizon entities as of May 2005.

5

Rather than concede that he chose not take to the Court's request for information as seriously as those of potential investors, Black maintains that the values provided in his original financial affidavit were in good faith but merely "approximate." Black points the Court to the following caveat, "The information provided is complete to the best of my ability to date. I do not believe I have any other assets or liabilities. However, should any other assets or liabilities come to my attention I will provide it forthwith." Def. Submission at 3. This was false: Black had in hand documents flatly contradicting the Horizon information he swore to in his affidavit.

Even after Black filed his original affidavit in November 2005, he continued to receive financial information on the Horizon entities and the Alberta Newspaper Group from McBride and others. For example, on March 21, 2006, McBride sent Black EBITDA and debt figures for Horizon and Alberta. *See* Exhibit E. Again, these figures contradicted the information in Black's November 2005 affidavit. Less than a week later, on March 27, 2006, McBride sent Black the audited financial statements for the years 2003 through 2005, as well as Horizon's income tax returns. *See* Exhibit F. Black never provided these updated materials to the government or the Court, despite his promise to do so "forthwith."

The truth of the matter is that prior to November 30, 2005, even without the information provided by McBride, Black had all the information necessary to provide a reasonable estimate of the value of his shares in Horizon. As of January 2002, defendant had executed a copy of the "First Amendment to Horizon Shareholders' Agreement," which clearly stated the formula for determining the fair market value of those shares. See Exhibit G (describing formula as "7.2 times EBITDA" for Canadian operations and "7.8 times EBITDA" for U.S. operations). As a businessman who has spent a good portion of his career buying and selling newspapers, defendant was as familiar as

6

anyone with the concept of EBITDA and how to obtain valuation information for Horizon.[2]

Indeed, for further proof Black was perfectly capable of more accurately valuing his Horizon shares, one need only look to the fact that in July 2005, he transferred 7,365 shares in Horizon Canada to his wife, Barbara Black, in exchange for a promissory note in the amount of $17 million Canadian. In this transaction, Black and his wife assigned a value of $2,308 per share in Horizon Canada. Accordingly, if he used the same methodology with the Court that he used with his wife, Black should have valued his 5,477 shares in Horizon Operations at approximately $12 million CDN. Instead, Black valued those shares in his first financial affidavit at approximately $3 million.

Nor does the fact that Horizon-related transactions were referenced in civil litigation naming Black, Radler, and others, justify the 90% discount rate that Black applied to his shares in Horizon in his original financial affidavit. As an initial matter, Black did not indicate in any way on his initial affidavit that he was reducing the value of those shares to take into account the risk of pending litigation. In contrast, when defendant listed his shares in Ravelston, he explained that he could not assign a dollar value to his 64% ownership stake "due to current litigation." *See* November 30, 2005 Financial Affidavit at 13g. Moreover, Black had no problem valuing his shares at a significantly higher amount five months earlier in the Barbara Black $17 million transaction, described in the previous paragraph. That transaction was completed while the civil litigation cited by defendant was already pending.

Black has offered no explanation in his latest submission for how the cloud of litigation led

---

[2] At the July 12, 2006 status, Black's counsel's suggested that because the November 30, 2005 affidavit was prepared by a lawyer who had "no financial background," formulas involving terms like EBITDA may have escaped Black. *See* 7/12/06 Tr. at 9-11. While his counsel at the time may have had no financial background, Black was an extremely sophisticated businessman and well versed at the valuation of newspapers using "EBITDA." *See e.g.*, Exhibit H.

to an estimated valuation for Horizon U.S. of $1.5 million. The closest Black has ever come to offering a plausible explanation for the $1.5 million figure was at the July 12, 2006 status where his counsel opined that he had a "financial statement as to Horizon" stating that "the net value or the shareholder equity in that company was 5.7 million and [Black] owned 25 percent of that. So, the lawyer approximated at 1.5." 7/12/06 Tr. at 10. Again, what is the truth? Was Horizon undervalued because of ongoing litigation, lawyer error or a desire to hide the truth from the government and this Court?

Even if Black's initial $1.5 million valuation in fact reflected the cloud of litigation hanging over Horizon, as discussed above, it was incumbent upon Black to inform the government and the Court when circumstances changed such that his shares were worth considerably more. As soon as Black had information indicating that his shares in Horizon Publications were substantially more valuable than $1.5 million, even if the price came as a "surprise" to him and his lawyers (Def. Submission at 6), he had an obligation to disclose that information to the government and the Court. Rather than provide this information, Black waited until after the Court ordered him to submit a revised financial affidavit, based on the entirely unrelated circumstance of his default on the mortgage for his Palm Beach property, to disclose the fact that decreased litigation risk generated a ten-fold increase in the market price of his shares.

### The Midas Touch Continues

In his latest filing, Black attempts to explain the difference between his valuation of Alberta Newspapers, Ltd. in his original affidavit ($5.5 million) versus his revised financial affidavit ($6 million). Black again complains that Alberta is a privately held corporation, and he had difficulty obtaining current financial information. This claim, too, is contradicted by Black's correspondence

8

with McBride: had Black asked, McBride could have just as easily e-mailed information regarding Black's financial interest in Alberta to the government as he did to Kerr Financial in October 2005. *See* Exhibit D. Moreover, the EBITDA numbers for Alberta provided by McBride to Black in March 2006 suggest a value for the Alberta in excess of $100 million (10x EBITDA of $10.9 million) – significantly higher than the EBITDA figures presented by Black in his latest submission. *See* Def. Submission at Exhibit 5. Currently, Black and his wife together own roughly 36% of Alberta, thus the value of their investment is *not* a mere $6 million as Black affirms in his latest Revised Financial Statement, it is instead approximately $36 million.

Prior to July 2005, Black owned a 36% stake in Alberta. The government has learned that back in July 2005, at the same time that Black transferred his Horizon Canada shares to his wife – purportedly in exchange for a $17 million promissory note – Black also transferred a portion of his stake in Alberta to his wife (leaving Black with a 16% stake in Alberta and his wife with a 20% stake in Alberta). Despite this July 2005 transfer to his wife, there is *nothing* in Black's financial statement indicating that Black received a promissory note (or a cash payment) from this $20 million transfer to his wife.

More significantly, however, while Black mentions in a footnote that "negotiations regarding the purchase of Alberta Newspapers shares are presently ongoing" (Def. Submission at 7 n.5), Black neglected to advise this Court (or the government) that he stands to gain slightly more than $20 million in cash from this proposed sale. *See* Exhibit I. Thus, once again, Black has managed to turn an investment which he valued to the government and the Court at approximately $6 million into almost $20 million in cash.

9

**Black's Financial Dealings with his Wife**

Of the many open questions raised by Black's response, another of the more troubling ones is the apparent free flow of millions of dollars to Black from his wife's corporation, and the fact that the Court has little or no information about the extent of those transfers or the amount of assets held by Ms. Black that are available to Black. In particular, Black's latest response reveals for the first time that his wife loaned him $2.3 million during the period from January 2006 through April 2006. *See* Def. Submission Exhibit 6 (Schedule 1). Black has failed to explain why this $2.3 million was not listed as income in his revised financial affidavit, nor has he provided sufficient information to determine whether he has received any other loans from his wife prior to January 2006. In addition, the $2.3 million loan appears to have been made to Black separate from the $17 million promissory note that Black holds from Ms. Black's corporation ("4246161 Canada Ltd.")[3] for the transfer of shares in Horizon Canada. Although defendant neglected to list payments made on this promissory note as income, his revised financial affidavit indicates that there is still $7.7 million Canadian outstanding on this promissory note. *See* Revised Financial Affid. at 7. Black's submission does not explain, however, why Ms. Black would loan defendant $2.3 million, rather than pay down the $7.7 million outstanding promissory note.

Additionally, as described in the previous section pertaining to Alberta, in July 2005, Black apparently transferred roughly $20 million in shares from Alberta to his wife. There is no indication anywhere in Black's financial statements that Black received consideration for this transfer. Indeed, it is unclear whether or not Black is including his wife's newly acquired stake in Alberta when he

---

[3]Although Ms. Black has an ownership interest in CBCC (Black's corporation), it would appear from his Revised Financial Statement that Black has no ownership stake in Ms. Black's corporation.

provides his financial information to the Court and the government concerning Alberta.

Essentially, it appears that whenever Black needs money, his wife (or at the very least, her corporation) stands ready to provide millions of dollars in cash without so much as a promissory note. Yet, when Ms. Black needs cash, sometimes promissory notes are drawn up (and sometimes they are not) and due dates are set (according to his original financial affidavit, Ms. Black's promissory note is due in 2008). Clearly, the Blacks have a unique financial arrangement into which the government and this Court have little or no information. Consequently, it is impossible to obtain a complete and accurate picture of the financial resources available to Black without a financial affidavit from Ms. Black and her corporation. Without this vital information, this Court and the government are still left guessing whether the current bond is adequate to secure Black's continued appearance.

## Forensic Accounting – "Limitations of Scope"

Black has submitted vague, incomplete and unverified information about his finances. The schedule of receipts prepared by Black's forensic accountant lists $77,012.44 for "sale of shares" without any information as to what those shares are or whether Black has any more shares available to sell. The schedule also lists "dividend, interest and sundry income" of $63,871.52 in the two months between December 2005 and January 2006 without any further explanation of the source of these funds. In addition, the same schedule references a "loan from wife's company" during an "estimated" time period of January 2006 through April 2006 of $2.34 million U.S. Also listed are "Loans from friends" in January 2006 totaling $500,000 Canadian and additional "Loans from friends" in February of 2006 totaling $100,000 U.S. The report does not explain who these friends are, how many loans Black received, or what the terms of those loans are.

More significantly, the forensic accounting report has so many qualifications and reservations as to be meaningless. In describing the scope of the analysis performed, the report makes clear that "[w]e have interpreted the word 'income' to mean all receipts of monies, by or on behalf of Conrad Black during this period *for which we have been provided with supporting documentation*" (emphasis added). Because they relied on the documents provided to them, rather than doing their own inquiry, the report states: "We are unable to conclude that all receipts made by or on behalf of Conrad Black are included in Schedule 1." Moreover, the forensic accountant points out that "[t]he characterization of the receipts is based upon explanations provided to us," and they "have not verified the characterization of the all of the receipts." Indeed, the accountants confirm that there are various bank accounts referenced by Black for which they have not received bank statements and are therefore not covered in their report. Finally, it remains unclear whether the monthly expenses listed by Black in his Revised Financial Statement include his expenses in Palm Beach and the United Kingdom.

WHEREFORE, the government respectfully requests that defendant be ordered to submit: (1) a complete financial statement under oath from Barbara Amiel Black and 4246161 Canada Ltd. and (2) information regarding any and all payments, loans or transfers from Barbara Amiel Black, 4246161 Canada Ltd., or other entities controlled by Barbara Amiel Black to the defendant and/or CBCC. In addition, the government requests that defendant's bond be increased to reflect the updated information concerning defendant's financial circumstances.

        Respectfully submitted,

        PATRICK J. FITZGERALD
        United States Attorney

By: /s/ Eric H. Sussman
    ERIC H. SUSSMAN
    JEFFREY H. CRAMER
    JULIE B. RUDER
    EDWARD N. SISKEL
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 353-5300

Dated: August 4, 2006

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following documents:

**Government's Response to Defendant Black's Statement of Information Requested by the Court**

were served on June 23, 2006, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

        By: /s/ Eric H. Sussman
           ERIC H. SUSSMAN
           JEFFREY H. CRAMER
           JULIE B. RUDER
           EDWARD N. SISKEL
           Assistant United States Attorney
           219 South Dearborn Street
           Chicago, Illinois 60604
           (312) 353-5300