**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05 CR 727 |
| | ) | |
| CONRAD M. BLACK, JOHN A. | ) | |
| BOULTBEE, PETER Y. ATKINSON, | ) | |
| MARK S. KIPNIS, and THE RAVELSTON | ) | |
| CORPORATION LIMITED, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On August 17, 2006, a grand jury returned a seventeen-count third superseding indictment (the "Indictment") naming four individual Defendants – Conrad M. Black, John A. Boultbee, Peter Y. Atkinson, Mark S. Kipnis – and a corporate Defendant, the Ravleston Corporation Limited (collectively, "Defendants"). The Indictment charges that Defendants committed the following offenses: (1) mail and wire fraud, in violation of 18 U.S.C. §§1341, 1343, including the deprivation of the intangible right to honest services, in violation of 18 U.S.C. §1346, (2) money laundering, in violation of 18 U.S.C. §1957; (3) obstruction of justice, in violation of 18 U.S.C. §1512(c)(1); (4) racketeering, in violation of 18 U.S.C. §1962(c); and (5) criminal tax violations, in violation of 26 U.S.C. §7206(2). Defendants have filed a number of motions to dismiss and motions to strike challenging the legal and factual sufficiency of the Indictment. For the reasons discussed below, the Court denies those motions.

**LEGAL STANDARD**

I.     **Motions To Dismiss**

Fed. R. Crim. P. 12(b)(2) provides that "[a] party may raise by pretrial motion any

defense, objection, or request that the court can determine without a trial of the general issue."

When considering a motion to dismiss under Rule 12(b)(2), "a court assumes all facts in the

indictment are true and must 'view all facts in the light most favorable to the government.'"

*United States v. Segal*, 299 F. Supp. 2d 840, 844 (N.D. Ill. 2004) (quoting *United States v.

Yashar*, 166 F.3d 873, 880 (7th Cir. 1999)).  When viewed in that light, an indictment is sufficient

if it satisfies three, constitutionally-mandated requirements.  *United States v. Anderson*, 280 F.3d

1121, 1124 (7th Cir. 2002).  "First, [an indictment] must adequately state all of the elements of

the crime charged; second, it must inform the defendant of the nature of the charges so that he

may prepare a defense; and finally, the indictment must allow the defendant to plead the

judgment as a bar to any future prosecution for the same offense."  *Id.* (citing *United States v.

Smith*, 230 F.3d 300, 305 (7th Cir. 2000); further noting that "[t]he Fifth Amendment guarantees

the right to an indictment by grand jury and serves as a bar to double jeopardy, while the Sixth

Amendment guarantees that a defendant be informed of the charges against him.").  In this

regard, "[i]ndictments need not exhaustively recount the facts surrounding the crime's

commission," *United States v. Agostino*, 132 F.3d 1183, 1189 (7th Cir. 1997), rather "when

determining the sufficiency of an indictment, [a court] look[s] at the contents of the subject

indictment 'on a practical basis and in [its] entirety, rather than in a hypertechnical manner.'"

*United States v. McLeczynsky*, 296 F.3d 634, 636 (7th Cir. 2002) (quoting *Smith*, 230 F.3d at

305).  In addition, "[a]n indictment, or a portion thereof, may be dismissed if it is otherwise

defective or subject to a defense that may be decided solely on issues of law." *United States v. Labs of Virginia, Inc.*, 272 F. Supp. 2d 764, 768 (N.D. Ill. 2003); *see also United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005) ("[t]he propriety of granting a motion to dismiss an indictment under [Fed. R. Crim. P.] 12 by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact. If a question of law is involved, then consideration of the motion is generally proper." (citation omitted)).

## II.     Motions To Strike

Federal Rule of Criminal Procedure 7(d) provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment." Fed. R. Crim. P. 7(d). The related Advisory Committee Notes explain that the rule "introduces a means of protecting the defendant against immaterial or irrelevant allegations in an indictment . . . which may, however, be prejudicial." "Motion to strike portions of the indictment should be granted 'only if the targeted allegations are clearly not relevant to the charge and are inflammatory and prejudicial.'" *United States v. Andrews*, 749 F. Supp. 1517, 1518 (N.D. Ill. 1990) (citation omitted); *see United States v. Williams*, 445 F.3d 724, 733 (4th Cir. 2006) ("[A] motion to strike surplusage from the indictment should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial") (citations omitted); *United States v. Michel-Galaviz,* 415 F.3d 946, 948 (8th Cir. 2005). "Simply put, legally relevant information is not surplusage [and] due to the exacting standard, motions to strike information as surplusage are rarely granted." *United States v. Bucey*, 691 F. Supp. 1077, 1081 (N.D. Ill. 1988).

With these principles in mind, the Court turns to the merits of Defendants' Motions.

## ANALYSIS

### I.      The Parties and Other Key Entities

Hollinger International, Inc. ("International") was a Delaware corporation with an office located in Chicago, Illinois. (R. 219-1, Indictment at 1, ¶1a.) International was a holding company that was publicly traded on the New York Stock Exchange. (*Id.*) Through its operating subsidiaries, International owned and published newspapers around the world, including the *Chicago Sun-Times*, *The Daily Telegraph* in the United Kingdom, the *National Post* in Toronto, Canada, the *Jerusalem Post* in Israel, and numerous community newspapers in the United States and Canada. (*Id.*) International maintained an audit committee (the "Audit Committee") consisting of three independent directors that functioned as International's independent director committee for purposes of reviewing and approving the fairness of "related party" transactions between International and its controlling shareholders, officers, and/or directors. (*Id.*)

Hollinger Inc. ("Inc.") was a Canadian corporation with its principal office located in Toronto, Canada. (*Id.* at 2, ¶1b.) Inc. was a holding company that was publicly traded on the Toronto Stock Exchange. (*Id.*) Inc's primary asset was its interest in International, which it held directly through various subsidiaries. (*Id.*) Inc. held approximately 30% of International's equity, but still controlled a majority of International's stock voting power. (*Id.*) This disproportionate voting power existed because most of Inc.'s shares in International were Class B common stock that had a 10-1 voting preference over the Class A common shares held by International's public shareholders. (*Id.*)

Defendant the Ravelston Corporation Limited ("Ravelston") was an Ontario, Canada

corporation with its principal office located in Toronto, Canada.  (*Id.* at 2, ¶1c.)  Ravelston was a privately held corporation, with 98.5% of its equity owned by officers and directors of International and Inc., and 1.5% owned by the estate of a former Inc. director.  (*Id.*)  Ravelston's principal asset was its controlling interest in Inc., which it held directly and through various subsidiaries, and which was approximately 78% of Inc.'s equity during the relevant time period. (*Id.*)  Ravelston, thus, was the controlling shareholder of International through its controlling interest in Inc.  (*Id.* at 3, ¶1c.)

Defendant Conrad M. Black ("Black") is a trained attorney and was a Canadian citizen until 2000 when he became a member of the United Kingdom's House of Lords.  (*Id.* at 3, ¶1d.) He resided in Toronto, London, and Palm Beach, Florida, and frequently stayed at an apartment owned by International in New York City.[1]  (*Id.*)  Black, through Conrad Black Corporation ("CBCC"), owned approximately 65.1% of Ravelston.  (*Id.*)  Through his controlling interest in Ravelston, Black indirectly owned approximately 51% of Inc., and through his ownership in Inc., Black indirectly owned approximately 15% of International.  (*Id.*)  Despite having only a minority ownership in International, Black maintained voting control over International through Inc.'s ownership of International's "super-voting" Class B Common Stock.  (*Id.*)  Black also served as Chief Executive Officer and Chairman of the Board of Ravelston, Inc. and International.  (*Id.*)

Defendant John A. "Jack" Boultbee, ("Boultbee"), a Canadian citizen and a Chartered Accountant in Canada, owned through Mowitza Holdings, Inc. approximately 0.98% of Ravelston.  (*Id.* at 3, ¶1e.)  Boultbee also served as:  (1) Chief Financial Officer of Ravelston; (2)

---

[1]        In December 2000, Black purchased the apartment from International.  (*Id.*)

Chief Financial Officer, Executive Vice President and a Director of Inc.; and (3) Executive Vice President and, for a period of time, Chief Financial Officer of International. (*Id.* at 3-4, ¶1e.)

Defendant Peter Y. Atkinson ("Atkinson"), a Canadian citizen and licensed attorney in Canada, owned 0.98% of Ravelston. (*Id.* at 4, ¶1f.) Atkinson also served as Vice President and General Counsel of Inc., and Executive Vice President of International. (*Id.*)

Defendant Mark S. Kipnis ("Kipnis"), a United States citizen and an attorney licensed in Illinois to practice law since 1974, served as Vice President, Corporate Counsel and Secretary of International. (*Id.* at 4, ¶1g.)

F. David Radler ("Radler"), a former Defendant who pled guilty in this case on September 20, 2005, was a Canadian citizen who resided in Vancouver, Canada. Radler, through FDR Ltd., owned approximately 14.2% of Ravelston. (*Id.* at 5, ¶1h.) Radler served as the President of Ravelston and also served as the Deputy Chairman of the Board of Directors, the President and the Chief Operating Officer of both International and Inc. (*Id.*)

Defendants Black, Boultbee, Atkinson, and Ravelston provided International with executive services,[2] along with certain accounting, financial reporting and other administrative functions pursuant to a management services agreement[3] between Ravelston and International.

_____

[2]    Black, Radler, Boultbee and Atkinson were not employees of International, but rather of Ravelston. (*Id.* at 5, ¶1i.)

[3]    The management services agreement, which Kipnis signed on behalf of International and was dated as of January 1, 1998, provided that International's independent directors and Ravelston would meet at least annually to determine whether Ravelston would continue to provide these services to International and at what fee. (*Id.* at 5-6, ¶1i.) In the agreement, Ravelston represented and promised that it would discharge its duties thereunder honestly, in good faith, and in the best interest of International. (*Id.*) The agreement further stated that Ravelston would provide the details of any conflict of interest involving Ravelston's performance of its management services to Kipnis, as International's Secretary, who owed a

(*Id.* at 5-6, ¶1i.)

## II.     Defendants' Motions To Dismiss the Honest Services Charges

### A.     The Charged Conduct

As is relevant for purposes of this Opinion, the Indictment alleges that, at times material to the charged honest services offenses, the following facts occurred:

Commencing in May of 1998 and continuing through 2001, International embarked on a business plan to sell off nearly all of its United States community newspaper assets.  (*Id.* at 7, ¶1k.)  In May 1998, an International subsidiary sold *American Trucker* and several other smaller publications to Intertec Publishing Company for a total amount of approximately $75 million. (*Id.*)  From early 1999 through late 2000, International and its subsidiaries sold virtually all of International's United States community newspapers (except for those in the Chicago metropolitan area), in a series of sales to a variety of purchasers:

| Purchaser | Total Amount (approx.) | Closing Date |
|-----------|------------------------|--------------|
| Community Newspaper Holdings, Inc.  ("CNHI") | $472 million | 2/1/99 |
| Horizon Publications Inc. ("Horizon")[4] | $43.7 million | 3/31/99 |
| Forum Communications Inc. ("Forum") | $14 million | 9/30/00 |
| PMG Acquisition Corp. ("Paxton") | $59 million | 10/2/00 |

---

fiduciary duty to present all material facts concerning all related party transactions to International's Audit Committee for its review and approval.  (*Id.*)  Unless specifically authorized by International's Audit Committee, Black, Radler, Boultbee, and Atkinson received all of their compensation for their work at International, including all bonuses, from Ravelston. (*Id.*)

[4]      Radler, Kipnis, and other International executives owned Horizon.  (*Id.* at 7, ¶1k.) None of the other purchasers had any ownership relationship with International.  (*Id.*)

| Newspaper Holdings Inc.[5] ("CNHI II") | $90 million | 11/1/00 |
|---|---|---|

(*Id.*)  Radler supervised the negotiations of the business terms of each of these transactions, and Kipnis participated in the documentation and closing of each transaction.  (*Id.* at 7, ¶1l.)  The closing documents for each of these transactions included a non-competition agreement signed by International, in which International promised not to acquire or establish a newspaper within a certain geographic distance from the newspapers it sold for a certain period of time after the sale at issue.  (*Id.* at 7-8, ¶1m.)  Such agreements are standard practice in the newspaper industry because newspaper purchasers buy not just the trade name of the newspaper, but also its subscriber and advertiser bases.  (*Id.*)  The Indictment asserts, however, that Defendants abused this standard practice to benefit themselves at the expense of International's shareholders by inserting themselves and Inc. as recipients of non-competition fees that should have, and otherwise would have, been paid exclusively to International.  (*Id.*)

### 1.    The Non-Competition Agreements

#### a.    *American Trucker*

On May 11, 1998, International (through a subsidiary) sold *American Trucker* and *Mine and Quarry Trader* to Intertec Publishing Corp. for $75 million.  (*Id.* at 10, ¶4.)  The closing documents provided that $2 million would be paid to International to obtain a non-competition agreement.  (*Id.*)  Radler signed the asset purchase agreement and non-competition agreement on behalf of International.  (*Id.*)  Intertec did not request or receive a non-competition agreement from Inc. as part of the transaction.  (*Id.*)

In January 1999, approximately eight (8) months after the sale, Black, Boultbee, and

---

[5]        Newspaper Holdings Inc. was a subsidiary of CNHI I.  (*Id.* at 7, ¶1k.)

Radler decided to divert to Inc. the $2 million that International received for the *American Trucker* non-competition agreement. (*Id.* at 10, ¶5.) Consistent with this decision, Ravelston's agents caused the Executive Vice President of International's Community Newspaper Division to send a memorandum to International's Assistant Treasurer (and Radler) falsely stating that the $2 million "was actually for [Inc.] as compensation for the Non-Compete as specified in the American Trucker transaction." (*Id.*)

On February 1, 1999, Kipnis signed the $2 million check from International to Inc. (*Id.* at 10-11, ¶6.) These funds purportedly represented the entire $2 million non-competition payment from the *American Trucker* transaction to Inc. as compensation for Inc.'s assent to the non-competition agreement. (*Id.*) Ravleston's agents and Kipnis, however, knew that Inc. had never signed or been asked to sign a non-competition agreement in the *American Trucker* transaction. (*Id.*) Inc. did not present a competitive threat to any of the publications sold in this transaction because Inc. did not employ staff who could manage newspaper properties in the United States other than the staff already working for International, which was subject to the non-competition agreement. (*Id.*) Defendants Ravelston, Black, Boultbee, Radler and Kipnis did not disclose the $2 million payment from International to Inc. as a related-party transaction to International's Audit Committee. (*Id.* at 11, ¶7.)

### b.  CNHI I

On February 1, 1999, International sold certain newspaper assets to CNHI for approximately $472 million. (*Id.* at 11-12, ¶8.) The deal letter for the CNHI transaction, executed in December 1998, provided that International would sign a non-competition agreement in exchange for $50 million, presumably CNHI's actual valuation of International's

non-competition. (*Id.*)

After that deal letter, in January 1999, Defendants Ravelston, Black, Boultbee, and Radler, decided to insert Inc. as a non-competition covenantor, and decided that Inc. would receive $12 million (or approximately 25%) of the $50 million originally slated for International's non-competition agreement. (*Id.* at 12, ¶9.) Defendants Black, Boultbee, Radler, and Kipnis knew that CNHI had not requested to add Inc. to the non-competition agreement. (*Id.*)

In late January 1999, just days ahead of closing the CNHI deal on February 1, 1999, Kipnis inserted Inc. into the closing documents as a non-compete covenantor. (*Id.* at 12, ¶10.) The final, executed covenant stated that "[CNHI] was not willing to enter into the Exchange Agreement and Lenders are not willing to provide financing to [CNHI] for the acquisition of the Newspapers unless Covenantors execute this Agreement." (*Id.*) Kipnis signed the asset purchase agreement and non-competition agreement on behalf of International, and Radler signed the non-competition agreement on behalf of Inc. (*Id.*) According to the Indictment, both Kipnis and Radler signed the non-competition agreements knowing that CNHI was willing to enter into the transaction without Inc.'s non-compete agreement. (*Id.*)[6] On February 1, 1999,

_____

[6]     Defendants, that is, structured the deal so that CNHI was no worse for the wear – CNHI's non-competition payment was the same. (*Id.*) The end result, however, yielded a significant personal gain to Defendant Black. (*Id.*) By virtue of his ownership interests in International, Inc., and Ravelston, Black could gain an increased share of earnings merely by transferring money between companies. (*Id.* at 6, ¶1j.) For example, if $100 was transferred from International to Inc., Black would net $36 just by virtue of the transaction alone because Black owns 15% of International and 51% of Inc. (*Id.*) The same idea applies to Black's ownership interest in Ravelston. (*Id.*) For every $100 transferred from International to Ravelston, Black loses $15 (from his share of International's $100), but gains $65 (from his share of Ravelston's $100), for a personal net gain of $50. (*Id.*) Applying this idea to this transaction in particular, Black, instead of owning 15% of $50 million ($7.5 million), owned

Defendant Kipnis caused $12 million of the transaction proceeds to be wire transferred directly to Inc. instead of International. (*Id.* at 12, ¶11.)

According to the Indictment, the *American Trucker* and CNHI I transactions served as the "template" for Defendants' fraud scheme. (*Id.* at 13, ¶13.) In January 1999, Ravelston's agents, including Black, Boultbee, and Radler, decided that, in connection with all future sales of International's United States community newspapers, Inc. would become a non-compete covenantor as a matter of course, and would receive 25% of the proceeds allocated to the non-competition agreement in each transaction. (*Id.*) Defendant Kipnis was present at the time the decision to implement the template was made and characterized it as having been made by "Toronto" – a reference to Ravelston's agents based in Toronto, Canada. (*Id.*) Defendants Ravelston, Black, Boultbee, and Kipnis all failed to disclose the plan to implement the template to International's Audit Committee. (*Id.*)

### c. Horizon

Black and Radler owned substantial interests in Horizon, a privately-owned newspaper company. (*Id.* at 14, ¶14.) In an agreement dated March 31, 1999, International agreed to sell certain publications to Horizon for $43.7 million. (*Id.*) Black, Boultbee, and Radler decided that the amount of the non-competition agreement accompanying the transaction would be $5 million – with International and Inc. splitting it according to the template. (*Id.*) On June 30, 1999, Kipnis helped implement the template by including Inc. in the transaction documents, and

---

15% of the $38 million paid to International ($5.7 million) and 51% of the $12 million paid to Inc. (approximately $6.1 million). In this instance then, Black gains $6.3 million by including Inc. with International as a non-compete convenantor. Thus, as alleged in the Indictment, International (and its shareholders) lose what should have been its exclusive non-competition fee to Inc., and Black nets a personal gain. (*Id.*)

causing $1.2 million to be wire transferred to Inc. in August 1999 when Horizon received the

funding necessary to close the transaction. (*Id.* at 14, ¶15.) Kipnis signed the asset purchase

agreement and non-competition agreement on behalf of International, and Radler signed the non-

competition agreement on behalf of Inc. (*Id.*) As the Indictment describes this transaction, "in

the Horizon transaction, Ravleston's agents, including Black, Boultbee, and Radler, had in

essence negotiated an agreement with themselves (Inc.), not to compete against themselves

(Horizon), resulting in them paying themselves (Inc.) approximately $1.2 million." (*Id.*)

### d.  Forum and Paxton

On September 30, 2000, International entered into an Asset Purchase Agreement to sell

newspapers to Forum Communications Co. for $14 million, $400,000 of which was allocated to

non-competition agreements. (*Id.* at 16, ¶17.) On October 2, 2000, International entered into an

Asset Purchase Agreement to sell newspapers to Paxton for $59 million, $2 million of which was

allocated to non-competition agreements. (*Id.*) At the time of these deals, Radler thought that

Kipnis had included Radler, Black, Boultbee, and Atkinson as additional non-compete

covenantors and that 3% of the proceeds from each transaction had been set aside to fund the

non-compete payments to the International officers. (*Id.* at 17, ¶19.) In fact, these amounts had

not been set aside. (*Id.* at 17, ¶20.) Thereafter, on April 9, 2001, Black, Boultbee, Atkinson,

Radler, and Kipnis caused an International subsidiary to pay $600,000 to Black, Boultbee,

Atkinson, and Radler, as "supplemental non-competition payments." (*Id.* at 17, ¶21.) None of

Defendants, however, actually had signed a non-compete agreement. (*Id.*)

### e.  CNHI II

On November 1, 2000, International sold another batch of newspapers to CNHI, this time

for $90 million.  (*Id.* at 18, ¶22.)  Pursuant to the "template" established by Ravelston's agents,

Kipnis inserted Inc. into the CNHI asset purchase agreement as a non-compete covenantor.  (*Id.*)

The asset purchase agreement, dated September 28, 2000, allocated $3 million of the purchase

price to International and Inc.' non-competition agreements – $2.25 million to International

(75%) and $750,000 to Inc. (25%).  CNHI had not requested to include Inc. as a non-compete

covenantor.  (*Id.*)

In late October 2000, Kipnis asked CNHI to include Black, Boultbee, Atkinson, and

Radler as additional covenantors, and CNHI did not object.  (*Id.* at 18, ¶23.)  Just prior to

closing, Black directed Radler to allocate approximately $9.5 million of the transaction proceeds

to the non-competition agreements for Black, Boultbee, Atkinson, and Radler, and Radler passed

the directive on to Kipnis.  (*Id.* at 19, ¶24.)  As Defendants were aware, International otherwise

would have received that $9.5 million as proceeds from the CNHI II transaction.  (*Id.*)  At the

closing, on November 1, 2000, Kipnis signed the asset purchase agreement on behalf of

International and the non-competition agreement on behalf of International, Inc., Black,

Boultbee, Atkinson, and Radler.  (*Id.*)  Kipnis signed the non-competition agreement knowing

that CNHI was willing to enter into the transaction without Inc. or the four individuals' non-

compete agreement.  (*Id.*)

On November 1, 2000, Kipnis, in addition to wiring $750,000 to Inc., tried to convince

CNHI to wire the $9.5 million directly to Black, Boultbee, Atkinson, and Radler.  (*Id.* at 19,

¶26.)  CNHI refused in part because it had never heard of Boultbee or Atkinson, but allowed

Kipnis to handwrite the names and disbursement amounts for the four International officers on

the bank's wiring instructions.  (*Id.*)  Kipnis subsequently arranged to send the $9.5 million to

American Publishing Company, a subsidiary of International, which later issued checks totaling $9.5 million to Black, Boultbee, Atkinson, and Radler. (*Id.* at 19-20, ¶27.) Kipnis also caused American Publishing Company to issue him a $100,000 bonus check. (*Id.*)

### f. The February 2001 Payments from American Publishing Company

In February 2001, Black, Boultbee, Atkinson, Radler, and Kipnis fraudulently mischaracterized bonus payments to the four International officers as non-competition agreements. (*Id.* at 20, ¶28.) Black, Boultbee, Atkinson, and Radler decided that they would pay themselves, purportedly on behalf of International, a bonus of $5.5 million. (*Id.*) They labeled these payments as non-competition payments, rather than bonus compensation to take advantage of the potential tax benefits that genuine non-competition payments received under Canadian tax laws. (*Id.*) Kipnis prepared (and signed) non-competition agreements between American Publishing Company and Black, Boultbee, Atkinson, and Radler. (*Id.* at 20-21, ¶29.) Each executive agreed not to compete for three years after he left International's employ. (*Id.*) The agreements were backdated to December 31, 2000. (*Id.*) By the time Defendants executed the agreements, American Publishing owned only one community paper, a weekly newspaper in Mammoth Lake, California, that International was at the time trying to sell. (*Id.*) As the Indictment characterizes it, "Black, Boultbee, Atkinson, and Radler had signed a $5.5 million agreement not to compete in the newspaper business with a company that was, for all intents and purposes, no longer in the newspaper business." (*Id.*) In February 2001, Black, Boultbee, Atkinson, Radler, and Kipnis caused an American Publishing Company subsidiary to issue checks totaling $5.5 million to Black, Boultbee, Atkinson, and Radler. (*Id.*) Defendant Kipnis arranged for the delivery of the checks, which like the non-competition agreements, were

backdated to December 31, 2000.  (*Id.*)

### g.    CanWest

In early 2000, International sold to CanWest Global Communications Corp. hundreds of Canadian newspapers, an internet investment called Canada.com, and a fifty percent interest in the *National Post*.  (*Id.* at 29, ¶2a.)  International owned exclusively about 2/3 of the assets sold.  (*Id.*)  The purchase price was $2.1 billion, with $51.8 million allocated to non-competition agreements.  (*Id.* at 29, ¶¶2a, 2b.)  Defendant Black negotiated the transaction, and Defendants Boultbee, Atkinson, and Kipnis participated in reviewing and finalizing the transaction.  (*Id.* at 29, ¶2b.)  On July 28, 2000, Defendants Black, Boultbee, and Atkinson inserted Boultbee and Atkinson as non-compete convenantors.  (*Id.* at 30, ¶5.)  Prior to this date, CanWest had requested only that International, Ravelston, Black, and Radler sign non-competition agreements, and the transaction agreement had not allocated any of the sales proceeds to such agreements.  (*Id.*)  Defendants Black, Boultbee, and Atkinson agreed to insert Boultbee and Atkinson as non-compete covenantors and recipients of non-competition fees as a mechanism through which International would pay them a bonus.  (*Id.* at 31, ¶6.)  Until this time, International had never paid Boultbee or Atkinson a bonus; Ravelston had paid all of their compensation through its management fees.  (*Id.*)  Defendants decided to label these payments as non-competition payments, rather than bonus compensation, in order to take advantage of the potential tax benefits that genuine non-competition payments received under Canadian tax laws.  (*Id.*)  In addition, at Defendants' direction, the $51.8 million set aside for the non-competition payments decreased International's compensation for the newspapers it was selling to CanWest.  (*Id.* at 31, ¶5.)

On September 1, 2000, Kipnis prepared and sent a memorandum to International's Audit Committee regarding the CanWest transaction. (*Id.* at 32, ¶7.) According to the Indictment, this memorandum mischaracterized the transaction in certain material ways. For instance, this memorandum stated that: (1) the transaction agreement allocated $32.4 million to non-competition payments, when the transaction agreement actually so allocated $51.8 million; (2) CanWest requested to include Atkinson and Boultbee as non-competition convenantors, when CanWest had not so requested; and (3) International would receive $2.6 million for its non-competition agreement, when International in fact received nothing. (*Id.*) At the Audit Committee meeting on September 11, 2000, Defendant Kipnis allegedly misrepresented other facts relating to the CanWest transaction. (*Id.* at 33, ¶8.) Among other items identified in the Indictment, Kipnis stated that CanWest had originally insisted on Black and Radler each receiving $16.8 million for their non-competition agreements, when CanWest never insisted that any non-compete covenantor receive any money. (*Id.*) The Audit Committee approved the non-competition payments, in part, based on these representations. (*Id.*) The CanWest deal closed on November 16, 2000, (*id.* at 34, ¶9), but neither International's Form 10-K nor its proxy statement (both filed in early 2001) disclosed the non-competition payments made to Ravelston, Black, Boultbee, Atkinson, and Radler. (*Id.* at 35, ¶11.)

In April 2001, an outside attorney discovered these payments in the course of due diligence in connection with a proposed loan to International. (*Id.*) That attorney opined that International needed to disclose these payments in a filing with the SEC. (*Id.*) In response to the lender attorney's inquiry, Defendants Black, Boultbee, Atkinson, and Kipnis decided to alter the paper record on which International approved the CanWest payments. (*Id.* at 35, ¶12.)

-16-

Defendants sought ratification of the payments from the Audit Committee and the Board of Directors based on a memorandum dated May 1, 2001 (the "May Memorandum"). (*Id.*) The stated purpose of the May Memorandum, which International's Audit Committee and Board of Directors reviewed, was to correct certain "inadvertent" inaccuracies in the information previously disclosed to these entities. (*Id.*) The May Memorandum, which Kipnis signed and Defendants reviewed, contained certain alleged misrepresentations, including that: (1) CanWest refused to consummate the deal without Boultbee and Atkinson signing non-competition agreements;[7] and (2) the non-competition payments reflected the actual value that CanWest attributed to the obligors' non-competition agreements. (*Id.*) The May Memorandum also failed to correct the September memorandum's representation that International would receive $2.6 million for its non-competition agreement. (*Id.*)

## 2. Abuse of Perquisites

The Indictment also alleges that Defendants Black and Boultbee maintained a scheme to defraud International and its shareholders by abusing certain perquisites, including International's corporate residence in New York City, International's corporate jet, and International's reimbursement of Black's business-related entertainment expenses. (*Id.* at 44, ¶2a.)

---

[7] On May 15, 2001, International filed a Form 10Q with the SEC that discussed the CanWest transaction and made the same representation. (*Id.* at 40, ¶50.) On May 23, 2002, Black made similar representations at International's annual shareholders meeting. (*Id.* at 40-41, ¶16.)

### a.    The New York City Apartment

International owned a second-floor apartment in New York, New York (the "Second Floor Apartment"), which International authorized Black to use when he was in New York City. (*Id.*)  International, through a subsidiary, purchased the Second Floor Apartment in December 1994 for $3 million, and International gave Black the option to purchase that apartment.  (*Id.*) The option agreement provided that International would pay for "all closing costs and capital improvements, decorating and furnishings needed, as agreed between Black and the Company, to put the Apartment into appropriate habitable condition for the uses contemplated by Black and the Company."  (*Id.* at 45, ¶2b.)  In 1996, however, Black planned to spend more that $2 million to, among other things:  (1) reduce the number of bedrooms from six to three, and (2) decorate the apartment in lavish fashion.  (*Id.*)  At some point, several shareholders complained about the company spending $3 million on an apartment in New York City for use by an executive who was a Canadian citizen and who, for tax reasons, could only spend a limited number of days each year in the United States.  (*Id.*)  Black, thereafter, agreed to pay for the proposed renovation to the apartment, but the parties did not change the terms of the option agreement.  (*Id.*)  The parties also did not discuss whether International would reimburse Black for this expense, or whether Black's payment thereof created any loan from Black to International.  (*Id.*)

In January 1998, Black purchased the ground floor apartment (the "Ground Floor Apartment") directly underneath the Second Floor Apartment for approximately $499,000.  (*Id.* at 45, ¶2c.)  In 1998 and 1999, while Black owned the Ground Floor Apartment, International paid more than $1.5 million for a total renovation of the Ground Floor Apartment, which included the creation of living quarters for Black's servants.  (*Id.*)  Black paid little, if anything,

toward the renovation of the Ground Floor Apartment. (*Id.*)

Defendant Black concealed the fact that International had paid for the renovation of his Ground Floor Apartment by causing International to make false statements in its proxy statements about these payments. (*Id.* at 48, ¶11.) International's 1999 proxy statement described the Second Floor Apartment that International had purchased for Black's use in 1994, and then stated that International in 1998 had paid $957,722 for "building out and maintaining" that apartment. (*Id.*) International's 2000 proxy statement again referred to the Second Floor Apartment and then stated that International had paid $143,500 for "building out and maintaining" that apartment. (*Id.*) The Indictment alleges that in both instances the "building out and maintaining" expenses pertained to the Second Floor Apartment. (*Id.*)

In addition, after receiving non-competition proceeds from the CNHI II and CanWest transactions in November 2000, Black decided to purchase the Second Floor Apartment for the same price that the company had paid for it six years earlier – $3 million. (*Id.* at 48, ¶13.) In order to justify the price, Defendants Black and Boultbee falsely stated to "Executive B" that the option agreement allowed Black to purchase the apartment at International's "cost." (*Id.*) A "short while later," Boultbee called Executive B and told him that Black would purchase the Second Floor Apartment for $3 million, suggested that this was the "market value" in light of Black's payment for the renovation, and directed Executive B to write a memorandum memorializing this transaction after calling Executive B's friends in real estate to confirm the $3 million amount. (*Id.*) Executive B did as directed, in part, to defuse shareholder complaints. (*Id.*) Thereafter, Boultbee told Executive B that Black would pay the $3 million for the Second Floor Apartment by tendering to the company $2,150,000 in cash, along with Black's interest in

-19-

the Ground Floor Apartment, which Boultbee said had a fair market value of $850,000. (*Id.* at 49, ¶15.) Defendant Boultbee did not explain this valuation, or the inconsistency between the lack of appreciation of International's interest in the Second Floor Apartment and the sizable appreciation in the Ground Floor Apartment. (*Id.*) The parties later finalized the purchase agreement based upon these "fair market values." (*Id.* at 49-51, ¶¶16-20.)

In sum, the option agreement required that Defendant Black pay the company "fair market value" and cash consideration for the Second Floor Apartment. (*Id.* at 51, ¶20.) Black did neither – he paid International only its initial cost, and his purchase payment included the transfer to International of the Ground Floor Apartment. (*Id.*) Defendant Black did not present the material facts related to his December 2000 purchase of the Second Floor Apartment to the Audit Committee. (*Id.*) International's related proxy statement also failed to fully disclose material facts regarding this transaction. (*Id.* at 51, ¶21.)

### b. The Bora Bora Vacation

In the summer of 2001, Black caused International to pay for his use of International's corporate jet to transport himself and his wife on a personal vacation to Bora Bora in French Polynesia. (*Id.* at 46, ¶5.) Black and his wife departed Seattle for Bora Bora on July 30, 2001 and returned to Seattle on August 8, 2001, logging a total of 23.1 hours in flight. (*Id.*) The trip cost tens of thousands of dollars. (*Id.*) Black did not disclose his personal use of International's corporate jet to the Audit Committee. (*Id.* at 46, ¶6.) When International's accountants sought to have him reimburse International for this cost, Black refused to pay, stating in an August 2002 email to Atkinson that "[n]eedless to say, no such outcome is acceptable." (*Id.*)

### c. The Birthday Party

In December 2000, Black caused International to pay more than $40,000 for his wife's surprise birthday party at La Grenouille restaurant in New York City. (*Id.* at 49, ¶8.) The party cost approximately $62,000, including 80 dinners at $195 per person, and $13,935 for wine and champagne. (*Id.*) The party was a social occasion with little, if any, business purpose. (*Id.*) Defendant Black, without consulting International's Audit Committee, determined that International would pay approximately $42,000 for the party and that he would pay only $20,000. (*Id.*)

### B. Defendants' Arguments

Defendants challenge the sufficiency of the Indictment's Section 1346 charges on several grounds. They argue that: (1) Section 1346 is unconstitutionally vague because it fails to provide adequate notice and allows arbitrary enforcement; (R. 262-1, Def. Black's MTD Mail Fraud Counts and Predicate Acts at 4-7; R. 268-1, Def. Kipnis's Motion to Dismiss Honest Servs. Charges at 12-14); (2) the Indictment fails to allege facts sufficient to sustain an honest services offense; (*see, e.g.*, R. 270-1, Def. Atkinson's MTD Counts 1, and 5-9 at 4-8), (3) a Section 1346 charge cannot be predicated on state law; (R. 262-1, Def. Black's MTD Mail Fraud Counts and Predicate Acts at 8-10); (4) Section 1346 creates an impermissible common law crime; (R. 262-1, Def. Black's MTD Mail Fraud Counts and Predicate Acts at 10-12), and (5) Section 1346 violates separation-of-powers principles; (R. 262-1, Def. Black's MTD Mail Fraud Counts and Predicate Acts at 13-14).[8] Defendant Kipnis further argues that the Indictment fails

---

[8] Regarding the last two asserted bases for dismissal, Defendants fail to adequately develop their arguments. (R. 261-1, Def. Black's Motion at 13, 17.) Accordingly, Defendants have not provided the Court with any reason to depart from the lead of other courts within this

to charge the necessary elements of a Section 1346 crime because it does not allege that he

received a "personal gain."[9]  The Court will address these arguments in turn.

### 1.  Section 1346 Generally

The mail fraud and wire fraud statutes prohibit devising a "scheme or artifice to defraud,

or for obtaining money or property by means of false or fraudulent pretenses, representations, or

promises," and executing that scheme by use of the mails, 18 U.S.C. §1341, or by use of wire,

radio, or television communication in interstate commerce.  18 U.S.C. §1346.  "Until 1987,

federal courts read both statutes to criminalize not only schemes for obtaining money or

property, but also schemes to deprive another of 'the intangible right of honest services'" – a

_____

District that have addressed this issue.  *See United States v. Sorich*, 427 F. Supp. 2d 820, 837
(N.D. Ill. 2006) ("There is [] no reason to believe the statute is so broad that it permits
prosecutors to pursue 'personal predilections' and thus violates the separation of powers.");
*United States v. Warner*, No. 02 CR 506, 2004 WL 1794476, *2 (N.D. Ill. Aug. 11, 2004)
(rejecting defendant's argument that Section 1346 "creates an impermissible common law crime;
violates separation of powers; and violates core federalism principles.  Courts, including this
one, however, have routinely rejected such challenges to the application of 'honest services'
fraud"); *see also United States v. Bloom*, 149 F.3d 649, 655-57 (7th Cir. 1998) (suggesting that
the honest services statute, as construed with certain limiting principles, does not constitute a
common-law crime).

[9]        Defendant Black has joined in Defendant Atkinson's Motion to Dismiss or Strike
Allegations in Counts 1 and 5-9, Defendant Boultbee's Motion to Dismiss Count 1 and 5-7 on
Grounds of Duplicitousness, Defendant Boulbee's Motion to Dismiss Counts 10-12, and
Defendant Kipnis' Motion to Dismiss Counts 16 and 17.  (R. 259-1, Def. Black's Motion to
Adopt); R. 272-1, Order Granting Def. Black's Motion to Adopt.)  Defendant Kipnis has joined
in Atkinson's Motion to Dismiss or Strike Allegations in Counts 1 and 5-9.  (R. 255-1, Def.
Kipnis' Motion to Adopt); R. 271-1, Order Granting Def. Kipnis' Motion to Adopt.)  Defendant
Boultbee has joined in Defendant Kipnis' Motion to Dismiss Counts 16 and 17, Defendant
Kipnis' Motion to Dismiss the Honest Services Charges, Defendant Black's Motion to Dismiss
the Mail Fraud Counts, Defendant Black's Motion to Dismiss Counts 13-15 (because failure to
dismiss will prejudice Boultbee even though his is not named as a Defendant to those counts),
and Defendant Atkinson's Motion to Strike or Dismiss Counts One and 5-9.  (R. 274-1, Def.
Boultbee's Motion to Adopt); R. 277-1, Order Granting Def. Boultbee's Motion to Adopt.)

"doctrine [ ] applicable to [various] categories of defendants, [including] . . . private actors who abuse fiduciary duties by, for example, taking bribes . . ." *United States v. Rybicki*, 354 F.3d 124, 133 (2ᵈ Cir. 2003).  In 1987, the Supreme Court, in *McNally v. United States*, 483 U.S. 350, 107 S. Ct. 2875, 97 L. Ed. 2d 292 (1987), held that, contrary to the courts' common reading, the language of "[t]he mail fraud statute [18 U.S.C. § 1341] clearly protects property rights," *id.* at 356, 107 S. Ct. at 2879, but does not criminalize schemes "designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly." *Id.* at 358, 107 S. Ct. at 2881.  "Under *McNally*, all schemes or artifices to defraud relating to intangible rights to . . . honest services . . . [were] therefore beyond the mail-fraud proscriptions." *Rybicki*, 354 F.3d at 134.  "By necessary implication, the wire-fraud proscriptions were similarly limited." *Id.*

In the following year, Congress enacted 18 U.S.C. §1346 specifically to overrule *McNally*.  That Section states:

> **Definition of "scheme or artifice to defraud"**
> For the purposes of this chapter [18 U.S.C. § 1341 et seq.], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

*See also Bloom*, 149 F.3d at 655 ("In *McNally* the Supreme Court described the intangible rights theory this way:  'a public official owes a fiduciary duty to the public, and misuse of his office for private gain is a fraud.'"  This is the theory that *McNally* disapproved as unsupported by §1341, and that by enacting §1346 Congress reinstated." (internal citation omitted)).  Under this statute, courts have held that, breaching a fiduciary duty constitutes a deprivation of honest services.  *See id.* at 654-57 (citing cases); *see also Rybicki*, 354 F.3d at 138 n.13 (2ᵈ Cir. 2003); *United States v. Warner*, 2006 WL 2583722, *15 (N.D. Ill. Sept. 7, 2006) ("[A]lthough the term

'intangible right to honest services' may not be defined by statute, the term has been addressed

by the courts, both before and after section 1346 was enacted in 1988."). Yet "[n]ot every

breach of every fiduciary duty works a criminal fraud." *Bloom*, 149 F.3d at 654 (quoting *United*

*States v. George*, 477 F.2d 508, 512 (7th Cir. 1973)). Rather, "[m]isuse of office (more broadly,

misuse of position) for private gain is the line that separates run of the mill violations of

state-law fiduciary duty . . . from federal crime." *Id.* at 655 (parentheses in original); *see also*

*United States v. Hausmann*, 345 F.3d 952, 956 (7th Cir. 2003) (expressing "doubts as to the

applicability of these 'intangible-rights theory' provisions of the mail and wire fraud statutes to

cases of breach of fiduciary duty with nothing more"). Accordingly, the Seventh Circuit has

held "that an employee's undisclosed derivation of profits from business he transacted on his

employer's behalf amount[s] to a deprivation of the employer's intangible right to honest

services in violation of 18 U.S.C. §§ 1341 and 1346." *Hausmann*, 345 F.3d at 956 (citing *United*

*States v. Montani*, 204 F.3d 761, 768-69 (7th Cir. 2000)).

## 2.     Vagueness

Defendants argue that Section 1346, so construed, is unconstitutionally vague because it

fails to provide sufficient notice regarding what conduct falls within the statute's scope. (R. 261-

1, Def. Black's Motion at 4 ("Here, §1346 flunks both the 'notice and 'standards' prongs of the

vagueness test. The 'intangible right of honest services' is a term without uniform or accepted

definition.").) The Court disagrees.

"The void for vagueness doctrine rests on the basic principle of due process that a law is

unconstitutional 'if its prohibitions are not clearly defined.'" *Karlin v. Foust*, 188 F.3d 446, 458

(7th Cir. 1999) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L.

Ed. 2d 222 (1972)).  "Vagueness may invalidate a criminal law for either of two independent

reasons.  First, it may fail to provide the kind of ordinary notice that will enable ordinary people

to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary

and discriminatory enforcement."  *City of Chicago v. Morales*, 527 U.S. 41, 56, 119 S. Ct. 1849,

144 L. Ed. 2d 67 (1999) (citing *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L.

Ed. 2d 903 (1983)); *Grayned*, 408 U.S. at 108-09, 92 S. Ct. at 2298-99 (by failing to clearly

define prohibited conduct "[v]ague laws may trap the innocent by not providing fair warning

[and may] . . . impermissibly delegate[] basic policy matters to policemen, judges, and juries for

resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and

discriminatory application").

A party may raise a vagueness challenge by arguing either that a statute is vague as

applied to the facts at hand, or that a statute is void on its face.  As to facial vagueness

challenges, a court, generally speaking, "must uphold a facial challenge 'only if the enactment is

impermissibly vague in all of its applications.'"  *Fuller v. Decatur Public School Bd. of Educ.

School Dist. 61,* 251 F.3d 662, 667 (7th Cir. 2001) (quoting *Village of Hoffman Estates v.

Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95, 102 S. Ct. 1186, 1191, 71 L. Ed. 2d 362

(1982).  An "as applied" challenge, in contrast, asks whether the defendant "receive[d] fair

warning of the criminality of his own conduct from the statute in question" because "[o]ne to

whose conduct a statute clearly applies may not successfully challenge it for vagueness."  *Parker

v. Levy*, 417 U.S. 733, 756, 94 S. Ct. 2547, 2562, 41 L. Ed. 2d 439 (1974).

Defendants here raise both types of vagueness challenges – only the "as applied"

challenge merits discussion.[10]  Regarding that challenge, Defendants argue that Section 1346 is

unconstitutional because it failed to put them on notice that their conduct could result in criminal

liability.

The "honest services" statute is not unconstitutionally vague as applied to the facts

alleged in the Indictment.  The Indictment alleges that each Defendant is an officer and/or a

director of International, a publicly-owned Delaware corporation.  (R. 219-1, Indictment at 1-4,

¶¶1a, 1d, 1e, 1f, 1g.)  As officers and directors, Defendants "[stood] in a fiduciary relation to the

corporation and its stockholders" and "[were] not permitted to use their position of trust and

confidence to further their private interests . . ."  *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939)

(the corporate duty owed "requires an undivided and unselfish loyalty to the corporation [and]

demands that there shall be no conflict between duty and self-interest"); *Cede & Co. v.*

*Technicolor, Inc*., 634 A.2d 345, 361 -362 (Del. 1993) ("Essentially, the duty of loyalty

mandates that the best interest of the corporation and its shareholders takes precedence over any

interest possessed by a director, officer or controlling shareholder and not shared by the

_____

[10]        Defendants acknowledge, as they must, that every court to address the issue of
facial vagueness, including the Seventh Circuit and this Court – *see United States v. Levine*, No.
05 CR 691, 2005 WL 3597707, *4 (N.D. Ill. Dec. 29, 2005) – has held that Section 1346 is not
unconstitutional.  *Rybicki*, 354 F.3d at 143 (Section 1346 is not unconstitutional on its face);
*United States v. Frost*, 125 F.3d 346, 371 (6th Cir. 1997) (same); *see also Hausmann*, 345 F.3d
952, 958 (7th Cir. 2003) (rejecting the arguments that "the mail and wire fraud statutes did not
provide [defendants] with adequate notice of the criminality of their kickback scheme, and that
application of the mail and wire fraud statutes to the facts of this case invites the government
arbitrarily to police the fairness of private business transactions through enforcement of criminal
statutes" and "find[ing] that the mail and wire fraud statutes, 18 U.S.C. §§1341, 1343, and 1346,
are not unconstitutionally vague, as applied under the intangible-rights theory to a kickback
scheme enabled by the offender's misuse of his fiduciary position gain"); *United States v.*
*Munson*, 2004 WL 1672880, *1 (N.D. Ill. July 28, 2004).  Defendants fail to argue why these
cases are unsound or why *Hausmann* fails to control the outcome of this case.  Accordingly, the
Court rejects Defendants' argument.

stockholders generally.  Classic examples of director self-interest in a business transaction
involve either a director appearing on both sides of a transaction or a director receiving a
personal benefit from a transaction not received by the shareholders generally.").  The
Indictment further alleges that notwithstanding their fiduciary duties Defendants, through a
series of transactions, systematically siphoned off millions of dollars in non-competition
payments away from International by inserting themselves or Inc. as non-compete convenantors,
(*see, e.g.*, R. 219-1, Indictment at 10, ¶¶4-6; 12, ¶9; 14, ¶¶14, 15; 16-17 ¶¶19-21; 18, ¶¶22-24;
20-21, ¶¶28, 29; 31, ¶6), even though the purchasers did not request or need non-competition
agreements from Inc. or Defendants, (*see, e.g., id.* at 10-11, ¶¶4, 6; 12, ¶9; 19, ¶24; 20-21, ¶¶29;
30, ¶5), and even though neither Inc. nor Defendants posed actual competitive threats to the
purchasers (*see, e.g., id.* at 5-6, ¶6; 14, ¶¶14-15; 20-21, ¶29).  In addition, as to Defendants Black
and Boultbee, the honest services charges based on the alleged abuse of perquisites (Counts 10
through 12) also are sufficient because, as detailed above, both Defendants used their corporate
positions to use International's funds for personal use.  (*See, e.g., id.* at 44-52.)  This alleged
conduct at least raises the inference that Defendants misused their fiduciary positions for private
gain.  In turn, when juxtaposed with the language of the "honest services" statute, the
Indictment's allegations reveal that, for each Count, each charged Defendant had fair notice that
the alleged conduct was criminal.  *See United States v. Hausmann*, 345 F.3d 952, 957-58 (7th Cir.
2003) (rejecting an "as applied" vagueness challenge because previous Seventh Circuit authority
"placed the defendant 'on notice that criminal liability under the mail and wire fraud statutes –
particularly under an intangible-rights theory – attaches to the misuse of one's fiduciary position
for personal gain").  Even if the "honest services" statute were imprecise at its edges, as

Defendants contend – and the Court here does not hold that such is necessarily the case – the Indictment nonetheless is sufficient because, as alleged, the charged conduct lies not at the periphery but near the core of prohibited "scheme[s] . . . to deprive another of the intangible right of honest services." 18 U.S.C. §1346.

### 3. Factual Sufficiency

Defendant Black further argues that the Court should dismiss the mail fraud counts and predicate acts because they fail to particularize the Delaware "corporate law" forming the gravamen of the charges. (R. 261-1, Def. Black's Motion to Dismiss Mail Fraud and Predicate Acts.)[11] "[U]nder the intangible-rights theory of federal mail or wire fraud liability, a valid

---

[11] In addition, Defendants argue that the Indictment fails to allege the materiality of the omitted facts regarding the related party transactions. The Court, however, need not read the Indictment in such a hypertechnical manner. *See United States v. Allender*, 62 F.3d 909, 914 (7th Cir. 1995) ("[t]he test for validity [of an indictment] is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards" – "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself-as long as the statutory language unambiguously sets out all the elements necessary to constitute the offense" (internal citation omitted)); *Anderson*, 280 F.3d at 1124 ("In setting forth the offense, the indictment should generally track the words of the statute itself, so long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished. It is required, at a minimum, that an indictment provide the defendant with some means of pinning down the specific conduct at issue." (internal quotation and citation omitted)). Regardless of whether the Indictment specifically labels the omissions as "material," the allegations in the Indictment, as more fully set forth above, are sufficient to establish materiality.

Defendants also argue that the Indictment (1) incorrectly describes Delaware law as requiring that a fiduciary must "maximize the benefit" to the corporation and refrain from benefitting oneself at the corporation's expense; and (2) incorrectly alleges that misappropriation of corporate opportunities amounts to a fraudulent deprivation of honest services. (R. 269-1, Def. Atkinson's Motion to Dismiss or Strike Allegations in Counts 1, 5-8 (further arguing that the indictment is fatally flawed once all of the erroneous conclusions of law are stricken).) As noted in this Section, the Indictment alleges all the essential elements of the charged crimes. Thus, Defendants' arguments about the precise contours of the Delaware law of fiduciary duty do not provide a basis for dismissal, but rather are better addressed in jury instructions.

-28-

indictment need only allege . . . that a defendant used the interstate mails or wire communications system in furtherance of a scheme to misuse his fiduciary relationship for gain at the expense of the party to whom the fiduciary duty was owed." *Hausmann*, 345 F.3d at 956. The Indictment here thus is sufficient because it alleges that (1) Defendants knowingly devised or participated in a scheme to defraud International and its shareholders of the intangible right to their honest services by systematically reallocating International's non-competition payments; (2) Defendants acted knowingly and with the intent to defraud; and (3) in order to carry out the scheme, Defendants utilized interstate mailings and wire communications. (R. 219-1, Indictment at 22-28, 42, 43, 52-55.) *See also id.*; *see also United States v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005) (elements for mail or wire fraud include "(i) participated in a scheme to defraud; (ii) acted with intent to defraud; and (iii) used the mail or wires in furtherance of the fraudulent scheme"). In addition to charging all of the elements of the charged offense, the Indictment, for essentially the same reasons as discussed in the previous section, also reasonably informs Defendants of the nature of these charges. It thus is sufficient under Seventh Circuit precedent. *Hausmann*, 345 F.3d at 956 (indictment sufficient because it alleged that "[d]uring the time period of the scheme . . . defendant Hausmann . . . owed a fiduciary duty to the clients of the law firm, . . . including the obligation of [the law firm] to disclose to the client any financial interest that the law firm may have involving the representation; to advise the client in a conflict-free manner; . . . to negotiate in the best interest of the client; and to provide accurate and complete information to the clients regarding the financial terms of personal injury case settlements, as well as the amount of compensation taken by the lawyers involved in the case" (some internal punctuation omitted)); *see also Levine*, 2005 WL 3597707, at *2-3.

Aside from Defendants' general objection, Defendant Kipnis independently asserts that the Section 1346 charge against him fails because he did not personally gain from the alleged fraud scheme. (R. 268-1, Kipnis Mem. at 1 (contending that "[i]t is well-settled law in the Seventh Circuit and numerous other circuits that to state an offense for honest services fraud, an indictment must allege that the defendant engaged in the charged scheme for his own personal gain. Because the government has not alleged – and cannot plausibly allege – that Kipnis participated in the charged scheme for personal gain, the honest services charges against him set forth in Counts 1 through 9 must be dismissed . . .").) Kipnis's argument fails because, under Seventh Circuit precedent, a participant in a scheme need not personally receive the benefits of the fraud in order to be criminally liable:

> [Defendant] argues that if the extra [health insurance] coverage she received was not in exchange for her complicity in the fraud, she is not guilty of the form of fraud, with which she was charged, that consists of an official's depriving the government of his or her honest services. 18 U.S.C. §§1341, 1343, 1346. The argument is a non sequitur. A participant in a scheme to defraud is guilty even if he is an altruist and all the benefits of the fraud accrue to other participants, just as a conspirator doesn't have to benefit personally to be guilty of conspiracy – a point so obvious that we can't find a case that states it . . . In the case of a successful scheme, the public is deprived of its servants' honest services no matter who receives the proceeds.

*United States v. Spano*, 421 F.3d 599, 602-03 (7th Cir. 2005). In any event, the Indictment charges that Kipnis received a $100,000 bonus check as a result of his role in the charged fraud scheme. Kipnis's argument that the bonus arose, not from the fraud, but rather in the normal course of his service as International's Corporate Counsel, involves a question of fact that the Court cannot resolve in Defendant's favor at this stage. *United States v. Caputo*, 288 F. Supp. 2d 912, 916 (N.D. Ill. 2003) ("arguments raised in a motion to dismiss [an indictment] that rely on disputed facts should be denied." (citing *United States v. Shriver*, 989 F.2d 898, 906 (7th Cir.

1992)).

### 4. Federalism

Defendants next argue that the Indictment is "constitutionally unacceptable" because Congress did not "clearly indicate[]" that State law could help define the meaning of "the intangible right to honest services" or provide the basis for federal mail or wire fraud charges. (R. 261-1, Def. Black's Motion at 10.) Defendants' argument fails under Seventh Circuit precedent.

In *Hausmann*, the Seventh Circuit held that an indictment under Section 1346 did not "'overreach[]' the scope of the federal criminal law by criminalizing conduct which is regulated by state law." The court reasoned that the case before it "casts no meaningful doubt on Congress's authority to regulate use of the interstate mails and wire communications systems in furtherance of fraudulent conduct:"

> The indictment alleged such use of the interstate mail and wire communications systems, including an allegation that kickback payment checks were mailed out of state. Moreover, as the magistrate judge aptly noted in his recommendation to deny Appellants' motions to dismiss the indictment, "[w]ithout some showing that either the statutes in question or the prosecution of this case contravene some specific rule of constitutional or statutory law, the mere fact that the conduct in question is of a sort traditionally dealt with through state law cannot serve as a basis for dismissing [the] indictment." Appellants have made no such showing, and we are unpersuaded by the argument.

*Hausmann*, 345 F.3d at 958-59. "Thus, [while] the Seventh Circuit does not mandate that a fiduciary duty of honest services be defined only by reference to state law, [ ] the Seventh Circuit does not appear to prohibit any consideration of state law in determining the nature of that duty." *Warner*, 2006 WL 2583722, at *17 (noting that "[t]he court is mindful of these federalism concerns, but finds this contention inapplicable to this case as well" – "[t]he jury did not convict Defendants of using the mails to violate state law; rather, the jury found that [defendant] used the

mails in breaching his federal duty, created by the mail fraud statute, to provide honest

services."). Indeed, in *Hausmann*, the Seventh Circuit upheld a conviction that looked to state

law to help define the deprivation of honest services. 345 F.3d at 956 (citing the Wisconsin

Supreme Court Rules of Professional Conduct for Attorneys and holding that "the indictment's

statement that '[t]he kickback arrangement was concealed from the clients of

Hausmann-McNally in violation of the fiduciary duty described above' clearly alleges

Hausmann's misuse of the fiduciary relationship); *see also United States v. Brown*, 459 F.3d

509, 519 (5th Cir. 2006) ("We have previously undertaken the task of considering the

pre-*McNally* case law. Thus, we have written, '[h]onest services are services owed to an

employer under state law,' including fiduciary duties defined by the employer-employee

relationship"). Accordingly, Defendants have not asserted any valid basis for dismissal of the

honest services counts.

### III.     Defendant Boultbee's Motion To Dismiss Counts 1 and 5 through 7

In this motion, Defendant Boultbee urges dismissal of Counts 1 and 5-7 on the grounds

of duplicitousness. He argues that these counts are duplicitous because they charge the

transaction at issue inconsistently: as both separate counts and as a single overall scheme. (R.

248-1, Def. Boultbee's Motion to Dismiss Counts 1 and 5-7.) Defendant's motion is denied.

"Duplicity is the joining of two or more offenses in a single count." *United States v.*

*Hughes*, 310 F.3d 557, 560 (7th Cir. 2002) (quoting *United States v. Marshall,* 75 F.3d 1097,

1111 (7th Cir. 1996)); Fed. R. Crim. P. 8(a). The Seventh Circuit recently reiterated that "an

indictment is not duplicitous if it charges a single offense carried out through many different

means." *United States v. Davis*, __ F.3d __, 05-3481, 2006 WL 3690669, at *6 (7th Cir. Dec. 15,

2006). "The overall vice of duplicity is that the jury cannot in a general verdict render its findings on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or both." *Hughes*, 310 F3d at 560 (quoting *United States v. Buchmeier*, 255 F.3d 415, 425 (7th Cir. 2001). "A duplicitous indictment also 'may expose a defendant to other adverse effects including improper notice of the charges against him, prejudice in the shaping of evidentiary rulings, in sentencing and of course the danger that a conviction will result from less than a unanimous verdict.'" *Id*. (quoting *Buchmeier*, 255 F.3d at 425); *see also Davis*, 2006 WL 3690669, at *6 ("The dangers of a duplicitous indictment are that the defendant may not understand the charges against him, might be convicted by less than a unanimous jury, may be prejudiced by evidentiary rulings at trial, or may be subjected to double jeopardy").

Count 1 of the Indictment alleges a scheme to defraud based on Defendants' receipt of millions of dollars in non-compete payments from the sale of seven separate community newspapers between 1998 and 2001. The Indictment alleges that through this scheme, Defendants caused International to sell off seven separate community newspapers for their personal gain. Counts 5 through 7 each charge separate mail frauds and deprivation of honest services based on separate mailings in furtherance of the scheme charged in Count 1 of the Indictment. Count 1 charges a single scheme carried out through various transactions. It does not lump together numerous discrete instances of criminal conduct. As such, it is properly charged. *Davis*, 2006 WL 3690669, at *6 (no duplicity where indictment charging health care fraud scheme "sets out an ongoing and continuous course of conduct, accomplished through three different methods, that were repeated on numerous (likely daily) occasions over several years"); *United States v. Berardi,* 675 F.2d 894, 897-98 (7th Cir. 1982); *Warner*, 2004 WL

1794476, at *20. Counts 5 through 7 charge separate mailings in furtherance of that scheme, and thus are properly charged as separate offenses. *See United States v. Kirby*, 587 F.2d 876, 882 (7th Cir. 1978) ("Because they involve different mailings, [the three mail fraud counts] stated separate offenses and were also not multiplicious with each other.").

Defendants' arguments in support of their motion are unavailing. First, Defendants argue that divestment of the community newspapers "was part of an open and above-board business plan" is an issue of fact for the jury. (R. 318-1, Def.'s Reply at 2.) It is not proper for the Court to resolve factual disputes at the motion to dismiss stage. *See Caputo*, 288 F. Supp. 2d at 916.

Second, Defendants' argument that three of the community newspaper transactions in Count 1 are time-barred fails because "[i]n a mail fraud case, the statute of limitations runs from the date of the mailings." *United States v. Dunn*, 961 F.2d 648, 650 (7th Cir. 1992). Because the mailings at issue in Counts 1, and 5 through 7 were all within the statute of limitations, the scheme is not time-barred.

Finally, the dangers of duplicity are not present here. The indictment fully apprises Defendants of the charges against them, any concerns regarding unanimity by the jury can be addressed through jury instructions, Defendants do not identify any potential prejudice from evidentiary rulings at trial, and Defendants do not argue that they may be subjected to double jeopardy. Defendants' motion is denied.

## IV. Defendant Boultbee's Motion To Dismiss Counts 10 through 12

Boultbee also has moved to dismiss Counts 10 through 12 of the Indictment, contending that they fail to state an offense against him because they: (1) fail to allege his knowing participation in the charged wire fraud scheme; and (2) are duplicitous. (R. 250-1, Def.

Boultbee's Motion to Dismiss Counts 10-12).

### A.    Knowing Participation

As noted above, the elements of a wire fraud offense under Section 1343 are: "(1) a scheme to defraud; (2) an intent to defraud; and (3) use of the mails or wires in furtherance of the scheme." *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006); *see also United States v. Alhalabi*, 443 F.3d 605, 611 (7th Cir. 2006). Defendant Boultbee challenges Counts 10 through 12 as deficient on the ground that they fail to allege that Defendant Boultbee had any involvement in some of the "perks" Defendant Black received – including Defendant Black's trip to Bora Bora and the $62,000 surprise birthday party for Black's wife – and that they fail to allege that Defendant Boultbee's assistance was knowingly part of any fraudulent scheme.

The Indictment alleges that Defendants Boultbee and Black "devised, intended to devise, and participated in a scheme to defraud International and International's public shareholders of money, property and their intangible right of honest services, and to obtain money and property from these victims by means of materially false and fraudulent pretenses, representations, promises and omissions." (R. 219-1, Indictment at 45-46, 53, 54.) It further alleges that Defendant Boultbee assisted Defendant Black in abusing the "perquisites provided to BLACK by International for the purpose of benefitting BLACK at the expense of the corporation and its public majority shareholders." (*Id.* at 46, 53, 54.) Regarding the New York City apartments, the Indictment alleges that Defendant Boultbee defrauded International of its right to receive his honest services in connection with the renovation of the Ground Floor Apartment and the purchase of the Second Floor Apartment in New York City. (*Id.* at 47, 48, 53, 54.) The Indictment further details conversations that Defendant Boultbee had with Executive B in

-35-

connection with the purchase and renovation of the apartments.  (*Id.* at 48-49, 53, 54.)  Finally, the Indictment alleges that for purposes of executing the scheme, Defendants Black and Boultbee knowingly caused to be transmitted in interstate commerce the wire transfers set forth in Counts 10, 11, and 12.  (*Id.* at 52, 53, 54.)  These allegations set forth all three elements, explaining the fraudulent scheme and describing actions taken by Defendant Boultbee in furtherance of the scheme.  The Indictment specifically alleges that he "devised, intended to devise, and participated in a scheme to defraud."  These allegations satisfy the government's burden.  *See generally Alhalabi*, 443 F.3d at 611.

Furthermore, the Seventh Circuit has clearly held that a defendant need not have awareness of his co-schemer's acts in furtherance of a scheme to defraud as long as "the evidence adequately establishes [the defendant's] own knowing participation in the same scheme."  *United States v. Adeniji*, 221 F.3d 1020, 1026 (7th Cir. 2000).  Indeed, "evidence of one participant's actions in furtherance of a scheme to defraud is admissible against the other participants in that scheme, just as it is in a conspiracy case."  *Id.* at 1027; *see also United States v. Lanas*, 324 F.3d 894, 900 (7th Cir. 2003) (evidence of one participant's actions in furtherance of a mail fraud scheme is admissible against other participants in that scheme).  Under this clearly established law, the failure to allege that Defendant Boultbee had knowledge of some of Defendant Black's acts in furtherance of the scheme is not fatal to Counts 10 through 12.

Defendant's reliance on *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000) and *United States v. Berlin*, 472 F.2d 1002 (2d Cir. 1973) – two non-binding cases – is unavailing.  In both of these cases, the indictments at issue failed to allege an essential element of the tax violation charged.  In *Pirro,* for example, the Second Circuit affirmed the dismissal of a portion of the

-36-

indictment where the charge did not rest on a clear violation of the law, and where it " failed to sufficiently allege the second element of a section 7206(1) violation, namely a material falsehood or an omission that amounted to a material falsehood." *Pirro*, 212 F.3d at 93. Similarly, in *Berlin*, the appellate court reversed a conviction for aiding and abetting in the submission of a false application for mortgage insurance to the Federal Housing Administration because the indictment only alleged that the defendant had "counseled and caused" such a submission, not that he knew of the falsity of the statements and/or documents that had been submitted. The *Berlin* court held that without this allegation of an essential element of the crime – that the defendant knew the submission was false – the indictment was deficient. In contrast, Counts 10 through 12 of the Indictment each allege the requisite elements of a wire fraud offense. Defendant's motion is accordingly denied.

### B. Duplicity

Defendant Boultbee also contends that challenges Counts 10 through 12 are duplicitous.[12] Counts 10 through 12 allege a common scheme to defraud with three separate wire transfers. Given the underlying scheme, joinder is proper under Rule 8(a). *See* Fed. R. Crim. P. 8(a) (permiting joinder of counts in an indictment if the "offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan"); *United States v. Jamal*, 87 F.3d 913, 914 (7th Cir. 1996). Further, as noted above, a scheme to defraud can be carried out in more than one way without being duplicitous. *See, e.g., Berardi*, 675 F.2d at 898. Defendant does not argue that he will

---

[12]     Defendant Boultbee did not reply to the government's response on this issue. (*See* R. 327-1, Reply.)

suffer prejudiced by the allegedly duplicitous counts. Indeed, Counts 10 through 12 each identify a single wire communication executed in furtherance of the alleged schemes to defraud and give Defendants sufficient notice of the nature of the charges against them. If necessary, the Court will address any concern regarding a non-unanimous jury verdict through the jury instructions and/or verdict form. *See United States v. Cherif,* 943 F.2d 692, 701 (7th Cir. 1991).

## V. Defendant Black's Motion To Dismiss Count 13

Defendant Black has moved to dismiss Count 13 of the Indictment, which charges him with money laundering pursuant to 18 U.S.C. §1957. Specifically, that charge states that:

> [O]n or about December 22, 2000, . . . [Defendant Black] "knowingly engaged and attempted to engage in a monetary transaction affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the wire transfer of $2,150,000 from an account controlled by [Defendant Black] at CIBC in Toronto to [Hollinger] International's account at Bank One in Chicago, such having been derived from a specified unlawful activity, namely the use of an interstate carrier for the purpose of executing and attempting to execute a scheme to defraud and to obtain money and property in connection with the CNHI II transaction in violation of [18 U.S.C. §1341] and the use of a wire transmission in interstate and foreign commerce for the purpose of executing a scheme to defraud and to obtain money and property in connection with the Can West transaction in violation of [18 U.S.C. §1343].

Defendant Black argues that the Court should dismiss this Count on the grounds that (1) the United States lacks jurisdiction to prosecute Defendant Black for the offense; and (2) venue is not proper in the Northern District of Illinois. (R. 263-1, Def. Black's Motion to Dismiss Count 13.) The Court denies Defendant's motion.

### A. Jurisdiction

Jurisdiction exists to prosecute the offense charged in Count 13. Section 1957(a) states, in relevant part:

> Whoever . . . knowingly engages . . . in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity,

shall be punished as provided in subsection (b).

In order to prove money laundering under this Section, the government must prove the following elements:  (1) knowingly engaged or attempted to engage in a monetary transaction, (2) in criminally derived property, (3) of a value greater than $10,000, and (4) derived from specified unlawful activity.  *See generally United States v. George*, 363 F.3d 666, 675 (7th Cir. 2004).

Section 1957(d) directs that the "circumstances referred to in subsection (a) are:

(1) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States; or

(2) that the offense under this section takes place outside the United States and such special jurisdiction, but the defendant is a United States person.

18 U.S.C. §1957(d).

Defendant Black argues that Section 1957(d) precludes jurisdiction here because the transaction at issue originated outside the United States and Defendant Black is not a United States person.  Defendant argues that because Count 13 alleges that he caused the transfer of funds from a financial institution in Canada, the "monetary transaction" took place in Canada, not the United States.

The plain statutory language defeats Defendant's argument.  The charged transaction took place in the United States because the funds were transferred into the Northern District of Illinois.  Section 1957(f)(1) defines "monetary transaction" as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, *or to a financial institution* . . . ."  18 U.S.C. §1957(f)(1) (emphasis added) – precisely the crime charged in Count 13.  The transfer at issue was directed to an account in Chicago, and the monetary transaction was completed when the transfer was

completed in Chicago.

Defendant argues that the Court must focus on the "knowingly engage" language of the statute, and that Defendant knowingly engaged in the transfer in Canada, not the United States. The "knowingly engage" language, however, does not alter the definition of transfer which includes sending money to a financial institution.

*United States v. Li*, 856 F. Supp. 421 (N.D. Il. 1994), *aff'd*, 55 F.3d 325 (7th Cir. 1995), Defendant's principal case in support of his argument, does not provide otherwise. In *Li*, the district court vacated a conviction of a money laundering charge under Section 1956(c)(3). The "transaction" at issue under the statute was a deposit into a bank account. The district court held – and the Seventh Circuit affirmed – that the statute of limitations started to run upon the "initiation of the deposit" because all of the elements of the transaction had been completed at that time. *Id.* at 423. Defendant argues that this holding supports his argument that the transfer was completed when it was initiated in Canada. The statute at issue in *Li*, however, was 1956(a)(1). That statute criminalizes conduct where a defendant "conducts or attempts to conduct" certain financial transactions. As the *Li* court explained, the term "conducts" includes "either initiating '*or*' concluding a transaction." It further noted that there "is no requirement that the transaction be both initiated *and* concluded. Merely initiating a deposit satisfies the conducting a financial transaction element of the offense." *Id.* In contrast, Section 1957 does not contain any such language criminalizing the initiation of a monetary transaction. Further, a transfer of funds as charged in Count 13 is a different transaction than the deposit a funds at issue in *Li*. As noted above, a transfer is specifically defined as a transfer of funds "to a financial institution." Thus, the receipt at the financial transaction of the wire transfer is part of the

transaction.

Defendant Black also argues that Section 1956(a)(2) specifically includes language governing transactions commencing outside of the United States and going to a place in the United States – "[w]hoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States." 18 U.S.C. §1956(a)(2). Defendant Black contends that if Congress had intended for Section 1957 to apply to a non-United States person who engaged in a prohibited monetary transaction outside the United States, it would have included similar language in Section 1957. While it is true that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion," *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300 (1983), the specific language in Section 1957(d) covers the charged crime – it took place in the United States. The language from Section 1956(a)(2) is not necessary.

### B. Venue

Defendant Black argues that venue for Count 13 does not lie in the Northern District of Illinois. Defendant contends that the monetary transaction took place in Toronto, Canada and was completed there, thus venue is not proper here. The Court disagrees.

Venue is proper in the Northern District of Illinois under Section 1956(i)(1). That statute sets forth the venue provision for Section 1957 offenses:

Except as provided in paragraph (2), a prosecution for an offense under this section or section 1957 may be brought in –

-41-

(A) any district in which the financial or monetary transaction is conducted; or

(B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

18 U.S.C. §1956(i); *see generally Whitfield v. United States,* 543 U.S. 209, 217, 125 S.Ct. 687, 693 (2005). Although Congress added this provision after the December 2000 charged transaction, the amended venue provision nonetheless applies. *See United States v. Nichols*, 416 F.3d 811, 824 (8th Cir. 2005) ("Amendment to a venue statute is a procedural change applicable to suits filed prior to amendment.").

Venue is appropriate in the Northern District of Illinois under either prong of this statute. First, the monetary transaction at issue was conducted in this District. The transaction concluded in Chicago when the funds were transmitted to Bank One.

Second, the government is prosecuting the underlying specified unlawful activity in this District, and the Indictment alleges that Defendant Black participated in the transfer of the proceeds of the specified unlawful activity from Canada to Chicago – the District where the transaction at issue was conducted. The specified unlawful activity referenced in Count 13 includes: (1) the mail fraud scheme in connection with the CNHI II transaction charged in Count 1 of the Indictment, and (2) the wire fraud scheme in connection with the CanWest transaction charged in Count 8 of the Indictment. Venue is proper in the Northern District of Illinois for these specified unlawful activities because they are offenses that took place in this District. *See generally United States v. Ebersole*, 411 F.3d 517, 527 (4th Cir. 2005).

Even without the venue provision of Section 1956(i), venue is still proper in the Northern District of Illinois. It is clear that "any offense against the United States begun in one district

and completed in another, or committed in more than one district, may be inquired of and

prosecuted in any district in which such offense was begun, continued, or completed."  18 U.S.C.

§ 3237(a).  Because the monetary transaction at issue was completed when it was transferred to

the account in Chicago, venue is proper here.  *See United States v. Stewart*, 256 F.3d 231, 243

(4th Cir. 2001) ("money laundering offenses constitute continuing offenses that properly can be

tried either in the district where the offense began, continued, or was completed."); *United States

v. Peterson*, 357 F. Supp. 2d 748, 752 (S.D.N.Y. 2005) (venue proper where charged money

laundering offense involved transaction where illegal proceeds cleared through New York).

Defendant's heavy reliance on *United States v. Cabrales*, 524 U.S. 1, 6-7, 118 S. Ct.

1772, 1775-76, 141 L. Ed. 2d 1 (1998)[13] is misplaced.  In *Cabrales*, the Supreme Court affirmed

the Eighth Circuit's ruling that money laundering under Section 1957 was not properly charged

in Missouri where the transactions at issue "began, continued, and were completed only in

Florida."  524 U.S. at 8; 118 S.Ct. at 1776.  The transaction at issue took place completely within

Florida – the deposits and withdrawals both took place in Florida.  The Supreme Court rejected

the government's argument that because the underlying criminal activity which generated the

funds that were ultimately the subject of the monetary transaction at issue took place in Missouri,

venue was proper in Missouri.  In rejecting this argument, the Supreme Court acknowledged the

Eighth Circuit's pronouncement that "[m]oney laundering . . . might rank as a 'continuing

offense,' triable in more than one place, if the launderer acquired the funds in one district and

transported them into another."  The Seventh Circuit has made clear that "*Cabrales* stands for

---

[13] Notably, the Supreme Court decided this case before the venue amendment to the money laundering statute.

the proposition that venue is improper in a district if the only acts that occurred in that district do not provide evidence of the elements of the charged crime." *United States v. Ochoa*, 229 F.3d 631, 636 (7th Cir. 2000).

Here, the transaction at issue concluded in Chicago. Unlike *Cabrales*, here, the monetary transaction began in Canada and ended in the Northern District of Illinois. As the Seventh Circuit has noted, "[in] *Cabrales,* the conduct in Missouri took place before the money laundering began, and relying on the continuing offense theory, the Supreme Court determined that the offense was not "begun, continued, or completed," in the language of 18 U.S.C. §3237(a). *United States v. Ringer*, 300 F.3d 788, 792 n.3 (7th Cir. 2002); *see also Ochoa*, 229 F.3d at 636 (noting that in *Cabrales* the indictment did not "allege that the funds had been transported from one state to another."). Accordingly, venue is proper in the Northern District of Illinois.

**VI.     Defendant Black's Motion To Dismiss Count 14**

Defendant Black has also moved to dismiss or strike portions of Count 14 of the Indictment. In this motion, Defendant requests that the Court strike references to a Canadian Inspector and the order prohibiting the removal of documents from 10 Toronto Street should be stricken as irrelevant to the 18 U.S.C. §1512 charge. In addition, Black argues that (1) Count 14 fails to satisfy Section 1512's "nexus requirement" between the obstructive act and the official proceeding; (2) Count 14 is duplicitous by charging that Black attempted to obstruct three different official proceedings, which could result in conviction by a less than unanimous jury; and (3) Count 14 should be dismissed for lack of venue. (R. 264-1, Def. Black's Motion to Dismiss Count 14). Defendant's motion is denied.

Count 14 of the Indictment charges Defendant Black with obstructing justice, pursuant to 18 U.S.C. § 1512(c)(1). That section provides that whoever "corruptly . . . alters, destroys, mutilates, or conceals a record, document or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding" has committed a crime. *Id.* The statute defines "official proceeding" as "a proceeding before a judge or court of the United States . . . or a Federal grand jury; . . . [or] a proceeding before a Federal Government agency which is authorized by law." 18 U.S.C. §1515(a)(1).

In Count 14, Defendant Black is charged with concealing and attempting to conceal the content of 13 boxes from inside offices at 10 Toronto Street "with the intent to impair their availability for use in official proceedings, namely the SEC proceeding against BLACK, the criminal investigation of BLACK by a Federal grand jury and the pending criminal proceeding against BLACK before a judge and court of the United States." (R. 219-1, Indictment at 59.)

### A.     Motion To Strike

#### 1.     The Canadian Inspector and Court Order

First, Defendant Black seeks to strike the references in Count 14 to a Canadian Inspector and a Canadian court order prohibiting removal of the documents from 10 Toronto Street. Count 14 alleges that the Superior Court of Justice in Ontario, Canada appointed a Canadian Inspector to investigate Hollinger Inc.'s affairs. On December 17, 2004, the Canadian court ordered that no documents "currently resident at 10 Tornoto Street shall be removed, altered or destroyed without the consent in writing of the Inspector or further Order of this Court." (R. 219-1, Indictment at 57 ¶ 2e.) It further alleges that on May 20, 2005, a representative of Hollinger, Inc. advised the Canadian Inspector that Defendant Black planned to remove boxes of

documents from the 10 Toronto Street offices. (*Id.* at 58-59.) In response, the Inspector allegedly advised security personnel at 10 Toronto Street of the December 17, 2004 Canadian court order, and security personnel returned certain boxes that they had assisted Defendant Black's assistant in removing that day. Later that day, Defendant Black allegedly went to 10 Tornoto Street and removed the boxes himself, along with his chauffeur and his assistant. (*Id.* at 59.)

Defendant asserts that these allegations are inflammatory and prejudicial. The references to the Canadian Inspector and Canadian order, however, are legally relevant to the alleged obstruction of the official proceedings in that they explain the circumstances surrounding the charged May 20, 2005 conduct. Namely, the government intends to introduce evidence that the security guards at the 10 Toronto Street offices precluded Ms. Maida, Defendant Black's assistant, from removing the boxes earlier in the day because of the Canadian court order. Defendant Black allegedly returned himself later that day – with Ms. Maida and his chauffeur – to remove the boxes of documents and items through a back door. Therefore, the Canadian Inspector and order allegations are intertwined with the chronology of events and are thus legally relevant. *Bucey*, 691 F. Supp. at 1081 ("Simply put, legally relevant information is not surplusage.").

Finally, the Court's instructions to the jury will make clear that violation of the Canadian order is not the crime charged in the Indictment.

### 2. The United States Attorney's Office's Investigation

Second, Defendant asks the Court to strike the reference to the United States Attorney's Office's investigation because such an investigation is not an "official proceeding" under the

statute and is irrelevant.  Count 14 alleges that the United States Attorney's Office filed a motion

to intervene, for a limited, temporary stay of discovery in the SEC proceeding, and served that

motion on Defendant Black's counsel.  (R. 219-1, Indictment at 57, ¶ 2(g)).  The motion noted

that the United States Attorney's Office in the Northern District of Illinois was "conducting a

criminal investigation of Black, Radler, Hollinger, Inc. (collectively, 'the SEC defendants')."

(*Id.*)  The motion explained the general scope of the investigation and stated that the

"government's criminal investigation seeks to determine whether the SEC defendants and others

have violated various federal laws."  (*Id.*)

Defendant Black's concern that the jury might conclude that the United States Attorney's

Office's investigation is an "official investigation" will be remedied by the Court's instructions

to the jury regarding the law, including the definition of an "official proceeding."  *United States*

*v. White*, 443 F.3d 582, 588 (7th Cir. 2006) ("[a] jury is presumed to follow the instructions that

they were given").  Furthermore, Count 14 clearly identifies the "official proceedings" at issue –

the SEC proceeding, the Federal grand jury investigation, and the proceedings in this Court.

Accordingly, Defendant's request to strike is denied.

## B.    Nexus

Defendant Black argues that the Court should dismiss Count 14 because it does not

satisfy the "nexus" requirement as articulated in *Arthur Andersen v. United States*, 544 U.S. 696,

125 S.Ct. 2129, 161 L.Ed.2d 1008 (2005), as to the federal grand jury proceeding and the

criminal proceeding.  Defendant does not contest the nexus as to the SEC proceeding.

In *Arthur Andersen*, the Supreme Court reversed a conviction for obstruction of justice

under Section 1512(b)(2).  The Supreme Court held that the instructions were erroneous, in part,

because they "led the jury to believe that it did not have to find *any* nexus between the 'persua[sion]' to destroy documents and any particular proceeding." *Id.*, 544 U.S. at 707, 125 S. Ct. at 2136. Defendant Black argues that Count 14 suffers from this same deficiency because the "official proceeding" must be related "in time, causation or logic with the 'official proceeding.'" He argues that the Indictment does not allege that he had knowledge of, or contemplated, the Indictment or the grand jury investigation on May 20, 2005.

Defendant Black essentially asks the Court to make a factual determination that the government cannot prove a nexus between the allegedly obstructive act and the grand jury investigation, or between the allegedly obstructive act and the criminal proceeding. Such a determination is for the jury, not the Court. The Court will instruct the jury as to any nexus requirement under Section 1512(c)(1), to the extent such a requirement exists.

Here, the Indictment is sufficient to apprise Defendant Black of the charges against him. *United States v. Stout*, 965 F.2d 340 (7th Cir. 1992). Section 1512(f) makes clear that "an official proceeding need not be pending or about to be instituted at the time of the offense." 18 U.S.C. §1512(f). The allegations in Count 14 meet the government's burden at this stage. Accordingly, Defendant's motion is denied.

### 3.  Duplicity

Defendant Black contends that Count 14 is duplicitous because it charges him with obstructing three separate proceedings – the SEC proceeding, the federal grand jury investigation, and this criminal proceeding. Count 14 charges Defendant Black with a single, continuous course of conduct. It alleges that Defendant Black committed a single act (corruptly removing and concealing the boxes), on a single day (May 20, 2005), with a single intent

(preventing the documents frm being used in an official proceeding against him). Even if the government could have charged a Section 1512(c) violation for each of the official proceedings, it is clear, that " two or more acts, each one of which would constitute an offense standing alone, may be joined in a single count without offending the rule against duplicity." *Berardi*, 675 F.2d at 898; *see also Buchmeier,* 255 F.3d at 421; *United States v. Peel*, 2006 WL 2864107, at *2 (S.D. Ill. 2006) (denying motion that Section 1512 charge was duplicitous).

Defendant's argument that charging both an attempt and a substantive offense in the same count renders Count 14 duplicitous also fails. *See e.g. United States v. Summit Refrigeration Group, Inc.*, 2006 WL 2091115, at *5 (E.D. Wis. Oct. 26, 2006) (Count not duplicitous where attempt and substantive offense both charged in same count).

Further, the Court will instruct the jury regarding the unanimity of their verdict. Such an instruction will negate Defendant Black's concern regarding a non-unanimous verdict. *See United States v. Hughes*, 310 F.3d 557, 561 (7th Cir. 2002) ("the instructions negated any possibility that Mr. Hughes was convicted on the basis of a non-unanimous verdict"); *Buchmeier*, 255 F.3d at 426 (same).

Finally, the other potential harms caused by duplicitous charges are not present here. First, Count 14 specifically notifies Defendant of the nature of the charges against him. Second, Defendant has not identified any potential prejudicial evidentiary rulings that could result from the charges in Count 14. Third, he does not face any double jeopardy problems. *See Buchmeier*, 255 F.3d at 426. Accordingly, Defendant's motion to dismiss Count 14 as duplicitous is denied.

### D.     Venue

Defendant also seeks to dismiss Count 14 for lack of venue because "none of the acts

alleged to have been committed by Mr. Black, as set forth in Count 14, occurred in the Northern District of Illinois."  (R. 264-1, at 15.)  Defendant Black further argues that the alleged obstructive actions only took place in Canada.  He argues that Section 1512(i)'s venue provision conflicts with Article III, § 2, cl. 3 and the Sixth Amendment of the United States Constitution because it exceeds Congress' authority to legislate.

Venue is proper in the Norther District of Illinois.  Indeed, Section 1512(i) specifically provides that "[a] prosecution under this section . . . may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected or in the district in which the conduct constituting the alleged offense occurred."  18 U.S.C. § 1512(i) (parentheses original); *see also United States v. Frederick*, 835 F.2d 1211 (7th Cir. 1987) (pre-Section 1512(i) case holding that venue proper in district where the affected judicial proceeding was conducted).  The three official proceedings at issue here – the SEC proceeding, the grand jury investigation, and the court proceedings – are all in the Northern District of Illinois.  Accordingly, venue is proper in this District.

Furthermore, Congress has the authority to "enforce its laws beyond the territorial boundaries of the United States."  *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991); *United States v. Bowman,* 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922) (criminal statutes can apply to act outside the United States where Congress so intended). The issue of whether a statute has extraterritorial application is one of Congressional intent.  *See id.* (extraterritorial application of statutes is one of Congressional intent); *Foley Bros. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949) (same); *United States v. Yousef*, 327 F.3d 56, 86 (2[d] Cir. 2003) ("As long as Congress has indicated its intent to reach such conduct, a

United States court is bound to follow the Congressional direction unless this would violate the due process clause of the Fifth Amendment.") (internal citations and quotations omitted): *United States v. DeLeon*, 270 F.3d 90, 92-93 (1ˢᵗ Cir. 2001) (Congress has the power to criminalize acts occurring outside the United States that were "deliberately directed to producing an effect within the United States").  Here, Section 1512(h) explicitly provides that "[t]here is extraterritorial Federal jurisdiction over an offense under this section."  18 U.S.C. § 1512(h).  Congress has expressly made its intent clear to criminalize conduct outside the United States that obstructs official proceedings in the United States.

**VII.    Defendant Black's Motion To Dismiss Count 15**

Defendant Black argues that the Court must dismiss Count 15 on the following grounds: (1) extra-territorial jurisdiction; (2) Count 15's "Pattern of Racketeering" allegations are deficient because they refer only to a close-ended scheme, not of exceedingly long duration; (3) RICO is unconstitutional on its face and as applied; and (4) Section 1346 is not listed as a RICO predicate act.  (R. 265-1, Def. Black's Motion to Dismiss Count 15.)  None of these arguments merit significant discussion.

First, because each of the alleged predicate acts in question occurred in the United States, the Indictment does not charge purely extra-territorial conduct, thus undercutting the premise of Black's argument.  (R. 219-1, Indictment at 62-67 (arguing that, with respect to RICO, Congress did not "clearly manifest" an intent for the statute to be applied to extra-territorial content, thus triggering a presumption against the extra-territorial application of United States law")).  Second, as charged in the Indictment, the RICO count consists of seven (7) predicate acts over a period of more than two years.  Defendant's argument that these allegations do not constitute a

"pattern" of racketeering is a factual argument that the Court, at this stage, cannot resolve in Defendant's favor. Third, the Seventh Circuit, on several occasions, has held that RICO is not unconstitutionally vague on its face, *United States v. Korando*, 29 F.3d 1114, 1119 (7th Cir. 1994) (rejecting argument that "RICO is unconstitutional in that it does not define the criminal offense with sufficient clarity such that ordinary people understand what is allowed and what is forbidden"); *United States v. Sanders*, 962 F.2d 660, 678 (7th Cir. 1992) (same); *United States v. Glecier*, 923 F.2d 496, 497-98 n.1 (7th Cir. 1991), or as applied if the underlying predicate acts are not unconstitutionally vague, *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991) (finding RICO not unconstitutionally vague as applied defendants "[p]rovided the statutes criminalizing the predicate acts are not unconstitutionally vague – and no one argues they are – the defendants are on adequate notice that they are committing crimes, and the fact that they may not be aware of the extent of their criminality and consequent exposure to punishment is a detail (the original conception of RICO as a sentence-enhancement provision is pertinent here)" (parentheses original)). For the reasons stated above, the charged mail and wire fraud scheme that serves as the basis for the RICO count is not unconstitutionally vague. Thus, these cases control the outcome here. Finally, Section 1346 effectively operates as a "definitional clause" for mail and wire fraud violations under 18 U.S.C. §§1341 and 1343. *See, e.g., United States v. Boscarino*, 437 F.3d 634 (7th Cir. 2006) (honest services violation could serve as a basis for a money-laundering conviction: "Section 1346 does not create a separate crime. It is a definitional clause . . . [t]he scheme to defraud itself violates §1341, which is a listed predicate offense for the money-laundering statute."). Because RICO identifies the mail and wire fraud statutes as predicate acts, 18 U.S.C. §1961(1), Defendant's argument fails.

**VIII.   Defendant Kipnis' Motion To Dismiss Counts 16 and 17**

In this motion, Defendant Kipnis contends that Counts 16 and 17, which allege violations of 26 U.S.C. §7206, are defective because the Indictment fails to allege: (1) that International's United States corporate income tax returns for 1999 and 2000 were actually filed, purportedly an essential element of the crime charged; (2) Defendant Kipnis' culpable conduct in preparation or filing of those tax returns; and (3) how or why those tax returns were materially false in the fist place, given that the alleged under-reporting of income relates to money that – according to the Indictment itself – was diverted from International.  (R.252-1, Def. Kipnis' Motion to Dismiss 16 & 17).  Defendant's motion is denied.

The Indictment alleges that, at all material times, International was required to pay federal corporate income taxes in the United States and, to that end, had retained a tax preparer to report receipts, expenses, and total income from International.  (*Id.* at 68, ¶¶2a, 2b.) Throughout 1999, Defendants received various sums of cash from transactions, in the aggregate amount of approximately $13 million, and, caused those amounts to be deposited into accounts other than accounts controlled by International, which, in turn, caused International to incorrectly report the non-competition payments in 1999.  (*Id.* at 68, ¶2d.)  On September 15, 2000, Defendants willfully procured and assisted in the preparation of a false and fraudulent United States Corporation Tax Return (Form 1120) and accompanying schedules, on behalf of International, for the calendar year 1999.  (*Id.* at 68, ¶2.)  Defendants did not believe that the 1999 federal corporate tax return was true and correct as to every material matter, in that it was stated in that return, line 11, that the total income of International was approximately $394 million when, in fact, Defendants knew that total income materially exceeded that amount and

-53-

included gross receipts of approximately $13 million, which was not reported on the corporate

return.  (*Id.* at 68-69, ¶3.)  The Indictment further alleges that, in 2000, Defendants willfully

procured a false tax return for International in the same manner.  (*Id.* at 70-71, ¶¶2-3.)

These allegations are sufficient to sustain a charged under Section 7206(2).  That statute,

in relevant part, prohibits:

> (2) Aid or assistance. – Willfully aids or assists in, or procures, counsels, or advises the
> preparation or presentation under, or in connection with any matter arising under, the
> internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent
> or is false as to any material matter, whether or not such falsity or fraud is with the
> knowledge or consent of the person authorized or required to present such return,
> affidavit, claim, or document; . . .

Construing this language, the Seventh Circuit has held that "[t]he essential elements of an

offense under section 7206(2) are (1) that defendant aided, assisted, procured, counseled, advised

or caused the preparation and presentation of a return; (2) that the return was fraudulent or false

as to a material matter; and (3) that the act of the defendant was willful." *United States v. Hooks*,

848 F.2d 785, 788-89 (7th Cir. 1988); *United States v. Dunn*, 961 F.2d 648, 651 (7th Cir. 1992)

("To establish a violation of 26 U.S.C. § 7206(2), the government must prove, *inter alia*, that the

defendant acted willfully").

In contrast to this Seventh Circuit authority, Kipnis proposes that Section 7206(2)

requires a fourth essential element:  that the fraudulent or false tax return actually be filed.  To

support this contention, Kipnis relies on three non-binding cases, each considering whether a

Section 7206(2) charge violates the statute of limitations.  Those cases, however, cannot control

the outcome here.  As statute of limitations cases, they address, of course, when the clock starts

running on the limitations period.  But, critically, in analyzing when a crime *is completed*, a

court need not to consider when that *it first arises* – the question at issue here.  Regardless,

Kipnis' argument runs afoul of the statutory language and Seventh Circuit precedent directly on point.

Kipnis' other two arguments effectively ask the Court to resolve factual inferences in his favor – something that the Court cannot do at this juncture. The Indictment, which need not be read in a "hypertechnical manner," supports the reasonable inference that Kipnis was culpable in preparing the allegedly false tax returns. Indeed, the Indictment alleges that Kipnis was directly involved in preparing the closing documents for the *American Trucker*, CNHI, Horizon, Forum, Paxton, and CanWest transactions. And given the size of the alleged fraudulent transactions, the Indictment further supports the reasonable inference that the tax returns at issue are materially false. (R. 219-1, Indictment at 68-70 (alleging that Kipnis' actions caused International to misstate its earnings by $13 million and $16 million in 1999 and 2000, respectively).) Accordingly, the Court denies Kipnis' Motion to Dismiss Counts 16 and 17.

## CONCLUSION

For these reasons, the Court denies Defendants' motions to dismiss and motions to strike the Third Superseding Indictment.

Dated:  December 21, 2006                    ENTERED

_____

AMY J. ST. EVE
United States District Court Judge