UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05 CR 727-01 |
| vs. | ) | Honorable Amy J. St. Eve |
| | ) | |
| CONRAD M. BLACK, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT BLACK'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR JUDGMENT OF ACQUITTAL**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................ii

BACKGROUND ...............................................................................................................1

FACTUAL OVERVIEW.....................................................................................................2
    A.  The APC Counts .....................................................................................................2
    B.  The Forum/Paxton Supplemental Payments...........................................................3
    C.  Interference With An Official Proceeding ..............................................................3

ARGUMENT.....................................................................................................................4

I. JUDGMENT OF ACQUITTAL SHOULD BE ENTERED AS TO THE APC NON-COMPETES BECAUSE THERE WAS INSUFFICIENT EVIDENCE OF A SCHEME TO DEFRAUD INTERNATIONAL, THE ALLEGED VICTIM. ............................................5
    A.  There was insufficient evidence of a scheme to defraud International.....................7
    B.  There was insufficient evidence of intent. ..............................................................9

II. THE EVIDENCE FAILED TO PROVE THAT MR. BLACK POSSESSED AN INTENT TO DEFRAUD WITH RESPECT TO THE SUPPLEMENTAL PAYMENTS..............................10

III. JUDGMENT OF ACQUITTAL SHOULD BE ENTERED ON THE OBSTRUCTION COUNT ..........................................................................................................................13
    A.  There is insufficient evidence of Mr. Black's intent to obstruct justice ...................14
    B.  There is insufficient evidence that Black believed that his conduct was "likely to affect" any official proceeding. .........................................................................................17

CONCLUSION.................................................................................................................18

## TABLE OF AUTHORITIES

**Cases**

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) ......................................................... 17, 18

*Jackson v. Virginia*, 443 U.S. 307 (1979) ......................................................................................... 4

*United States v. Aguilar*, 515 U.S. 593 (1995) ............................................................................... 17

*United States v. Kimmons*, 917 F.2d 1011 (7th Cir. 1990) .............................................................. 5

*United States v. Kitchen*, 57 F.3d 516 (7th Cir. 1995) ..................................................................... 4

*United States v. Morales*, 902 F.2d 604 (7th Cir. 1990) ................................................................. 16

*United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991) ....................................................... 17

*United States v. Peters*, 277 F.3d 963, 967 (7th Cir. 2002) ................................................... 4, 5, 14

*United States v. Peterson*, 236 F.3d 848 (7th Cir. 2001) .......................................................... 5, 14

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006). ............................................................ 17

*United States v. Reich*, 479 F.3d 179 (2d Cir. 2007) ..................................................................... 17

*United States v. Rivera*, 273 F.3d 751 (7th Cir. 2001) .................................................................... 4

*United States v. Stirone*, 361 U.S. 212 (1960) ................................................................................ 6

*United States v. Sullivan*, 903 F.2d 1093 (7th Cir. 1990) ............................................................... 5

*United States v. Windom*, 19 F.3d 1190 (7th Cir. 1994) ............................................................ 5, 14

# BACKGROUND

On November 17, 2005, the grand jury returned a First Superseding Indictment naming Conrad M. Black as a defendant. Doc. 47. That indictment was superseded several times (Docs. 97, 219); eventually, the government asked Mr. Black to waive indictment, and he agreed to be tried pursuant to the Superseding Information ("Information") filed on January 10, 2007. Doc. 407. The 17-count Information named Mr. Black in fourteen counts, including mail and wire fraud, money laundering, tax fraud, obstruction of justice, and RICO.[1]

The jury acquitted Black and his co-defendants on the bulk of the charges, including six of the mail/wire fraud counts, two counts of tax fraud, and the RICO count. Specifically, the jury returned not guilty verdicts on counts relating to the CNHI II, Forum, Paxton, and CanWest transactions, as well as the so-called "perks," tax and RICO counts. The jury found all defendants guilty of Counts One and Six (the APC counts) and Count Seven (the Forum/Paxton supplemental payments), and found Mr. Black guilty of Count Thirteen (obstruction of justice).

Prior to trial, Mr. Black moved to dismiss and to sever the obstruction count (Docs. 264, 340) and to dismiss the mail and wire fraud counts (Doc. 261); he also joined the co-defendants' motions (Doc. 259). The Court denied those motions. Docs. 377, 435. At the close of the government's case, Black moved for judgment of acquittal and renewed that motion at the close of the evidence. Doc. 716. The Court reserved judgment on the Rule 29 motions and, as of the date of this motion, they remain pending.

---

[1] During trial the government voluntarily dismissed the money laundering charge (Count Thirteen) from the Information. Doc. 683. A renumbered and redacted version of the Information was provided to the jury.

## FACTUAL OVERVIEW

### A.     The APC Counts

According to the government's key witness, F. David Radler, the APC non-competes at issue in Counts One and Six were funded by approved but unpaid management fees owed to Ravelston, a private holding company owned in large part by Mr. Black. Tr. 9001: 12-16. Each year, Ravelston entered into a management services agreement with International to provide executive and other staff to International. The Audit Committee approved the management services agreement every year, and the government has not charged the management fees as part of any scheme. Tr. 8994: 4-8; 15089: 18-19 ("Remember, nothing illegal about the management fees. No one saying that.").

At some point in early 2001, Radler discovered $5.5 million in the reserve accounts of APC, which he understood to be APC's portion of the management fees owed to Ravelston for 2000. Believing he could obtain a tax benefit in Canada by taking the management fees as non-competes (Tr. 7945: 13-23), Radler directed Roland McBride (an APC executive who reported to him) to pay out the $5.5 million to key executives as non-compete payments. Tr. 8835: 16-18. Mr. Black signed the APC non-compete agreement in February 2001, and he subsequently received a payment of $2,612,500. GX APC 9.

Black was not involved in the drafting of the APC non-compete agreements or any other aspect of the transaction except his signature on the agreement itself. He was not included on the inter-company accounting memos or correspondence regarding the payments. Radler directed the drafting of the APC non-compete agreements and ordered the disbursement of the funds from the APC accounts.

### B.   The Forum/Paxton Supplemental Payments

Count Seven deals with "supplemental payments" made to Mr. Black and others in 2001.  In the fall of 2000, International sold several newspapers to two purchasers, Paxton Media Group and Forum Communications (the "Forum and Paxton deals").  Mr. Radler negotiated these transactions. In September 2000 – before either of the deals closed – Black, Radler, and Richard Perle (an International board member) signed Executive Committee Consents approving the Forum and Paxton transactions.  GX Executive 1D and 1E.  The Forum and Paxton Consents included approval of the inclusion in the agreements of non-compete commitments by International and "certain executive officers of International." *Id.*  In December 2000, the Board "unanimously approved and adopted" the Executive Committee Consents for the Forum and Paxton transactions. GX Board 1D.

Consistent with the Executive Committee Consents, it was anticipated that Black and other individuals would receive non-compete payments as a result of the Forum and Paxton transactions. Due to an error in the drafting process, no individual non-compete provisions were included in the documentation of these transactions, which closed in the fall of 2000.  Tr. 7931: 17-23.  In the spring of 2001, Radler inquired about the non-competes for these transactions and was told no agreements had been signed as part of the deal.  *Id.*  Notwithstanding the absence of agreements, Radler called Roland McBride, discovered $600,000 in the reserve accounts for Forum and Paxton, and decided to allocate the money as non-compete payments.  Tr. 7836: 15-19; Tr. 7932: 1-3.  Radler then directed McBride to send checks representing the Forum and Paxton non-competes to Black, among others.  Black received $285,000 from these supplemental payments.  GX Supp. Payment 2.

### C.   Interference With An Official Proceeding

Count Thirteen charged Mr. Black with interfering with an official proceeding by removing thirteen boxes of documents from his office at 10 Toronto Street on May 20, 2005.   Black's actions

on that day are not in dispute. He does, however, vigorously contest the government's claim that he removed those boxes with the intent to obstruct an official proceeding. *See* Information at 59, ¶ 3.

As outlined at trial, on April 13, 2005, Hollinger Inc. evicted Black from his office at 10 Toronto Street and ordered him out by May 31, 2005. GX Eviction Letter 1 (attached to Stipulation of Donald Vale, Doc. 626). On May 20, 2005, Mr. Black's assistant, Joan Maida, decided to pack and move boxes from Black's office in advance of the eviction date. Tr. 11433: 17-25; 11434: 1-15. Ms. Maida packed the boxes with what she believed were Black's personal files, including his personal bank account information, correspondence, and writings, as well as his personal copies of Hollinger business documents. *Id.*; Tr. 11435: 1-21. Mr. Black had no involvement in packing the boxes or choosing their content. Tr. 11436: 14-20.

A security guard at 10 Toronto, Lance Bloomfield, put the boxes in Maida's car, but she was told later that day that she could not take the boxes with her. The boxes were then retrieved from her car and placed inside the front doorway at 10 Toronto. Tr. 11498: 20-25; 11443: 5-10.

Mr. Black then went to 10 Toronto and, shortly after 5:00 pm, moved the boxes from the back door of the building to his car, pointing at the security cameras along the way. Black did not attempt to conceal his actions from anyone. A few days later, a Canadian court ordered Black to return the boxes, which he did.

## **ARGUMENT**

Entry of judgment of acquittal is appropriate when, considering the evidence in the light most favorable to the government, no rational jury "could have found the existence of each element of the crime beyond a reasonable doubt." *United States v. Kitchen*, 57 F.3d 516, 529 (7th Cir. 1995); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Peters*, 277 F.3d 963, 967 (7th Cir. 2002); *United States v. Rivera*, 273 F.3d 751, 755 (7th Cir. 2001). Judgment of acquittal is required

even where the government's evidentiary failure relates to only one element of the crime charged. *Kitchen*, 57 F.3d at 523 (reversing conviction where government failed to prove element of crime).

Further, the jury's decision may not be based on impermissible inferences and mere speculation.[2] This is of particular importance where, as here, there is scant and questionable direct evidence supporting the government's case, and the evidence leaves open plausible theories of innocence. As discussed more fully below, each of the counts on which Mr. Black has been found guilty depend on circumstantial evidence and inferences. Because in this case those inferences are unreasonable or based on speculation, the verdicts must be set aside and judgments of acquittal granted.

## I. JUDGMENT OF ACQUITTAL SHOULD BE ENTERED AS TO THE APC NON-COMPETES BECAUSE THERE WAS INSUFFICIENT EVIDENCE OF A SCHEME TO DEFRAUD INTERNATIONAL, THE ALLEGED VICTIM.

From the beginning, the government's case on APC was a suspicion in search of a crime. First, the government alleged that the APC non-competes were bonuses taken in the form of non-competes "for the purpose of defrauding the Canadian tax authorities." Third Superseding Indictment, ¶ 28 (Doc. 219). Dropping its "fraud on Canada" theory,[3] the government next alleged that, by failing "to investigate and fully disclose the actual nature of these related party transactions," Black "fraudulently depriv[ed] International of honest services." Superseding Information, ¶ 31, *and,*

---

[2]  *See, e.g. Peters*, 277 F.3d at 967 ("'[E]ach link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation.'") (citation omitted); *United States v. Peterson*, 236 F.3d 848, 855 (7th Cir. 2001) ("To render a guilty verdict, the jury must hear sufficient evidence to avoid resorting to excessively strained inferences or guesswork."); *United States v. Windom*, 19 F.3d 1190, 1201 (7th Cir. 1994) ("[T]he Court will not allow speculation to substitute for proof"); *United States v. Kimmons*, 917 F.2d 1011, 1017 (7th Cir. 1990) ("[T]he piling of inference upon inference . . . is not sufficient in a criminal case where 'innocent until proven guilty' reigns supreme") (citation omitted); *United States v. Sullivan*, 903 F.2d 1093, 1098 (7th Cir. 1990) ("[S]uch a hypothesis would be grounded on 'piling inference upon inference,' a practice disapproved of by the Supreme Court") (citations and quotations omitted).

[3]  In response to Defendant Boultbee's Motion to Strike, the government agreed to strike Canada as a charged victim. *See* Response to Motion to Strike Canada as Charged Victim (Doc. 305) *and* Minute Order denying as moot Defendant Boultbee's Motion (Doc. 346).

*see generally*, ¶¶ 28-34 (hereinafter "Information"). At trial, the government claimed the APC non-competes were nothing more than a "money grab."[4] Tr. 13705: 19-20.

No rational juror could possibly conclude beyond a reasonable doubt that any of these fanciful theories provided a basis for conviction. The facts adduced at trial simply do not permit any such conclusion. David Radler was the only witness to testify about the origin of these payments, and his testimony was unequivocal: the APC non-competes were "part of unpaid, but approved management fees owed to Ravelston." Tr. 9001: 12-16. In other words, Radler believed the APC funds rightfully belonged to the Ravelston executives and that International's Audit Committee had approved the payments. *Id.* If this testimony was accurate – and no evidence was offered to refute it or to support an alternative interpretation – the funds in question (management fees owed to Ravelston) did not belong to International, which was accordingly not deprived of any money or property, as 18 U.S.C. § 1341 requires. To the contrary, the only possible conclusion to be drawn from the government's evidence is that Black and others received money from the APC account that they believed was owed to them. This evidence cannot permit a conclusion – certainly not a conclusion beyond a reasonable doubt – that Black or the others knowingly participated in a scheme intended to deprive International either of honest services (as the information alleged) or of property (as the government argued at trial).

Undeterred by its own witness's testimony to the contrary, the government argued in closing that "[t]he APC money was not pre-approved management fees." Tr. 15086: 16-18. This assertion,

---

4       With respect to the APC non-competes, the Information charged Mr. Black with depriving International of its right to his honest services. Information, ¶ 30. At trial, however, the government argued that the APC payments were "a money grab" and a "theft" of money. Tr. 855:11 ("[I]t's just a money grab."); Tr. 13705: 19-20 ("This was . . . just a money grab."); Tr. 13705: 24-25 ("[T]hey wanted some more money - more of the company's money. And, so, they took it."); Tr. 13709: 22 ("Now we're coming to the end of the thefts."). Having charged Mr. Black with honest services fraud, the government constructively amended the Information by arguing an offense that was not charged in the Information and a reversal is required. *United States v. Stirone*, 361 U.S. 212, 216 (1960) (reversing conviction and recognizing long-standing rule that "after an indictment has been returned its charges may not be broadened except by the grand jury itself").

of course, is not evidence, nor is it supported by any evidence. While the Court must view the facts offered at trial in the light most favorable to the government, that does not mean that the Court must accept the government's invitation to ignore its own evidence and credit a wholly unproven theory.[5]

In the end, the government provided insufficient evidence to permit rational jurors to conclude either (1) that there was any scheme to defraud International; or (2) even if there was such a scheme, that Mr. Black had any knowledge of the scheme or intended to participate in such a scheme.

### A.    There was insufficient evidence of a scheme to defraud International.

The government's evidence regarding the APC payments is largely undisputed, and it simply cannot establish the existence of a scheme to defraud International. Radler, the government's key witness on this point, testified unequivocally that in early 2001, he believed that International still owed Ravelston management fees for 2000. Tr. 8999: 19-25; 9000: 1-9. Radler directed Roland McBride to pay $5.5 million to "key executives," and McBride did so. GX APC 4, 5. The payments were characterized as non-compete rather than management-fee payments because Radler understood that by taking the APC management fees in the form of non-compete payments, the payees would stand a "good chance" of receiving their money "tax-free in Canada." Tr. 7945: 13-23.

The sum total of the government's evidence is that Radler directed the payment of money he believed he was rightfully owed, and did so in an attempt to avoid Canadian taxes. That is no evidence of a scheme to defraud *International*. At most, Radler's testimony shows he tried to avoid

---

[5]    Indeed, the government has gone even further than that. It suggested in its closing argument that a conviction was appropriate based on the *defendants'* failure to *disprove* the government's theory. "[N]ot a single one of these defendants," the government stated in a strikingly improper argument, "has offered you any evidence that they actually were pre-approved management fees." Tr. 15086: 18-20. It goes without saying that the government bears the burden of proof, not the defendants. To suggest the defendants had to offer affirmative evidence of their innocence improperly shifts the burden of proof to defendants and vitiates the presumption of innocence and the privilege against compelled self-incrimination.

paying taxes to Canada, but Canada is not the charged victim.  International is, and International suffered no loss from the APC non-competes.

Of course, the Information under which Mr. Black was tried does not even *allege* that International was deprived of money or property, though that was the government's theory at trial. Instead, the Information alleges that Mr. Black engaged in a scheme to deprive International of his honest services by failing "to investigate and fully disclose the actual nature of these related party transactions."[6]  Information, ¶ 30.  The government has never made clear the gravaman of these allegations and, frankly, we remain baffled by them.  What exactly was Mr. Black charged with failing to investigate or disclose, and when did this supposed failure take place?

Regardless, the government's honest services theory fails for the same reason as the "theft" theory.  First, even the government concedes that the management fees were legal.  Tr. 15089: 18-19 ("Remember, nothing illegal about the management fees.  No one saying that.").  There is also no dispute that the Audit Committee had, in fact, approved those fees as a related-party transaction.  If Mr. Black believed that the payments he received were drawn from the pool of funds set aside for the approved management fees (and there is nothing on which to predicate a finding that he did not so believe), failure to ask the Audit Committee to *re-approve* funds they had already approved is neither a breach of fiduciary duty nor a deprivation of honest services.[7]

---

[6]     The Information alleges that "these payments were fraudulent deprivations of International's right to receive honest services," but does not state that the payments deprived International of money or property. Information, ¶ 28-34; *compare* ¶ 7 (alleging, with respect to American Trucker, that "the $2 million payment was a theft of International's corporate assets and a fraudulent deprivation of honest services") *with* ¶ 30 (regarding APC, "these payments were fraudulent deprivations of International's right to receive honest services").  Even if APC were "money or property" counts, there is still no evidence supporting that claim. The only evidence adduced at trial regarding these funds shows that they were management fees.  The government cannot claim fraud over funds International contracted to pay.

[7]     Moreover, the government's claim that Black deprived International of his honest services by not investigating the payments and "fully" disclosing them charges him with conduct occurring outside the alleged scheme.  Black was not charged with securities fraud or "failing to investigate;" he was charged with mail fraud related to the APC non-competes in a scheme that ended in May 2001.  Information, ¶ 2.  Black's alleged "failure to investigate" or accurately disclose the APC non-compete payments at some indeterminate

Second, any dishonesty in connection with the distribution of the APC funds – and we do not believe that there was any – could arise only in connection with Mr. Radler's mischaracterization of the nature of the payments. This did not implicate any duty owed by the defendants to International and therefore cannot form the basis for an honest service theory of fraud directed against International.

**B.     There was insufficient evidence of intent.**

Even assuming the Court disagrees with the foregoing, no rational juror could find beyond a reasonable doubt that Mr. Black acted with the requisite intent – *i.e.*, that he acted "knowingly with the  intent to deceive or cheat Hollinger International" of money, property or honest services. Doc. 767, p. 29. While a defendant's knowledge may be proven by "all the facts and circumstances surrounding the case," there is simply no evidence of Black's intent to defraud International through the APC non-competes. The government introduced no evidence at all from which any rational juror could conclude that Black believed that the money he received was anything other than a legitimate management fee. Indeed, at the time of the payments, Radler, who admitted to conceiving of the idea to characterize these payments as the proceeds of non-compete agreements, believed the money was Ravelston's, not International's. Tr. 7948: 1-4. If Radler believed the money belonged to Ravelston, there is no basis whatsoever to suppose that Black believed any differently. Receiving money believed to be owed to you is no evidence of intent to defraud, but it was the only evidence bearing on intent that was introduced at trial.[8]

---

future time is separate, uncharged conduct distinct from the alleged scheme.   It goes without saying that Mr. Black cannot be found guilty for acts occurring after the completion of the charged scheme.

[8]     Indeed, not a single document connects Mr. Black to the APC non-competes other than the agreement itself (GX APC 8). Black is not included on the inter-company accounting memos regarding the payments (GX APC 4, 5 and 17) or the correspondence regarding the non-compete agreements (GX APC 6, 7). The check issued from APC (GX APC 9, 10) does not even indicate it was payment for a non-compete agreement.

It is the government's burden to prove each element beyond a reasonable doubt and, while the evidence must be viewed in the government's favor, "this principle cannot be used as a substitute for essential proof." *Kitchen*, 57 F.3d at 523. The only evidence adduced at trial about the origin of these payments directly contravenes the government's theory. The APC non-competes were management fees, and those management fees had been approved. There was no scheme. Likewise, Mr. Black did not direct the payment of the APC non-competes; he did not draft the agreements; he did not discuss them with McBride, or anyone else. He did nothing other than sign his name. There was no intent.

## II. THE EVIDENCE FAILED TO PROVE THAT MR. BLACK POSSESSED AN INTENT TO DEFRAUD WITH RESPECT TO THE SUPPLEMENTAL PAYMENTS

Here is the government's case on Forum and Paxton: Around August 2000, Radler and Black allegedly had a phone conversation wherein Radler "pointed out" that International was in the process of negotiating deals with Paxton, Forum and CNHI. Tr. 7785: 17-18. Radler allegedly told Black that they "had an opportunity to take personal non-competes" in the U.S. deals. Tr. 7786: 4-7, 14-18. Black responded that they should "insert themselves" into the agreements, which Radler understood to mean "take non-competes from the . . . next three transactions." Tr. 7788: 2-5. Radler then asked Mark Kipnis to "work on [the individual non-competes] as part of the negotiations." Tr. 7790: 21-24.

In September 2000 – before either of the deals closed – Black, Radler, and Richard Perle signed Executive Committee Consents approving the Forum and Paxton transactions. GX Executive 1D, 1E. Both Consents included approval of the execution of non-compete agreements by International and "certain executive officers of International." In December 2000, the Board "unanimously approved and adopted" the Executive Committee Consents for the Forum and Paxton transactions. GX Board 1D. Subsequently, in the spring of 2001, Black called Radler and

10

asked "*whether* there were non-competes at Forum and Paxton"; Radler said he would "get back to him." Tr. 7834: 25, 7835: 1-3. Radler then called McBride, discovered $600,000 in the reserve accounts for Forum and Paxton, and "made a decision to allocate the $600,000." Tr. 7932: 2-3. Then, according to Radler, he called Black and told him that the $600,000 "could be allocated" to the individual non-competes, to which Black "agreed." Tr. 7932: 22-24. At some point after this call, Black received a check for $285,000. GX Supp. Payment 2, 3.

This evidence, viewed in the light most favorable to the government, is insufficient for a jury to find beyond a reasonable doubt that Black intended to defraud International. A conviction on this count would necessarily require the jury to conclude that Black *knew* the payment he received from the reserve account was not actually money that had been approved and set aside as a legitimate non-compete payment. In order to come to this conclusion, the jury would have to conclude – beyond a reasonable doubt – that Black learned this information from his alleged conversations with Radler. The conversations recounted by Radler, assuming they occurred at all, fall well short of permitting such a conclusion beyond a reasonable doubt.

The prelude to the supplemental payments was the August 2000 conversation initiated by Radler, in which Black supposedly proposed that future agreements contain non-competes covering the individuals – something that was approved but not implemented with respect to Forum and Paxton. There was nothing wrongful here, and in fact the defendants were acquitted on all counts in which non-compete provisions were approved and included in the written contracts. This conversation thus does little to help the government meet its burden.

The conversations more specifically connected to the supplemental payments likewise get the government no closer to proof beyond a reasonable doubt. In the first of these, Black allegedly asked *whether* there were non-competition agreements in Forum and Paxton. Tr. 7834: 25, 7835: 1. At that juncture, then, Black did not even know that the planned and approved individual non-

11

competes had been omitted from the agreements.[9]  Nor, apparently, did Radler, who testified that

he told Black that he would get back to him.  Tr. 7835: 2-3.

When Radler did "get back" to Black, he told him that there was $600,000 that "could be

allocated" towards the non-competes.  Tr. 7932: 22-24.  According to Radler, he originally "thought

the [non-compete] money had been set aside" for the individual non-competes.  Tr. 7835: 17-18.

And when he subsequently discovered that "there was no non-competes," it was Radler who "made

a decision to allocate the $600,000."  Tr. 7932: 1-3.

Perhaps a mind-reader could discern from Radler's cryptic "could be allocated" comment

that there were in fact no individual non-competes in the Forum/Paxton agreements, but that is not

especially plausible, and certainly far from clear.  And apart from this conversation, there is no other

evidence the government can point to that Radler, or anyone else, ever told Black that there were no

non-competes.  All Black knew at the end of the call was that there was money to be allocated

among the individuals.  This would hardly have surprised him, given that he had obtained approval

of the inclusion of non-competes in the transactions.  In sum, based on the fact that: 1) Black signed

Executive Committee Consents stating that individuals would sign non-compete agreements in the

Forum & Paxton deals (GX Executive 1D, 1E) ; 2) the Board approved those Consents (GX Board

1D); and 3) Radler told Black only that there was money to be allocated to the individuals for non-

competes, Black had no reason to know that the funds Radler told him "could be allocated" had

actually come from International's reserve accounts.[10]

---

[9]     Black did not, as the government argued in closing, ask "Where's the money? We were supposed to get money in Forum and Paxton, too."  Tr. 13710: 20-21.  But if he had, that would actually *undermine* the government's hypothesis, essential to sustaining the conviction, that Black knew there were no non-compete provisions in the Forum and Paxton contracts but nevertheless decided to misappropriate moneys as though there in fact had been such provisions.

[10]     This conclusion is reinforced by the fact that Black had no role in the mechanics of the implementation of the supplemental payments.  It was Radler who directed McBride to issue checks to the defendants, and there is no evidence that Black knew anything about Radler's conversations with McBride. He was not copied on McBride's April 2001 memo directing the payment of funds to the defendants, though

Certainly Black received proceeds from the supplemental payments, but there was nothing wrong with that unless Black knew these distributions were misappropriations of moneys rightfully belonging to International. That the government has utterly failed to prove. Judgment of acquittal as to Count Seven should be entered.

## III.   JUDGMENT OF ACQUITTAL SHOULD BE ENTERED ON THE OBSTRUCTION COUNT

No reasonable jury could find that Mr. Black, by removing boxes from his office in May 2005, intended to "impair their availability for use in official proceedings." The *actus reus* is not contested, but it is black letter law that an *actus reus* without *mens rea* does not constitute a crime. Here, it was incumbent on the government to prove that Black acted with the intent to obstruct an official United States investigation (not a Canadian proceeding). This it failed to do.

The government's obstruction case comes down to two things: a Canadian court order and a lot of speculation. Without the Canadian court order, the government's case is reduced to a man removing boxes from his office – the office he had for twenty years, and from which he had just been evicted. Tr. 11474: 5-15. The government invited the jury to speculate that Mr. Black *must* have been removing those boxes on that day in order to shield their contents from the prying eyes of the government. But they offered no proof that this was his reason for removing the boxes – certainly no proof that any juror could conclude beyond a reasonable doubt was more likely than the defense's perfectly plausible innocent explanation for Black's actions.

In the end, the government's case boiled down to the fact that it was *possible* that Black was attempting to obstruct an official proceeding when he removed the boxes. And we cannot deny that, however improbable, it was possible that this was his motive. But "possible guilt" is not the

---

Radler was. GX Supp. Payment 1. Throughout its closing the government argued that "*they* decide to take the money" and "*they* divvy it up -- Mr. Black and Mr. Radler." Tr. 13711: 5-6. But there is just no evidence "they" decided to do anything. In fact, it was Radler who decided to "divvy it up" and it was Radler who decided "to take the money."

standard for conviction, especially when there exists an innocent explanation for the conduct that is at least as plausible as the government's theory of guilt. A conviction may, of course, be based on circumstantial evidence, but that does not mean that the government may obtain a conviction based on speculation or the piling on of inferences. *See United States v. Peters*, 277 F.3d 963, 967 (7th Cir. 2002); *United States v. Peterson*, 236 F.3d 848, 855 (7th Cir. 2001) ("[t]o render a guilty verdict, the jury must hear sufficient evidence to avoid resorting to excessively strained inferences or guesswork"); *United States v. Windom*, 19 F.3d 1190, 1201 (7th Cir. 1994). Here, no reasonable juror could find Mr. Black guilty without resort to speculation. As such, judgment of acquittal must be entered as to Count Thirteen.

### A.     There is insufficient evidence of Mr. Black's intent to obstruct justice

The government bears the burden of proving Black intended to obstruct an official proceeding at the time he moved the boxes. 18 U.S.C. § 1512(c)(1). The government's theory at trial was that Black must have decided to remove the boxes from his office on the day he did because he was concerned about an upcoming SEC document request that his attorneys had learned about the day before. This hypothesis was eviscerated by the unequivocal testimony of those attorneys that, at the time Mr. Black removed the boxes from his office, no one had yet informed him of the upcoming document request.[11] In the face of this evidence, the government resorted to telling the jury that it should infer a sinister purpose because it was "quite a coincidence" that the removal happened the day after Black's lawyers learned of the upcoming document request. Tr. 14997: 19-22.

---

[11]     According to the testimony of Jennifer Owens, Alex Bourelly, and Dan Rosenthal, the SEC letter from Kay Pyszka was forwarded by Ms. Owens to Mr. Bourelly and Mr. Rosenthal on May 19, 2005. None of these three individuals forwarded that e-mail to Mr. Black, nor did they have any other contact with Mr. Black on the 19th or 20th of May 2005. Tr. at 11341-44, 11403-04, 12496-97.

14

The defense's explanation of Black's motivation was simple:  Having been evicted from his office in mid-April, he was in the process of moving personal items (including personal copies of business documents) to a temporary office.  When his secretary (who testified that she had packed the boxes and decided which items to include) was prevented by building security from removing these personal items, Black came and got them himself.  This action was entirely consistent with his personality.

The government presented no evidence to show that this explanation was untrue, or even unreasonable.  Indeed, the circumstantial evidence both supports the explanation and undermines the government's theory that Black was attempting to hide documents from the government.  For example, Black had complied with prior SEC document requests,[12] and many of the documents in the thirteen boxes he removed had in fact been previously produced to the SEC.[13]  There was also evidence that attorneys had already copied the documents in Black's office files.  Tr. 11437: 5-10, 18-20 ("They copied everything.")  There, accordingly, is a wholly inadequate foundation for the government's theory that Black had reason to believe that his removal of personal copies from his office would ultimately cause anything to be withheld from the SEC or any other government agency.

Of course, on a motion for a judgment of acquittal, this Court must view the evidence in the light most favorable to the government.  Certainly, we do not contend that this Court is obligated to credit the defense version of events over that of the government.  But the government is required to submit evidence from which a rational juror could conclude the defendant's guilt *beyond a reasonable doubt*.  Such evidence must give rise to more than speculation and possibilities, and must not depend

---

[12]     According to the testimony of Laurent Wiesel (a former attorney of Black's), Black had complied with four or five prior SEC document requests in 2003 and 2004.  Tr. 12943-52.

[13]     According to the testimony of Ms. Owens, the musings, bank statements, and other relevant documents had already been produced to the SEC well before May 20, 2005.  Tr. 11348-353.

on a chain of dubious assumptions. Here, those assumptions would have to include: that Black knew or believed that the boxes packed by his secretary contained inculpatory documents; that he believed that such documents were not included in the extensive production already made to the SEC; that he thought copies of the documents did not reside in files at 10 Toronto; and that, for reasons unilluminated by the evidence, he suddenly departed from his past practice of cooperating with government document requests. Maybe so, but these suppositions are hardly established in a manner that permits any reasonable person to conclude beyond a reasonable doubt that Black acted with obstructive intent.

Nor does the hypothesis that Black's actions violated the Canadian court order carry the day for the government. First of all, it is far from clear that the removal of the documents in fact violated the order, let alone that Black believed he was violating the order or was concerned about facing Canadian sanctions. But even if this was a suspicious circumstance, it still falls far short of solving the government's problem: its claim that Black acted with obstructive intent remains profoundly speculative.

At bottom, the government's obstruction case appears to rest on a distorted version of *res ipsa loquitur*: Black removed documents some of which, even if duplicates, were potentially germane to the investigations, therefore he must have done so with obstructive purpose. But *res ipsa loquitur* can be applied only when alternative explanations do not exist. That is hardly this case, where an entirely plausible, innocent explanation exists for the defendant's actions.

In sum, no reasonable person could possibly decide beyond a reasonable doubt that the government's explanation is true. At most, the government has shown that it is *possible* Mr. Black is guilty. That is not enough to support a conviction. *See, e.g.*, *United States v. Morales*, 902 F.2d 604, 608 (7th Cir. 1990) ("If the prosecution's theory and the alternative theory were equiprobable or close to it, [the defendant] would have to be acquitted."); *United States v. Mulheren*, 938 F.2d 364, 372

16

(2d Cir. 1991) (reversing conviction based on evidence that was "at least as consistent with innocence as with guilt").

### B. There is insufficient evidence that Black believed that his conduct was "likely to affect" any official proceeding.

Section 1512(c)'s intent element imposes a "nexus requirement" mandating that the obstructive conduct be related in time, causation, or logic to the official proceeding. *Arthur Andersen LLP v. United States*, 544 U.S. 696, 708 (2005); *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995); *United States v. Reich*, 479 F.3d 179, 185-86 (2d Cir. 2007); *United States v. Quattrone*, 441 F.3d 153, 171 (2d Cir. 2006). This is not simply an objective standard; in order to convict a defendant of obstruction, the government must prove that he actually knew that his act would likely affect an official proceeding. "If the defendant lacks knowledge that his actions are likely to affect the judicial proceeding . . . he lacks the requisite intent to obstruct." *Arthur Andersen, LLP*, 544 U.S. at 707-08 (quoting *Aguilar*, 515 U.S. at 599).

The government charged Mr. Black with obstructing three official proceedings: the SEC lawsuit, a federal grand jury investigation, and a pending trial in the Northern District of Illinois. Information at 59, ¶ 3. While we do not know which proceeding the jury convicted on, no reasonable jury could find that the intent element was satisfied with respect to *any* of these three proceedings. With respect to the SEC investigation, the government's theory was that Black chose to move the boxes when he did because he had recently learned of an impending document request. But as we detail above, the undisputed evidence at trial positively disproved that theory: Black was unaware of the document request when he moved the boxes. As for the grand jury investigation and "pending trial," there was simply no evidence that Black was aware, or could even have contemplated, either of those proceedings. There was no grand jury investigation pending at the time Black moved the boxes out of his office, nor was there a criminal trial pending. While an "official proceeding" need not be pending or about to be instituted at the time of the alleged

17

obstruction, it must have at least been foreseeable to the defendant when the obstructive act occurred. Therefore, the actions alleged must have at least been performed "in contemplation [of a] *particular* official proceeding." *Arthur Andersen LLP*, 544 U.S. at 708 (emphasis added). There is simply no evidence that Mr. Black was "in contemplation of" either a grand jury proceeding or a full-out criminal trial when he removed the boxes from 10 Toronto Street.

## <u>CONCLUSION</u>

WHEREFORE, based on the foregoing, Defendant Conrad M. Black respectfully moves this Honorable Court to enter an order granting full or partial judgment of acquittal and any other equitable relief the Court deems just and appropriate.

Respectfully submitted,

/s/ Marc W. Martin

EDWARD L. GREENSPAN
GREENSPAN, WHITE
144 King Street East
Toronto, Ontario
M5C 1G8
(416) 366-3961

EDWARD M. GENSON
GENSON & GILLESPIE
53 W. Jackson Blvd., Suite 1420
Chicago, IL 60604
(312) 726-9015

MARC W. MARTIN
MARC MARTIN, LTD.
53 W. Jackson Blvd., Suite 1420
Chicago, IL 60604
(312) 408-1111
*Attorneys for Defendant Conrad M. Black*

<u>CERTIFICATE OF SERVICE</u>

I, EDWARD M. GENSON, an attorney for Defendant Conrad M. Black, hereby certify that on this, the 27th day of August, 2007, I filed the above-described document on the CM/ECF system of the United States District Court for the Northern District of Illinois, which constitutes service of the same.

Respectfully submitted,

/s/ Edward M. Genson

EDWARD M. GENSON
GENSON & GILLESPIE
53 W. Jackson Blvd., Suite 1420
Chicago, IL 60604
(312) 726-9015