UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.  05 CR 727 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| CONRAD M. BLACK, et al. | ) | |

**GOVERNMENT'S CONSOLIDATED RESPONSE TO
DEFENDANTS' OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORTS**

The defendants' objections to the PSRs fall into four broad categories:  (1) defendants argue that the PSRs overstate the loss amount; (2) defendants argue they should not receive any enhancement for abuse of trust; (3) defendants dispute the PSRs' conclusions concerning their roles in the offense, arguing for further reductions; and (4) in various ways, some of the defendants assert their acceptance of responsibility for their participation in the offense.  The government disagrees, for the reasons stated below.[1]

**1.      The PSRs Understate – Not Overstate – the Loss Amount**

To read defendants' objections to the loss amount in the PSR, one would think they were convicted of completely separate counts of cashing bad checks.  Defendants base their entire argument on the flawed assumption that the jury's verdict was limited to finding them responsible for improperly collecting their own non-competition payments.  Instead, the jury found defendants guilty of *participating together in a scheme to defraud* International and its shareholders.  Each defendant was found guilty of a joint scheme that was designed to deprive International of money

---

[1]In this response, the government addresses defendants' objections to the PSRs' Guidelines calculations.  Some of the defendants' submissions went beyond the PSR, arguing as to what defendants' sentences should be.  Except for certain issues relating to acceptance of responsibility, discussed in Section 4 below, the government intends to address defendants' non-Guidelines arguments, including their commentary concerning the Section 3553 factors, at sentencing.

and honest services in order to enrich the senior executives at the expense of their company. The scheme followed a pattern – a template – that worked essentially the same way for each of the non-compete payments, and defendants worked together to cover up the true nature of those payments from the Board of Directors and the shareholders. When viewed in light of all the evidence at trial, defendants' criminal conduct involved, at a minimum, a loss of $6.1 million. As discussed in the government's objections to the PSR, the full loss amount on the U.S. community non-compete scheme is over $32 million, and defendants should be held responsible for all of it.

## A. Defendants Are Responsible for the Entire $600,000 Loss from the Supplemental Payments

Defendants acknowledge – as they must – that the jury found the $600,000 in Supplemental Payments for the Forum and Paxton transactions were an outright theft from International. The evidence showed and the jury found that the buyers never required Black, Radler, Boultbee and Atkinson's non-compete agreements, and such agreements did not even exist. As part of their scheme, defendants and Radler simply took $600,000 in sales proceeds from the sale of International's assets and gave it to the senior executives. Defendants' argument seems to be that they should be held responsible only for their individual non-compete payments, because they could not reasonably foresee the payments to their co-schemers.

With regard to defendant Black, the evidence showed that not only could he reasonably foresee the amounts paid to the other executives, Black specifically discussed the amounts with his co-schemer Radler, and they agreed to the allocation of the $600,000 in reserves from the Forum and Paxton transactions. Black attempts to disregard this evidence (Black Br. at 46-47), based on Radler's initial statement that he "believed" the conversation was with Black. Regardless of

2

Radler's phrasing, he was unequivocal that the conversation was with Black and that they discussed the amount to be paid to each of the four senior executives. Tr. 7932-7933. Radler was cross-examined extensively on his recall of the conversation, and he was clear that it was with Black. Moreover, the fact that Black and Radler discussed how to divide the non-competition payments between themselves and Boultbee and Atkinson is consistent with the rest of the evidence at trial, which showed that Black was actively involved in discussions about the amount and distribution of other non-compete payments and had a financial incentive to do so. Defendants attempted to convince the jury that Radler was single-handedly stealing money from the company and yet giving away a substantial share of his fraud proceeds to innocent and unwitting colleagues, but the jury rejected that theory as contrary to the evidence and common sense. Instead, the jury reached the logical conclusion from the evidence that defendants were co-schemers working together to perpetrate the fraud and dividing the proceeds among the senior executives.

Defendants Atkinson and Boultbee contend that the evidence did not show they had any knowledge of the Supplemental Payments received by their co-schemers. As defendants acknowledge, the Guidelines require only that loss attributable to co-schemers' conduct be reasonably foreseeable. As an initial matter, the evidence did show that defendants communicated with each other about the distribution of the non-compete payments. For example, defendants discussed the allocation of the CanWest non-compete payments and gave input on how they thought the money should be distributed among them. Govt. Ex. CanWest-26. And defendant Atkinson was responsible for distributing the checks and getting the non-compete agreements signed by Black and Boultbee in the APC transaction. Govt. Exs. APC-6, 7. Why would the scheme operate any differently when defendants were allocating the money in the Forum and Paxton transactions? Here,

defendants knew that $600,000 had been paid to senior executives in non-compete payments related to the Forum and Paxton transactions – not just the $15,000 that Boultbee and Atkinson had received individually. They knew that their non-competes were not required by the buyers in those transactions and that they had not even signed non-compete agreements. Consequently, they knew the disclosures in International's public filings and in Black's comments to shareholders, describing these payments as a condition of the deal, were false.

Moreover, as with the rest of the non-compete payments in defendants' scheme, Atkinson and Boultbee were actively involved in covering up the true nature of their fraud. The evidence showed that immediately following International's 2002 annual shareholder meeting – when shareholders were asking questions about the non-compete payments – Black, Radler, Boultbee and Atkinson discussed what to do about the questions from shareholders and together decided that the position to take was that the non-competes were a thing of the past and would not be repeated in the future. *See* Govt. Ex. Shareholder-8. Similarly, Atkinson and Black communicated in May 2003 as the pressure was mounting to appoint a Special Committee to investigate the non-compete payments, and Atkinson wrote to Black: "I think they are setting a trap. We should only add three [new independent directors] after the non compete review phase is completed by the board." Gov. Ex. Shareholder-51. As the court stated in *United States v. Edwards*, 945 F.2d 1387, 1391 (7th Cir. 1991), "conduct of co-conspirators . . . can be considered 'reasonably foreseeable' to a particular defendant if that defendant has demonstrated a substantial degree of commitment to the conspiracy's objective, either through his words or his conduct."[2]

---

[2]Defendant Black also mischaracterizes the evidence of his role in concealing the payments through Executive Committee consents. Black Br. at 47-48. Contrary to Black's assertion, Marie
(continued...)

4

Finally, the evidence showing defendants' knowing participation in the fraud with regard to the Supplemental Payments cannot be viewed in isolation from the evidence of their fraud with the APC payments and the other non-compete payments. As discussed below, defendants' supplemental payments were received just two months after receiving checks for $137,500 and $2.6 million from APC. Defendants' efforts were coordinated with each other, they shared the proceeds of their fraud in a consistent pattern, and they took similar steps to conceal their fraud. *See United States v. Adeniji*, 221 F.3d 1020, 1029 (7th Cir. 2000) (co-schemers' share of loss amount was reasonably foreseeable where evidence showed they coordinated efforts, took similar steps closely in time and shared the proceeds). All of the evidence demonstrating their knowing participation in those fraudulent payments and their coordinated efforts at concealing the fraud, supports the reasonable foreseeability of the money they each received from the Forum and Paxton deals as well.[3]

---

[2](...continued)
Josee-Kravis was correct that the Executive Committee consents served to obtain approval for the underlying transactions without disclosing that they involved payments to individual executives. The Executive Committee consents did not say anything about non-competes, and the resolutions referenced in the consents (which were never actually presented to the Board) at most referenced the fact that there were non-compete agreements with certain executive officers – they did not say anything about *individual executives receiving payment for their non-compete agreements*. Govt Ex. Executive-1D, 1E. And as Ms. Kravis explained, Board members did not assume that senior executives would receive *payment* for a non-compete that was part of a sale of International's assets.

[3]     While the Court acquitted defendant Kipnis of Count Six, the government maintains that he should be held responsible for the loss amount associated with the Supplemental Payments. The Court's determination that the evidence did not prove beyond a reasonable doubt that Kipnis knew these payments were being made, does not mean they can not be relevant conduct that Kipnis is responsible for by a preponderance of the evidence. The evidence showed that Radler had a conversation with Kipnis about individual non-compete payments in Forum and Paxton. Shortly thereafter, Kipnis was copied on the memorandum from Roland McBride directing that checks in the amount of $600,000 be sent to the senior executives for non-compete payments in Forum and Paxton. On April 9, 2001, checks for these non-compete payments were sent from APC to Kipnis's office in Chicago and then distributed to the senior executives. Kipnis knew at the time that there
(continued...)

**B.    Defendants Are Responsible for the Entire $5.5 Million Loss from the APC Payments**

Defendants contend that the $5.5 million in APC non-compete payments should not be included in the loss calculation because they could have been under the same mistaken impression as Radler that the money was coming from Ravelston management fees.  Defendants made this argument to the jury in asserting that the evidence did not prove their intent to defraud beyond a reasonable doubt, and the jury rejected it.  Defendants next made this argument to the Court in post-trial motions claiming that a reasonable jury could not conclude beyond a reasonable doubt that they had an intent to defraud, and the Court rejected it.  Defendants now try a third time under the far less stringent preponderance-of-the-evidence standard, and their arguments should be rejected for the same reasons.

As the Court recognized in rejecting this argument:

> The non-competition agreements – each signed by Defendant Kipnis on behalf of APC and the respective individual officer – stated that they were executed "[i]n consideration of [APC's] concurrent payment to Officer . . ." (Gov. Exs. APC 8, 11, 13, 15.)  None of these agreements mentions or even suggests that the money was a payment coming from Ravelston's management fees.  Indeed, they represent that APC is paying the individual officers not to compete with APC, International's subsidiary.  In addition, the checks disbursing the $5.5 million are each drawn on APC's account – not a management fee or Ravelston account.  (Gov. Exs. APC 9, 10, 14, 16.)

11/05/07 Mem. Op. at 11-12.  Because every piece of information associated with these payments indicated to defendants that they were paid directly from APC to the senior executives for non-compete agreements, the "reasonably foreseeable pecuniary harm" from defendants' scheme was International's loss of $5.5 million.  There is simply no evidence in the record to suggest that

---

[3](...continued)
were no individual non-competes signed in Forum and Paxton and yet distributed $600,000 in checks as payment for non-competes in these transactions.

6

defendants shared Radler's mistaken belief or that he communicated his belief to them, whereas all the evidence demonstrates that defendants knew the money was coming from APC as payment for their fraudulent non-competes.

Moreover, defendants act as if the only proof of their fraudulent intent was the fact that they signed an agreement and deposited the checks. But as the PSR correctly concluded, and as the evidence amply demonstrated at trial, defendants' intent was manifest by their joint efforts to disguise and conceal the payments. If defendants believed the APC payments were simply pre-approved management fees, there would be no reason to lie about them to the Board and the shareholders. Instead, defendants characterized the APC payments in public filings as made "in connection with the sales of United States newspaper properties in 2000" and "to satisfy a closing condition." Gov. Exs. Filing-9F, 9G. These representations were false and served to disguise the payments as a necessary cost of getting a deal done. The APC payments were not made in connection with the sales of any newspapers and were not a condition of any closing. To the contrary, defendants initiated the payments on their own and decided to pay themselves $5.5 million without anyone on the Board knowing about, let alone requiring, such payments. While the Audit Committee had the responsibility for vetting and approving related-party payments like these, defendants did not present the APC payments to the Audit Committee and they were never approved. Moreover, as regular attendees of International Board meetings, defendants knew that the Board had never expressed any desire to receive non-competition agreements from senior executives, let alone to pay them $5.5 million for those agreements.[4]

_____

[4]Defendants continue to argue – as they did unsuccessfully to the jury – that they cannot be held accountable for missing these errors in the public filings, because members of the Audit Committee
(continued...)

Atkinson argues that this evidence of concealment cannot be considered in determining whether the entire amount of the fraud was reasonably foreseeable, because the disclosures were made a year after the APC payments were received.[5]  Atkinson Br. as 22-23.  Atkinson fundamentally misunderstands the nature and extent of this evidence.  *Cf. United States v. Boatner*, 99 F.3d 831, 835-837 (7th Cir. 1996) (defendants held responsible for entire loss amount where they worked together to defraud one victim and concocted a common cover story); *United States v. Thomas*, 199 F.3d 950, 954 (7th Cir. 1999) (defendant held responsible for proceeds received by co-schemers where, *inter alia*, defendant helped conceal the scheme).  The fact that defendants lied to the shareholders about the $5.5 million demonstrates that they knew at the time that they were not entitled to that money and that they could not accurately disclose the nature of the payments.  As the

---

[4](...continued)

missed them multiple times.  Black Br. at 42.  Of course, defendants were in a fundamentally different position with regard to the information in these disclosures than the Audit Committee.  Unlike the Audit Committee, defendants knew that the buyer had not required their non-competes, that – in the case of APC – the payment was not in connection with the sale of a newspaper assets, and that with regard to the Supplemental payments they had not even signed a non-compete agreement.  Moreover, defendants Black, Boultbee and Atkinson – unlike the Audit Committee – were the ones who received hundreds of thousands of dollars for their fraudulent non-competes.

Equally misplaced is defendant Atkinson's argument that because KPMG did not identify the APC payments as "a potential 'actual loss' to International" after reviewing the work papers in 2000 and 2001, Atkinson Br. at 26-27, no loss was reasonably identifiable to him.  Again, it was Peter Atkinson – not the members of KPMG's audit team – who signed a non-compete agreement with APC and received $137,000 knowing that (i) no one on the Board had expressed a concern about having senior executives sign non-competes; (ii) there had been no negotiation over the terms of the non-compete or the consideration paid; (iii)  APC owned only one newspaper in Mammoth, California at the time; (iv) the Board had never been presented with or approved the non-compete payments; and (v) he had received substantial amounts of money both before and after the APC payments for non-compete agreements that also had not been required by the buyer.

[5]      It should be noted that Atkinson and Kipnis were well aware of the amounts received by their co-schemers for their APC non-competes because Kipnis sent the checks to Atkinson and Atkinson sent back the executed non-competes for himself, Black and Boultbee.  Govt. Exs. APC 6 and 7.

Court already recognized, if defendants truly believed that the APC payments were simply management fees being recharacterized as non-compete payments, they would not have had to lie to the Board and the shareholders about it. 11/05/07 Mem. Op. at 10 (false disclosure evidence "supports an intent to defraud International because if Defendants had believed the payments were legitimate, they would not have misrepresented the true nature of the payments to shareholders in public filings").

Moreover, the false disclosures were not the only evidence of defendants' joint participation in covering up the nature of the non-compete payments. None of the defendants disclosed the APC payments in their Proxy Questionnaires for fiscal year 2000 or 2001. Govt. Exs. Filing-1, 4, 5, 7, and 8. The language in defendants' proxy questionnaires was often identical, suggesting some coordination of their efforts in how they would characterize payments or whether they would disclose them at all. The evidence also showed that none of the defendants disclosed to Cravath (at any point) that the senior executives had received these other non-compete payments, despite the fact that (1) Cravath lawyers had just informed Atkinson, Boultbee, and Kipnis that this type of payment had to be disclosed and failure to do so could result in shareholder liability, and (2) defendants had just received their APC and Supplemental payments within months of the conversation with Cravath. In addition, defendant Kipnis admitted to the Special Committee that when the defendants received the $5.5 million from APC for their non-competes, APC had only one small paper in Mammoth, California and "there'd be no reason for any of the individuals to compete with American Publishing Company even in the unlikely event they were to leave" International. Tr. 9437. Together, this evidence shows defendants knew what they were doing could not be disclosed because it was a theft from International, and they took steps together to make sure the truth was hidden from International

9

and its shareholders. Consequently, defendants should all be held accountable for the total loss

amount associated with their fraud scheme.[6]

## 2.    All Defendants Should Receive the Abuse-of-Trust Enhancement

A defendant's base offense level is increased two levels if the defendant abused a position

of public or private trust "in a manner that significantly facilitated the commission or concealment

of the offense." USSG § 3B1.3 (1998). For purposes of applying USSG § 3B1.3 (2007), "public

or private trust" refers to a position:

> characterized by professional or managerial discretion (*i.e.*, substantial discretionary
> judgment that is ordinarily given considerable deference). Persons holding such
> positions ordinarily are subject to significantly less supervision than employees
> whose responsibilities are primarily non-discretionary in nature. For this adjustment
> to apply, the position of public or private trust must have contributed in some
> significant way to facilitating the commission or concealment of the offense (*e.g.*, by
> making the detection of the offense or the defendant's responsibility for the offense
> more difficult).
> ...

USSG § 3B1.3 n.1 (2007).

To determine whether USSG § 3B1.3 applies, this Court employs a two-part test which asks:

"(i) whether the defendant occupied a position of trust; and (ii) whether [the defendant's] abuse of

the position of trust significantly facilitated the crime." *United States v. Sierra*, 188 F.3d 798, 802

(7th Cir. 1999). Furthermore, "[i]n determining whether the defendant abused a position of trust,

[the Court] analyze[s] the circumstances from the perspective of the victim." *United States v.*

---

[6]The government hesitates to respond to defendant Black's absurd suggestion that he should
receive credit against the loss amount associated with his fraud scheme because he and co-schemer
Radler were part owners of International. Black Br. at 45. Black's argument is akin to a bank robber
seeking to deduct the cost of the bullets used during the robbery or his gas money in driving the
getaway car. Not only is the argument baseless, but Black's suggestion that he stands in the same
position as the people he stole money from is yet more proof of his utter lack of acceptance of
responsibility and disregard for the victims of his fraud.

*Baldwin*, 414 F.3d 791, 798 (7th Cir. 2005); *see United States v. Hathcoat*, 30 F.3d 913, 919 (7th

Cir. 1994) (noting that if the victim-employer placed the defendant in a position of trust

"'characterized by professional or managerial discretion' which facilitated the execution and

detection of the crime, then it is appropriate to enhance the sentence").

Initially, defendants Kipnis and Boultbee argue that it would be double-counting to apply a

two-level abuse of trust enhancement since the honest services crimes defendants were convicted

of "necessarily include[]" an abuse of trust. *See* Kipnis Br. at 10; Boultbee Br. at 10-11.

Defendants, however, have misapplied the Sentencing Guidelines. "Generally, impermissible double

counting occurs when identical conduct justifies two upward adjustments under the Guidelines."

*United States v. Beith*, 407 F.3d 881, 888 (7th Cir.2005) (*citing United States v. Haines,* 32 F.3d 290,

293 (7th Cir.1994)). "Put another way, a district court may not describe the same conduct in two

different ways to justify two upward adjustments." *Id.* (*citing United States v. Salyers,* 160 F.3d

1152, 1163-64 (7th Cir.1998)); *United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir.1997);

*United States v. Compton, III,* 82 F.3d 179, 183 (7th Cir.1996). The Seventh Circuit recognized that

some factual overlap may occur, "so long as there is sufficient factual basis for each [upward

adjustment]," *Haines*, 32 F.3d at 293-94, and the court does not "dr[a]w from the same well," *United*

*States v. Kopshever*, 6 F.3d 1218, 1224 (7th Cir.1993). "A district court does not engage in double

counting when it enhances a defendant's sentence for separate elements of the same act ...." *United*

*States v. Burke,* 125 F.3d 401, 405 (7th Cir.1997). *Compare Kopshever,* 6 F.3d at 1224 (finding

double counting where the district court enhanced defendant's sentence based on the vulnerability

of the victims, pursuant to § 3A1.1, and the unusually serious psychological harm suffered by the

victims, pursuant to § 5K2.3 as both enhancements involved the same underlying conduct), *with*

11

*United States v. Myers,* 355 F.3d 1040, 1044 (7th Cir.2004) (rejecting double counting argument of a defendant convicted of knowingly receiving materials depicting a child engaged in "sexually explicit conduct," pursuant to 18 U.S.C. § 2252, as two-point enhancement, pursuant to § 2G2.2(b)(1), was premised on child's prepubescence and the four-point enhancement, pursuant to § 2G2.2(b)(3), was premised on the "sadistic conduct" conveyed in video of child which depicted actions which would inflict pain upon the child).

Here, the base offense level does *not* include defendants' "position of trust."[7]  Instead, Guideline § 2B1.1 is premised solely upon the financial loss to International and the financial benefit to the defendants, not *how* the defendants managed to successfully steal the money from International.  Without the abuse of trust enhancement, defendants' positions of trust would not be taken into consideration at all, and these senior corporate officers would be treated the same as any other entry level employee who stole money from the company.  The abuse of trust enhancement in this case accounts for a characteristic separate and apart from the simple theft or embezzlement of funds.  *See United States v. Sinclair*, 74 F.3d 753, 763 (7th Cir. 1996) (no impermissible double counting where offense level for the underlying offense does not account for an abuse of trust). Indeed, defendants do not cite any cases where the Seventh Circuit has held that an abuse of trust enhancement would be inappropriate double counting where a defendant was convicted of an honest services violation.

Defendants Boultbee and Atkinson also argue that their abuse of trust did not "significantly facilitate the commission or concealment of the offense."  Atkinson Br. at 40.  This argument cannot

---

[7]The government maintains its position that the enhancement under § 2B1.1(b)(15)(A) (violation of securities law while a director or officer of a public company).  Should the Court apply this enhancement, it *would be double counting* to apply § 3B1.1.  *See* Guideline § 2B1.1, cmt. nt. 14(c).

be factually sustained. It is hard to imagine how this crime could ever have been committed without the top four executives and the general counsel working *together* to facilitate this scheme. For example, Atkinson, Boultbee and Kipnis each concealed the full nature of the non-compete payments from the lawyers from Cravath in April/May of 2001. This directly facilitated the concealment of the crime. If Atkinson or Boultbee had told Bud Rogers or Paul Saunders that the officers had just received millions of dollars from non-compete agreements, which were never requested by the buyers, the entire fraud might have been revealed. Simply put, these men used their positions of trust – collectively – to defraud the board of directors, the audit committee, the auditors, the outside attorneys and ultimately the shareholders of International.

Boultbee also asserts that the abuse-of-trust enhancement is not warranted because the "evidence demonstrates overwhelmingly that the Board would have approved the payments had the Board been informed of them." Boultbee Br. at 12. Boultbee weaves together this bit of fortune-telling by citing testimony from Marilyn Stitt, Patrick Ryan, and Chris Paci. *Id*. That testimony, however, all related to the Audit Committee meeting on February 25, 2002, after which KPMG mistakenly believed that the U.S. community non-compete payments had previously been approved. Gov. Ex. Audit-8D. Despite KPMG's mistaken belief, the Audit Committee members were quite clear that they had never known about or approved any of the U.S. community non-compete payments, both to Inc. and to the top executives, and that the reason given for why senior executives were receiving non-compete payments would have been material to their decision.

Relying principally upon *United States v. Holt*, 170 F.3d 698, 703-04 (7th Cir. 1999), Atkinson contends that he did not abuse his position to commit the crime nor conceal it after the fact. Atkinson Br. at 40-42. The facts of *Holt* bear little resemblance to the facts in this case. The Court

13

in *Holt* found that the defendant, a police officer, did not abuse his position of trust by running a

license plate because that did not "significantly facilitate the commission or concealment of the

offense." *Holt*, 170 F.3d at 703. The Court noted that the government could not point to any

evidence that the defendant's act was a part of the conspiracy or related in any way to concealing his

crime. *Id*.

Similarly, *United States v. Moore*, No. 91 CR 764, 192 WL 37474, at *4 (N.D. Ill. Feb. 20,

1992) is distinguishable. Atkinson Br. at 41. The defendant in *Moore* was a manager and travel

agent at the victim-company. *Id*. Noting that the government's only basis for the abuse-of-trust

enhancement was an affidavit, which did "not persuade the court that Moore's position as a manager

facilitated the commission of the crime," Judge Williams declined to apply the abuse-of-trust

enhancement. *Id*. Additionally, there was no evidence that the defendant used his position or special

skill to conceal the fact that he was charging money to an unauthorized American Airlines credit

card. *Id*.

Unlike the facts in both *Holt* and *Moore*, these defendants' efforts allowed the embezzlement

to occur and the crime to remain hidden. As the senior management of International, defendants

were able to insert non-compete agreements into transactions (or in the case of APC, to generate the

transaction itself) and siphon off millions of dollars that otherwise would have gone to the company.

The defendants all told the Audit Committee, Board of Directors, shareholder, lawyers, and/or

accountants that the buyers requested the non-competes from the officers. They then used their

positions to keep the truth about the non-compete payments from the Audit Committee, Board of

Directors, and outside counsel. *See United States v. Dion*, 32 F.3d 1147, 1150 (7th Cir. 1994) (abuse-

of-trust enhancement warranted where defendant's position gave him the opportunity not easily

afforded to others to commit and conceal fraud).

Amazingly, even at this late date, Atkinson also contends that the Audit Committee was informed about the transactions. Atkinson Br. at 41. That is incorrect, as each of the Audit Committee members testified. Atkinson argues that the three Audit Committee members were presented with information about the non-compete payments on 11 occasions. As was fully aired at trial, these "11 occasions" consisted of references in draft and final SEC filings several years after the non-compete payments were made, which falsely characterized the nature and reasons for the payments. Nothing about the SEC disclosures constitutes "informing" the Audit Committee about defendants' thefts from the company.

The defendants' positions enabled them to embezzle funds by entering into fraudulent agreements and placed them in a position where they could conceal the offense and convincingly lie to a host of individuals who had no idea that the foxes were minding the hen house.

**3.     None of the Defendants Should Receive a Mitigating-Role Reduction**

Not surprisingly, given defendants' refusal to acknowledge their participation in any criminal scheme at all, all of the defendants argue that they should receive mitigating-role reductions. Black argues that he played a minor role and should get a two-level deduction; Boultbee and Atkinson argue that they should get a three-level deduction; and Kipnis asserts he should get four levels off as a minimal participant. There is no support, factually or legally, for giving any of the defendants a mitigating-role reduction.

In the government's November 27, 2007 filing, we cited multiple Seventh Circuit cases that flesh out when a mitigating-role reduction is appropriate. Gov.'s Br. at 26-31. The law is clear that minor role is not about ranking the scheme participants; it is about determining whether a defendant

is "*substantially* less culpable than the *average* participant." *Id.* When a defendant is an integral component of the scheme, he cannot be a minor or minimal participant, even if he played a much lesser role than his co-schemers. *Id.* Even though it is their burden to show they are entitled to the reduction under Guideline § 3B1.2, defendants totally ignore this case law, relying instead on a handful of cases from other circuits and districts. Defendants do not even acknowledge, let alone address, this Circuit's extensive mitigating-role case law.[8]

Black, for example, cites only three cases in support of his farfetched argument that he should receive a minor-role reduction: *United States v. Martin*, 369 F.3d 1046 (8th Cir. 2004); *United States v. Petrelli*, 306 F. Supp. 2d 449 (S.D.N.Y. 2004); and *United States v. Arthur*, No. 04-122, 2006 WL 3857491 (E.D. Wis. 2006). Black's Br. at 50. Black argues that these cases stand for the proposition that "a defendant may receive the minor role adjustment despite disproportionate profit in the offense provided that their role in the conduct was comparatively small." *Id.* None of the cases says that. In *Martin*, the Eighth Circuit found that the district court did not clearly err in awarding the minor-role reduction to a bribe taker, as compared to the briber. *Martin*, 369 F.3d at 1062. In both *Petrelli* and *Arthur*, the district court's opinion addressed why the court chose not to give a four-level minimal-participant reduction. *Petrelli*, 306 F. Supp. 2d at 452; *Arthur*, 2006 WL 3857491, at *5.

Even if the cases did say what Black represents, and even if that somehow trumped this Circuit's law, as a factual matter, Black's role in the scheme was not "comparatively small." As

---

[8] The government does not suggest that cases from other jurisdictions cannot be instructive, especially in situations where the facts are highly similar or this Circuit's case law is undeveloped. But where, as here, there is abundant Seventh Circuit law and a unique fact pattern, the defendants' failure to cite or address the applicable law is improper.

detailed in the government's November 27, 2007 brief, and as proved at trial, Black was no bystander in this scheme: he jumped in with both feet, directing what money was to be taken from what transaction, apportioning money among the co-schemers, and plotting to conceal the thefts from the shareholders and Special Committee. Black's effort to attribute the scheme exclusively to his partner, Radler, is as specious now as it was at trial.

As to Boultbee, he asserts that he did not do anything but sign the APC non-compete and receive and deposit two checks; therefore, argues Boultbee, he should get three levels off. Boultbee's Br. at 10. As the government points out in its November 27 brief, the scheme is far broader than just the APC and supplemental payments, and the role-adjustment inquiry must focus on the defendant's participation in the scheme as a whole, and relevant conduct. The trial evidence established that Boultbee – the Hollinger companies' tax and financial guru – directly participated in crafting the fraudulent scheme to divert money to Hollinger, Inc. Boultbee signed and filed false SEC filings concerning the non-compete payments, and failed at numerous board and shareholder meetings to inform the directors and shareholders that he and his co-schemers were taking money for the top executives and Inc., even though that money was supposed to go to International. Boultbee himself pocketed over $600,000 from the U.S. community non-compete scheme. On these facts, Boultbee was not "substantially less culpable than the average participant" in the scheme; he *was* an average participant. This remains true, even if the Court focused solely on Boultbee's role with respect to the APC and supplemental payments.

Atkinson, too, fails to address the minor-role case law, relying principally on the *Arthur* and *Petrelli* decisions. Atkinson's Br. at 32-33. The only Seventh Circuit case Atkinson addresses is *United States v. Loscalzo*, 18 F.3d 374 (7th Cir. 1994). In that case, the Court affirmed the district

17

court's three-level mitigating-role adjustment, declining to award a fourth level off, because the defendant "understood fully what he was getting into." *Id.* at 388. There was no discussion in *Loscalzo* of why the defendant qualified for a mitigating-role adjustment at all, as that was not at issue. As with Boultbee, Atkinson played an integral role in the U.S. community non-compete fraud scheme, and is unable to carry the burden of showing that he was "substantially less culpable than [the scheme's] average participant." Atkinson's 2003 e-mails to Black, alone, show his high-level efforts to conceal the scheme, belying any notion that he was a mere incidental player. Gov. Exs. Shareholder-42, 51, 55.

Kipnis argues he should get four levels off because of "[h]is lack of knowledge about and understanding of the fraud's scope and structure." Kipnis's Br. at 9. This makes no sense. Kipnis directly participated in every single one of the fraudulent U.S. community non-compete transactions. Not only did he participate, but Kipnis was the person who actually created or caused the creation of the fraudulent documents used to effectuate each one of the frauds. He signed contracts on behalf of International and Inc., falsely representing himself to be an Inc. officer, and transferring International's money to Inc. He drafted the phony APC non-compete agreements, and signed on behalf of the company, and directed the checks to the top executives. Kipnis knew the entire scope and structure of the fraud, because he was personally involved in every aspect of it.

The cases Kipnis cites – again, not one from the Seventh Circuit – do not help his argument. In *United States v. Moeller*, 80 F.3d 1053, 1063 (5th Cir. 1996), the court agreed with the district court's minimal-role finding as to defendant Quicksall, but only after noting that Quicksall "clearly had an inadequate understanding of the contracts-for-politics scheme, as compared to his superiors," and – as someone who had not graduated from college – was "[unable] to grasp the finer parts of the

conspiracy." Kipnis, by contrast, had advanced degrees and substantial high-level legal experience. In addition to being the general counsel of one of the world's largest publishing companies, he was also the chairman of the Audit Committee of Cobiz, another public company. There is no basis for concluding that Kipnis's sentence should be reduced because he did not understand the U.S. community non-compete fraud scheme.[9]

Kipnis's final argument is that he should get four levels off because he received no money from the non-compete payments. Kipnis's Br. at 9-10. Although Kipnis cites a Fifth Circuit case from 11 years ago and a Ninth Circuit case from 15 years ago to support this argument, he neglects much more recent cases from this Circuit that squarely reject his position. *United States v. Corral*, 324 F.3d 866, 874 (7th Cir. 2003) (rejecting argument that defendant should get minor role because he did not profit from transaction, because "whether a participant stands to profit from the crime does not reflect upon that person's role within the offense").

**4.     None of the Defendants Should Receive a Reduction for Acceptance of Responsibility**

**A.     Atkinson Is Not Eligible for a Reduction for Acceptance of Responsibility**

As a general rule, defendants who go to trial are not entitled to the offense level adjustment for acceptance of responsibility. *See* Guideline §3E1.1, cmt. n.2 (the adjustment "is not intended to

---

[9]The same is true with respect to another case Kipnis cites, *United States v. Olson*, 76 F.3d 393, 1995 WL 743845 (10th Cir. 1995) (unpublished opinion) (affirming minimal-role reduction where defendant lacked knowledge concerning scheme). Kipnis's Br. at 9. The heart of the U.S. community non-compete scheme was that the top executives and Inc. were receiving money as purported non-compete payments, even though buyers had not required non-competes from Inc. or the executives. And in the case of the APC and supplemental payments, the top executives were receiving money as purported non-compete payments even though there were no non-compete agreements at all (supplemental payments), or the payments were based on ginned up contracts that had no substance and were designed only to get the money to the executives on a tax-free basis. Mark Kipnis knew all of that, and had the same duties of care and loyalty as his co-defendants. He was not kept in the dark about any of the central aspects of the scheme.

apply to a defendant who puts the government to its burden of proof at trial by denying the essential

factual elements of guilt"). Denying the reduction to defendants who go to trial to contest factual

guilt serves the system of incentives and disincentives created by Guideline § 3E1.1, namely (1)

sparing the government the time, expense, and risk of trial, and (2) reducing the risk of recidivism

by requiring the defendant to "fac[e] up to the wrongfulness of his conduct [by taking] the first step

to better behavior in the future." *United States v. Lopinski*, 240 F.3d 574, 575 (7th Cir. 2001).

Nevertheless, in *Lopinski*, the Seventh Circuit explained that even though a guilty plea is a

"necessary condition for the acceptance of responsibility discount; [] it is not sufficient." *Id.* For

example, the court suggested that "[t]he merely strategic guilty plea, which may reflect nothing more

edifying than a certainty of conviction if the defendant invokes his right to a trial, does not auger well

for his future behavior." *Id.* Thus, the court unequivocally held, "Acceptance of responsibility is

not regret for the consequences of innocent mistakes, but a recognition that one has violated the

law." *Id.* at 576. *See also United States v. Miller*, 343 F.3d 888, 891 (7th Cir. 2003) (Seventh Circuit

"requires defendants to honestly acknowledge the wrongfulness of their conduct and not minimize

it"); *United States v. Travis*, 294 F.3d 837, 841 (7th Cir. 2002) (acceptance of responsibility requires

defendant to "fully appreciate the illegality of his actions").

Relying primarily on *United States v. Bean*, 18 F.3d 1367 (7th Cir. 1994), Atkinson argues

that because he "voluntarily" repaid of portion of the non-compete fees he received almost two-and-

a-half years earlier, he has properly demonstrated "acceptance of responsibility" and should receive

a two-level reduction pursuant to Guideline § 3E1.1. *Bean* does permit the sentencing court to

consider the pre-trial payment of restitution as a basis for a two-level acceptance-of-responsibility

reduction even when a defendant does not plead guilty. *Bean* does not, however, make such a

payment standing alone sufficient where a defendant fails to "honestly acknowledge the wrongfulness of [his] conduct" or "fully appreciate the illegality of his actions." *See United States v. Filipiak*, 466 F.3d 582, 584 (7th Cir. 2006) (voluntary payment of restitution prior to adjudication of guilt is "one factor that might signal a defendant's acceptance of responsibility").

In the present case, Atkinson has *never* acknowledged the wrongfulness of his conduct or even admitted that he violated the law. Instead, Atkinson has consistently maintained that he never did anything wrong and never intended to defraud anyone – a position that is wholly inconsistent with acknowledging a violation of the wire-fraud statute. *See Lopinski*, 240 F.3d 576 (defendant was in "denial" when he maintained that he never intended to defraud anyone). The simple payment of money, without any acknowledgment of wrongdoing, is not sufficient to allow Atkinson to receive a reduction for acceptance of responsibility under Seventh Circuit law. Indeed, the law is clear that even if Atkinson had pled guilty, he still would not be entitled to receive a two-level reduction unless he was able to establish to this Court that he "fully appreciate[d] the illegality of his actions."

Moreover, the circumstances surrounding Atkinson's repayment of a portion of his non-compete payments do not suggest any appreciation of the wrongfulness of his conduct or his violation of the law. First of all, Atkinson did not make any payment until November 2003 – over two-and-a-half years after the last fraudulent non-compete payment. Second, Atkinson only made his payment after the Special Committee had substantially completed its investigation and Atkinson's attempts to "protect the scheme from being uncovered, and maintain a united position with his co-schemer Black" failed. *See* 11/5/07 Mem. Op. and Order at 20. Third, Atkinson's payment was accompanied by a letter to Gordon Paris in which he explicitly disavowed any wrongdoing and maintained that he "believe[d] that all necessary approval had been obtained for

those payments." The payments were not an act of contrition or an acknowledgment of wrongdoing by Atkinson. They were "strategic" payments made in the hope that his situation would not worsen and the company would ignore his criminal conduct. *See Lopinski*, 240 F.3d at 575 ("strategic guilty plea . . . does not auger well for [] future behavior"). *See also United States v. Booker*, 248 F.3d 683, 690 (7th Cir. 2001) ( "the defendant must demonstrate to the district court's satisfaction that he accepts responsibility for his conduct in a moral sense").

**B.      This Court Should Consider That Other Defendants Have Shown a Lack of Remorse for Their Criminal Conduct**

All of the defendants make a point of emphasizing to this Court that it should consider a broad range of factors when sentencing the defendants, including the characteristics of each defendant and the need for general and specific deterrence. *See, e.g.,* Black Br. at 4-6, 7-32; Kipnis Br. at 2-5, 7-8. Apart from Atkinson, none of the other defendants addresses how his lack of remorse should be evaluated by this Court when sentencing him for his criminal conduct. In this Circuit, "[i]t is well established that a sentencing judge may consider lack of remorse when imposing a sentence." *United States v. Johnson*, 903 F.2d 1084, 1090 (7th Cir. 1990) (citing *United States v. Nowicki*, 870 F.2d 405, 407 (7th Cir. 1989)) (court may consider defendant's refusal to recognize his offense); *United States v. Perez*, 858 F.2d 1272, 1275 (7th Cir. 1988) (court may consider potential for deterrence and "whether defendant is contrite"); *United States v. Ford*, 840 F.2d 460, 467 (7th Cir. 1988) (relevant factor for sentencing is whether defendant refuses to recognize his offense); *United States v. Marquardt*, 786 F.2d 771, 782 (7th Cir. 1986). Where a defendant has shown a complete failure to recognize the illegality of his actions, the possibility of recidivism is considerable.

### i.    Conrad Black

Out of all of the defendants, Black has been the most vocal in his lack of remorse and his refusal to recognize the offense. While Black's lawyers and sympathizers urge the Court to take into account the fact that Black "unfailingly displayed respect for the court and the trial proceedings," Black Br. at 8, Black has consistently demonstrated contempt for the judicial process and this jury's verdict. To this day, Black maintains his offenses of conviction were "rubbish" and "nonsense," and that the criminal justice system is "essentially [] a substitute for a wealth-redistribution policy." Black insists he did "absolutely nothing" wrong and that he has been "unjustly convicted."[10] Indeed, Black's conduct makes clear that he would engage in the very same conduct again if given the opportunity. The government believes this Court should consider more than what Black's lawyers and sympathizers have provided. For a complete picture of Black's lack of remorse and the need for deterrence, this Court should examine what Black himself has said since his conviction. Accordingly, the government has provided this Court with several of Black's post-conviction statements. *See* Black's 8/23/07 and 9/19/07 E-Mails to *Men's Vogue* (attached hereto as Exhibit 1), available at http://www.mensvogue.com/business/articles/2007/11/conrad_black_email (last checked on December 3, 2007); Black's 11/30/07 BBC Interview (audio recording filed with the Court and served on all parties), available at

---

[10]    Months after the close of evidence and despite his decision not to testify, Black insists on providing this Court with a lengthy recitation of "the reality" of his conduct relating to the obstruction of justice charge. Black Br. 34. Black's version of "reality", however, has no citations to the record and is contradicted in numerous instances by the evidence actually presented at trial. And unlike that evidence, Black's recitation is neither provided under oath, nor subject to cross-examination. The substance of Black's account should be disregarded by this Court. If it is considered at all, it should be viewed as yet another instance of Black's stunning lack of remorse.

http://search.bbc.co.uk/cgi-bin/search/results.pl?q=Conrad+Black&edition (last checked on December 3, 2007).

Additionally, the government also believes that this Court should consider that in 1982, a district court in the Northern District of Ohio found, in the context of a preliminary injunction motion, that Black, as Chairman of the Board and a controlling shareholder of Norcen Energy Resources Limited ("Norcen"), had violated federal securities laws by hiding Norcen's intent to acquire a controlling stake in a target corporation, Hanna Mining Company ("Hanna Mining"). *See Hanna Mining Company v. Norcen Energy Resources Limited*, 574 F. Supp. 1172 (N.D. Ohio 1982). Black's actions resulted in a consent decree which he has clearly violated by his conduct in this case.

### ii.     Mark Kipnis

In his filings to this Court, Kipnis has likened himself to a foil in a Greek tragedy. *See* Kipnis Rule 29 Br. at 3 (case has many elements of a Greek tragedy – Kipnis was a "foil in that play"). Kipnis insists that he was not a person "who took money that didn't belong to him" or helped others steal money. Kipnis Sentencing Br. at 2. He maintains that he was not "deceitful," and his conviction was based solely on a "failure" in corporate governance. *Id.* Kipnis is mistaken.

This jury concluded that Kipnis engaged in a criminal scheme to enrich his co-defendants and that he *intended* to defraud the company and its shareholders. This was not a simple mistake or negligence on the part of Kipnis. Ultimately, the jury concluded beyond a reasonable doubt that Kipnis decided to help his co-defendants steal money. Whether it was contrary to his character up to that point or not, Kipnis's conduct with respect to the U.S. community non-compete scheme was deceitful. Kipnis's refusal to acknowledge these essential facts should give this Court great pause before granting the extraordinary requests that Kipnis and his counsel seek here. Moreover, the

government takes exception to Kipnis's self-serving attempts to portray his conversations with the government as "honest and forthcoming." Kipnis Br. at 5. The terms under which Kipnis spoke with the government preclude the government from going into further details. However, the government emphatically denies that Kipnis was honest or forthcoming about his own conduct or the conduct of others in his conversations with the United States Attorney's Office.

## CONCLUSION

The government requests that the Court adopt the sentencing guidelines calculations set forth in the government's version and in its November 27, 2007 objections.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:    /s/ Eric H. Sussman
       ERIC H. SUSSMAN
       JEFFREY H. CRAMER
       JULIE B. RUDER
       EDWARD N. SISKEL
       Assistant United States Attorneys
       219 South Dearborn Street
       Chicago, Illinois 60604
       (312) 353-5300

Dated: December 3, 2007

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following document:

Government's Consolidated Response to Defendants' Objections to the Presentence Investigation Reports

was served on December 3, 2007, in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the District Court's system as to ECF filers.

By:  /s/ Edward N. Siskel
ERIC H. SUSSMAN
JEFFREY H. CRAMER
JULIE B. RUDER
EDWARD N. SISKEL
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300