**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 05 CR 727-01** |
| | ) | **Honorable Amy J. St. Eve** |
| **CONRAD M. BLACK,** *et al.* | ) | |

**DEFENDANT BLACK'S RESPONSE TO
GOVERNMENT'S CONSOLIDATED OBJECTIONS
<u>TO PRESENTENCE INVESTIGATION REPORTS</u>**

**TABLE OF CONTENTS**

DEFENDANT BLACK'S RESPONSE TO GOVERNMENT'S CONSOLIDATED
OBJECTIONS TO PRESENTENCE INVESTIGATION REPORTS…………………………1

I.      THE COURT SHOULD CONSULT THE 2000 VERSION OF THE UNITED
        STATES SENTENCING GUIDELINES IN FASHIONING BLACK'S
        SENTENCE……………………………………………………………………….2

II.     THE PSI CORRECTLY CONCLUDED THAT THE CONVICTIONS DO NOT
        INVOLVE A $32 MILLION LOSS………………………………………………....3

III.    THE PSI CORRECTLY DETERMINED THAT THERE SHOULD BE NO
        ENHANCEMENT FOR CONDUCT OUTSIDE THE U.S. OR FOR USE OF
        SOPHISTICATED MEANS………………………………………………………11

        A.      No Substantial Part Of The Offense Was Committed From Outside
                The United States …………………………………………………………..11

        B.      The Offense Did Not Involve Sophisticated Means……………………………..14

IV.     THE FOUR-LEVEL SECURITIES LAW ENHANCEMENT SHOULD NOT BE
        APPLIED………………………………………………………………………...17

        A.      Application of the Securities Fraud Enhancement Would Violate *Ex Post
                Facto* Principles……………………………………………………...............17

        B.      The Facts Do Not Support Application of the Securities Fraud
                Enhancement………………………………………………………………..20

V.      A LEADER/ORGANIZER ENHANCEMENT IS NOT APPROPRIATE……………...25

**TABLE OF AUTHORITIES**

<u>CASES</u>

*Hollinger Int'l v. Hollinger Inc.*, 2004 WL 2278545 (N.D. Ill. Oct. 8, 2004)……………………...23

*McConville v. SEC*, 465 F.3d 780 (7th Cir. 2006)……………………………………………….21

*Miller v. Florida*, 482 U.S. 423 (1987)…………………………………………………………...19

*United States v. Arnaout*, 431 F.3d 994 (7th Cir. 2005)…………………………………………13

*United States v. Avila*, 465 F.3d 796 (7th Cir. 2006)………………………………………….....7

*United States v. Bacallao*, 149 F.3d 717 (7th Cir. 1998)…………………………………………7

*United States v. Beler*, 20 F.3d 1428 (7th Cir. 1994)…………………………………………....6

*United States v. Bjorkman*, 270 F.3d 482 (7th Cir. 2001)………………………………………26

*United States v. Blaylock*, 413 F.3d 616 (7th Cir. 2005)………………………………………27

*United States v. Booker*, 543 U.S. 220 (2005)………………………………………………...5, 19

*United States v. Brown*, 944 F.2d 1377 (7th Cir. 1991)………………………….……………27

*United States v. Bullock*, 454 F.3d 637 (7th Cir. 2006)…………………………………....…7

*United States v. Bustamante*, 493 F.3d 879 (7th Cir. 2007)……………………………….....17

*United States v. Caputo*, 456 F. Supp.2d 970 (N.D. Ill. 2006)………………………………..19

*United States v. Crockett*, 82 F.3d 722 (7th Cir. 1996)…………………………………………7

*United States v. DeGovanni*, 104 F.3d 43 (3rd Cir. 1997)………………………………………29

*United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006)……………………………………18, 19

*United States v. Dickler*, 64 F.3d 818 (3rd Cir. 1995)………………………………………….20

*United States v. Dove*, 247 F.3d 152 (4th Cir. 2001)…………………………………………..20

*United States v. Duarte*, 950 F.2d 1255 (7th Cir. 1991)………………………………………...6

*United States v. Ebbole*, 917 F.2d 1495 (7th Cir. 1990)……………………………………….22

*United States v. Faust*, 456 F.3d 1342 (11th Cir. 2006)……………………………………………...5

*United States v. Forchette*, 220 F. Supp. 2d 914 (E.D. Wis. 2002)……………………………...29

*United States v. Frith,* 461 F.3d 914 (7th Cir. 2006)……………………………………………...20

*United States v. Gilman*, 478 F.3d 440 (1st Cir. 2007)…………………………………………...18

*United States v. Guyton*, 36 F.3d 655 (7th Cir. 1994)…………………………………………29

*United States v. Herrera*, 878 F.2d 997 (7th Cir. 1989)...............................................................27

*United States v. Horne*, 474 F.3d 1004 (7th Cir. 2007)…………………………………………...10

*United States v. Jung*, 473 F.3d 837 (7th Cir. 2007)……………………………………………19

*United States v. Kaufman*, 800 F. Supp. 648 (N.D. Ind. 1992)…………………………………15

*United States v. Kopshever*, 6 F.3d 1218 (7th Cir. 1993)……………………………………...17

*United States v. Kraig*, 99 F.3d 1361 (6th Cir. 1996)……………………………………………16

*United States v. Litchfield*, 959 F.2d 1514 (10th Cir. 1992)……………………………………...29

*United States v. MacMahon*, 495 F.3d 410 (7th Cir. 2007)……………………………………..…5

*United States v. Mankiewicz,* 122 F.3d 399 (7th Cir. 1997)…………………………………29, 30

*United States v. Monti*, 477 F. Supp. 2d 943 (N.D. Ill. 2007)…………………………………...19

*United States v. Mustread*, 42 F.3d 1097 (7th Cir. 1994)…………………………….……27, 30

*United States v. O'Hagan*, 521 U.S. 642 (1997)…………………………………………………...21

*United States v. Ortiz*, 431 F.3d 1035 (7th Cir. 2005)……………………………………..…7

*United States v. Pagan*, 196 F.3d 884 (7th Cir. 1999)…………………………………………27

*United States v. Parmelee*, 42 F.3d 387 (7th Cir. 1994)…………………………………………30

*United States v. Peterson*, 101 F.3d 375 (5th Cir. 1996)…………………………………..…20, 21

*United States v. Pimental*, 367 F. Supp. 2d 143 (D. Mass 2005)………………………………5

*United States v. Ramos*, 932 F.2d 611 (7th Cir. 1991)…………………………………………...27

iii

*United States v. Restrepo-Suares*, 2007 WL 2985005 (D.D.C. 2007)……………………….....18

*United States v. Ritsema*, 31 F.3d 559 (7th Cir. 1994)…………………………………….7

*United States v. Ronning*, 47 F.3d 710 (5th Cir. 1995)………………...………………………29

*United States v. Safavian*, 461 F. Supp. 2d 76 (D.D.C. 2006)…………………………….....18

*United States v. Schaefer*, 291 F.3d 932 (7th Cir. 2002)…………………………………………20

*United States v. Schmeilski*, 408 F.3d 917 (7th Cir. 2005)…………………………………17

*United States v. Schweihs*, 971 F.2d 1302 (7th Cir. 1992)……………………………..……27

*United States v. Sykes*, 7 F.3d 1331 (7th Cir. 1993)……………………………………………7

*United States v. Taylor*, 272 F.3d 980 (7th Cir. 2001)…………………………………………..7

*United States v. Thompson*, 944 F.2d 1331 (7th Cir. 1991)………………………………………27

*United States v. Vargas*, 16 F.3d 155 (7th Cir. 1994)………………………………..………27

*United States v. Warner*, 2007 WL 3101807 (7th Cir., Oct. 25, 2007)…………………………15

*United States v. Wasz*, 450 F.3d 720 (7th Cir. 2006)………………………………………..27

*United States v. Watts*, 519 U.S. 148 (1997)…………………………………………………...5

*United States v. White*, 888 F.2d 490 (7th Cir. 1989)……………………………………...6

*Weaver v. Graham*, 450 U.S. 24 (1981)………………………………………………………19

STATUTES

18 U.S.C. § 3553(a)…………………………………………………………………….2, 10, 25

P.L. 107-204 § 1104, codified at 28 U.S.C. § 994……………………………………………18

U.S. Const., art. I § 9……………………………………………………………………………18

SENTENCING GUIDELINES

U.S.S.G. § 1B1.1, Application Note 1(H)……………………………………………………20

U.S.S.G. § 1B1.11(b)(1)…………………………………………………………………………20

U.S.S.G. § 2B1.1(b)(2) (2000)…………………………………………………………………3

iv

U.S.S.G. § 2B1.1(b)(9) (2005)………………………………………………………………...11

U.S.S.G. § 2B1.1(b)(9) (2007)………………………………………………………………….3

U.S.S.G § 2B1.1(b)(15) (2007)………………………………………………………3, 19, 20

U.S.S.G. § 2B1.1, Application Note 8(b)…………………………………………………...14

U.S.S.G. § 3B1.1 (2005)………………………………………………………………………25

U.S.S.G. § 3B1.1, Application Note 4………………………………………………26, 29

U.S.S.G. § 3B1.1, Introductory Commentary………………………………………………31

U.S.S.G. § 3B1.2 (2005)………………………………………………………………………25

U.S.S.G., App. C, Amend. 647 (2004)………………………………………………...18

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 05 CR 727-01** |
| | ) | **Honorable Amy J. St. Eve** |
| **CONRAD M. BLACK, *et al.*** | ) | |

**DEFENDANT BLACK'S RESPONSE TO
GOVERNMENT'S CONSOLIDATED OBJECTIONS
TO PRESENTENCE INVESTIGATION REPORTS**

After failing to convince the jury of Conrad Black's guilt on the majority of the

counts in the Superseding Information, the government shot for the moon with the

Probation Department. Heavily relying on conduct not supported by convictions, it

beseeched the Probation Department to assess a bevy of sentencing guidelines

enhancements that could have the practical effect of sending Black to prison for the

remainder of his life.[1] In many respects, however, the PSI rejected the government's

positions. The Probation Department's disagreement with the government has not been

limited to Black's case. From the government's current filing, it is apparent that

probation officers assigned to the co-defendants' cases, too, rejected the government's

draconian and overreaching approach to the guidelines.

The government's Consolidated Objections to Presentence Reports show no

tempering of its positions. However, as shown below, the probation officer did not err in

refusing to recommend application of the series of guidelines enhancements urged by the

government. For the reasons stated below and in any pleadings filed by co-defendants,

which we respectfully adopt, the government's objections to the PSI should be overruled.

---

[1]       Though it does not say so directly, the government suggests an adjusted offense level of
36, which results in a sentencing range of 188-235 months for a criminal history I offender.

I.     **THE COURT SHOULD CONSULT THE 2000 VERSION OF THE UNITED STATES SENTENCING GUIDELINES IN FASHIONING BLACK'S SENTENCE**

The parties have briefed the issues regarding the applicable version of the United States Sentencing Guidelines, but the latest filings add a new wrinkle:  The PSIs for Defendants Jack Boultbee, Peter Atkinson and Mark Kipnis used the 2000 version of the Sentencing Guidelines in calculating their advisory guidelines range.  *See* Govt's Consolidated Objections 1.  The government objects and asks the Court to apply the 2007 version to all defendants.[2]

Quite the opposite is appropriate.  As a matter of fundamental fairness and parity, the Court should look to the 2000 sentencing guidelines in Black's case, as in those of his co-defendants.  In returning verdicts on the fraud counts, the jury made no distinction among the defendants.  Black was not convicted of any additional fraud counts, and his culpability, as measured by the fraud offenses of conviction, is on the same plateau as the co-defendants.

Black's obstruction conviction is the event triggering the Probation Department's recommendation that the Court employ the 2005 version of the guidelines.  The obstruction guideline has remained constant in the 2000, 2005 and 2007 guidelines versions.  That is, the Sentencing Commission's intent has always been for an obstruction conviction to result in a two-level increase to the offense level in cases in which the defendant is convicted of obstruction and underlying offenses.  If this Court applies the 2005 or 2007 guidelines to calculate Black's sentence, the obstruction conviction alone

---

[2]     While the government invokes the 2007 version of the guidelines, there is no material difference between the 2005 and 2007 versions.

could result in a dramatic increase, far beyond two levels.[3]  In total, use of the later book, as the government interprets it, could result in a guidelines calculation *eight levels higher* than the corresponding level under the 2000 manual.[4]  The obstruction conviction simply should not have such a dramatic effect on the advisory range.  Such a result would be unreasonable and exalt form over substance.  Under the unique circumstances of this case, it is most reasonable for the Court to consult the 2000 guidelines in fashioning Black's advisory guidelines range, or in exercising discretion under 18 U.S.C. § 3553(a).

## II.    THE PSI CORRECTLY CONCLUDED THAT THE CONVICTIONS DO NOT INVOLVE A $32 MILLION LOSS

In its submission to the Probation Department, the government contended that notwithstanding its failure to secure any conviction on Counts Two through Five, or the RICO count, Black should nevertheless be held liable for a loss of over $32 million.  *See* Gov't's Version 7-8.  The PSI rejected the government's position, finding instead that the counts of conviction and relevant conduct entailed a total loss of $6.1 million.  Specifically, the PSI concluded that Black should be held responsible for a total of $5.5

---

[3]    Assuming for purposes of argument a loss amount of $6.1 million (as found in the PSI), the difference in the loss enhancements between the 2000 and the 2005/2007 guidelines is 4 levels.  Moreover, the government claims that an *additional* two-level enhancement should be applied under the 2007 guidelines because a substantial part of the scheme was allegedly executed outside the United States or involved sophisticated means.  U.S.S.G. § 2B1.1(b)(9) (2007). The government also maintains that the offense involved a violation of securities laws, which would result in another, four-level increase under a later guideline not in effect when the alleged fraud was consummated.  U.S.S.G § 2B1.1(b)(15)  (2007).  Black, of course, objects to the proposed § 2B1.1(b)(9) and (15) enhancements.

[4]    The 2000 guidelines contain a 2-level enhancement for more than minimal planning.  *See* U.S.S.G. § 2B1.1(b)(2) (2000).  We thus say 8 levels in the event the Court consults the loss table in the 2000 guidelines and applies a more than minimal planning enhancement.

million in the APC transaction and $600,000 for the supplemental payments. PSI 16-18.[5]
Use of a $6.1 million loss figure is no mere slap on the wrist insofar as the advisory
guidelines are concerned: under the 2000 version of the guidelines, this loss amount adds
14 levels to the base offense level; under the 2005 or 2007 manual, the result is an 18-
level increase.[6]

The government nevertheless continues to assert that Black's offense level should
be based on a loss of $32 million. For this, it advances two alternative arguments: 1) that
by convicting on Count One, the jury accepted the government's description in the
Information of the broad "U.S. community newspaper" scheme; and 2) that even if the
conduct underlying the convictions *was* limited to the APC and supplemental-payment
transactions, the rest of the U.S. community newspaper transactions constitute relevant
conduct.[7]

---

[5]     The PSI rejected Black's arguments that no loss accrued in the APC transaction, and that
he should be held responsible, at most, for $486,000 in relation to the supplemental payments
counts ($600,000 reduced by Black's 18% stake in International). Black objected to this aspect of
the PSI loss finding in his November 28, 2007 filing.

[6]     In the section denominated "Factors That May Warrant Departure," the PSI noted, but
did not necessarily recommend, the following:

> Pursuant to § 2B1.1, Application Note 19(c), there may be cases in which the
> offense level determined under this guideline substantially overstates the
> seriousness of the offense. In such cases a downward departure may be
> warranted. Of the total loss of $6.1 million to International for all counts of
> conviction, Conrad Black personally received $2,885,000.

PSI 46. We submit that use of the $6.1 million figure itself substantially overstates the loss for
which Black should be held responsible.

[7]     The government has disavowed intention to seek loss responsibility for Counts Eight and
Nine (the CanWest counts), and Counts Ten through Twelve (the perquisite counts). *See* Govt's
Version 8 n. 2.

The government's first argument is, to put it mildly, a stretch.  The government

claims that it "established defendants' guilt beyond a reasonable doubt of fraud in all the

U.S. community non-compete payments, and that the jury's verdict on Count One covers

the entire $32.15 million loss from the U.S. community non-compete scheme."  Govt's

Consolidated Objections 3.[8]  But if the jury determined that the government had proved

guilt beyond a reasonable doubt on every U.S. community newspaper non-compete

transaction, it would have found the defendants guilty on Counts Two through Five, and

it would have found Black guilty on the RICO count.[9]  Indeed, this Court's decision on

the defendants' post-trial motions appears to recognize this fact.  In its Memorandum

Opinion and Order, the Court addressed the defendants' insufficiency challenges to

Counts One, Six and Seven.  In denying those motions (save Kipnis' Count Seven

conviction), the Court treated Counts One and Six as relating to the APC transaction, and

---

[8]     Black's response to the government's motion for a preliminary order of forfeiture, R. 902, also addresses the scope of Count One.  Black incorporates his forfeiture response and those of the co-defendants herein by reference.

[9]     Aside from intending to preserve the issue for possible future Supreme Court review, *cf. United States v. MacMahon*, 495 F.3d 410, 424-25 (7th Cir. 2007), Black is not here contending that the acquittals erect a *per se* ban on consideration of the underlying conduct in the sentencing calculus.  Rather, Black asserts that the government has failed to meet its burden of proving that the non-compete transactions aside from APC and the supplemental payments constitute part of Count One or relevant conduct.  The issue Black seeks to preserve is whether the *Sixth Amendment* precludes consideration of acquitted conduct in sentencing.  *See United States v. Booker*, 543 U.S. 220, 240 & n. 4 (2005) (Stevens, J.) *citing United States v. Watts*, 519 U.S. 148 (1997) (*per curiam*) (noting *Watts* "presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause," and did not consider whether "the sentencing enhancement had exceeded the sentence authorized by the jury verdict in violation of the Sixth Amendment"); *United States v. Pimental*, 367 F.Supp.2d 143, 150 (D. Mass 2005) ("it makes absolutely no sense to conclude the Sixth Amendment is violated whenever facts essential to sentencing have been determined by a judge, rather than a jury, ... and also conclude that the fruits of the jury's efforts can be ignored with impunity by the judge in sentencing"); *see also United States v. Faust*, 456 F.3d 1342, 1350 (11th Cir. 2006) (Barkett, J., dissenting).

Count Seven as relating to the supplemental payments. It nowhere suggested that Count One related to anything more than the APC non-competes.[10]

The government's second argument is no stronger than its first. The government contends that cases in the Seventh Circuit "advocate a broad interpretation of relevant conduct." Govt's Consolidated Objection 2. We disagree. In fact, the Seventh Circuit has recognized that the relevant conduct rule has scrupulously-enforced limitations. *See United States v. Beler*, 20 F.3d 1428, 1432 (7th Cir. 1994); *United States v. Duarte*, 950 F.2d 1255, 1263 (7th Cir. 1991); *United States v. White*, 888 F.2d 490, 500 (7th Cir. 1989).

One of those well-established limits is that the government must prove the relevant conduct by a preponderance of the evidence, using reliable evidence. *See, e.g., Beler*, 20 F.3d at 1431-33. As the PSI found, the government failed to meet this burden. The government's criticism of the PSI's analysis lacks merit. Contrary to the government's insinuations, the PSI examined the charges, the proposed relevant conduct, the parties' submissions (including the government's *Santiago* proffer) and the guidelines issues in detail. Pages 1-11, 13-14 and 16-18 of the single-spaced PSI are devoted to discussion of such matters. That the probation officer arrived at a legal conclusion the

---

[10]     *See* District Court Document ("R.") 929: 6 ("The jury found Defendants Black, Boultbee, Atkinson, and Kipnis guilty of the non-competition charges relating to non-competition agreements with Radler, Black, Boultbee and Atkinson and American Publishing Company, and the 'supplemental payments' from the transactions with Forum Communications and Paxton."); *id* at 8 ("Both Counts One and Six pertain to mailings in connection with non-competition agreements between American Publishing Company ("APC") and Defendants Black, Boultbee and Atkinson and co-schemer Radler, totaling $5.5 million."); *id* at 13 ("Count Seven charges a scheme to defraud involving $600,000 in non-competition payments taken out of the reserves from the Forum and Paxton transactions, even though no non-competition agreements were executed in either of these transactions. It charges that Defendants knowingly caused a mailing in furtherance of the scheme on or about April 9, 2001 which contained four checks: $285,000 for Conrad Black; $285,000 for F. David Radler; $15,000 for John Boultbee; and $15,000 for Peter Atkinson. The $600,000 was referred to at trial as a 'supplemental non-competition payment.'").

government does not like does not mean she engaged in a superficial analysis. Notably, the PSI held Black responsible for the payments received by his co-defendants, concluding that the payments were reasonably foreseeable to Black. PSI 17-18: 543-563. The PSI thus *did* find relevant conduct -- just not all the relevant conduct the government urged.

Another limitation is that relevant conduct must bear a "similarity, regularity, and temporal proximity . . . to the offense of conviction." *United States v. Sykes*, 7 F.3d 1331, 1336 (7th Cir. 1993); *see also United States v. Taylor*, 272 F.3d 980, 983 (7th Cir. 2001) (even conduct close in time to, or contemporaneous with, the offense of conviction, does not necessarily constitute relevant conduct); *United States v. Ritsema*, 31 F.3d 559, 567 (7th Cir. 1994) (same). But here, the transactions the government claims constitute relevant conduct are plainly distinct from the conduct underlying the counts of conviction. The fact is, the Seventh Circuit has held that even *similar* transactions are not necessarily relevant conduct for sentencing purposes.[11] In this case, the agreements and payments related to the counts of conviction are *fundamentally different* from the transactions the government seeks to include as relevant conduct.

As the PSI recognized (and this Court acknowledged in its order denying post-trial motions), the APC non-competes and the "supplemental" payments stand apart from

---

[11]     *See United States v. Crockett*, 82 F.3d 722, 730 (7th Cir. 1996) ("The mere fact that the defendant engaged in other drug transactions is not sufficient to justify treating those transactions as 'relevant conduct' . . . ."); *see also*, *United States v. Avila*, 465 F.3d 796 (7th Cir. 2006) (vacating sentence and finding defendant's "cooking" of cocaine and firing upon another gang not "relevant conduct" to sentencing for possession marijuana with intent to distribute); *United States v. Ortiz*, 431 F.3d 1035, 1041 (7th Cir. 2005) (finding district court's determination of relevant conduct clearly erroneous); *United States v. Bullock*, 454 F.3d 637, 641-42 (7th Cir. 2006) (remanding for resentencing based on district court's impermissible determination of relevant conduct); *United States. v. Bacallao*, 149 F.3d 717, 721 (7th Cir. 1998) (vacating sentence where no regularity, similarity or temporal proximity between convicted conduct and relevant conduct).

the other transactions falling under the U.S. community newspapers rubric. They occurred in February and April 2001, months after the last U.S. community newspaper sale closed in November 2000. Importantly, other than the fact that they involved real or purported agreements not to compete, the APC payments share no characteristics with the other transactions. Unlike the U.S. community non-competes, the APC non-compete payments were not related to newspaper sales. Likewise, the "supplemental" payments, which occurred months after the closing of the newspaper deals, are fundamentally unlike the other, transaction-related non-competes.

This Court's opinion on the post-trial motions endorsed this view. Comparing the APC non-competes to others, this Court stated:

> [U]nlike the other non-competition agreements that Defendants executed
> in connection with the sale of community newspapers and the other
> charges in the Information, the APC agreements did not involve the sale of
> any of International's assets. There was no seller, no buyer, no closing,
> and no transaction. Instead, Defendant Kipnis drafted non-competition
> agreements for the four individuals, and those individuals pocketed $5.5
> million in purported non-competition payments.

R. 929: 8.

APC is further unlike the other non-competes in that, unlike the other transactions involving asset sales to third parties, the defendants agreed not to compete with an International subsidiary – not a third party – and the agreements were not to take effect until after the defendants left International. On this note, this Court's memorandum opinion noted:

> Significantly, at the time they signed these "non-competition" agreements
> with APC, APC only owned one small weekly community newspaper in
> Mammoth Lake, California, that APC planned to sell, and eventually sold
> for only one dollar plus working capital. (Tr. at 7941, 7943-44, 9624-25;
> Gov. Ex. APC 18). Moreover, APC did not intend to re-enter the
> community newspaper business in the United States. In other words,
> Defendants received $5.5 million not to compete even though there was

8

> essentially nothing to compete against. Furthermore, the non-competition agreements were executed with International's own subsidiary, APC. In essence, Defendants paid themselves not to compete with themselves.

R. 929: 9.

Likewise, the supplemental payments are dissimilar to the unconvicted U.S. community newspaper transactions. Unlike the other transactions, in which payments were tied to non-compete agreements that were executed as part of the relevant newspaper sales, the supplemental payments were taken out of reserve accounts and not tied to any non-competition agreements. These payments were made months after the Forum and Paxton deals closed; there were no written agreements, no wire transfers from purchasers, no lawyers, and no accountants.

The fact is, these transactions were different from the rest of the U.S. community newspaper transactions. The government's submission hardly establishes anything different. The CNHI transactions are the only so-called "relevant" conduct the government discusses in detail. And, this discussion omits very important facts, which show that those transactions were far from nefarious. With respect to CNHI I, the evidence established the following:

- ♦ Neither CNHI's CEO, Michael Reed, nor its lawyer, Tom Henson, ever met, negotiated with, or spoke to Black in connection with the transaction. Tr. 1861, 1907, 2213.

- ♦ Both Mr. Reed and Mr. Henson testified at trial that Inc.'s non-compete agreement was a condition of closing under the contract, Tr. 1883, 2016, that the non-compete clauses were enforceable provisions, and that the non-compete agreements were valid contracts rather than sham agreements. Tr. 2269.

- ♦ The only information connecting Black to this transaction is Radler's uncorroborated testimony.

♦  The non-compete payment in CNHI I was disclosed to KPMG at the time. Tr. 5168; Kipnis KPMG 211.

♦  There was evidence that Governor Thompson confirmed that the Audit Committee had approved Inc.'s receipt of the CNHI I non-compete funds. Govt Ex. Audit 3 (Ex. 14 to Conrad Black's Version of the Offense); Tr. 12827; Sukonick Deposition 768-770; Govt Ex. Audit 8D.

The government's discussion of CNHI II is similarly infirm because it fails to grapple with the following crucial facts:

♦  no one spoke to or met with Black during the transaction;

♦  the individual non-competes were provided for in the signed contract documents;

♦  Radler's testimony on the subject was uncorroborated; and

♦  the individual non-competes appear in KPMG's contemporaneous work papers. Kipnis KPMG 234 (Black's Version of the Offense, Ex. 12).

Finally, the sheer magnitude of the proposed relevant conduct enhancement – $26 million in loss – in contrast with the actual convicted conduct, is a stark example of the tail wagging the dog. If the general scheme allegations were deemed relevant conduct, the resulting loss would be over $20 million, subjecting Black to a 16-level increase to the base offense level under the 2000 guidelines (or a 22-level increase under the 2005 and 2007 guidelines). "[A] sentence based almost entirely on evidence that satisfied only the normal civil standard of proof would be unlikely to promote respect for the law or provide just punishment for the offense of conviction." *United States v. Horne*, 474 F.3d 1004, 1007 (7th Cir. 2007). Under the circumstances of this case, a significant increase in punishment based on purportedly relevant conduct found by a civil standard does not "promote respect for the law" or "provide just punishment for the offense," as required

10

by Congress. 18 U.S.C. § 3553(a)(2)(A). This is especially true when the enhancement

is based on evidence that was rejected by a jury.

### III. THE PSI CORRECTLY DETERMINED THAT THERE SHOULD BE NO ENHANCEMENT FOR CONDUCT OUTSIDE THE UNITED STATES OR FOR USE OF SOPHISTICATED MEANS

The government asked the Probation Department to recommend that Black's

offense level be increased through application of U.S.S.G. § 2B1.1(b)(9)(B) and (C)

(2005). This upward adjustment, which appears in the 2000, 2005 and 2007 versions of

the guidelines provides in relevant part:

> If … (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means, increase by 2 levels.

The government argued that Black's conduct met both standards; the PSI rejected

each argument. PSI 18-19: 564-615. In both instances, the PSI was correct.

### A. No Substantial Part Of The Offense Was Committed From Outside The United States

The PSI contains a thorough discussion about the non-applicability of U.S.S.G. §

2B1.1(b)(9)(B). The Probation Department concluded that "the majority of the offense

conduct took place within the United States," because a) the mailings all occurred in

Illinois, b) all the relevant decisions were made in Illinois, by Radler, who directed other

employees in Illinois to issue the payments and cut the checks, and c) the only activity

outside the United States was Black's cashing of checks in Canada, where he lived. *See*

PSI 18: 564-587.

The Probation Department was correct. The extraterritorial-conduct enhancement

is included in the guidelines because offenses occurring on foreign soil are generally

more difficult to uncover and prosecute. But the enhancement is not intended to apply

any time extraterritorial activity surfaces. Rather, the offense conduct must *substantially* occur outside the United States.

That "plus" factor is plainly missing in this case. Black's only extraterritorial activity was the passive receipt of checks in his home country. The counts of conviction, after all, involved agreements not to compete with American Publishing Company – a U.S. subsidiary of International that historically operated and managed only U.S. newspapers. As the government repeatedly heralded, at the time the defendants signed the agreements, APC owned only one newspaper: *The Mammoth Times* in Mammoth Lakes, California. Moreover, the offense conduct was conceived and largely executed by Radler in the United States. The non-compete agreements themselves were drafted in Chicago, and the payments came out of APC's Marion, Illinois offices. The supplemental payments were almost entirely U.S.-based as well. They came from APC's reserve accounts and were sent from APC's Marion office. In Black's case, the payments were eventually sent to Canada and were put into the bank by an administrative assistant. The simple act of mailing items to Canada certainly is not the type of "substantial" extra-territorial conduct the enhancement is designed to encompass.

The government goes on at length about the resources it spent pursuing MLAT requests and Rule 15 depositions.[12] This does not support the enhancement. It cannot be that a foreign defendant's sentence is subject to substantial increase simply because witnesses exercise their legal rights not to cross the border in response to process. In any

---

[12] The government also cites part of a Background Note as to why sentencing increases are appropriate for "these types of offenses." Govt's Consolidated Objections 5. The filing fails to mention that the "types of offenses" in the Background Note are "[o]ffenses that involve the use of financial transactions or financial accounts outside the United States *in an effort to conceal illicit profits and criminal conduct*." Once the entire Background Note is considered, it is clear that this is not the type of transaction to which the enhancement was intended to apply.

event, use of MLAT and the Rule 15 depositions did not relate to Counts One, Six or Seven; rather, they primarily related to the acquitted CanWest counts, and perhaps the obstruction count (the guideline for which does not contain an extra-territorial activity enhancement). American witnesses voluntarily appeared at trial and testified in support of the APC and supplemental payment counts.

*United States v. Arnaout*, 431 F.3d 994, 999 (7th Cir. 2005), cited by the government, is distinguishable on its facts. *Arnaout* is a terrorism case. The defendant operated a "charity," ostensibly for overseas humanitarian purposes. In reality, the defendant diverted donations to support groups involved in armed confrontations and violence overseas. As the Seventh Circuit observed, "the support … included boots intended for ultimate use by Chechen soldiers, and boots, tents, uniforms and an ambulance intended for ultimate use by Bosnian soldiers. Arnaout also used donor funds to purchase uniforms for a department of a provisional but unrecognized government in Chechnya." *Id*. at 998. The extra-territorial "plus" factor is readily discernible in *Arnaout,* but clearly missing here.

Finally, the government's present argument flies in the face of its own previous position. Before trial, Black moved to dismiss the RICO count on the ground that the members of the alleged "enterprise" were located outside the United States, and therefore outside the jurisdiction of a United States court. R. 265. The government argued in response that jurisdiction was proper because the predicate acts – the alleged mail and wire frauds, including the counts of conviction – "involved conduct in the United States." R. 301: 6. In denying Black's motion, the Court found that "each of the alleged predicate acts in question occurred in the United States." R. 378: 51.

13

### B.       The Offense Did Not Involve Sophisticated Means

The term "sophisticated means" is defined in U.S.S.G. § 2B1.1, Application Note 8(b) as involving "*especially* complex or intricate offense conduct pertaining to the execution or concealment of the offense" (emphasis added).  Application Note 8(b) further provides that "conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."

The PSI recommended against use of this enhancement.  PSI 19: 595-615.  The PSI pointed out that "the offenses may be viewed as what the government referred to as 'money grabs,' and their concealment as simple omissions of facts to the shareholders." The PSI further stressed that the "offenses did not involve the use of fictitious entities, corporate shells or offshore financial accounts."  In addition, the PSI observed that application of this enhancement would amount to double-counting since the abuse of trust enhancement, § 3B1.1, already accounted for Black's "contribution in a significant way to the commission or concealment of the offense, *e.g.,* by making the detection of the offense or the defendant's responsibility for it more difficult."  Examining the totality of the evidence, the PSI concluded that the offenses were not especially complex or intricate.

The government again objects.  It initially compares this case to a hypothetical corporate-fraud scheme and claims that the "four month trial" revealed this scheme to be "unique, brazen, calculating, manipulative – and complex."  Govt's Consolidated Objections 6.  The government's adjectives are a red herring.  The issue for the Court is whether the offense involved "especially complex or intricate offense conduct pertaining

14

to the execution or concealment of the offense." And the length of the trial, in large part controlled by the number of witnesses the government chooses to call, should not figure into a determination of whether an offense is especially complex. *Cf. United States v. Warner*, 2007 WL 3101807 (7th Cir., Oct. 25, 2007) (Posner, J., dissenting from denial of rehearing *en banc*).

Furthermore, the government's dramatic rhetoric has virtually no connection to the counts of conviction. Most of the government's discussion focuses on the conduct that underlay the counts on which the jury acquitted. This is not surprising: During the trial, the government itself characterized the APC and supplemental payments as simple thefts – "money grabs", Tr. 13705, 13709 – rather than complicated transactions. Of course, it now claims that "the probation office has misunderstood the context" of that statement. Govt's Consolidated Objections 7. Try as it may to back away from its own prior position, however, the government cannot escape the facts. The probation office got it right. These offenses, as charged, were not especially complex. *See United States v. Kaufman*, 800 F. Supp. 648, 655 (N.D. Ind. 1992) (declining to apply a sophisticated means enhancement).

To put it simply, this case is not Enron or WorldCom. There was no second set of books, no hidden or offshore accounts, and no false entities hiding complicated financial fraud. Rather, the government has contended from the beginning that APC and the supplemental payments were simple thefts. The defendants literally are charged with having written checks to themselves from the company coffers. Neither the payments nor the identity of those who received them was hidden or obscured in any way. The conduct was straightforward, open (in the government's words, "brazen"), and obvious.

The government's argument is based on the supposition that the case must have been complex because International was supposedly hoodwinked. As detailed in the co-defendants' filings and Black's November 28, 2007 filing, there is substantial evidence that International's attorneys, accountants, and audit committee were actually aware of the non-compete payments at issue. But even if they were not, that would not demonstrate that the fraud was sophisticated. Indeed, *any* fraud, by definition, involves an attempt to conceal. The guidelines provide for an enhancement only when a fraud is "especially" complex. And on that score, the government's discussion falls flat.

There is also authority for the proposition that "the sophisticated means enhancement requires the sentencing court to look at the actions taken by the individual." *United States v. Kraig*, 99 F.3d 1361, 1371 (6th Cir. 1996). Here, the government has not made a case for establishing that *Black* employed sophisticated means with respect to the offenses of conviction. For example, the government points to Black's execution of Executive Committee Consents for the Forum and Paxton transactions; the government contends that this document was part of an ingenious plot to conceal the fraud. But the evidence makes it highly improbable that these consents were drafted with the intent to conceal anything. The consents misstated the amount of the transactions by tens of millions of dollars, included facts that are not in the final transaction documents, and omitted facts in those documents. There was no indication that they were part of a plan to conceal anything. Riddled with errors and inconsistencies, the consents actually reveal that the actions at issue were neither sophisticated nor complex.

The government's reliance on Black's statements at the shareholder meetings fares no better. As discussed below in the context of the proposed securities law

16

enhancement, Black addressed the U.S. community newspaper transactions in general terms, and did not specifically mention APC or the supplemental payments at the shareholder meetings. *See* GX Shareholder 7 and 54.

Lastly, the government has failed to address the double-counting concern identified by the probation officer. Improper double-counting occurs when the same conduct is described in two different ways to justify two different enhancements that lead to separate upward adjustments. *See United States v. Bustamante*, 493 F.3d 879, 889-90 (7th Cir. 2007); *United States v. Schmeilski*, 408 F.3d 917, 919 (7th Cir. 2005); *United States v. Kopshever*, 6 F.3d 1218, (7th Cir. 1993). In this case, the concealment-related conduct cited by the government also constitutes conduct covered by the abuse of trust guideline. If the Court applies an abuse of trust enhancement, then also applying a sophisticated means enhancement would punish the same conduct twice.

## IV. THE FOUR-LEVEL SECURITIES LAW ENHANCEMENT SHOULD NOT BE APPLIED

Despite the fact that no offense in the Information charged the defendants with a violation of securities law, the government urged application of this enhancement in its Version of the Offense. The Probation Department, however, rejected the government's request on grounds it was not factually supported. The government again objects.

### A. Application of the Securities Fraud Enhancment Would Violate *Ex Post Facto* Principles

After the frauds alleged in this case were completed, Congress passed the Sarbanes-Oxley Act. Effective August 29, 2002, the legislation directed the United States Sentencing Commission to:

> (1) promptly review the sentencing guidelines applicable to securities and accounting fraud and related offenses;

(2) expeditiously consider the promulgation of new sentencing guidelines or amendments to existing sentencing guidelines to provide an enhancement for officers or directors of publicly traded corporations who commit fraud and related offenses ….

P.L. 107-204 § 1104, codified at 28 U.S.C. § 994.

Pursuant to this law, the Sentencing Commission added the following new specific offense characteristic to U.S.S.G. § 2B1.1:

(15) If the offense involved—

(A) a violation of securities law and, at the time of the offense, the defendant was (i) an officer or a director of a publicly traded company ….

increase by **4** levels.

*See* U.S.S.G., App. C, Amend. 647 (2003).

Application of the securities law enhancement in this case would violate the prohibition against retroactive application of penal laws. *See* U.S. Const., art. I § 9. We understand the superficial appeal of dismissing the *ex post facto* objection on the basis of *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006) - a minority view among the federal courts.[13] *See, e.g., United States v. Gilman*, 478 F.3d 440, 449 (1st Cir. 2007); *United States v. Restrepo-Suares*, 2007 WL 2985005 (D.D.C. 2007); *United States v. Safavian*, 461 F. Supp. 2d 76 (D.D.C. 2006). This case is different from *Demaree* because the sentencing increase at issue here was enacted in direct response to a law

---

[13] In *Demaree*, the difference between the sentence under the old and new laws was three months. The Seventh Circuit observed that the purpose of the Ex Post Facto Clause "is not to enable criminals to calculate with precision the punishment that might be imposed on them." 459 F.3d at 793. Even the most sophisticated criminal, the court noted, would not have been able to predict his sentence under the old regime so precisely as to make a three-month difference consequential. In contrast, a 4-level increase in an offense level translates into *years* in the penitentiary. Even *Demaree* acknowledged that the Ex Post Facto Clause protects "people against … being punished more severely than their crime was punishable when committed." *Id*.

enacted by Congress. If the Court decides to increase Black's offense level by four levels on the basis of § 2B1.1(b)(15) (2007), it would be effectively implementing a penalty passed by Congress -- in addition to consulting an advisory sentencing guideline. A prohibition against retroactive application of a law increasing punishment for conduct occurring before the effective date of the law lies at the core of the Ex Post Facto Clause. *See Miller v. Florida*, 482 U.S. 423, 435 (1987) (retroactive application of a State sentencing guideline violated *ex post facto* principles because it made "more onerous the punishment for crimes committed before its enactment") (*quoting Weaver v. Graham*, 450 U.S. 24, 36 (1981)).[14] Furthermore, because the Sarbanes-Oxley Act was not in effect at the time of the alleged conduct in this case, no defendant was provided notice of the increased penalties and given a chance to adjust his conduct. Finally, it is important to note that *Demaree* does not mandate application of the securities law enhancement. *See* 459 F.3d at 795 (district court's "freedom to impose a reasonable sentence outside the range is unfettered"); *see also United States v. Jung*, 473 F.3d 837 (7th Cir. 2007); *United States v. Monti*, 477 F. Supp. 2d 943 (N.D. Ill. 2007); *United States v. Caputo*, 456 F. Supp. 2d 970 (N.D. Ill. 2006); U.S.S.G. § 1B1.11(b)(1). Even if the Court were to find that application of § 2B1.1(b)(15) would not technically violate the *ex post facto* provisions, application of the provision certainly would run afoul of values espoused in the Ex Post Facto Clause and would, as we next show, apply the enhancement far outside its heartland.

---

[14]    In *Miller*, the State relied on cases that had sustained application of parole guidelines against *ex post facto* claims. 482 U.S. at 434. The Supreme Court found such cases inapposite. Ironically, *Demaree* relied on those same parole cases in finding no *ex post facto* violation. Under the circumstances of this case, *United States v. Booker*, 543 U.S. 220 (2005), does not render the parole cases apposite. If the Court applied § 2B1.1(b)(15) here, it would be doing more than using a "flexible 'guidepost[]' ... in the exercise of discretion." *Miller* 482 U.S. at 435. It would be increasing punishment based upon a law enacted by Congress.

**B.      The Facts Do Not Support Application of the Securities Fraud Enhancement**

Despite criticizing the PSI as "wrong both as a matter of law in interpreting the guidelines and on the facts established at trial," Govt's Consolidated Objections 11-12, the government's submission suffers from those exact flaws itself.  Notwithstanding its sweeping assertions, the government's arguments in support of a U.S.S.G. § 2B1.1(b)(15) enhancement miss the mark.

The plain language of the guidelines makes clear that in order to justify a securities fraud enhancement, the defendant's alleged SEC violation must be "offense" conduct.  In other words, it must be either "the offense of conviction" itself, or "relevant conduct."  U.S.S.G. § 1B1.1, Application Note 1(H).  With respect to relevant conduct, it is well-established that non-criminal conduct does not constitute "relevant conduct."  *See United States v. Schaefer*, 291 F.3d 932, 939 (7th Cir. 2002); *United States v. Dove*, 247 F.3d 152, 155 (4th Cir. 2001); *United States v. Peterson*, 101 F.3d 375, 384 (5th Cir. 1996); *United States v. Dickler*, 64 F.3d 818, 830-31 (3rd Cir. 1995); *see also United States v. Frith,* 461 F.3d 914, 918 (7th Cir. 2006) (citing cases).

Here, Black was not convicted of securities fraud; to be eligible for the enhancement, he would have to have committed a securities violation that qualifies as relevant conduct.  The government contends that Black *civilly* violated §§ 10(b), 13(a), 13(b)(2)(A), or 13(b)(2)(B) of the securities laws, but it fails to explain how that allegation – if true – would constitute *criminal*, relevant conduct.  It is the government's burden to show that Black violated a securities law under criminal standards, not civil, and that is a distinction with a difference.  For example, in the criminal 10b-5 securities

20

fraud context, the government must prove knowing and willful conduct;[15] under civil standards, the scienter requirement is substantially reduced. Further, the government claims that Black's offense should be increased by four levels because he "knew or was reckless in not knowing" that International's 2003 public filings were materially misleading. Govt's Consolidated Objections 17 n. 4. It is troubling that the government appears to contend that *reckless* behavior that would normally result in a civil penalty (at most) may increase the guidelines range by a whopping four levels. (In any event, the government has not explained how filings made in 2003 can be conduct "relevant" in the pertinent sense to a fraud scheme that ended in May 2001.)

Likewise, without identifying the conduct at issue, and relying on the civil 10b-5 standard, the government claims that "the jury has already found three out of the four" elements of a 10b-5 violation. Govt's Consolidated Objections 14. Even under the civil standards upon which the government relies, that is just not the case. The elements of a civil 10b-5 violation are: 1) a misrepresentation or omission, 2) that was material, 3) made with scienter, 4) in connection with the purchase or sale of securities. *McConville v. SEC*, 465 F.3d 780, 786 (7th Cir. 2006).[16] By contrast, the elements of mail fraud are

---

[15] "To establish a criminal violation of Rule 10b-5, the Government must prove that a person 'willfully' violated the provision." *United States v. O'Hagan*, 521 U.S. 642, 665 (1997) *citing*, 15 U.S.C. § 77ff(a) ("Any person who willfully violates any provision of this chapter . . . or any rule or regulation thereunder the violation of which is made unlawful . . . shall upon conviction be fined . . . or imprisoned, or both").

[16] We do not concede the use of civil securities law standards in this context. Criminal securities fraud resting on a 10b-5 violation imposes additional elements, including a heightened mental state. *United States v. Peterson*, 101 F.3d 375, 379 (5th Cir. 1996) ("[To prevail on a 10b-5 securities fraud prosecution,] the Government must prove that the defendant: (1) knowingly and willfully, (2) through the use of the instrumentalities of commerce and the mails and (3) in connection with the purchase and sale of a security, (4) used manipulative and deceptive devices in violation of Rule 10b-5 by (a) employing any device, scheme, or artifice to defraud, (b) making any untrue statement of material fact or omitting to state a material fact necessary in order to

1) that the defendant knowingly participated in a scheme to defraud, and 2) that he used the mails in furtherance of the scheme. *See* R. 767: 21 (elements jury instruction). In considering the mail fraud counts, the jury never considered – much less decided – securities fraud issues. To the contrary, this Court specifically instructed the jury that "the defendants in this case are not charged with securities fraud." R. 767: 32.

And that fact is key: Black was not *charged* with securities fraud. The government made the decision to pursue mail and wire fraud claims, not securities fraud – perhaps because of the severe difficulties it would face in proving that Black and/or the other defendants acted with the requisite mental state. The guidelines should not be used as an end-run around due process by permitting the government, at the sentencing stage, to argue that a defendant is guilty of an entirely different crime (or, in this case, a civil violation), and to prove that crime under a lower standard of proof. *See United States v. Ebbole*, 917 F.2d 1495, 1501 (7th Cir. 1990) ("[W]e feel compelled to observe that this provision of the Guidelines 'obviously invite[s] the prosecutor to indict for less serious offenses which are easy to prove and then expand them in the probation office.'"). That is especially true where, as here, Black had no incentive to argue against securities fraud claims at trial. At this late date, Black is left to defend himself against entirely new – and highly complex – securities law allegations after the fact, and on a scant evidentiary record.

Moreover, there was simply no evidence at trial regarding, among other things, whether Black had the requisite mental state or whether the alleged misrepresentations or omissions were material, much less how those elements fit within the complicated

---

make the statement, under the circumstances, not misleading, or engaging in any act, practice or course of business which operates or would operate as a fraud or deceit.").

securities law regime. And yet the government claims that it "proved at trial that . . . defendants made repeated misrepresentations and omissions of material facts . . ." and that, "[b]ased on the evidence at trial, defendants violated several provisions of the securities laws." Govt's Consolidated Objections 13. To the contrary, the evidence in the trial record does not support the government's sweeping generalizations and conclusory statements.[17]

As a preliminary matter, the government fails to explain how the conduct it invokes constitutes relevant conduct. Instead, the government outlines a litany of potential securities fraud violations relating to, as best one can tell, every non-compete alleged in the Information – including CanWest and the entire U.S. community non-compete scheme – and occurring after the end of the charged scheme.[18] As evidenced by the not guilty verdicts on Count Five and the RICO count, the jury acquitted Black of the bulk of the U.S. community charges, and even the government concedes CanWest should not be considered for sentencing purposes. Govt's Version 8 n. 2. Rather than focusing on specific, relevant conduct, the government relies instead on vague descriptions of acquitted and non-relevant conduct.

---

[17]     The government's reliance on Judge Manning's opinion in the *Hollinger International* matter is equally misplaced. In dismissing International's civil RICO claims the court agreed that International's claims were merely *actionable* as securities fraud and expressly declined to consider the merits of such claims. Indeed, the very quotes the government cites include footnotes to that effect: "In reaching this conclusion, the Court does not make any determination as to the merits of any securities fraud claims against Defendants or International" and "In holding that section 1964(c) precludes International's RICO claims, this Court is not making any determination as to [the] validity of the fraudulent actions underlying these claims. This decision simply holds that the claims are 'actionable' as securities fraud." *Hollinger Int'l v. Hollinger Inc.*, 04-cv-698, 2004 WL 2278545, *7 n. 8 and *10 n. 1 (N.D. Ill. Oct. 8, 2004).

[18]     For example, the government argues that unidentified "defendants . . . delayed making proper disclosure in public filings despite receiving information from lawyers at Cravath that this was material information . . . ." Govt's Consolidated Objection 13. Cravath's advice related to disclosures regarding CanWest (conduct the government concedes is not relevant for sentencing).

For example, the government claims that "the defendants" caused International to keep inaccurate books and records, and file inaccurate annual reports, Govt's Consolidated Objection 16, but fails to explain how Black had a culpable role in causing any of these alleged but unidentified violations to occur. Black had virtually no involvement in the drafting of International's public filings, no substantive contact with International's outside auditors, and no opportunity to manage International's books and records. The government struggles to come up with an argument, ultimately claiming that Black's signing of the Executive Committee Consents "had the effect of" circumventing International's internal controls. *Id.* at 17. But Black did not draft these consents. He signed them, they were presented to and ratified by the full board, and included in the corporate minute books. There is no indication that he focused on the false statements and chose to endorse them. Without more, this evidence is inconsequential, as the government points to no evidence of Black's mental state in signing consents he did not draft.

The government does not stop there. Without pointing to a specific statement, it claims that "Black made material misstatements and omissions about the non-compete payments at annual shareholder meetings." Govt's Consolidated Objections 13. This conclusory statement is not enough to satisfy the government's burden. And even if the government had gone into more detail, it could not have done much better. The bulk of Black's comments about non-compete agreements at both shareholder meetings concerned CanWest – which the government acknowledges is not relevant for sentencing purposes. Govt's Version 8 n. 2. Black's references to the U.S. community non-

competes were general and cannot be tied to statements to the offenses of conviction. *See* GX Shareholder 7 and 54.

In short, the facts of the case simply do not support application of the securities law enhancement, as the Probation Office correctly concluded. PSI 20: 643-50. Applying the four-level securities law enhancement, at this late stage would offend general principles of fairness. The government did not charge Black with securities fraud, and the jury did not convict him of securities fraud. Substantially increasing Black's sentence based on conduct he had no incentive to defend against at trial, does not, as 18 U.S.C. § 3553(a)(1)(A) requires, "promote respect for the law" or bring about "just punishment for the offense" of which he was convicted.

## V.    A LEADER/ORGANIZER ENHANCEMENT IS NOT APPROPRIATE

The probation officer has concluded that Black's offense level should not include any aggravating role in the offense enhancement, U.S.S.G. § 3B1.1 (2005). PSI 20-21: 652-687.[19] The government objects and submits that Black's offense level should be increased under U.S.S.G. § 3B1.1.[20]

In reaching the determination that a leadership upward adjustment is inappropriate, the PSI stressed that the government had relied on transactions not deemed relevant conduct. With respect to the conduct at issue, the PSI aptly observed that the

---

[19]    Conversely, the probation officer recommended against reducing Black's offense level for mitigating role in the offense. U.S.S.G. § 3B1.2 (2005). Black has objected to this recommendation. The government's response notes that the co-defendants' PSIs have recommended mitigating role adjustments. Because Black's role in the offense did not substantially differ from the others – Radler being at all times the prime mover and organizer – Black's offense level, too, should be decreased for his limited role.

[20]    The government's response is not clear as to whether it is seeking a 4, 3 or 2 level increase under § 3B1.1. In its response, the government fails to argue that Black led or organized an offense involving five or more participants, or one that was otherwise extensive.

Superseding Information did not allege that Black directed "anyone else in the criminal activity." PSI 21: 667-668. The PSI concluded that the government failed to prove by a preponderance of the evidence that "Black supervised anyone in the criminal activity, as required by § 3B1.1, Application Note 2." PSI 21: 684-686. In a similar vein, the PSI noted that an aggravating role in the offense enhancement should not apply "to a defendant who merely suggests committing the offense." PSI 21: 671-73 (citing U.S.S.G. § 3B1.1, Application Note 4). The PSI also emphasized that Black's leadership role in the Hollinger companies "is not indicative of his role in the criminal activity." PSI 21: 674-675. While Black (like Radler, whom the government agrees should not receive a leadership enhancement) claimed a larger share of proceeds, this fact, alone, the PSI concluded, does not merit increasing Black's offense level.

The PSI's analysis is entirely correct. At the outset, the government's request for a leadership enhancement is misguided because the majority of the conduct it cites does not, as argued above, amount to relevant conduct to the offenses of conviction. A defendant's leadership role in non-relevant conduct or "'collateral conduct' will not justify an enhancement under § 3B1.1." *United States v. Bjorkman*, 270 F.3d 482, 497 (7th Cir. 2001). As stated in *Bjorkman*, "not all criminal conduct will satisfy this criterion, and the government bears the burden of proving that the conduct at issue is relevant conduct and not purely collateral to the offense." *Id*. In light of this standard, the government's references to non-relevant or collateral conduct are not sufficient grounds on which to increase Black's offense level under § 3B1.1.

The guidelines do not define the terms "leader" and "organizer." *United States v. Ramos*, 932 F.2d 611, 618 (7th Cir. 1991). As such, § 3B1.1 analysis often treads in

murky waters. *United States v. Mustread*, 42 F.3d 1097, 1103 (7th Cir. 1994). One principle that has emerged from the cases is that to qualify for a leadership enhancement, the government must prove that the defendant had some real and direct influence over at least one other criminal participant. *See United States v. Blaylock*, 413 F.3d 616, 620 (7th Cir. 2005).[21] The exertion of control must entail control over others in criminal activity. *See United States v. Wasz*, 450 F.3d 720, 730 (7th Cir. 2006) ("[T]he defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime."); *United States v. Pagan*, 196 F.3d 884, 893 (7th Cir. 1999) (it is not in keeping with the purpose of § 3B1.1 to brand a defendant a leader or organizer unless there is evidence that the defendant led or organized "some aspect of the criminal enterprise").

And here is where the government's submission is lacking. The government points to no credible evidence that Black exercised real and direct influence over others in *criminal activity*. With respect to APC, the government argues only that Black allegedly authorized the payment of $5.5 million for APC as a "tax generated non-compete." Govt's Consolidated Objections 24. Black, however, was not involved in drafting the APC non-compete agreements, or any other aspect of the transaction. He was not included on inter-company accounting memos or correspondence regarding the payments. He simply signed the non-compete agreement. It was Radler who decided to structure the APC payments as non-competes to obtain favorable Canadian tax treatment

---

[21]      *See also United States v. Mankiewicz,* 122 F.3d 399, 405 (7th Cir. 1997); *Mustread*, 42 F.3d at 1103 (7th Cir. 1994); *United States v. Vargas*, 16 F.3d 155, 159-60 (7th Cir. 1994); *United States v. Schweihs*, 971 F.2d 1302, 1318 (7th Cir. 1992); *United States v. Brown*, 944 F.2d 1377, 1381 (7th Cir. 1991); *United States v. Thompson*, 944 F.2d 1331, 1348-49 (7th Cir. 1991); *United States v. Herrera*, 878 F.2d 997, 1002 (7th Cir. 1989).

and who directed the drafting of the APC non-competes and the disbursement of the funds.

A similar absence of affirmative leadership conduct exists with respect to the supplemental payments. Significantly, the PSI refers to testimony supposedly provided by Radler that Black "told him how to divide the supplemental payments." PSI 21: 681-682. The Probation Office ascribes this information to the government, which provided transcript cites (but not the relevant transcript pages) that purportedly established this assertion.[22] But, as discussed in Black's objections to the PSI, this point is not supported by the trial transcript. Radler's testimony regarding the supplemental payments is found at pages 7834-7837 and 7930-7932 of the trial transcript. *See* Ex. A. That testimony shows that *Radler* made the decision regarding allocation of the $600,000. Tr. 7932. Sometime thereafter, Radler allegedly spoke to Black, who "agreed" with the decision. *Id*. Nothing in the transcript justifies the contention that Black directed the allocation.

In seeking the leader/organizer enhancement, the government also points to Black's leadership positions at Ravelston, Inc., and International. Govt's Consolidated Objections 21. As the probation officer found, the fact that Black had a leadership role in the Hollinger companies does not mandate the imposition of a leadership enhancement. The probation officer's finding constitutes a correct application of the principle that the leader/organizer enhancement should be applied only where the defendant leads or organizes others in the criminal activity. Indeed, it is well-established that a defendant's leadership role in employment activity does not itself merit a conclusion that the defendant led or organized criminal activity. *See United States v. DeGovanni*, 104 F.3d

---

[22] We have provided the Probation Office with the actual transcript pages and attach them hereto.

43 (3rd Cir. 1997) (finding leadership enhancement improper where police sergeant was supervisor in police force, but not in criminal venture); *United States v. Ronning*, 47 F.3d 710, 712 (5th Cir. 1995) ("[m]anagement responsibility does not make a leader or organizer"); *United States v. Litchfield*, 959 F.2d 1514, 1523 (10th Cir. 1992) (finding application of organizer/leader enhancement clearly erroneous; "[a]lthough defendant might be termed an organizer or leader of the mining operation [as opposed to the fraud scheme], that operation was not itself criminal activity"); *United States v. Forchette*, 220 F. Supp. 2d 914, 919 (E.D. Wis. 2002) ("The [leader/organizer] enhancement does not apply to a defendant who manages a business or property used in the fraud . . . The fact that defendant controlled these employees in their work duties does not mean that he controlled their criminal activities."); *see also United States v. Guyton*, 36 F.3d 655, 661-63 (7th Cir. 1994) (vacating a § 3B1.1(a) enhancement where the district court found the defendant to be the "head man, the organizer or leader of this group").

Application Note 4 to § 3B1.1 sets forth a list of factors for consideration. While the government walks through these factors, its response suffers from the fundamental defect of applying them to transactions beyond the offenses of conviction and relevant conduct. As for the "greater fruits" factor, we do not dispute that Black received a greater share of the proceeds from the APC and supplemental payment transactions. But as the Seventh Circuit held in *United States v. Mankiewicz,* 122 F.3d 399, 405 (7th Cir. 1997)*,* the presence of a single factor does not automatically justify the imposition of a leader/organizer enhancement. Here, it would be particularly inappropriate. The PSI found, correctly, that Black's receipt of a larger share was more a function of his larger

29

financial interest in the company than his deployment of control over other criminal participants.

In *Mustread*, the Seventh Circuit vacated a leadership/organizer enhancement even though the defendant was "at the top" of a criminal network and "exercised total decision making authority over" purchases on behalf of the network. *Mustread*, 42 F.3d at 1103-04; *see also United States v. Parmelee*, 42 F.3d 387, 395 (7th Cir. 1994) (role in the offense adjustment for supervisory or managerial role unwarranted notwithstanding the defendant's importance in an alien smuggling operation). Similarly, in *Mankiewicz*, the defendant recruited his father for assistance in the commission of a large marijuana offense. He directed his father to a marijuana-loading scene, and asked his father to accompany the informant to a hotel so the informant could complete the transaction with the conspiracy's leader. On these facts, the Seventh Circuit reversed the district court's imposition of an upward adjustment under § 3B1.1(c). If an aggravating role in the offense increase was not warranted in cases such as *Mustread*, *Parmelee* and *Mankiewicz*, it likewise is not warranted here. In nearly every case, the government will be able to point to some sort of broadly-defined "leadership" activity undertaken by a defendant. The mere fact that the defendant played *some* role in an offense does not *ipso facto* satisfy the standards for a leadership enhancement.

The government's position in Radler's case is also noteworthy. In Radler's plea agreement, the government agreed that no upward adjustment for leader/organizer was warranted. *See* R. 21. The government advocated this position even though Radler received a greater share of the proceeds from the APC and supplemental payments than Boultbee and Atkinson, and even though he was the moving force and organizer in both

30

instances. Certainly, if Radler does not qualify for a leadership/organizer enhancement for his role in the APC and supplemental payment transactions, then Black cannot possibly qualify. Applying a leader/organizer enhancement to Black would be both incongruous and unjust.

In conclusion, there are cases, including this one, that do not warrant an aggravating-role upward adjustment for *any* defendant. Indeed, the Introductory Commentary to § 3B1.1 provides that "[w]hen an offense is committed by more than one participant, §3B1.1 or §3B1.2 (*or neither*) may apply" (emphasis added). This case is one in which § 3B1.1 is inappropriate.

Respectfully submitted,

/s/ Marc W. Martin

JEFFREY B. STEINBACK
CAROLYN P. GURLAND
53 W. Jackson Blvd., Suite 1459
Chicago, IL 60604
(847) 624-9600

EDWARD M. GENSON
GENSON & GILLESPIE
53 W. Jackson Blvd., Suite 1420
Chicago, IL 60604
(312) 726-9015

EDWARD L. GREENSPAN
GREENSPAN, WHITE
144 King Street East
Toronto, Ontario
M5C 1G8
(416) 366-3961

MARC W. MARTIN
MARC MARTIN, LTD.
53 West Jackson Blvd., Suite 1420
Chicago, IL 60604
(312) 408-1111

## CERTIFICATE OF SERVICE

MARC W. MARTIN, an attorney, on behalf of Defendant Conrad Black, hereby certifies

that, on December 3, 2007, he served the foregoing,

DEFENDANT BLACK'S RESPONSE TO
GOVERNMENT'S CONSOLIDATED OBJECTIONS
TO PRESENTENCE INVESTIGATION REPORTS

in accordance with Fed. R. Civ. P. 5, Local Rule 5.5 and the General Order on Electronic Case

Filing ("ECF") pursuant to the district court's system as to ECF filers.

Respectfully submitted,

/s/ Marc W. Martin

MARC W. MARTIN
MARC MARTIN, LTD.
53 W. Jackson Blvd., Suite 1420
Chicago, IL 60604