**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05 CR 727 |
| | ) | |
| CONRAD M. BLACK, JOHN A. BOULTBEE, | ) | |
| PETER Y. ATKINSON, and MARK S. KIPNIS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On July 13, 2007, following approximately four months of trial, a jury convicted

Defendants Conrad M. Black, Peter Y. Atkinson, John A. Boultbee, and Mark S. Kipnis of three

counts of mail fraud, in violation of 18 U.S.C. §1341, including the deprivation of the intangible

right to honest services, in violation of 18 U.S.C. §1346.[1]  Currently before the Court is the

government's Motion for a Preliminary Order of Forfeiture (the "Motion"), which seeks to hold

Defendants Black, Boultbee, Atkinson, and Kipnis jointly and severally liable for the forfeiture

of $16,925,000 pursuant to 28 U.S.C. §2461(c), 18 U.S.C. §981(a)(1)(C), and Federal Rule of

Criminal Procedure 32.2.  For the reasons stated below, the Court grants the motion in part and

denies it in part.

_____

[1]      In addition, the jury convicted Defendant Black of one count of obstructing justice, in violation of 18 U.S.C. §1512(c)(1).  The jury acquitted Defendants of all remaining counts, which charged various other acts of mail and wire fraud, racketeering (against Defendant Black only), in violation of 18 U.S.C. §1962(c), and criminal tax violations, in violation of 26 U.S.C. §7206(2).  After the close of its case, the government dismissed a money laundering count, which named only Defendant Black.

## BACKGROUND

### I.     The Charged Fraud Scheme

As the Court has detailed previously, the Superseding Information (the "Information")

charged Defendants with participating in a scheme to defraud Hollinger International and its

shareholders in connection with the sale of International's so-called "U.S. community

newspapers," a process that began in May 1998 and continued through 2001. *See United States

v. Black*, 469 F. Supp. 2d 513 (N.D. Ill. 2006).[2]  The key entities involved in the scheme were (1)

Hollinger International, Inc. ("International"), a Delaware corporation that was publicly traded

on the New York Stock Exchange, (2) Hollinger Inc. ("Inc."), a Canadian corporation that was

publicly traded on the Toronto Stock Exchange, and (3) The Ravelston Corporation, Ltd.

("Ravelston"), a privately-held Canadian company.  (R. 407-1, Information at ¶1.)  Defendants

Black and Boultbee, and co-schemer Radler were officers of all three companies and each had

ownership interests in Ravleston.[3]  (*Id.*)  Defendants Atkinson and Kipnis were attorneys and

officers of International.  (*Id.*)  Atkinson also was an officer of Inc. and had an ownership stake

in Ravelston.  (*Id.*)  As charged, Defendants' scheme aimed to obtain money and property from

International, and to deprive International and its shareholders of Defendants' honest services.

The Information alleged that Defendants used various methods to accomplish the charged

scheme.  In particular, the Information charged that Defendants:  (1) improperly diverted money

---

[2]      The referenced ruling described the allegations charged in the Third Superseding
Indictment, which are effectively identical as those in the Information, the operative charging
document here.  (R. 219-1; R. 407-1.)

[3]      The original indictment, returned August 18, 2005, named F. David Radler and
Ravelston as Defendants.  Both have since pleaded guilty.  (R. 17-1, R. 502-1.)

from a non-competition agreement with International; (2) improperly inserted Inc. into the

non-competition agreements associated with International's sale of assets; (3) improperly

inserted themselves as individual officers into non-competition agreements in connection with

the sale of International's assets; and (4) created non-competition agreements that were not

connected to the sale of the community newspapers. (*Id.* at 8-27.) Count One of the Information

sets out the specifics of the entire charged scheme, which included the following transactions:

> *American Trucker* and *Mine and Quarry Trader*: On May 11, 1998, International, through its subsidiary, sold *American Trucker* and *Mine and Quarry Trader* to Intertec Publishing Corp. for $75 million. (*Id.* at 10, ¶4.) The closing documents provided that $2 million would be paid to International to obtain a non-competition agreement. (*Id.*; Gov't Exs. Trucker 7, 8.) In January 1999, approximately eight (8) months after the sale, Black, Boultbee, and Radler decided to divert to Inc. the $2 million that International received for the *American Trucker* non-competition agreement. (*Id.* at 10, ¶5.)

> *CNHI(1)*: On February 1, 1999, International sold certain newspaper assets to CNHI for approximately $472 million. (*Id.* at 11-12, ¶8.) The deal letter for the CNHI transaction, executed in December 1998, provided that International would sign a non-competition agreement in exchange for $50 million. (*Id.*) After that deal letter, in January 1999, Defendants Black, Boultbee, and Radler, decided to insert Inc. as a non-competition covenantor, and decided that Inc. would receive $12 million of the $50 million originally slated for International's non-competition agreement. (*Id.* at 12, ¶9; *see also* Gov't Ex. CNHI 10 and 14.)

> *Horizon*: Black and Radler owned substantial interests in Horizon, a privately-owned newspaper company. (R. 407-1, Information at 14, ¶14.) In an agreement dated March 31, 1999, International agreed to sell certain publications to Horizon for $43.7 million. (*Id.*) Black, Boultbee, and Radler decided that the amount of the non-competition agreement accompanying the transaction would be $5 million, split between International and Inc. (*Id.*; *see also* Gov't Ex. Horizon 4.)

> *CNHI(II)*: In November 2000, International sold another batch of newspapers to CNHI, this time for $90 million. (*Id.* at 17-18, ¶22.) Pursuant to the established "template," Kipnis inserted Inc. into the CNHI asset purchase agreement as a non-compete covenantor. (*Id.*) The asset purchase agreement allocated $3 million of the purchase price to International and Inc.'s non-competition agreements – $2.25 million to International and $750,000 to Inc. Black, Radler, Boultbee, and Atkinson also received approximately $9.5 million of the transaction proceeds labeled as non-competition agreements. (*Id.* at 18, ¶24; *see also* Gov't Exs. CNHI 18-23.)

*Forum and Paxton*:  On September 30, 2000, International entered into an Asset Purchase Agreement to sell newspapers to Forum Communications Co. for $14 million, $500,000 of which was allocated to non-competition agreements.  (R. 407-1, Information at 16, ¶17; *see also* Gov't Ex. Forum 10.)  On October 2, 2000, International entered into an Asset Purchase Agreement to sell newspapers to Paxton for $59 million, $2 million of which was allocated to non-competition agreements.  (R. 407-1, Information at 16, ¶17.)  At the time of these deals, Radler thought that Kipnis had included Radler, Black, Boultbee, and Atkinson as additional non-compete covenantors and that 3% of the proceeds from each transaction had been set aside to fund the non-compete payments to the International officers.  (*Id.* at 17, ¶19.)  In fact, these amounts had not been set aside.  (*Id.* at 17, ¶20.)  Thereafter, on April 9, 2001, Black, Boultbee, Atkinson, Radler, and Kipnis caused an International subsidiary to pay $600,000 to Black, Boultbee, Atkinson, and Radler, as "supplemental non-competition payments."  (*Id.* at 17, ¶21.)  None of Defendants, however, actually had signed a non-compete agreement.  (*Id.*; *see also* Gov't Exs. Supp Payment 1-6.)

*APC*:  In February 2001, Black, Boultbee, Atkinson, and Radler received $5.5 million from APC, a subsidiary through which International had owned its U.S. community newspapers outside the Chicago area, in the form of purported non-compete payments.  (R. 407-1, Information at 20, ¶¶28-29; *see also* Gov't Exs. APC 9, 12, 14, 16.)  By the time Defendants executed the agreements, American Publishing owned only one community paper, a weekly newspaper in Mammoth Lake, California, that International was at the time trying to sell.  (R. 407-1, Information at 20, ¶29.)

The Information describes each of these transactions in detail in Count One, but the mailing associated with that count pertains only to the February 2001 Federal Express delivery of the APC non-competition agreements.  (R. 407-1, Information at 22.)  The remaining counts related to this scheme charged mailings or wire communications pertaining to the following transactions:  Forum (Count II), Paxton (Count III), CNHI(II) (Counts IV and V), APC (Count VI), and the Supplemental Payments (Count VII).  (*Id.*)  Although the American Trucker, CNHI(I), and Horizon transactions formed part of the alleged scheme, there were no counts charging specific mailings or wire communications associated with those transactions.  (*Id.*; *see*

*also*, R. 915-1, Gov't Reply at 5.)  The jury convicted Defendants on Counts I, VI, and VII[4] –

counts that were either not related to a sale of newspapers (Counts I and VI) or were separate

from the transaction and not pursuant to non-competition agreements (Count VII).  Although

Defendants had the right to a jury trial on certain forfeiture issues following the jury's verdict,

each Defendant waived that right and agreed instead to have the Court resolve issues relating to

forfeiture.  (R. 811–1, 820-1, 824-1, 830-1.)  *See also United States v. Tedder*, 403 F.3d 836, 841

(7th Cir. 2005) ("[T]he sixth amendment does not apply to forfeitures . . .  Although Fed. R.

Crim. P. 32.2 offers the defendant a jury trial, this provision (unlike the sixth amendment) is

limited to the nexus between the funds and the crime; Rule 32.2 does not entitle the accused to a

jury's decision on the amount of the forfeiture." (parentheses in original))

## II.     The Relevant Forfeiture Count

       As required under Fed. R. Crim. P. 32.2, the Information provided notice of the

government's intent to seek forfeiture "as part of any sentence imposed in connection with a

conviction on Counts One through Seven."  (R. 407-1, Information at 72.)  Specifically,

Forfeiture Allegation One of the Information charged that:

> [D]efendants [ ] did engage in violations of Title 18, United States Code, Sections 1341
> 1343 thereby subjecting to forfeiture to the United States, pursuant to Title 28, United
> States Code, Section 2461(c), and Title 18, United States Code, Section 981(a)(1)(C), all
> property constituting, or derived from, proceeds the defendants obtained directly or
> indirectly, as the result of such violations, namely $32,00,000, including but not limited
> to:

>> a.     $8,558,035, which represents the net proceeds from BLACK's sale of the
>>         Second Floor Apartment that was seized by the United States in October

---

[4]      The Court subsequently granted Defendant Kipnis's motion for judgment of
acquittal on Count VII.  *See United States v. Black*, No. 05 CR 727, 2007 WL 3254452 (N.D. Ill.
Nov. 5, 2007).

2005;

b.    BLACK's residence at 1930 S. Ocean Boulevard in Palm Beach, Florida, both of which [*sic*] are pledged to secure BLACK's bond in this case;

c.    $2,620,746.69 that represents BLACK's purchase of a 26 carat diamond ring from Graff Diamonds Limited purchased on or about November 21, 2000; and

d.    $604,435 that represents BLACK's purchase of an antique pearl and diamond bow brooch from S.J. Phillips Ltd. on or about November 21, 2000.

Pursuant to Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p), if any of the property described above as being subject to forfeiture . . . it is the intent of the United States to seek forfeiture of any other property belonging to defendants up to the value of the above forfeitable property, including but not limited to the following:

a.    ATKINSON's residence at 3101 Redwood Road, Napa, California, which is pledged to secure ATKINSON's bond in this case.

(R. 407-1, Information at 72-73.)  The Information contained three other forfeiture allegations, but those allegations are related to counts of acquittal and thus are no longer relevant.

Pursuant to Forfeiture Allegation One, the government now requests forfeiture of $16.25 million in alleged ill-gotten proceeds against Defendants jointly and severally.  The government contends that such a forfeiture award is appropriate because "the jury has found defendants guilty of participating in a scheme to defraud International of $32.15 million in the form of non-compete payments to Inc. and the individual directors.  All of that money constitutes proceeds of the fraud scheme."  (R. 850-1, Gov't Motion at 10.)  But because criminal forfeiture of mail fraud proceeds became available only as of August 23, 2000, the government seeks only $16.25 million of the overall alleged proceeds.  (*Id.* at 11.)  The government, that is, is seeking forfeiture of proceeds acquired after that date – *i.e.*, CNHI(II), Forum, Paxton, APC and the Supplemental

Payments – but not before – *i.e. American Trucker* ($2 million), CNHI(I) ($12 million), and Horizon ($1.2 million).  (*Id.* at 11-12.)

## ANALYSIS

Defendants challenge the government's motion for a preliminary forfeiture order on several grounds.  Defendants contend that:  (1) the applicable statutory framework does not allow forfeiture at all in this case; (2) alternatively, the statutory framework allows only for an *in rem* forfeiture of traceable property, not an *in personam* money judgment like the government seeks here; (3) even if a money judgment is permissible, they cannot be liable for proceeds related to counts on which they were acquitted; (4) they cannot be held jointly and severally liable because there is no charged or proved conspiracy; and (5) that the forfeiture amount the government seeks would violate the Eighth Amendment's Excess Fines Clause.  The Court will address each argument in turn.

## I.    The Current Statutory Framework

The government seeks forfeiture pursuant to two statutes:  18 U.S.C. §981(a)(1)(C) ("Section 981"), a statute bearing the caption "Civil Forfeiture," and 28 U.S.C. §2461(c) ("Section 2461"), a statute enacted in 2000 as part of the Civil Asset Forfeiture Reform Act ("CAFRA").  Section 2461(c) acts as a "gap-filling" or "bridging" provision that grafts civil forfeiture provisions, like Section 981, onto criminal proceedings in certain circumstances:

> If a forfeiture of property is authorized in connection with a violation of an Act of Congress, and any person is charged in an indictment or information with such violation but no specific statutory provision is made for criminal forfeiture upon conviction, the Government may include the forfeiture in the indictment or information in accordance with the Federal Rules of Criminal Procedure, and upon conviction, the court shall order the forfeiture of the property in accordance with the procedures set forth in section 413 of the Controlled Substances Act (21 U.S.C. 853), other than subsection (d) of that section.

28 U.S.C. §2461(c) (2000).[5]  The civil forfeiture statute and the bridging provision are relevant

here because the "Criminal Forfeiture" statute, 18 U.S.C. §982 ("Section 982"), provides for

criminal forfeiture in mail and wire fraud cases, but only when fraud schemes are directed at

"financial institutions."  18 U.S.C. §982 (2000) (allowing criminal forfeiture upon "convict[ion]

of a violation of, or a conspiracy to violate – (A) section . . . 1341 [mail fraud] . . . of this title,

affecting a financial institution. . . .").  Section 981, in contrast, has a broader scope.  Section

981(a)(1)(C) provides for civil forfeiture of any real or personal property that "constitutes or is

derived from proceeds traceable to" an offense constituting "specified unlawful activity," as that

term is defined in 18 U.S.C. § 1956(c)(7).  Section 1956(c)(7) defines "specified unlawful

activity" to include "any act or activity constituting an offense listed in section 1961(1) [of Title

18]."  In turn, 18 U.S.C. §1961(1), a part of the RICO statute, identifies as "offenses" both 18

U.S.C. §§1341 and 1343, the general mail and wire fraud statutes, which, by extension, covers

violations of 18 U.S.C. §1346.  *See United States v. Boscarino*, 437 F.3d 634 (7th Cir. 2006)

("Section 1346 does not create a separate crime.  It is a definitional clause . . . [t]he scheme to

---

[5]        In 2006, well after the conduct at issue in this case ended, Congress amended this statute.  The statute now reads:

> If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure.  If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to to the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code.  The procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply to all stages of a criminal forfeiture proceeding, except that subsection (d) of such section applies only in cases in which the defendant is convicted of a violation of such Act.

28 U.S.C. §2461(c)(2006).

defraud itself violates § 1341 . . .").

## II.     The Availability of Criminal Forfeiture

Defendant Black contends that this statutory framework does not allow for forfeiture in this case because "Congress could not have intended §2461(c) to apply to offenses for which it drafted criminal forfeiture provisions, and that the law does not permit criminal forfeiture for a mail fraud offense without the special circumstances identified in 18 U.S.C. §982(c)(A), *e.g.*, mail fraud affecting a financial institution." (R. 902-1, Black's Resp. at 5 (citing *United States v. Croce*, 345 F. Supp. 2d 495 (E.D. Pa. 2004); further asserting that "[w]hether [Section] 2461 allows for forfeiture in a criminal mail fraud proceeding is an open question in the Seventh Circuit").)

In support of his argument, Defendant Black cites *United States v. Croce*, 345 F. Supp. 2d 495 (E.D. Pa. 2004), an opinion that the Third Circuit has since reversed. In *Croce*, the district court held that "18 U.S.C. § 982(a)(2)(A) is a specific statutory provision made for criminal forfeiture upon conviction of mail fraud . . . so [Section] § 2461(c) does not authorize us to order criminal forfeiture of mail fraud proceeds." *Id*. at 496. The district court, that is, concluded that by drafting 18 U.S.C. § 982(a)(2)(A) to permit criminal forfeiture only for mail fraud carried out against financial institutions, Congress had concluded that criminal forfeiture for mail fraud was "only appropriate when the mail fraud affected a financial institution." *Croce*, 345 F. Supp. 2d at 496 n.9. In that court's view, "[i]t seems highly unlikely that, in passing the broad language of § 2461(c), Congress intended to silently remove the limitations on criminal forfeiture in mail fraud cases that it had carefully inserted into § 982(a)(2)(A)." *Id.* The Third Circuit, however, has rejected *Croce*'s reasoning. *See United States v. Vampire Nation*,

451 F.3d 189, 199-200 (3d Cir. 2006) ("Although *Croce* [] presents a plausible construction of
the statute, we are not persuaded."); *United States v. Croce*, 209 Fed. Appx. 208, 214 (3d Cir.
2006) (reversing *Croce*: "Defendants' arguments are identical to those presented by the
defendant in *Vampire Nation*.  For the same reasons set forth in *Vampire Nation*, we reject those
arguments here.") (non-precedential order).  Elsewhere, the vast majority of courts, while
recognizing the "plausibility" of *Croce*'s reasoning, have held that Section 2461(c), together
with 981(a)(1)(C), allows for criminal forfeiture under the general mail and wire fraud statutes.
*See, e.g., United States v. Jennings*, 487 F.3d 564, 585 (8th Cir. 2007) ("we join the[] other
circuits in holding that § 2461(c) allows for criminal forfeiture of the proceeds of general mail
fraud"); *United States v. Edelkind*, 467 F.3d 791, 799-800 (1st Cir. 2006) (same); *United States
v. Lebed*, No. 05-361-02, 2005 WL 2495843, *9 (E.D. Pa. Oct.7, 2005) (same); *United States v.
Smairat*, 2006 WL 1554412, *8 (N.D. Ill. June 1, 2006) (same); *United States v. Schlesinger*,
396 F. Supp. 2d 267, 275 (E.D.N.Y. 2005) (same); *cf. United States v. Day*, 416 F. Supp. 2d 79,
86 (D.D.C. 2006) (following *Croce*).

The Court agrees with the overwhelming weight of authority on this issue.  In reaching
this conclusion, the Court must begin with the statutory language.  *See Landreth Timber Co. v.
Landreth*, 471 U.S. 681, 685, 105 S. Ct. 2297, 2301, 85 L. Ed. 2d 692 (1985) ("It is axiomatic
that the starting point in every case involving construction of a statute is the language itself."
(internal quotation omitted)); *Pittway Corp. v. United States*, 102 F.3d 932, 934 (7th Cir. 1996).
Where "the statute's language is plain, "the sole function of the courts is to enforce it according
to its terms."  *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241, 109 S. Ct. 1026, 1030
(1989) (internal quotation omitted).  Ascribing plain meaning to the words of 28 U.S.C. §

2461(c):

> [C]riminal forfeiture is not permitted unless (1) a substantive provision exists for civil forfeiture of the criminal proceeds at issue; and (2) there is no specific statutory provision that permits criminal forfeiture of such proceeds. Thus, we read the statute, enacted eight years after Congress last amended 18 U.S.C. §982(a)(2), as a "bridge" or "gap-filler" between civil and criminal forfeiture, in that it permits criminal forfeiture when no criminal forfeiture provision applies to the crime charged against a particular defendant but civil forfeiture for that charged crime is nonetheless authorized. Accordingly, under our reading, §2461(c) permits criminal forfeiture for general mail fraud because (1) 18 U.S.C. §981(a)(1)(C) authorizes civil forfeiture for general mail fraud; and (2) no statutory provision specifically authorizes criminal forfeiture for general mail fraud.

*Vampire Nation*, 451 F.3d at 199; *Smairat*, 2006 WL 1554412 at *9 ("Because there is no specific criminal forfeiture provision for wire fraud in the absence of 'special circumstances,' §2461(c) allows for criminal forfeiture of the proceeds of wire fraud . . . [T]his construction of the statute makes § 2461(c) a broad 'gap filler' that applies whenever civil forfeiture is permitted."). Put differently, "when there is no provision for criminal forfeiture, the government may use a civil forfeiture provision if it includes such allegation in the indictment. In instances where there is a specific criminal forfeiture provision – that specific provision and the procedures it sets forth – and not the civil forfeiture provision will apply." *Schlesinger*, 396 F. Supp. 2d at 276.

Even if the language of § 2461(c) were ambiguous, the legislative history of Section 2461(c) would nonetheless confirm the Court's reading. Indeed, "[f]ar from wanting to limit the substantive reach of the criminal forfeiture statute, Congress made clear in enacting the bridging statute that it hoped to encourage the use of criminal forfeiture procedures, with their greater protections, 'whenever any form of forfeiture is otherwise authorized by statute.'" *See Edelkind*, 467 F.3d at 799 (quoting H.R. Rep. 105-358(I), 1997 WL 677201 at *35-36 (1997)). "[This] intuition is further confirmed by Congress' later amendment that resolves doubts for the future in

-11-

the government's favor." *Id.* (citing USA PATRIOT Improvement and Authorization Act of

2005, Pub. L. 109-177, § 410 (2006)); *see also Schlesinger*, 396 F. Supp. 2d at 277 ("It appears

that in enacting more stringent due process protection in the civil forfeiture realm, Congress

inserted § 2461(c) to allow the government to seek forfeiture through an indictment rather than

commencing a separate civil action against a criminal defendant for forfeiture."); *Lebed*, 2005

WL 2495843 at *9 (explaining that a goal of CAFRA was to "expand[ ] the reach of federal

criminal forfeiture, such as to crimes that frequently generate criminal proceeds" (quoting H.

Rep. No. 105-358, at 35 (1997))); *United States v. Thompson*, No. 02 CR 116, 2002 WL

31667859, *3 (N.D.N.Y. Nov. 26, 2002) (in enacting § 2461(c), "Congress was merely filling a

gap in the current law by providing that where a criminal forfeiture provision existed, but no

mechanism for enforcement of that forfeiture was found in the statute, the provisions of 21

U.S.C. §853 would fill the gap").  For all these reasons, the Court concludes that Section

981(a)(1)(C) and Section 2461(c) combine to allow for criminal forfeiture in general mail and

wire fraud cases.

**III.    *In Personam* Forfeiture**

Defendants next argue that "the government's motion fails because [Section] 981, unlike

the criminal forfeiture statute, 18 U.S.C. §982, does not authorize the entry of an *in personam*

money judgment . . . .  Section 981 . . . under which the government moves for forfeiture here,

does not provide for a general money judgment and only allows for a judgment against

specifically enumerated property."  (R. 898-1, Def. Atkinson's Resp. at 3, 4 ("[a]n *in personam*

money judgment for forfeiture is therefore not a statutorily available remedy in this case"); R.

906-1, Def. Kipnis Resp. at 2 ("the basis for the government's forfeiture request[] does not

-12-

authorize the government to seek a money judgment . . ."), 8 ("The government has cited no cases suggesting that [Section] 981 and/or CAFRA allow it to seek a personal money judgment . . ."); R. 896-1, Def. Boultbee's Resp. at 4-6.)  The practical effect of this argument, as Defendants see it, is that each Defendant would be liable only for whatever share of the fraud proceeds he individually pocketed.  (*See* R. 898-1, Def. Atkinson's Resp. at 5 ("Because the government is limited in this civil forfeiture claim to seeking judgments against the property directly traceable to the offense, the Court cannot enter a judgment against any property of [a Defendant] in an amount in excess of what he received.").)

In resolving this challenge, the critical issue is whether, by superimposing the civil forfeiture statute onto criminal proceedings, Congress intended to limit the Court's authority to issuing *in rem* forfeiture orders – the type of order typically issued under Section 981.  *See United States v. Moya-Gomez*, 860 F.2d 706, 721 n.15 (7th Cir. 1988) ("Criminal forfeiture is an *in personam* proceeding against a defendant in a criminal case and is imposed as a sanction against the defendant upon his conviction.  In contrast, civil forfeiture is an *in rem* proceeding against the property that the government seeks to obtain, without regard to the guilt or innocence of the property owner because the theory is that the property itself has committed the wrong." (internal citation and quotation omitted)).  As Defendants point out, one court has concluded that because Section 2461 cross-references Section 981 a court may issue only *in rem* orders, not personal monetary judgments:

> To begin with, the Court finds no such authority emanating from the inherent nature of criminal forfeitures.  Arguing otherwise, the government emphasizes the distinction between civil and criminal forfeitures.  Civil forfeiture proceedings, it points out, operate *in rem* directly against specific property, while criminal forfeitures are *in personam* and "consequently [are] not limited by any requirement that the government trace the forfeited property to the underlying offense" . . . .

-13-

> It bears repeating in this regard that the government is proceeding – by operation of 28 U.S.C. § 2461(c) – under the civil forfeiture statute, 18 U.S.C. § 981. Accordingly, the Court's authority to order forfeiture in this case is limited to the defendant's "property" that is subject to forfeiture under Section 981. *See* 28 U.S.C. § 2461(c) . . . . [B]ecause civil forfeiture proceedings "are against specific property *in rem*," money judgments are unavailable in the civil forfeiture context, which includes forfeiture proceedings under Section 981. In other words, a money judgment does not constitute "property" that is subject to forfeiture under Section 981. The government offers no justification for construing the statute more broadly as it applies to criminal cases by operation of 28 U.S.C. § 2461(c).

*Day*, 416 F. Supp. 2d at 89 n.10 (D.D.C. 2006) (certain citation omitted); *cf. Vampire Nation*, 451 F.3d at 201-02 (upholding an *in personam* forfeiture judgment).

The Court finds *Day* unpersausive. Foremost, the *Day* court rested its analysis on a finding that there is "no [ ] authority emanating from the inherent nature of criminal forfeitures" for entering an *in personam* money judgment. *Day*, 416 F. Supp. 2d at 89 ("Notably absent from the applicable statutory framework, however, is a provision expressly authorizing money judgments."). There is, however, no room for such a finding under Seventh Circuit authority, which squarely holds to the contrary: the criminal forfeiture statute *allows for* personal money judgments. *United States v. Baker*, 227 F.3d 955, 970 (7th Cir. 2000) (holding that "[t]he district court also stated that the government could enforce its forfeiture award against Baker as a regular *in personam* judgment. This was proper, too."); *United States v. Candelaria-Silva*, 166 F.3d 19, 42 (1st Cir. 1999) *cited with approval in Baker*, 227 F.3d at 970 ("[a] criminal forfeiture order may take several forms. First, the government is entitled to an *in personam* judgment against the defendant for the amount of money the defendant obtained as proceeds of the offense."); *see also Vampire Nation*, 451 F.3d at 201-02 (personal money judgment appropriate even where judgment exceeded available assets); *United States v. Casey*, 444 F.3d 1071, 1074-77 (9th Cir. 2006) (same); *United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006) (same); *United*

*States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996) (the government entitled to a personal money

judgment equal to the amount involved in the money laundering offense, as well as order

forfeiting specific assets involved in, or traceable to, the offense).

Moreover, the statutory language that Section 2461 imports from Section 981 does not

limit the Court to entering *in rem* orders. Eliminating irrelevant language, the bridging statute

provides: "If a forfeiture of property is authorized in connection with a violation of an Act of

Congress . . ., [then] upon conviction, the court shall order the forfeiture of the property in

accordance with the procedures set forth in [Section 853]." 28 U.S.C. §2461(c). Plainly read,

the bridging provision looks to Section 981 (or any other civil forfeiture provision) to define the

substance of what is subject to forfeiture, but not the mechanics of executing an order of

forfeiture – for that it looks elsewhere, specifically to Section 853. Under these incorporated

procedures, the Court maintains the authority to issue an *in personam* money judgment.[6] *See,*

---

[6]     Section 982 does *not* contain any express provision allowing for money
judgments or *in personam* orders. Likewise, Section 981 does *not* expressly limit its application
to *in rem* proceedings or orders. Rather, it appears that the *in rem* limitation, if any, results not
from the terms of the statute itself, but from Section 981's incorporation of customs law
forfeiture procedures. *See United States v. Ursery*, 518 U.S. 267, 288-89, 116 S. Ct. 2135, 2147,
135 L. Ed. 2d 549 (1996) ("18 U.S.C. § 981, which is entitled 'Civil forfeiture,' provide[s] that
the laws 'relating to the seizure, summary and judicial forfeiture, and condemnation of property
for violation of the customs laws . . . shall apply to seizures and forfeitures incurred' under . . .
[Section ] 981. Because forfeiture proceedings under the customs laws are *in rem, see* 19 U.S.C.
§ 1602 *et seq.*, it is clear that Congress intended that a forfeiture under . . . [Section] 981, . . .
would be a proceeding *in rem*." (citation and certain punctuation omitted)); *United States v. 630
Ardmore Drive, City of Durham, Parkwood Tp., Durham County, North Carolina*, 178 F. Supp.
2d 572, 577-78 (M.D.N.C. 2001) (until recently, "[i]n order to initiate a forfeiture proceeding
under [18 U.S.C. §981], the Government must comply with specific procedural requirements"
established under customs law, which, in turn "required that the Government obtain both a
summons and a warrant for arrest *in rem* to properly begin a forfeiture proceeding" (citing Fed.
R. Civ. P. Supplemental Rule C(3))); *see also United States v. De Ortiz*, 910 F.2d 376, 382 (7th
Cir. 1990) ("We see no reason why Congress is not free to adopt procedures from an *in rem*
action into an *in personam* one." (parentheses in the original); *Tyler v. Defrees*, 7 U.S. (11 Wall.)

*e.g., United States v. McHan*, 345 F.3d 262, 266 (4th Cir. 2003) ("21 U.S.C. §853 [is] a statute

authorizing the *in personam* criminal forfeiture of property . . ."); *United States v. O'Dell*, 247

F.3d 655, 680 (6th Cir. 2001) ("The criminal forfeiture provisions of 21 U.S.C. § 853 authorize

an *in personam* action against a defendant in a criminal case, and forfeiture in such a case is

imposed as a sanction against the defendant upon his conviction." (internal quotation omitted)).

As a result, the Court holds that, under Section 2461 and Section 981, it maintains the authority

to issue *in personam* orders.[7]

## IV.     Forfeiture Amount

        Even though there is no factual dispute regarding the amounts at issue in each of the

charged aspects of the U.S. community newspaper scheme, the parties disagree as to the total

---

331, 346, 20 L. Ed. 161 (1871) ("Unquestionably, it was within the power of Congress to
provide a full code of procedure for these cases [involving the forfeiture of real property
belonging to confederate rebels], but it chose to [adopt] . . ., as a general rule, a well-established
system of administering the law of capture . . .").

        [7]        The Court is mindful that the Rule of Lenity potentially could apply when
construing forfeiture statutes. *See, e.g., United States v. One 1973 Rolls Royce, V.I.N.
SRH-16266*, 43 F.3d 794, 819 (3d Cir. 1994) (applying rule of lenity to civil forfeiture provisions
that are punitive and quasi-criminal in nature). "The rule of lenity, however, is not applicable
unless there is a grievous ambiguity or uncertainty in the language and structure of the Act, such
that even after a court has seized every thing from which aid can be derived, it is still left with an
ambiguous statute." *Chapman v. United States*, 500 U.S. 453, 463, 111 S. Ct. 1919, 1926 (1991)
(internal citation, quotation, and certain punctuation omitted); *Callanan v. United States*, 364
U.S. 587, 596, 81 S. Ct. 321, 326, 5 L. Ed. 2d 312 (1961) ("The rule [of lenity] comes into
operation at the end of the process of construing what Congress has expressed, not at the
beginning as an overriding consideration of being lenient to wrongdoers."). For the reasons
stated above, the statutory framework is not grievously or hopelessly ambiguous and thus the
Rule of Lenity does not apply. In any event, Defendants did *not* raise this argument and their
failure to do so constitutes waiver. *See, e.g., United States v. Ramsey*, 237 F.3d 853, 862 (7th
Cir. 2001) ("The government argues that Ramsey's failure to raise this issue in the district court
operates as a waiver, which precludes review by this court. We agree with the government, and
find that Ramsey's failure to raise the rule of lenity at the sentencing hearing operated as a
waiver.").

amount of forfeiture. The government contends that they have "prove[n] by a preponderance of the evidence that defendants engaged in a $32 million fraud scheme . . ." and that "[c]ourts have repeatedly recognized that a forfeiture judgment can and should include the proceeds of the entire scheme, regardless of whether the jury has acquitted the defendants of some counts within that scheme." (R. 850-1, Gov't Motion at 14-15 (citing *United States v. Genova*, 333 F.3d 750, 762 (7th Cir. 2003)).) Defendants argue, on the other hand, that as a matter of law and fact they can be accountable only for those transactions on which they stand convicted.[8] Specifically, they argue: (1) that the jury's acquittal on certain aspects of the charged scheme renders forfeiture improper (R. 896-1, Def. Boultbee's Resp. at 2-3; R. 902-1, Def. Black's Resp. at 9, 10); (2) that the forfeiture statute requires the forfeiture award to be tied to the specific transaction in the count of conviction (R. 902-1, Def. Black's Resp. at 7); and (3) that the government has not proven the other aspects of the transaction by a preponderance of the evidence (R. 898-1, Def. Atkinson's Resp. at 5-8; R. 906-1, Def. Kipnis's Resp. at 8-9 (same).)

Defendants' two legal challenges are unavailing. First, contrary to Defendant Boultbee's suggestion, the jury's verdict alone does not necessarily establish that the government failed to prove the existence of the charged scheme by a preponderance of the evidence. (R. 896-1, Def. Boultbee's Resp. at 2-3 ("[F]ar from representing a finding of any defendant's guilt of a $32 million fraud in the alleged U.S. community newspaper non-compete scheme, the jury's verdict represents an *acquittal* on all charged transactions except APC and the supplemental

---

[8]    Defendants Atkinson, Boultbee, and Kipnis also argue that a personal judgment for the entire sought-after amount would violate the Eighth Amendment's Excessive Fines clause. (R. 906-1, Def. Kipnis's Resp. at 2-7 (citing *United States v. Bajakajian*, 524 U.S. 321, 328 (1998)); R. 898-1, Def. Atkinson's Resp. at 16; R. 896-1, Def. Boultbee's Resp. at 9-10).) The Court will address this argument in Section VI below.

payments . . . The government has totally misconstrued the nature and meaning of the jury's verdict."); *see also* R. 902-1, Def. Black's Resp. at 9 ("But the jury did not convict the defendants of mail fraud with respect to all seven of these transactions, nor is there any reason to believe that the jury considered these seven transactions to constitute any kind of overarching 'general scheme.'"), 10 ("The jury acquitted the defendants of mail fraud with respect to the remaining transactions described in the government's submission. These acquittals were not based on any doubt whether the mailings in question had occurred, but clearly rest on the conclusion that the mailings were not in furtherance of a fraudulent scheme.").) Rather, a court can never conclusively determine the basis of a jury's verdict, *see, e.g., United States v. Powell*, 469 U.S. 57, 64-65, 105 S. Ct. 471, 476, 83 L. Ed. 2d 461 (1984); *Dunn v. United States*, 284 U.S. 390, 393-94, 52 S. Ct. 189, 190-91 (1932)), and thus a jury's verdict cannot sustain any particular inference. But, more to the point, the difference between the burden of proof at trial is more onerous than the burden at the forfeiture stage. *See United States v. Tedder*, 403 F.3d 836, 841 (7th Cir. 2005) (any forfeiture award "must find support in the preponderance of the evidence"); *United States v. Melendez*, 401 F.3d 851, 856 (7th Cir. 2005); *Genova*, 333 F.3d at 762; *see also United States v. Horne*, 474 F.3d 104, 1006-07 (7th Cir. 2007) ("All an acquittal means is that the trier of fact, whether judge or jury, did not think the government had proved its case beyond a reasonable doubt. The facts that a sentencing judge finds in determining what sentence to impose . . . need be found only by a preponderance of the evidence, the normal civil standard. This has been the rule since before the guidelines, and its constitutionality was affirmed by the Supreme Court in the *McMillan* case."). Second, contrary to Defendant Black's argument, the forfeiture statute does not have to relate only to the mailings at issue in the counts

-18-

of convictions. (R. 902-1, Def. Black's Resp. at 7 (arguing that forfeiture is not "tied to the offense" of conviction as required by 28 U.S.C. §2461(c): "These statutory provisions make clear that only proceeds connected to offenses of conviction are subject to forfeiture . . . Offenses, of course, are stated in independent counts.").) Rather, as a general matter, "[t]he fact that [a defendant] was acquitted of counts . . . does not eliminate all possibility of a forfeiture based on these activities. Even counts on which the jury acquits may be considered in sentencing, if the judge finds by a preponderance of the evidence that the criminal activities occurred." *Genova*, 333 F.3d at 762-63 (citing *United States v. Watts*, 519 U.S. 148, 117 S. Ct. 633, 136 L. Ed. 2d 554 (1997), and further noting that *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) does not apply because there is no "statutory maximum" for restitution or forfeiture); *see also United States v. Fruchter*, 411 F.3d 377, 384 (2d Cir. 2005) ("Although we have not previously considered whether proceeds derived from conduct forming the basis of a charge of which the defendant was acquitted can be counted as 'proceeds' of racketeering activity, it seems plain that they can."). Thus, regardless of Defendants' acquittal on certain counts, forfeiture is appropriate if the government proves that the forfeited amounts are (1) "proceeds" (2) "traceable to" (3) "any offense," which in this instance is the charged scheme to defraud. *See also United States v. Messino*, 382 F.3d 704, 714 (7th Cir. 2004) ("there must be a connection between the forfeited proceeds and the underlying criminal violations" (citing *Libretti*, 516 U.S. at 42, 116 S. Ct. 356; 21 U.S.C. § 853))

Having weighed the evidence presented at trial and the credibility of the witnesses, and having evaluated the government's showing in its motion, the Court finds that the government has not established by a preponderance of the evidence that the non-competition payments

related to CNHI(II), Forum, and Paxton constitute a part of an overarching scheme to defraud. There are material distinctions between CNHI(II), Forum, and Paxton, on the one hand, and the counts of conviction – the APC transaction and the Supplemental Payments – on the other. Occurring months after the last U.S. community newspaper sale closed in November 2000, the APC transaction and the Supplemental Payments did not involve third parties or the sale of International's assets, and, further, the Supplemental Payments were not even tied to non-competition agreements. Relatedly, in the CNHI(II), Forum and Paxton transactions, the buyers executed agreements that said the non-competes were a condition of closing (even though they later testified to the contrary), whereas the APC transaction and the Supplemental Payments did not involve any similar representations. Moreover, the evidence revealed that at least certain aspects of the CNHI(II), Forum, and Paxton transactions were disclosed to International's Audit Committee members. For these reasons, in the Court finds that the government has not met its burden. Rather, the only amounts properly subject to forfeiture here are those amounts related to the counts of conviction.

## V.     Joint and Several Liability

Defendants next argue that they cannot be held jointly an severally liable for any forfeiture award. The Court disagrees.

As a general rule, co-venturers in a criminal scheme – whether labeled as co-schemers, co-conspirators, or aiders and abettors – are jointly and severally liable for all proceeds generated under a fraud scheme. The rationale for this rule stems from (at least in part) the general notion that those involved in any sort of concerted action are together liable for its effect:

> [Defendant] makes the [] complaint that she should not have been found liable to forfeit more than $3 million of illegal proceeds, since so little of that amount found its way into

her pocket. But the proceeds of a conspiracy are a debt owed by each of the conspirators. It would be absurd to treat them more leniently than the law treats a lawful partnership, all of whose members are severally as well as jointly liable for the partnership's debts.[9]

*United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005). Like criminal conspirators, aiders and abettors may be jointly and severally liable with their principals for forfeiture awards, *see United States v. Reiner*, 397 F. Supp. 2d 101, 108 (D. Me. 2005), as a derivative of the "well engrained [principle] in the law that one who aids or abets the commission of an act is as responsible for that act as if he committed it directly." *United States v. Hooks*, 848 F.2d 785, 789 (7th Cir. 1988) (citing *Nye & Nissen v. United States*, 336 U.S. 613, 618, 69 S. Ct. 766, 769, 93 L. Ed. 919 (1949)); USSG 1B1.3(a)(1)(B) (providing that participants in "jointly undertaken criminal activity" are held accountable for the reasonably foreseeable conduct of their co-schemers regardless of whether a conspiracy is charged). In harmony with this general principle, Section 853 allows a court to enter joint and several forfeiture orders. *See Melendez*, 401 F.3d at 856; *United States v. Pitt*, 193 F.3d 751, 765 (3d Cir. 1999) ("Like 18 U.S.C. § 982(a)(1), 21 U.S.C. § 853(a)(1) imposes joint and several liability with respect to forfeiture."); *United States*

---

[9]     The *Spano* court further suggests that a defendant's liability for forfeiture of proceeds is not necessarily limited by the measure of "reasonable forseeability":

> A number of cases, it is true, though none in this circuit, require the defendant to forfeit only so much of the proceeds (not received by him) of the fraud as were foreseeable to him, by analogy to the liability of a conspirator for only those misdeeds of his coconspirators that were foreseeable by him. Other cases do not discuss this requirement. We have found no case that rejects it, but we note that there is a difference between criminal liability for the acts of others and liability on a debt created by partners in a criminal scheme.

*Spano*, 421 F.3d at 603 (parentheses original). A participant in a criminal joint venture thus may be jointly and severally liable for all proceeds of the venture (as a debt created by partners in a criminal scheme) even if not criminally liable for the unforeseeable acts of others in the joint venture.

*v. McHan*, 101 F.3d 1027, 1043 (4th Cir. 1996) (Section 853(a)(1) "is not limited to property

that the defendant acquired individually but includes all property that the defendant derived

indirectly from those who acted in concert with him in furthering the criminal enterprise").  This

rule holds true even if the charging document does not charge a conspiracy, *see United States v.*

*Macey*, 8 F.3d 462, 468 (7th Cir. 1993) ("We have long recognized that '[i]t is not essential that

the indictment contain a separate count charging conspiracy in order to take advantage of the

doctrines peculiar to conspiracy." (quoting *United States v. Wilson*, 506 F.2d 1252, 1257 (7th

Cir. 1974)); *United States v. Wormick*, 709 F.2d 454, 461 (7th Cir. 1983) ("[C]onspiracy

doctrines apply to a multi-member mail fraud scheme even if the indictment does not charge

conspiracy."), so long as the government proves the existence of a conspiracy or other criminal

joint venture by a preponderance of the evidence.

Accordingly, joint and several liability hinges on whether, as a factual matter, the

government has made such a showing by a preponderance.  Defendants contend that the

government has not carried its burden, but the only support for this argument is the unsupported

claim that "there is virtually no evidence from which a trier of fact could conclude that the

defendants – and Mr. Atkinson in particular – were acting in concert.  There is therefore no basis

in fact or law to hold codefendants here jointly and severally liable."  (R. 898-1, Def. Atkinson's

Resp. at 8; *see also id.* at 6 ("[t]here are no cases in the Seventh Circuit where joint and several

liability was applied absent proof of a conspiracy . . . .  Mr. Atkinson does not disagree that a

conspiracy need not be underlined charged.  Yet under the laws of this Circuit, the government must still

prove that a conspiracy underlined existed in order to avail itself of joint and several liability.  It is here that

the government falls short.  The government has not come anywhere close to meeting its burden

-22-

of showing that a conspiracy existed, mush less that Mr. Atkinson joined one."); R. 906-1, Def.

Kipnis Resp. at 9 (incorporating this "argument": "[a]s Defendant Atkinson demonstrates in his

forfeiture brief, no conspiracy has been proven and the imposition of joint and several liability

would be wholly improper here.").) For the reasons the Court detailed in its opinion on

Defendants' post-trial motions and its prior rulings during trial, the evidence established by a

preponderance of the evidence that the Defendants jointly participated in a scheme to defraud

regarding the APC non-compete payments. *United States v. Black*, 05 CR 727, 2007 WL

3254452, **4-6 (N.D. Ill. Nov. 5, 2007). And with the exception of Defendant Kipnis, the

evidence supports the same conclusion regarding the Supplemental Payments. *Id.* at **7-11. As

joint participants in a criminal venture, Defendants are jointly and severally liable for the

proceeds of the respective fraud schemes.

## VI.     The Eighth Amendment

Defendants' final legal challenge to the Motion is that the government's sought-after

forfeiture award would violate the Eighth Amendment's "Excessive Fines" clause. U.S. Const.

am. VII ("[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and

unusual punishments inflicted"). Preliminarily, the Court notes that Defendants' arguments in

this regard really take on the supposed excessiveness of imposing a forfeiture order for the entire

amount the government seeks. (R. 906-1, Def. Kipnis's Resp. at 7 ("holding Mark jointly and

severally liable for a $17 million forfeiture judgment would so far outweigh his role in and

benefit from the scheme that it would violate the Excessive Fines Clause of the Eighth

Amendment"); R. 896-1, Def. Boultbee's Resp. at 9 ("If the government were to be granted

forfeiture as to Boultbee in anything even remotely resembling the amount the government

seeks, such an amount would be 'grossly disproportional' to the seriousness of Boultbee's conduct, implicating the Eighth Amendment's Excessive Fines Clause"); R. 898-1, Def. Atkinson's Resp. at 16 ("an award holding Mr. Atkinson jointly and severally liable for a money judgment of $16,950,000 would violate his Eighth Amendment rights").)  For the reasons above, however, these arguments are largely moot because the Court is not granting the full amount of the government's request, but rather is limiting the forfeiture amount to the proceeds of the counts of conviction.

In any event, the forfeiture order here is consonant with the Eighth Amendment.[10]  "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality:  The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Bajakajian*, 524 U.S. at  334, 118 S. Ct. at 2036.  "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Id.*  "In applying this standard, the district courts in the first

---

[10]     Contrary to the government's suggestion, the sought-after forfeiture award is subject to the limitations of the Eighth Amendment's Excessive Fines clause.  (R. 915-1, Gov't Reply at 14-15 (asserting that the Eighth Amendment is implicated only when a forfeiture order involves forfeiture of non-proceeds).)  This is the case because the forfeiture order is "imposed at the culmination of a criminal proceeding and requires conviction of an underlying felony," *Bajakajian*, 524 U.S. at 328, 118 S. Ct. at 2033, which means the forfeiture order "constitute[s] punishment for an offense" and hence is a "fine" for purposes of the Eighth Amendment.  *See Austin v. United States*, 509 U.S. 602, 621-22, 113 S. Ct. 2801, 2811-12, 123 L. Ed. 2d 488 (1993); *see also Bajakajian*, 524 U.S. at 328, 118 S. Ct. at 2033.  To be sure, certain cases hold that "[f]orfeiture of proceeds cannot be considered punishment, and thus, subject to the excessive fines clause, as it simply parts the owner from the fruits of the criminal activity," *see, e.g., United States v. Alexander*, 32 F.3d 1231, 1236 (8th Cir. 1994), but it seems that such cases are imprecise.  It is not that proceeds forfeitures are not *subject to* the Eighth Amendment, but rather that, as direct proceeds of a crime, they are *not disproportionate* to the offense.  *See, e.g., United States v. Hurley*, 63 F.3d 1, 23 (1st Cir. 1995) ("holding a defendant liable for an amount of money foreseeably laundered by himself and his own co-conspirators is quite rational based on a proportionality analysis"); *United States v. Bollin*, 264 F.3d 391, 419 (4th Cir. 2001) (same).

instance . . . must compare the amount of the forfeiture to the gravity of the defendant's offense. If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional." *Id.* at 336-37, 118 S. Ct. at 2037-38. Here, the amount of forfeiture is directly proportional – the forfeited amount corresponds to the amount that Defendants wrongfully diverted from Hollinger International. *See also United States v. Browne*, 505 F.3d 1229, 1282 (11th Cir. 2007) ("[defendant's] reliance on *Bajakajian* is sorely misplaced. In that case, the defendant pled guilty to failing to report $356,144 in cash that he was trying to take overseas. In finding that his forfeiture of the entire amount was grossly disproportionate to the offense, the Court found significant the fact that the defendant's 'crime was solely a reporting offense,' and 'the violation was unrelated to any other illegal activities.' In this case, Devaney and Browne were convicted of conspiracy to abuse their positions in the unions and to misuse union assets for personal gain and substantive RICO violations. Accordingly, the district court's forfeiture order was within constitutional bounds." (quoting *Bajakajian*, 524 U.S. at 337-38, 118 S. Ct. at 2038)). Indeed, the Seventh Circuit's recent ruling in *United States v. Segal*, effectively forecloses any argument to the contrary: "It is true that the forfeiture is large. It is only excessive, however, if it is disproportional to the offense. We cannot say that it was. This was a massive fraud. When a defendant commits a multimillion-dollar crime, he can be required to forfeit assets also running into the millions." 495 F.3d 826, 840 (7th Cir. 2007).

*     *     *

For all these reasons, the Court overrules Defendants' objections to the government's request to hold Defendants' jointly and severally liable for an *in personam* money judgment. Accordingly, the Court orders that Defendants Black, Boultbee, Atkinson, and Kipnis are jointly

and severally liable for an *in personam* money judgment in an amount of $5.5 million

representing the proceeds from the APC transaction. In addition, the Court orders that

Defendants Black, Boultbee, and Atkinson are jointly and severally liable for an *in personam*

money judgment in an amount of $600,000 representing the proceeds from the Supplemental

Payments.

## VII.    Forfeiture of Specific Property

The government also requests the forfeiture of specific property as proceeds of the

offense. Specifically, the relevant forfeiture charge in the Information seeks the forfeiture of

Defendant Black's Palm Beach residence, certain jewelry,[11] or sales proceeds from the New

York apartment.[12] The Court agrees with Defendant Black that the government has not

demonstrated that this specific property is forfeitable.[13]

---

[11]      By not including any argument on this point in its Motion, the government has
not met its burden of proof regarding the jewelry identified in the Information's forfeiture
charge. Accordingly, the Court will address only the nexus between the "offense committed"
and Defendant Black's Palm Beach house and New York apartment. *See* Fed. R. Crim. P. 32.2.

[12]      Defendant Atkinson also spends much of his response objecting to the
government's pursuit of his California residence. The Information, however, lists that property
only as a substitute asset. Thus, any discussion of its availability for forfeiture is premature. *See*
21 U.S.C. §853(p); *see also* 28 U.S.C. §2461(c).

[13]      As a preliminary matter, Defendant Black first argues that the Court need not
address whether the specifically-identified property in the Information is forfeitable. (R. 902-1,
Def. Black's Resp. at 23, 26.) To the contrary, the Court must make a finding of whether there is
a "substantial nexus":

> [T]he court must determine what property is subject to forfeiture under the applicable
> statute. If the government seeks forfeiture of specific property, the court must determine
> whether the government has established the requisite nexus between the property and the
> offense. If the government seeks a personal money judgment, the court must determine
> the amount of money that the defendant will be ordered to pay.

Fed. R. Crim. P. 32.2(b)(1). As it must then, the Court turns to the issue of whether a substantial

The government's showing is insufficient to establish a nexus between the sought-after property and the proceeds from the APC and Supplemental Payments. The government contends that Defendant Black used proceeds from the APC non-competition payments and the Supplemental Payments to cover expenses and improvements in both specified properties.[14] As to the apartment, the government contends that, on February 12, 2001, Defendant Black deposited $2,612,500 (check #65282) from his APC non-competition payment into his account at Canadian Imperial Bank of Commerce (CIBC), and thereafter paid approximately $86,000 over the next two months from that account to Mlinaric, Henry, and Zervudachi, Inc. for improvements to the New York apartment. (R. 850-1, Gov't Motion at 18.) Then, after depositing his Supplemental Payment in the amount of $285,000 (check #065489) on April 11, 2001, Black spent approximately $164,200 out of his account for work performed by Mlinaric on the New York Apartment. (*Id.*) Likewise, as to the Palm Beach house, Black paid Hendrick Bros. for home improvements after he had deposited the APC and Supplemental Payments. (*Id.*) Specifically, Black issued to Hendrick Bros. (1) a check for approximately $320,000 (#8016684) on February 26, 2001, (2) a check for approximately $455,000 (#8016740) on March 9, 2001, and (3) a check for approximately $315,000 on May 14, 2001. (*Id.* at 18-19.)

Yet even though the account at issue contained legitimate funds in excess of $5.4 million, an amount well-exceeding Black's expenditures on the New York Apartment or Palm Beach House, the government does not attempt to trace these expenditures to any of the fraud proceeds.

nexus exists between the specified property and the offense committed.

[14]     The government also argues that a substantial nexus exists between the CNHI(II) payments and the specified properties, (R. 850-1, Gov't Motion at 17), but because the Court has determined that proceeds from that transaction are not forfeitable, it will focus on the purported nexus between the properties and the APC transaction and Supplemental Payments.

Instead, the government relies upon a few money laundering cases – mostly outside the forfeiture context – holding that when clean funds are comingled with tainted funds an entire bank account may become tainted. The government contends that "[t]he same analysis should apply here [because] [o]therwise a defendant need only funnel fraud proceeds through an account with 'clean' funds to eliminate the possibility of forfeiture." (R. 915-1, Gov't Reply at 13 (citing *United States v. Braxtonbrown-Smith*, 278 F.3d 1348 (D.C. Cir. 2002), *United States v. Rodriguez*, 53 F.3d 1439, 1447-48 (7th Cir. 1995), *United States v. Rutgard*, 116 F.3d 1270, 1292 (9th Cir. 1997), and *United States v. Swanson*, 394 F.3d 520 (7th Cir. 2005).) *See also Swanson*, 394 F.3d at 529 n.4 ("It is worth noting [ ] that a change in the form of proceeds obtained from the crime does not prevent forfeiture, provided that the proceeds were involved in the crime as required by 18 U.S.C. §982(a)(1). Section 982(b)(1) allows the government to obtain substitute assets if it cannot find property 'involved in' or 'traceable to' the offense of conviction. 21 U.S.C. § 853(p) (incorporated into 18 U.S.C. § 982(b)(1) by reference). For example, if Swanson used the funds skimmed from the Malta Clayton acquisition to purchase his home in New York, the home would then be forfeitable as well." (parentheses in original)).

The Court finds the government's cited authority unpersuasive. The operative language in the forfeiture statutes (both civil and criminal) is *not* the same for the offense of money laundering as it is for mail fraud, and, in fact, it varies materially:

> In order to be subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), property need only be "involved" in a transaction or attempted transaction. The claimants incorrectly argue[] that to be "involved" in a criminal activity for the purposes of forfeiture under 18 U.S.C. § 981, the property must "represent proceeds of a specified criminal activity." The government does not allege that the defendant properties represent the proceeds of criminal activity. Rather, the government correctly states that 18 U.S.C. § 981(a)(1)(A) requires only that the property be "involved in a transaction or attempted transaction" in violation of specified statutes. The Congressional intent to subject to forfeiture under

> 981(a)(1)(A), properties that are merely "involved" in criminal transactions is evidenced by *the more exacting language* of sections 981(a)(1)(B) and 981(a)(1)(C). Sections 981(a)(1)(B) and 981(a)(1)(C) permit the forfeiture of properties "constituting, deriv[ing] from, or traceable to" the proceeds of specified criminal activities. 18 U.S.C. §981(a)(1)(B), (a)(1)(C). Had Congress meant to narrow the definition of the involvement of forfeitable property in the transactions specified in section 981(a)(1)(A), it would have to look no further than the next provisions of that statute for the language to do so.

*United States v. All Assets of Blue Chip Coffee, Inc.*, 836 F. Supp. 104, 107 (E.D.N.Y. 1993) (emphasis added); *United States v. Melrose East Subdivision*, 357 F.3d 493, 505 (5th Cir. 2004) ("The government seeks forfeiture of the above property under two separate theories. First, under the proceeds theory, the government contends that the subject property 'constitutes or is derived from proceeds' of a 'specified unlawful activity,' namely health care fraud. *See* 18 U.S.C. § 981(a)(1)(C) (2000). Second, under the money laundering theory, the government contends that the property is 'involved in' a money laundering offense. *See id.* §981(a)(1)(A)." (certain citation omitted)); *see also United States v. $448,342.85*, 969 F.2d 474, 477 (7th Cir. 1992) ("Money need not be *derived from* crime to be '*involved*' in it" (emphasis added)). While clean money may be "involved in" a money laundering offense, *see United States v. Swanson*, 394 F.3d 520, 528 (7th Cir. 2005) ("Clean' money in a bank account, for example, may help to mask the criminal proceeds passing through.") – thus perhaps obviating a strict tracing analysis, *see United States v. $448,342.85*, 969 F.2d 474, 477 (7th Cir. 1992) ("[i]t is easy to imagine difficult problems in associating proceeds with crime. The law of trusts supplies an elaborate set of tracing rules, but rules designed to adjust accounts between (apparently) honest persons are not suited to frauds in which funds have been shuffled at least in part for the purpose of disguising their source") (internal citation omitted) – a court cannot necessarily forego a tracing analysis for forfeiture of mail fraud proceeds because the applicable statute requires otherwise.

-29-

The Third Circuit's holding in *United States v. Voigt*, is instructive on this point:

> We hold that the term "traceable to" means exactly what it says . . . . [T]his means that the government must prove by a preponderance of the evidence that the property it seeks under §982(a)(1) in satisfaction of the amount of criminal forfeiture to which it is entitled has some nexus to the property "involved in" the money laundering offense. For example, if the defendant receives $500,000 cash in a money laundering transaction and hides the cash in his house, the government may seize that money as property "involved in" the money laundering offense. If the defendant purchased a $250,000 item with that money, the government may seek the remaining cash as "involved in" the offense, whereas the item purchased is subject to forfeiture as property "traceable to" property involved in the money laundering offense.

> Where the property involved in a money laundering transaction is commingled in an account with untainted property, however, the government's burden of showing that money in the account or an item purchased with cash withdrawn therefrom is "traceable to" money laundering activity will be difficult, if not impossible, to satisfy . . . . The solution, we think, is to give effect to the substitute asset provision. Thus, once a defendant has commingled laundered funds with untainted funds – whether in a bank account or in a tattered suitcase – such that they "cannot be divided without difficulty," 21 U.S.C. § 853(p)(5), the government must satisfy its forfeiture judgment through the substitute asset provision. Once property subject to forfeiture under § 982(a)(1) is no longer identifiable due to some act of the defendant, the government may seek any property, cash or merchandise, in satisfaction of the amount of criminal forfeiture to which it is entitled.

89 F.3d 1050, 1087-88 (3d Cir. 1996); *see also United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992) ("the presence of one illegal dollar in an account does not taint the rest – as if the dollar obtained from fraud were like a drop of ink falling into a glass of water."); *cf. United States v. Trost*, 152 F.3d 715, 721 (7th Cir. 1998). Unlike the money laundering case the government cites, direct forfeiture under 18 U.S.C. §981(a)(1)(C) requires proof by a preponderance that the forfeited property is "traceable to" or "derived from" the fraud scheme.

The government, however, makes no real showing in this regard. It contends only that it "has established that nexus by showing that fraud proceeds were deposited into Black's personal CIBC account and then within a few weeks, if not days, were used to pay for improvements to

-30-

these two properties." This assertion is not necessarily true because, as Defendant Black points out, the amount of "clean" funds in the account far exceeds Black's expenditures on the New York Apartment and Palm Beach house.[15] In its reply, the government made no effort to take on this argument, but rather merely asserts (wrongly) that the government does not have to trace the proceeds. Because Defendant Black's account was sufficiently funded with non-tainted money (enough so to cover all expenditures the government has identified) and because the government has failed to engage in any sort of tracing analysis, the government has not proven by a preponderance that Black funneled the proceeds to the identified residences. At this stage, the government is entitled only to a money judgment for $6.1 million – the proceeds from APC and the Supplemental Payments.[16]

---

[15]     In this sense, this case is differs from *United States v. $448,342.85*, where the Seventh Circuit allowed forfeiture without tracing because "[e]ven if the fraud stopped at the end of 1988, the criminal proceeds vastly exceed the sums on deposit at the time of the seizure." 969 F.2d at 477.

[16]     Congress recently enacted 18 U.S.C. §984 to address the forfeiture of fungible assets, but that statute applies only to *in rem* proceedings. *Id.*

## CONCLUSION

For these reasons, the Court grants the government's motion in part and denies it in part. Pursuant to forfeiture provisions found in 18 U.S.C. §981(a)(1)(C) and 28 U.S.C. §2461(c), the Court orders that Defendants Black, Boultbee, Atkinson, and Kipnis be held jointly and severally liable for an *in personam* money judgment in an amount of $5.5 million representing the proceeds from the APC transaction. In addition, the Court orders that Defendants Black, Boultbee, and Atkinson be held jointly and severally liable for an *in personam* money judgment in an amount of $600,000 representing the proceeds from the Supplemental Payments. Consistent with the grant of authority in 21 U.S.C. §853(g), the Court further orders that the government shall in the first instance attempt to collect the forfeiture award from each Defendant *pro rata* in amounts proportionate to the fraud proceeds that each Defendant personally received. *See* 21 U.S.C. §853 ("Upon entry of an order of forfeiture under this section, the court shall authorize the Attorney General to seize all property ordered forfeited upon such terms and conditions as the court shall deem proper."). Should any amount remain outstanding the government may seek to satisfy the money judgments from any Defendant who is liable and through the substitution of assets, if necessary.


Dated:  December 10, 2007                    ENTERED:


                                             _____
                                             AMY J. ST. EVE
                                             United States District Court Judge


-32-