UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 05 CR 727-1 |
| | ) | |
| CONRAD M. BLACK | ) | Hon. Amy J. St. Eve |

**GOVERNMENT'S OBJECTIONS TO UPDATED PRESENTENCE
INVESTIGATION REPORT AND
POSITION PAPER AS TO SENTENCING FACTORS**

In July 2007, after an approximately four-month trial, a jury convicted defendant of

mail fraud for scheming with David Radler and his co-defendants to steal money from

Hollinger International. The jury also convicted defendant of obstructing justice. This Court

sentenced defendant to 60 months' imprisonment on the fraud counts, and 78 months'

imprisonment on the obstruction count, to be served concurrently. Defendant served

approximately 29 months of his sentence, then was released on bond. During the four years

after being convicted, defendant appealed to the Seventh Circuit and to the United States

Supreme Court. After the Supreme Court clarified the law concerning honest services, the

Seventh Circuit analyzed the record in this case and held that defendant's obstruction

conviction stands, as does his conviction for mail fraud relating to his theft of $600,000 from

Hollinger International in 2001. *United States v. Black*, 625 F.3d 386 (7th Cir. 2010). As to

the remaining counts on which the jury convicted defendant, concerning defendant's theft

of an additional $5.5 million from the company in 2001, the Seventh Circuit held that

although it was "unlikely" that the jury convicted defendant based solely on an honest-

services theory, it was possible; therefore, a new trial was warranted. *Id.* at 391.

Nevertheless, the Seventh Circuit emphasized that the evidence concerning the APC counts was "certainly sufficient to prove a pecuniary fraud," and that there has been "no acquittal..., just an error warranting – barely – a retrial." *Id.* at 394.

As suggested by the Seventh Circuit, *id.*, the government has elected in this case not to consume the Court's or parties' resources with a re-trial on the APC counts, particularly where the Seventh Circuit has made so clear – as has this Court in prior proceedings – that the government's trial evidence constituted "more than ample evidence" that defendant engaged in pecuniary fraud on the APC counts. *See* November 2007 Memorandum Opinion and Order at 8-11, Docket No. 929. The facts relating to defendant's crimes have not changed, and continue to support a sentence within the correctly calculated Guideline range. In addition, defendant's continued refusal to accept responsibility for his crimes, even after 29 months of being incarcerated, supports such a sentence. The government requests that the Court re-impose a 78-month sentence in this case.

## I.    BACKGROUND

### A.    The Offense Conduct

Beginning in 1998, Hollinger International sold off many newspapers it owned in Canada and the United States. Defendant and his co-schemers used these sales as an opportunity to skim money from the company for themselves. Knowing that non-compete agreements were a standard component of newspaper sales transactions, defendants manipulated certain of the deals to make it appear, falsely, that Hollinger International could not successfully complete the sales without peeling off some of the proceeds to defendant

and others. In deal after deal, defendant enriched himself at the company's expense, on the false pretense that companies would not buy Hollinger International's newspapers without non-compete assurances from defendant or a Canadian company that defendant controlled, Hollinger, Inc.

By 2001, defendant and his co-schemers had quietly completed multiple such transactions. Even though there was a blatant conflict of interest – defendant was personally benefitting at the company's expense – the payments were concealed from Hollinger International's Audit Committee, the body responsible for reviewing and approving related-party transactions.

In February 2001, defendant and his co-schemers took another $5.5 million from Hollinger International. This time, they created illusory employment non-compete agreements with APC, a Hollinger International subsidiary that was in the process of winding down its operations. (As of 2001, APC owned only one small weekly community newspaper in Mammoth Lake, California, that APC planned to sell, and eventually sold for only one dollar plus working capital. Nor did APC intend to re-enter the U.S. community newspaper business.) No one on the board of directors at Hollinger International or APC had requested non-compete agreements from defendant or his co-schemers, nor were such agreements reasonable or necessary. Defendant and his co-schemers created and signed the sham agreements not for legitimate purposes, but to provide a paper trail for a total of $5.5 million that they elected to pay themselves, on their own and without the knowledge or approval of the Audit Committee or board of directors. As an added motive, and as they had learned from

the previous transactions, calling the money "non-compete payments" saved the defendant and his co-schemers from paying taxes on the fraud proceeds in Canada.

Two months later, in April 2001, defendant and his co-schemers took another $600,000 from the company. Again, they falsely characterized the stolen money as non-compete payments deriving from the company's 2000 sale of newspapers to Forum and Paxton. But these so-called "supplemental payments" were not non-compete payments and had nothing to do with the Forum and Paxton newspaper deals. There were no individual non-compete agreements signed in those deals, and no one – not the buyers, not the Audit Committee, not the board of directors – knew about or authorized individual payments to defendant or other executives in connection with those transactions.

Defendant and his co-schemers tried to hide the payments. Defendant lied on proxy questionnaires, for example, concealing his receipt of the money. Defendant's co-schemers lied when questioned by the company's lawyers and auditors. When defendant and his co-schemers ultimately were forced to disclose these payments to the company's shareholders, they falsely represented the nature of the payments and the circumstances under which they were made. Defendant continued to conceal the true nature of the payments during a speech to shareholders in 2002, and by seeking to quash a Special Committee investigation concerning the payments in 2003.

Then, in 2005, defendant obstructed justice. Knowing of various ongoing investigations, he removed pertinent documents from his Canadian office despite being

instructed that he could not do so, sneaking the documents out the back while attempting to avoid security cameras.

### B.     December 2007 Sentencing

At the December 10, 2007 sentencing, the Court sentenced defendant for his convictions on Counts One and Six (involving APC), Count Seven (involving the supplemental payments), and Count Thirteen (obstruction of justice). The Court first considered which Guidelines Manual to apply. The Court determined that it would calculate and consider the then-current 2007 Guidelines; but, for various reasons, would apply the 2000 Guidelines Manual. Sent. Tr. at 11-15.

Under the 2000 Guidelines Manual, the base offense level under § 2F1.1 was six. With respect to loss amount, the Court found that the loss amount attributable to defendant Black was $6.1 million, resulting in a 14-level increase in the offense level under § 2F1.1(b)(1)(O). *Id.* at 16-19. The Court imposed a two-level enhancement because there was more-than-minimal planning, under § 2F1.1(b)(2)(A). *Id.* at 20. The Court declined to impose an enhancement under § 2F1.1(b)(2)(6)(B) based on the fraud's being committed outside the U.S. *Id.* at 20-22. The Court imposed a two-level enhancement because the offense involved sophisticated means. *Id.* at 20-35. With respect to role in the offense, the Court declined to impose an enhancement based on defendant Black's role in the offense. *Id.* at 36-39. The Court imposed a two-level enhancement for abuse of trust under § 3B1.3. *Id.* at 39-41. Finally, the Court imposed a two-level enhancement for obstruction of justice under § 3C1.1. *Id.* at 41.

5

As to defendant Black's obstruction conviction, the Court concluded that the base offense level was 22, and there was a two-level enhancement based on defendant's role in the offense. *Id.* at 41. The Court further determined that after applying the grouping rules, the combined offense level was 28. *Id.* Because there was no adjustment for acceptance of responsibility, *id.* at 29, and defendant Black's criminal history category was I, *id.*, the Court found that the applicable Guideline range was 78-97 months, *id.*

## C.    The Appeals

Since the December 2007 sentencing, this case has been heard twice at the Seventh Circuit and once at the United States Supreme Court. Sentencing was not at issue in any of the appellate proceedings. Instead, the primary issue on appeal concerned whether the jury was properly instructed as to honest services; and, if not, whether the error was harmless. Ultimately, after the Supreme Court ruled that the jury was not properly instructed as to honest services, the Seventh Circuit held that the error was partly harmless, and partly not. As to Count Seven (mail fraud involving the supplemental payments) and Count Thirteen (obstruction of justice), the error was harmless, and the jury's verdicts stand. As to Counts One and Six (mail fraud involving APC), the Seventh Circuit held that the error was not harmless, and remanded the case to the district court for a new trial. *Black*, 625 F.3d at 393-94.

With respect to the APC counts, the Seventh Circuit held that the evidence at trial "was certainly sufficient to prove a pecuniary fraud," and that "the jury was correctly instructed on the elements of such a fraud." *Id.* at 391. The Seventh Circuit further held that

although it was "unlikely" that the jury convicted defendants on the APC counts based solely on an honest-services theory, it was possible. *Id.* at 392. Even though the Court found that the APC counts must be remanded for a new trial, it made clear that its ruling was narrow and in no way undercut the significant evidence that the APC conduct was a money-and-property fraud. Thus, the Court stated:

> But although the defendants are entitled to a new trial on that count, the entitlement is moot unless the government decides to retry them. The government may wish instead, in order to conserve its resources and wind up this protracted litigation, to dismiss the APC count and proceed directly to resentencing. The judge could consider at the resentencing hearing the evidence that had been presented at the original trial concerning APC in determining what sentences to impose on the two counts (the $600,000 fraud involving Forum-Paxton and, with respect to Black, obstruction of justice as well) of which the defendants were properly convicted. 18 U.S.C. § 3661. "A jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam); *see also United States v. Quintero*, 618 F.3d 746, 755 (7th Cir. 2010); *United States v. Duncan*, 400 F.3d 1297, 1304-05 (11th Cir.2005). (And there was no acquittal on the APC count, just an error warranting – barely – a retrial.) But of course it is for the government to determine, not us, how to proceed on remand.

*Id.* at 394.

The government has done as the Seventh Circuit suggested. That is, "to conserve its resources and wind up this protracted litigation," the government has announced its intent to dismiss the APC counts with prejudice, if the Supreme Court denies defendant's pending petition for certiorari.

### D. Updated Presentence Investigation Report

The Probation Officer has issued an Updated Presentence Investigation Report. In that report, based upon the November 2000 Guidelines Manual, the Probation Officer calculated a Guideline range of 33 to 41 months. Updated PSR at 13, 38. The Probation Officer reached this range by finding a base offense level six under § 2F1.1(a), a ten-level increase for a $600,000 loss amount under § 2F1.1(b)(1)(K), a two-level enhancement under § 3C1.3 for abuse of trust, and a two-level enhancement under § 3C1.1 for attempted obstruction of justice. *Id.* at 13-18. The Probation Officer declined to find enhancements for more-than-minimal planning under § 2F1.1(b)(2), or sophisticated means under § 2F1.1(b)(6)(C). *Id.* at 15-16. As discussed below, the government objects to the Probation Officer's calculation, because it is incorrect.

## II. GOVERNMENT'S OBJECTIONS TO UPDATED PRESENTENCE INVESTIGATION REPORT

The government objects to parts of the Updated PSR. First, the government will address the Updated PSR's Guidelines-calculation errors. Second, the government notes additional corrections that should be made to the Updated PSR.

### A. Guidelines Manual

The Updated PSR uses the November 2000 Guidelines Manual to calculate defendant's offense level. Lines 405-406. The government's position is that the Probation Officer and the district court should consider and apply the current Guidelines Manual at the resentencing. Guideline § 1B1.11; *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006).

8

The Court has already instructed the parties that it will apply the 2000 Guidelines. The government preserves but does not repeat here its previous arguments concerning application of the current Guidelines Manual.

### B.      Loss Amount

The Updated PSR limits the loss amount to $600,000, erroneously failing to include the $5.5 million that defendant and his co-schemers stole from APC as relevant conduct under Guideline § 1B1.3. Lines 275-277, 411-412, 623-671, 705-711.[1]

Under Guideline § 1B1.3(a)(2), this Court should include as relevant conduct all acts and omissions committed and caused by defendant "that were part of the same course of conduct or common scheme or plan as the offense of conviction." Application Note 9(A) explains what the Guideline means by "common scheme or plan":

> For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi....

Application Note 9(B) explains what the Guideline means by "same course of conduct":

> Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently

---

[1] The complete picture of the fraud reveals even greater harm inflicted by defendant. The government previously argued that this Court should include additional relevant conduct relating to what was described in the charging instruments as the U.S. Community non-compete scheme, involving over $32 million. The Court already decided at the December 2007 sentencing not to include conduct beyond the $6.1 million involved in Counts One, Six, and Seven; the government preserves its objection but does not seek to relitigate the Court's ruling.

connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required....

Defendant's APC-related conduct qualifies under both parts of Guideline § 1B1.3(a)(2).

### 1.    *Common Scheme or Plan*

Any one of the factors in Application Note 9(A) – common victim, common accomplices, common purpose, or similar *modus operandi* – is sufficient to support a relevant-conduct finding. *United States v. Petty*, 132 F.3d 373, 381 (7th Cir. 1997) (single factor sufficient to support relevant-conduct determination). Here, *every* one of the factors supports a finding that defendant's APC-related conduct and his supplemental-payment-related conduct were part of a common scheme or plan.

First, for both sequences, the victim was the same: Hollinger International and its shareholders.

Second, for both sequences, the accomplices were the same: defendant schemed with Radler, Boultbee, Atkinson, and Kipnis.

Third, for both sequences, there was a common purpose: to enrich defendant, Radler, Boultbee, and Atkinson.

Fourth, for both sequences, there was a similar *modus operandi*: defendants took money from Hollinger International that they were not entitled to take, and tried to cover up the thefts by calling them non-compete payments. For the count of conviction, defendant and his co-schemers took the money out of the reserves of the Forum and Paxton sales, and called

10

the money "non-compete payments" even though they were not. For the APC-related conduct, defendant and his co-schemers took the money out of the profits of another newspaper sale, and called the money "non-compete payments" even though they were not. Defendant and his co-schemers told the same lies about both sets of payments. The primary difference between the two is that for the APC payments, defendant and his co-schemers papered over the thefts by creating an illusory and nonsensical employment non-compete agreement that prevented defendant from competing with himself; while for the supplemental payments, there was no paperwork. The *modus operandi* was not identical, but the Guideline does not so require. The Guideline refers only to a "similar" m.o.; and the m.o. here – using purported "non-compete payments" as a clever and legitimate-seeming way to draw un-approved money out of Hollinger – is certainly similar.

In *United States v. Swanson*, 483 F.3d 509, 512 (7th Cir. 2007), for example, defendant was a CEO who lied to his company's board of directors about the cost of a transaction, diverting $4 million for his own use. For this conduct, defendant was convicted at trial. *Id.* At sentencing, the government introduced evidence that defendant also engaged in another un-charged fraud: after being forced to resign from his company, defendant started a new venture and diverted over $1 million that had been invested in the startup, again lying to cover up his theft. *Id.* Even though the startup fraud was not alleged in the indictment and, therefore, was not convicted conduct, it was part of defendant's same course of conduct as the $4 million theft from his company. *Id.* at 512-13. Even though the victim was different, there was a similar *modus operandi*: "obtaining funds through mergers, acquisitions and joint

ventures." *Id.* at 514. In both instances, the defendant misused his position to convert investment money to his own use, and that was sufficient to find that the frauds were part of a common scheme or plan. *Id.*

As another example, in *United States v. Brierton*, 165 F.3d 1133, 1136-37 (7th Cir. 1999), a credit-union president pled guilty to one count of making a false entry in the credit union's records to deceive auditors. At sentencing, the government presented evidence that the president falsified loan documents beyond the one described in the count of conviction, secretly applied for and converted life insurance proceeds from the credit union to which she knew she was not entitled, and misapplied the credit union's funds by waiving fees and making disbursements to friends and family. *Id.* This conduct was part of a common scheme or plan, because it involved a common victim (the credit union); a common purpose (concealing the credit union's deteriorated financial condition, which resulted from defendant's actions); and a common *modus operandi* (manipulating credit union funds to conceal her illegal transactions). *Id.* at 1137. There were significant differences in the details of how defendant committed the convicted conduct and relevant conduct, but the commonalities support a relevant-conduct finding.

These cases evaluate relevant conduct by looking at the big picture of the defendant's conduct, a very common-sense way of interpreting what is part of a "common scheme or plan." In both *Swanson* and *Brierton*, the relevant conduct was not exactly the same as the convicted conduct; but it was similar, especially when considering that the defendants were

defrauding the same victim (*Brierton*) or acting with the same purpose (both cases).[2] Here, too, there are more commonalities than differences in the convicted and relevant conduct: defendant and his co-schemers fraudulently took money from Hollinger International, and covered up both thefts by falsely depicting the stolen money as legitimate non-compete payments.

### 2. Same Course of Conduct

Likewise, the factors in Application Note 9(B) – the degree of similarity of the offenses, the regularity of the offenses, and the time interval between the offenses – support a conclusion that defendant's APC and supplemental-payment thefts were part of the same course of conduct.

First, the sequences were very similar. Both involved taking money styled as "non-compete payments" that were not really non-compete payments. As to the count of conviction, defendant and his co-schemers cast the $600,000 as non-compete payments relating to Hollinger International's sale of newspapers to Forum and Paxton, even though there were no such agreements negotiated or executed, and the money had nothing to do with non-competes. Forum and Paxton did not request personal non-compete agreements with defendant or the other executives; such agreements were not necessary at all to protect these

---

[2] Unlike *Swanson* and *Brierton*, this case does not require resort to concepts of acquitted or uncharged conduct because the APC and the Forum-Paxton non-compete frauds were not multiple offenses at all. As alleged in the superseding information, they were parts of one scheme to defraud Hollinger International and its shareholders. The offense of conviction includes all parts of the scheme. This case thus presents an easier question of relevant conduct at sentencing than either *Swanson* or *Brierton*.

newspaper buyers, given the nature and location of the executives and the businesses, nor were such agreements created or signed. Nevertheless, defendant and his co-schemers took money out of the deals, falsely reporting on the company's books and records, and later to shareholders, that the money was for non-compete payments paid by Forum and Paxton. Likewise, defendant and his co-schemers took $5.5 million from APC not because they were truly being paid for non-compete agreements, or because APC needed, wanted, or had requested employment non-competes from the executives, but because the executives simply wanted the money. As with the $600,000, they were not entitled to the money, and Hollinger International – the victim – had not agreed that they could take it. The APC non-compete agreements were used solely to paper the transaction, and to provide a basis for defendant and his co-schemers to avoid taxes on the fraud proceeds in Canada.

Second, the frauds were repetitive. Indeed, the supplemental-payment part of the scheme and the APC conduct occurred at the tail end of a series of frauds, as shown at trial.[3] The APC thefts constituted the final theft in a series of repetitive thefts from Hollinger International, all styled – falsely – as legitimate non-compete payments to the top executives. Even if the Court considers only the APC and supplemental-payment thefts, they are repetitive for purposes of § 1B1.3.

---

[3]The government does not seek to re-litigate the Court's prior rulings concerning CNHI and the other U.S. community newspaper transactions; still, for purposes of evaluating whether the APC conduct is relevant conduct under Guideline § 1B1.3, the Court can and should consider that defendant and his co-schemers paid themselves the $5.5 million from APC only *after* successfully obtaining millions from the company in purported non-compete payments in other newspaper sales.

Third, the time interval was brief: only two months. Defendant and his co-schemers stole the APC payments in February 2001. Defendant and his co-schemers stole the supplemental-payment money in April 2001.

The Updated PSR states that the transactions "occurred in close temporal proximity," Line 655, but were "dissimilar" for three reasons: "1) the lack of any newspaper sale with regard to the APC non-competes, but the presence of non-compete agreements; 2) the lack of any executed individual non-competes with regard to Paxton and Forum; and 3) the apparently different purposes for the schemes, i.e., disguising bonus payments versus diverting monies to fund intended individual non-compete agreements, but for the oversight of Kipnis," Lines 657-661. This analysis is incorrect. It does not matter that Forum and Paxton involved newspaper sales and APC did not; the $600,000 that defendant and his co-schemers took in April 2001 had no more to do with newspaper sales than the $5.5 million they took in February 2001. Both series of events were part of the same scheme by the same people to steal money from the same company using the same cover story (*i.e.*, masking the thefts as legitimate non-compete payments, when they were not). The company's public disclosures lumped the payments together, making the same false representations about both sets of payments. Defendant, too, lumped the payments together when he personally addressed shareholders at the 2002 meeting, making the same false representations about both sets of payments.

A key problem in the Updated PSR, at Lines 455-457, 646-654, and 660-661, is its apparent, and mistaken, assumption that there were supposed to be non-compete agreements

15

in the Forum and Paxton deals covering the $600,000 taken by defendant and his co-schemers, and that the absence of such agreements was a mere "oversight." That is incorrect. Forum did not intend to enter non-compete agreements with the defendant and the other executives. Nor did Paxton. The only people who wanted non-compete agreements drafted were the schemers, as a cover story for the money that they intended to steal from the proceeds that Forum and Paxton agreed to pay Hollinger International. There was no reason whatsoever for the Hollinger International shareholders to lose $600,000 out of those deals to defendant and his co-schemers. Defendant just wanted the money, and the point of writing up non-compete agreements was to make the theft look legitimate. That is why this is fraud, as the jury, this Court, and the Seventh Circuit each found.[4/] *Black*, 625 F.3d at 393 (finding that the $600,000 fraud did not result from an "innocent mistake" in failing to prepare non-compete agreements, but instead, evidence showed that "no covenants were intended, and the fees were part of the purchase price of the newspapers, owed to Hollinger and stolen by the defendants").

Moreover, the Updated PSR mistakenly speculates about how the Supreme Court's honest-services ruling impacts the relevance of the APC-related conduct. Lines 662-671, 705-711. The Seventh Circuit held that the government's APC evidence "was certainly sufficient to prove a pecuniary fraud," and that "and the jury was correctly instructed on the

---

[4/]The Updated PSR makes the same error at Lines 322-323, 455-462, 509-513. The government objects to those lines as well.

16

elements of such a fraud." *Black*, 625 F.3d at 391.[5/] The Seventh Circuit also ruled that it was "unlikely" that the jury convicted defendants on the APC counts based solely on an honest-services theory. The Court of Appeals was correct, because – as the government's appellate briefs in this case explain in great detail – the government repeatedly told the jury that its honest-services theory in this case was that the defendants stole money from Hollinger in the form of phony non-compete payments. The government never argued that a mere non-disclosure or a mere fiduciary-duty breach would suffice to convict. By the same token, defendant's two attorneys mentioned "honest services" only *once* in their collective argument, which spanned 250 pages of the Court's transcript.[6/]

More to the point, the Updated PSR's speculation about honest services is not germane to the relevant-conduct analysis. At this procedural stage, this Court is to determine whether a preponderance of evidence supports a finding that defendant, together with his co-schemers, engaged in behavior that was that was part of the same course of conduct or common scheme or plan as the offense of conviction. As described above, the APC conduct plainly fits the bill.

---

[5/]This was the second time the Seventh Circuit found, as this Court already held, that the government's evidence as to APC established pecuniary fraud. *See United States v. Black*, 530 F.3d 596, 600 (7th Cir. 2008) ("The evidence established a conventional fraud, that is, a theft of money or other property from Hollinger by misrepresentations and misleading omissions amounting to fraud....").

[6/]Even this reference was to CanWest, not APC: "CanWest was a good transaction. A little rough, a little sloppy, . . . but not illegal, but not . . . a violation of the law. Not a violation of fiduciary duty. Not a violation of honest – of defrauding of honest services. There is nothing wrong with CanWest." Tr. 14006.

### C.     More-Than-Minimal Planning

Under Guideline § 2F1.1(b)(2), there is a two-level increase if the offense involved more-than-minimal planning. Application Note 1(f) to Guideline § 1B1.1 states that the enhancement applies when an offense involves "more planning than is typical for commission of the offense in a simple form," or when "significant affirmative steps were taken to conceal the offense, other than conduct to which § 3C1.1...applies." The Application Note further states, "'More than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." The enhancement is proper if any one of these three factors is present. *United States v. De Angelo*, 167 F.3d 1167, 1169 (7th Cir. 1999); *United States v. Green*, 114 F.3d 613, 618 (7th Cir. 1997).

Here, as this Court found at the December 2007 sentencing, the offense "clearly" involved more-than-minimal planning. Sent. Tr. 20. First, taking the offense of conviction by itself, it took more-than-minimal planning for defendant and his co-schemers to steal $600,000 from Hollinger International, and to conceal their theft for years. The steps they took to steal the money and conceal their crime included:

- •     Discussions among co-schemers (in particular, Black and Radler) about their desire to take the money;

- •     Radler's determining, through inquiries with an APC officer, that there was $600,000 in the company's reserves from the Forum and Paxton sales;

- •     Creating a memo directing the APC officer to issue checks to defendant, Radler, Boultbee, and Atkinson based on the false reason that the checks were for non-compete payments;

18

- Manipulating the company's check registers to reflect, falsely, that the money was for "non-compete payments";

- Obtaining and depositing the checks;

- Concealing the conflict-laden payments from the company's Audit Committee, which was required to approve related-party transactions;

- In proxy questionnaires, concealing the payments when asked directly about "other compensation" received from the company;

- Falsely reporting to the company's attorneys that the checks were legitimate non-compete payments arising from newspaper deals with Forum and Paxton, when the payments had nothing to do with Forum or Paxton and were not really non-compete payments;

- Falsely reporting the same to the company's auditors;

- Assisting the attorneys and auditors in drafting false and misleading disclosures to company shareholders;

- Alternately ignoring and berating shareholders who personally questioned defendant about the alleged non-compete payments, in an apparent effort to stop them from questioning the payments' propriety;

- Repeating the same lies to shareholders at a shareholder meeting in an attempt to persuade them – falsely – that it was essential for them to pay defendant and his co-schemers non-compete money in order to close the U.S. community newspaper sales; and

- Trying to manipulate the membership and responsibilities of a Special Committee appointed by the company's board of directors to investigate the non-compete payments, to avoid detection of the fraud.

This, alone, qualifies defendant for the more-than-minimal planning increase. (Indeed, it goes far beyond "minimal" planning, and qualifies defendant for the sophisticated-means enhancement as well, as discussed below.)

The Updated PSR declined to impose the enhancement. Lines 452-487. First, the Updated PSR characterized the supplemental-payment thefts as "a single taking" and "purely opportune," and stated the efforts to conceal "[did] not rise to the level of significant affirmative efforts." *Id.* The trial evidence shows that the Updated PSR is wrong. The $600,000 theft was not an isolated event. Defendant and his co-schemers did not, out of the blue, simply swipe the money from the company's coffers and call it a day. This was a series of events, part of a larger scheme, and included significant and sophisticated concealment in an effort to hide the theft from the company's Audit Committee, board of directors, lawyers, auditors, and shareholders. *See, e.g., United States v. Sloan*, 492 F.3d 884, 895 (7th Cir. 2007) (enhancement appropriate where fraudulent activity spanned several months, during which time defendant engaged in multiple acts that were "deliberate and made in such a way as to conceal the fraudulent scheme"); *United States v. Channapragada*, 59 F.3d 62, 66 (7th Cir. 1995) (enhancement applied where defendant took additional steps to conceal fraud from sophisticated victim). These acts rendered defendant's crime "more serious or unusual than the average offense." *United States v. Lewis*, 41 F.3d 1209, 1213 (7th Cir. 1994).

Nor is it correct to rely on general documentation concerning the Forum and Paxton transactions to conclude that defendant and his co-schemers provided partial information to the auditors and lawyers. Lines 469-483. The auditors, lawyers, and the board certainly knew that Hollinger International sold newspapers to Forum and Paxton. That's the "paperwork" that the auditors and lawyers received. Line 471. But no one – not the auditors, the lawyers,

the Audit Committee, the board, or the shareholders – was told, or approved, that defendant, Radler, Boultbee, and Atkinson would take $600,000 for themselves out of the money that Hollinger International earned on the newspaper deals, just because they wanted to. This is what defendant and his co-schemers set about to conceal, by falsely reporting that they received the money as part of the Forum and Paxton sales, as non-compete payments, with the independent directors' knowledge and approval.

Second, the Updated PSR erred in excluding the $5.5 million APC thefts from its more-than-minimal planning analysis, based on the wrong premise that the thefts were not relevant conduct. Lines 452-454. In addition to the concealment efforts described above, these thefts also involved the preparation and execution of phony employment non-compete agreements, and backdating of checks, likewise justifying the enhancement.

In sum, the $600,000 theft was not a spur-of-the-moment taking. It was calculated and involved significant affirmative acts of concealment. Together with the $5.5 million theft involving the APC payments, defendant engaged in more-than-minimal planning and should receive a two-level enhancement.

### D. Sophisticated Means

There is a two-level increase in the offense level under Guideline § 2F1.1(b)(6)(C) when an offense involved sophisticated means, *i.e.*, "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." The enhancement applies when the conduct shows more planning or concealment than other

frauds of the same kind. *United States v. Landwer*, —F.3d—, 2011 WL 1585080, *2 (7th Cir. April 28, 2011).

At the December 2007 sentencing hearing, after hearing argument from the parties, the Court imposed the sophisticated-means enhancement because defendant used a legitimate business concept – non-compete agreements – "to perpetrate a fraud and make it more difficult for the outside world to detect." Sent. Tr. 35. The Court continued, "That, along with the backdated checks, concealment of issues from the Audit Committee and the concealment from the shareholders, all of that evidence combines to satisfy the 'sophisticated means'; and, I will give the two-point enhancement for 'sophisticated means.'" *Id.* Although the backdated-checks reference applied solely to the APC thefts, the remaining factors on which the Court relied related to both the supplemental-payment thefts and the APC thefts.

The Updated PSR incorrectly omits a two-level increase in the offense level for sophisticated means under Guideline § 2F1.1(b)(6)(C). Lines 504-516. Simply placing a telephone number on a check as an act of concealment can support a finding of sophisticated means. *United States v. Robinson*, 538 F.3d 605, 607-608 (7th Cir. 2008). Thus, even analyzing the $600,000 theft by itself, as detailed in the previous section, defendant and his co-schemers' theft involved far more planning and concealment than a garden-variety fraud. Including the relevant conduct relating to the APC payments further supports a finding that this fraud involved sophisticated means.

### E.    Offense Level for Obstruction of Justice

The Updated PSR correctly analyzes the Guidelines calculation for defendant's obstruction-of-justice conviction, except that it uses the wrong offense level as a starting point. Lines 590-591, 602. Because the correct offense level for the underlying offense is 28, the offense level for obstruction begins at level 22. With a two-level increase based on defendant's supervisory role under Guideline § 3B1.1(c), the adjusted offense level for defendant's obstruction conviction is 24.

### F.    Adjusted Offense Level

The government objects to the Updated PSR's final calculation. Lines 606-607, 613, 615, 1234-1235. After grouping the offenses, the adjusted offense level under the 2000 Guidelines Manual should be 28. Based on a criminal history category I, defendant's Guideline range is 78-97 months.

The government objects to the Updated PSR's calculation at Lines 1240-1244 concerning the 2010 Guidelines range, for the reasons already stated.

### G.    Corrections to Updated PSR

Finally, there are four other errors in the Updated PSR that the government believes should be corrected:

First, the Updated PSR states in several places that the Supreme Court set aside the jury's verdicts with respect to the APC counts and upheld its verdict concerning the supplemental payments. Lines 148-151, 267-268, 621-622, 681-682. This is incorrect. The Supreme Court vacated the Seventh Circuit's earlier decision and remanded the case back

23

to the Seventh Circuit for harmless-error analysis. *United States v. Black*, 130 S. Ct. 2963, 2970 (2010). The Supreme Court specifically stated that it "express[ed] no opinion on the question of whether the error was ultimately harmless." *Id.*

Second, the Updated PSR states, with respect to the Forum and Paxton transactions, "It is true that payments to the Company (Inc.) were to satisfy a closing condition, as non-compete agreements were executed with respect to Inc." Lines 315-316. Although this is not an issue for this re-sentencing, the Updated PSR is incorrect. As company representatives testified at trial, neither Forum nor Paxton required non-compete agreements from Hollinger, Inc. in order to close their purchases from Hollinger International.

Third, the Updated PSR states that no victim impact statements have been received from Hollinger International shareholders. Lines 333-335. Although not re-submitted in writing to the Probation Office for this re-sentencing, a shareholder representative made a victim impact statement to the Court at the December 2007 sentencing. Sent. Tr. at 97-107.

Fourth, the Updated PSR suggests at Lines 1325-1328 that defendants Boultbee and Atkinson were re-sentenced by this Court to less time than the Court previously ordered, and at Lines 1329-1330 that defendant Radler did not serve his full sentence. The Updated PSR is incorrect. By the time this matter returned to the Court following the appellate proceedings, defendants Atkinson and Radler had already fully served the sentences imposed by the Court and been released from prison. That neither served the exact number of months stated in the Court's Judgment and Commitment Order is no different than any other defendant who earns good-time credit or finishes his sentence in accordance with established

24

policies of the prison where he is incarcerated. Defendant Boultbee, too, had already fully served the sentence imposed by the Court, taking into account the expected impact of the prisoner transfer treaty with Canada. This Court did not re-sentence defendant Boultbee or Atkinson to time served; rather, it issued amended Judgment and Commitment Orders using phrasing that accurately conveyed to the Bureau of Prisons that neither defendant Atkinson nor defendant Boultbee should be returned to prison, given that they had served their sentences.

## III.     GOVERNMENT'S POSITION ON SENTENCING

As a matter of process, the district court must properly calculate the Guidelines range, treat the Guidelines as advisory, consider the Section 3553(a) factors, and adequately explain the chosen sentence, including an explanation for any variance from the Guidelines range. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The correctly calculated Guidelines range under the 2000 Guidelines Manual is 78-97 months.

### A.     Consideration of Non-Convicted Conduct

Even if this Court does not ultimately determine that defendant's APC-related conduct is "relevant conduct" within the meaning of Guideline § 1B1.3, and even if that impacts other Guideline determinations made by the Court, the Court still can and should consider defendant's role in stealing $5.5 million from Hollinger International when sentencing the defendant. 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate

sentence."); *United States v. Vitrano*, 495 F.3d 387, 390 (7th Cir. 2007) (affirming district court's reliance at sentencing on defendant's wrongdoing that was un-convicted and that was not found to be relevant conduct); *United States v. Nowicki*, 870 F.2d 405, 406 (7th Cir. 1989) (sentencing judge has "great latitude in the information he uses to determine the sentence") (quoting *United States v. Perez*, 858 F.2d 1272, 1275 (7th Cir. 1988)). To be sure, the Seventh Circuit made clear that this Court may "consider at the resentencing hearing the evidence that had been presented at the original trial concerning APC in determining what sentences to impose on the two counts (the $600,000 fraud involving Forum-Paxton and, with respect to Black, obstruction of justice as well) of which the defendants were properly convicted," citing 18 U.S.C. § 3661 and relevant case law. *Black*, 625 F.3d at 394. Indeed, the Seventh Circuit made the point that there is an even stronger basis here than in many of the cases where sentencing judges relied on acquitted conduct, because "there was no acquittal on the APC count, just an error warranting – barely – a retrial." *Id.*

## B. Overview of Section 3553(a) Factors

The Court addressed Section 3553(a) factors at the December 2007 sentencing in this case, finding defendant's offenses to be "very serious," and noting the "great financial consequence of [defendant's] crime for the shareholders and for the company, including the people who work there." Sent. Tr. at 113. The Court found defendant's obstruction-of-justice crime to be "equally serious" as his fraud. *Id.* The Court evaluated the other Section 3553(a) factors as well. On the issue of preventing unwarranted disparity among sentences, the Court

referred to David Radler's 29-month sentence, observing that although Radler was "at least as culpable" as defendant, he cooperated in the investigation. *Id.* at 115-116.

The Court's observations from December 2007 remain true today. The most significant difference between the previous sentencing and now is that defendant has served a bit over a third of his sentence, and has presented the Probation Officer (and presumably will seek to present to the Court) accounts of his prison behavior. Lines 1119-1176.

Defendant has not been in any trouble while in prison; that is not surprising. He has made affirmative efforts to help fellow inmates, primarily through teaching. As he told the Probation Officer, he decided to "make the best of it" and volunteer as a tutor. Line 1140. Defendant's choice to use his time in prison to help others is laudable.

Defendant persists, however, in refusing to accept responsibility for his crimes. He protests his prosecution, his conviction, and the outcomes of his appeals. He does not acknowledge his theft of $600,000 from Hollinger International. He does not acknowledge his theft of $5.5 million from the company through the fanciful APC employment non-compete agreements. He does not admit obstructing justice. More broadly, he fails to acknowledge his central role in destroying Hollinger International through greed and lies, instead blaming the government and others for what he describes as an unjust persecution.[7]

---

[7]Notable examples include the following articles, authored by the defendant and published in the National Post: *Unjustly Incarcerated* (March 3, 2008), available at www.nationalpost.com/news/Unjustly+incarcerated/348425/story.html (proclaiming himself "falsely accused," "wrongly convicted," and "unjustly incarcerated"); *Canada's inhumane prison plan* (May 29, 2010), available at www.nationalpost.com/news/Canada+inhumane+prison+plan/3086246/story. html (questioning the ethics of prosecutors and judges on his case).

Defendant is entitled to hold and express that view; but his defiance is relevant to this Court's determinations concerning the need to impose a sentence that promotes respect for the law, provides just punishment for the offense, and affords adequate deterrence to criminal conduct.

Defendant stole from Hollinger International, and he sought to obstruct the investigation into his fraud. The jury so found, this Court so found, and the appellate courts have so found. It is good that defendant has maintained a positive outlook while in prison, and that he has found a way to contribute to that community; those positive actions do not, however, obviate the need for defendant to serve the remainder of a sentence that he earned through his offense conduct and his refusal to accept responsibility, a refusal that persists today. Indeed, it would send the wrong message both to defendant and the public to reduce defendant's sentence in the face of his repeated and false public claims that he is a victim of the American justice system run amok, when the exhaustive post-conviction review of this case has served only to reaffirm the accuracy of the factual findings about defendant's fraud and the validity of his convictions on the counts for which he is to be resentenced. Defendant is not a victim. He stole millions of dollars from a public company at its shareholders' expense, and he should be held fully accountable for his actions.

It is not customary for defendants to receive bond pending appeal. Defendant was fortunate to receive bond while the appellate courts considered his case. The Seventh Circuit has now reviewed defendant's case with the Supreme Court's guidance concerning honest services, and found only a minor jury-instruction error concerning the APC counts. The

Seventh Circuit made very clear that its finding did not undercut the strong evidence the government presented that defendant, with his co-schemers, stole the $5.5 million from APC, along with the other funds at issue. The Court of Appeals emphasized the propriety of this Court's continuing to hold defendant accountable for the APC thefts at this resentencing. Moreover, defendant's appeals did not in any way affect the 78-month sentence that this Court independently imposed for defendant's obstruction conviction, and which this Court ruled was "equally [as] serious" as defendant's fraud. Thus, particularly given defendant's adherence to his original position at the 2007 sentencing – that he has done no wrong – this Court should impose the same sentence today as it did in 2007.

## IV.  CONCLUSION

For the foregoing reasons, the United States respectfully requests this Court reimpose a 78-month sentence.

Dated: May 13, 2011

Respectfully submitted,
PATRICK J. FITZGERALD
United States Attorney

By:   s/ Julie B. Porter
JULIE B. PORTER
Assistant U.S. Attorney
219 South Dearborn Street, Room 500
Chicago, Illinois 60604
(312) 353-5300

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following document:

Government's Objections to Updated Presentence Investigation Report and Position Paper as to Sentencing Factors

was served on May 13, 2011, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

s/ Julie B. Porter
JULIE B. PORTER
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois
(312) 353-5300