UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 05 CR 727-01 |
| | ) | Hon. Amy J. St. Eve |
| CONRAD M. BLACK. | ) | |

**CONRAD BLACK'S SUBMISSION
IN RESPONSE TO UPDATED PRESENTENCE REPORT AND
IN AID OF RESENTENCING**

MIGUEL A. ESTRADA
DAVID DEBOLD
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, D.C.  20036
(202) 955-8500

CAROLYN GURLAND
2 North LaSalle Street
17th Floor
Chicago, Il 60614

*Attorneys for Defendant Conrad M. Black*

# TABLE OF CONTENTS

Page

A SENTENCE OF TIME SERVED WOULD BE SUFFICIENT,
YET NOT GREATER THAN NECESSARY, TO ACHIEVE ALL
OF THE PURPOSES OF SENTENCING .......................................................3

    A.    The § 3553(a) Factors Set Forth In Conrad Black's
November 28, 2007 Sentencing Submission Remain
Relevant To Resentencing. ...........................................................4

    B.    A Number Of New Facts And Circumstances, In
Combination With Those Considered At The Original
Sentencing, Call For A Sentence Of Time Served. .......................5

        1.    The History And Characteristics Of Mr. Black.................6

            a.    Mr. Black's Conduct While Incarcerated
At FCI Coleman Between March 3, 2008
And July 21, 2010 ......................................................8

            b.    Mr. Black's Conduct Since July 21, 2010. .............24

        2.    Just Punishment For The Offense And
Promotion Of Respect For The Law ................................27

        3.    Specific And General Deterrence.....................................34

        4.    The Advisory Sentencing Guidelines ...............................36

        5.    Avoidance Of Unwarranted Sentencing
Disparity.........................................................................41

CONCLUSION.............................................................................................46

Defendant Conrad M. Black responds to the updated Presentence Investigation Report (PSR) and sets forth his position on the appropriate sentence. Mr. Black disagrees with the presentence report on only two recommendations that would affect the advisory Guidelines range. (A few other corrections that do not affect the Guidelines calculations are found in Exhibit A.) Looking beyond the applicable range, a careful consideration of the totality of sentencing factors listed in 18 U.S.C. § 3553(a) fully supports the conclusion that a sentence of time served would be sufficient, but not greater than necessary, to achieve the purposes of sentencing. This Court should therefore reject the Government's invitation to proceed as though nothing of any consequence has occurred in this case since the original sentencing, and recognize that the nature of the offenses for which Mr. Black stands convicted and his relevant personal characteristics have changed significantly since 2007.

Mr. Black stands convicted on one count of mail fraud (count 7) and one count of obstructing a proceeding (count 13). On remand from the United States Supreme Court, the Seventh Circuit vacated two other mail fraud counts (counts 1 and 6) that were based on a set of transactions involving substantially larger payments than the sole remaining fraud count. The Probation Department recommends a Guidelines range of 33 – 41 months, which is shorter than the original range (78 – 97 months).

For the reasons explained below, **the correct range is 24 – 30 months**. Regardless, Mr. Black has already served the equivalent of nearly 33 months (after adjusting for good time credit that he earned)—the bottom of the Probation De-

partment's recommended range. Moreover, the § 3553(a) factors support a sentence of time served even should the advisory range turn out to be higher.

*First*, any additional prison time would exacerbate the unwarranted disparity between Mr. Black's sentence and the substantially shorter sentences completed by every other defendant in this case.

*Second*, Mr. Black's conduct since the original sentencing in 2007 demonstrates that additional prison time is unnecessary. He made the most of his two-and-a-half years of incarceration by tutoring other inmates and giving them the training and encouragement needed to obtain their General Equivalency Degrees (GEDs). Literally hundreds of Mr. Black's fellow inmates benefitted from a combination of his formal tutoring, the lectures he gave on American history, and his informal words of advice and encouragement. Since his release in July 2010, Mr. Black has remained in touch with a number of the inmates whom he helped while at FCI Coleman; he has continued to write weekly columns for recognized national publications; he has nearly completed another book on American history (among other writing projects); and he has worked with his sister-in-law to expand the mission of his family's charitable foundation to include worthy objectives influenced by his prison experiences.

*Third*, Mr. Black has suffered much more than others convicted of similar conduct or serving sentences of a similar length. He has suffered collateral consequences as a non-U.S. citizen; his fragile health and his age are significant mitigating factors; and the extended duration of this and related proceedings has weighed

heavily on him and his family. For these and additional reasons explained below, the Court should proceed as it did with Mr. Black's codefendants by imposing no prison time beyond that which he has already served.

## A SENTENCE OF TIME SERVED WOULD BE SUFFICIENT, YET NOT GREATER THAN NECESSARY, TO ACHIEVE ALL OF THE PURPOSES OF SENTENCING

The framework for imposition of a federal sentences is set forth in 18 U.S.C. § 3553(a). *See United States v. Booker*, 543 U.S. 220, 233-34, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586 (2007). That statute requires the Court to give careful consideration to a number of purposes and circumstances, including several that focus on a defendant and his life history. *Gall*, 552 U.S. at 50, 128 S. Ct. at 597; *Kimbrough v. United States*, 552 U.S. 85 (2007). Recent guidance from the Supreme Court and the Seventh Circuit confirms that "highly relevant—if not essential—to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and circumstances." *Pepper v. United States*, 131 S. Ct. 1229, 1235 (2011) (citation and internal quotation and alteration marks omitted); *id.* at 1240; *see also United States v. Reyes-Hernandez*, 624 F.3d 405 (7th Cir. 2010). The extent of discretion properly afforded to district courts in sentencing is well informed by the Supreme Court's repeated observation that the sentencing judge has a vantage point superior to that of appellate judges in the critical realm of determining the facts and assessing the role that they should play in fashioning the appropriate sentence. *See,*

3

*e.g., Gall*, 552 U.S. at 50-51; 128 S. Ct. at 597, *United States v. Rita*, 551 U.S. 338, 357-58; 127 S. Ct. 2456, 2469 (2007).

After weighing all of the relevant sentencing considerations, the conclusion is inescapable that a sentence of time served would fully achieve the purposes of sentencing, and the Court should therefore permit Mr. Black to continue his productive and law-abiding life beyond the confines of a federal prison.

### A. The § 3553(a) Factors Set Forth In Conrad Black's November 28, 2007 Sentencing Submission Remain Relevant To Resentencing.

Mr. Black's first sentencing filing to this Court in November 2007 provided a detailed description of a number of circumstances appropriately considered in his case. Many retain the powerful force that they held more than three years ago; for others, recent information (covered in the sections below) demonstrates their elevated significance. Because they were explained in detail in the previous submission, we offer only a brief summary here:

- At the time of the original sentencing in 2007, Mr. Black had already endured protracted investigations and litigation in numerous venues, which, in addition to having a punitive effect on Mr. Black, furthered the statute's objective of deterring others from criminal conduct.

- At the time of the original sentencing there was a significant disparity, even after taking cooperation into account, between the sentence that the government negotiated with David Radler and the one it sought for Mr. Black. The Court's effort to prevent unwarranted disparity through the sentences that it imposed has since been compromised by the amount of time that Mr. Radler and the other defendants actually served.

- Mr. Black had a strong history of devotion to his family and a strong record of compassionate treatment of employees and acquaintances.

4

- Mr. Black's contributions of his time and money to charitable causes and individuals in need were extremely generous.

- There was no cause for concern that Mr. Black might engage in improper conduct following completion of his sentence.

- Mr. Black had established himself as a renowned author and historian and a staunch defender of this country.

The sections that follow explain how these and a number of additional factors should be considered in arriving at the appropriate sentence of time served.

### B.     A Number Of New Facts And Circumstances, In Combination With Those Considered At The Original Sentencing, Call For A Sentence Of Time Served.

Several important facts are newly available to the Court. Some bear on the goal of avoiding unwarranted disparity, such as the fact that none of the other defendants sentenced in this case has served more than a fraction of the prison time that the Court imposed. As for Mr. Black's personal circumstances, his health has worsened appreciably since 2007. Blood pressure issues predating the start of his prison term worsened during his incarceration, reaching levels that Mr. Black's treating physician describes as injurious to his health and quality of life. Mr. Black, of course, also experienced a radical change in his day-to-day existence when he reported to prison in March 2008. How he handled that difficult transition speaks volumes about his character and any asserted necessity for additional punishment. That period of Mr. Black's life, in particular, is described in numerous letters from fellow inmates and others who witnessed first-hand Mr. Black's positive influence on those around him. The picture that emerges from these letters—written mostly by those whom Mr. Black befriended and assisted while in prison—is of a man de-

termined to triumph over severe personal setbacks by changing the lives of those around him for the better. Mr. Black's ability to rise above adversity in such a productive and dignified manner not only underscores the quality of his character, it helps to demonstrate why additional prison time is not needed to achieve the purposes of sentencing.

In this case, the applicable § 3553 factors provide a basis independent from the advisory sentencing guideline range for a sentence of time served. The § 3553(a) factors relevant to the Court's sentencing determination include: (1) Mr. Black's history and characteristics (§ 3553(a)(1)); (2) just punishment for the offense and promotion of respect for the law (§ 3553(a)(2)(A)); (3) specific and general deterrence (§ 3553(a)(2)(B) & (C)); (4) the advisory Guidelines range applicable to this case (§ 3553(a)(4)); and (5) the need to avoid unwarranted sentencing disparities among defendants found guilty of similar conduct (§ 3553(a)(6)).

### 1.    The History And Characteristics Of Mr. Black

Mr. Black's actions and experiences since December 2007 are properly before this Court as it determines whether further prison time is warranted. Earlier this Term, the Supreme Court instructed in *Pepper* that when the defendant's sentence has been set aside on appeal, post-sentencing information about that defendant (including post-sentence rehabilitation) is a component of the history and characteristics that must be considered at the resentencing.[1]

---

[1]    *Pepper* struck down as unconstitutional a provision of the PROTECT Act (18 U.S.C. §3742(g)(2)) that had prohibited district courts from imposing sentences be-

*Pepper* explains that "[a] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing," 131 S. Ct. at 1242 (quoting *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000)).[2] "Congress could not have been clearer in directing that '[n]o limitation . . . be placed on the information concerning the background, character, and conduct' of a defendant that a district court may 'receive and consider for the purposes of imposing an appropriate sentence,'" and "[t]he plain language of § 3661 makes no distinction between a defendant's initial sentencing and a subsequent resentencing after a prior sentence has been set aside on appeal." 131 S. Ct. at 1241 (ellipses in original; quoting 18 U.S.C. § 3661); *id.* at 1240 (reaffirming its previous ruling that it is "[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence" that a court be in "pos-

---

low the applicable Guidelines range unless the district court had relied on the same ground for departure at the original sentencing.

[2]    In its March 28, 2011 "Supplemental Government's Version of The Offense," the government rests its "nothing has changed" position on a passage at the end of the remand opinion noting this Court's ability to consider a broad range of information at sentencing, including unconvicted conduct.  Of course, the Seventh Circuit had no reason to consider any of the sentencing issues from the initial proceeding, including this Court's assessment of relevant conduct; no sentencing arguments were raised on appeal.  The panel also did not have the benefit of the Probation Department's extensive work in preparing the updated presentence report, including information regarding post-sentence rehabilitation that the Supreme Court ruled— five months after the Seventh Circuit's opinion—should now be considered.  The remand opinion did not purport to dictate how this Court (or the government, for that matter) should handle any of these various unbriefed issues. *United States v. Black*, 625 F.3d 386, 394 (7th Cir. 2010) (stating, with respect to a possible retrial of the vacated counts, "of course it is for the government to determine, not us, how to proceed on remand").  By electing to drop those counts on which the jury may very well have voted to convict for something that is not fraud, the government accepted the proposition that this Court, rather than an appellate court, is best equipped to make a just and equitable sentencing determination at the resentencing.

session of the fullest information possible concerning defendant's life and character-istics," and emphasizing the importance of "[p]ermitting sentencing courts to con-sider the widest possible breadth of information about a defendant"). This principle mandates consideration of the manner in which Mr. Black served his two-year-plus period of incarceration as well as his conduct post-release.

### a. Mr. Black's Conduct While Incarcerated At FCI Coleman Between March 3, 2008 And July 21, 2010

On the morning of March 3, 2008, amidst a crowd of unrelenting reporters who had literally surrounded his car, Conrad Black and his wife, Barbara, set out on the three-hour drive from his home in Florida to Coleman FCI to self-surrender. On arrival at Coleman, Mr. Black began a new phase of his life as inmate number 18330-424. Coleman administrative staff informed Mr. Black that he was no differ-ent from anyone else and that he was expected to conduct himself accordingly. It was a surprise to Mr. Black that someone might think there was any other possibil-ity to consider.

For the next 29 months, Conrad Black showed—through his attitude and ac-tions—something that even some of his most strident detractors have come to acknowledge: all of the words previously written to this Court about his charity, his generosity, and his strength of character were abundantly true, and indeed, under-statements.

*Mr. Black's assignment as tutor*

Garland Hogan was among the first of the inmates to encounter Mr. Black on the day he arrived at Coleman. As recounted in Mr. Hogan's letter, he told Mr. Black about the possibility of qualifying for a special work assignment. Mr. Black replied that he did not want a special assignment "but would prefer to simply perform whatever job he was given."[3]

On their own accord, prison staff familiar with Mr. Black's accomplishments as an author and historian persuaded the head of the education section to create a position for Mr. Black as a tutor in English. One of the first things Mr. Black did upon learning of his assignment was to obtain permission to double his work hours so that he could tutor four days a week. His small group of students soon swelled into nearly every one of the Vocational Training Division's General Equivalency Degree (GED) candidates. Mr. Black estimates that he tutored more than 100 student inmates over the course of approximately 28 months.[4] At the beginning, Mr. Black worked with students one-on-one.[5] As more and more inmates expressed interest in working with him, however, he tutored up to 4 students at a time.[6]

---

[3] Letter of Garland Hogan, p. 1.

[4] PSR p. 36, lines 1148-1149.

[5] PSR p. 36, line 1144.

[6] PSR p. 36, lines 1144-1145.

*Mr. Black's successes as a tutor*

Mr. Black was assigned inmates who had either failed the GED test or who were encountering difficulty with the test's writing section.[7] The many hours Mr. Black devoted to his students resulted in an astounding success: He helped FCI Coleman achieve a 67% increase in the graduation rate of its GED students.[8] Indeed, *every single one* of Black's students who was not transferred out of FCI Coleman before concluding his sessions with Mr. Black obtained his GED, whether on the first try or after teacher and student persevered through additional attempts.

As evidenced by the numerous letters written on Mr. Black's behalf from incarcerated Coleman inmates, the impact that Mr. Black had on the students he encountered was nothing less than astounding.

As recounted in the letter submitted by Robert Jennings, another of the tutors, many of the men with whom Mr. Black worked never would have passed the GED test without Mr. Black's efforts.[9] Mr. Jennings letter offers numerous examples of persons who benefitted from Mr. Black's assistance—inmates of varied ages, ethnicity, and skill levels. Mr. Jennings wrote: "Conrad reached across all barriers of race and age. He worked with any student who sought his help and gave as

---

[7]   PSR p. 36, lines 1145-1146.

[8]   November 13, 2010 Letter of Robert Jennings, p. 1.

[9]   *Id.*

much as humanly possible."[10]  Mr. Black's other fellow tutor, Regan Cornelius, confirmed that Mr. Black gave freely of his time, even when he was not required to do so, and in the process "turn[ed] a dark period into a positive light."[11]  Rufus Rochelle wrote that Mr. Black was willing to work with inmates who had been written off as hopeless causes, and after working with Mr. Black a number of them went on to achieve some of the highest GED scores recorded at Coleman.[12]

When asked about this experience during his recent interview with the Probation Department, Mr. Black related how a number of his students confided in him that they "had been told all of their lives that they could not achieve anything."[13]  With Mr. Black's assistance, each passed his GED test.  Some then went on to take college level classes thanks to Mr. Black's initiative.  Mr. Black realized not long after arriving at Coleman that the facility had no resources that might provide information to inmates about the availability of college correspondence programs.  Mr. Black took it upon himself to conduct research into the problem.  He located a catalog of available courses, purchased two copies, and made them available to fellow inmates interested in pursuing college-level courses.[14]

---

[10]  *Id.*, p. 2.  Mr. Black's ability to embrace all ethnic and religious traditions had been ingrained in him since childhood; as noted in the presentence report, Conrad's parents "abhorred ethnic and religious prejudice" although their beliefs "were not so widespread at the time."  PSR p. 25, lines 789-790.

[11]  November 5, 2010 Letter of Regan Cornelius.

[12]  November 15, 2010 Letter of Rufus C. Rochelle.

[13]  PSR p. 36, lines 1152-1154.

[14]  PSR p. 36, lines 1155-1158.

*Other teaching and lecturing services by Mr. Black*

Mr. Black's educational efforts at Coleman were not restricted to tutoring. Milton Nelson, an inmate employed as Coordinator of the Unit-Based Education Program, wrote that Mr. Black approached him in March 2008, soon after Mr. Black arrived at Coleman, and volunteered to teach inmates about American history and social economics.[15] The lectures would be an unpaid service separate from Mr. Black's work as a tutor. Mr. Nelson obtained authorization for the lectures from his supervisor. The program was a great success, with strong attendance over a period of two years by inmates as well as prison staff. The tone of the lectures, as described by Jerold Gunn, was one of inclusion and acceptance.[16] Mr. Gunn wrote of Mr. Black: "He treated all as equals; he did not talk down to them; he presented the topics in a cogent and understanding manner that left the inmates talking and thinking."[17]

As recounted in the letter from Andrew Compton, one of Mr. Black's lectures included discussion of unrest in Georgia, in the Caucasus region of Asia.[18] An inmate expressed worry over the welfare of his relatives who lived in Atlanta. Mr. Compton explained that Mr. Black handled the question "with tact and sensitivi-

---

[15]   November 13, 2010 Letter of Milton A. Nelson.

[16]   November 11, 2010 Letter of Jerrold L. Gunn.

[17]   *Id.*

[18]   December 7, 2010 Letter of Andrew Compton, p. 1.

ty."[19]  "[I]nstead of providing others the opportunity to disparage the inmate," Mr. Compton explained, Mr. Black "pointed out how disagreements can quickly escalate to full scale conflict."[20]  Mr. Compton wrote of this incident, "I realized that day, here was a guy without an agenda, making the best of his situation and using his skills to positively impact others."[21]

In February 2010, at the request of the individual who acted as inmate organizer for the African-American history program, Mr. Black served as the keynote speaker for African American History Day.[22]  Mr. Black has said that he was "honored to do so."[23]  As told by inmate organizer Andrew Gebrehawariat, over 200 men including prison staff and wardens attended the program, which was later rated as one of the best correctional programs in Coleman's history.[24]  Mr. Gebrehawariat explained, "No one ever welcomed another person from another race to be the keynote speaker in such a function, but I was compelled to request the knowledge of Mr. Black and foremost because of the character he exemplified daily before the 1,900 odd men here at Coleman."[25]

---

[19]  *Id.*

[20]  *Id.*

[21]  *Id.*

[22]  November 17, 2010 Letter of Andrew Gebrehawariat, pp. 1-2.

[23]  PSR p. 36, line 1166.

[24]  Letter of Andrew Gebrehawariat p. 1-2.

[25]  *Id.*, p. 2.

### *Mr. Black's continued religious devotion while incarcerated*

Mr. Black was actively involved with Catholic religious services both as a congregant and, when requested, as a speaker. As noted in the presentence report, Mr. Black converted to Catholicism in 1986 after having been raised as a non-practicing Anglican-Episcopalian.[26] His conversion "was the culmination of 15 years of serious study of the Catholic faith."[27] Garland Hogan's letter describes Mr. Black's enthusiasm for the Church, the liturgy and Catholic traditions.[28] Robert Jennings described Mr. Black's efforts in the Catholic community at Coleman including participation in special programs and delivering motivational presentations to inmates involved in the drug rehabilitation program.[29]

### *Mr. Black's friendships and informal contributions in the prison community*

Although Mr. Black provided indisputably valuable educational services through his official roles of tutor and lecturer, the letters suggest that his greatest contribution at Coleman may have been how he interacted with others informally, serving as unofficial mentor and advisor to numerous men who found it helpful to speak with Mr. Black on a broad variety of topics. Troy Slay explained that he met with Mr. Black every Friday and that "[t]hrough Mr. Black, I discovered passion,

---

[26] PSR p. 26, lines 830-833.

[27] *Id.*

[28] Letter of Garland Hogan, p. 2.

[29] November 13, 2010 Letter of Robert Jennings, p. 2.

purpose, love[,] dedication and forgiveness."[30] Martin Bradley described the daily sight of "various inmates walking the track, sitting in common areas or even during mealtimes in deep discussion with Conrad."[31] Mr. Bradley explained that Mr. Black turned away no one who sought out his advice, support or friendship regardless of their race or education level, the crime of which they were convicted, or, for some, diminished mental capacity.[32]

Andrew Compton noted that Mr. Black always greeted the families of his fellow inmates warmly even when they interrupted his own family visits.[33] Rufus Rochelle wrote that Mr. Black encouraged him to always stay positive and counseled that he would, in Mr. Rochelle's words, obtain blessing sooner than he expected.[34] Mr. Rochelle also described how Mr. Black was always available to, and supportive of, those who lost loved ones while incarcerated.[35] Roy Geer wrote that Mr. Black was constantly pointing out the positives and imparted a religious, philosophical and practical view that helped Mr. Geer to endure that part of his life spent incarcerated at Coleman.[36]

---

[30] November 15, 2010 Letter of Troy Slay, p. 2.

[31] Letter of Martin Bradley, p. 1.

[32] *Id.*

[33] December 7, 2010 Letter of Andrew Compton, p. 1.

[34] November 15, 2010 Letter of Rufus C. Rochelle.

[35] *Id.*

[36] November 15, 201 Letter of Roy Geer.

Mr. Black's willingness to engage with and assist the people around him while at Coleman was constant and sincere. He never belittled anyone's point of view, and he related to everyone whom he met at Coleman as an equal. Donald Ayers wrote that "[i]t was not Lord Black here [at Coleman], or Mr. Black but Conrad[,] [w]ho carried no pretense he was anything but another inmate doing his time and helping without hesitation even when not asked."[37] Charles Hoffectar echoed this sentiment observing that even though Mr. Black was viewed as a celebrity by the Coleman inmates when he arrived, he never made anyone feel uncomfortable but instead found a way to "uplift men who were losing their families and feeling depressed" and spending "untold hours" providing hope and encouragement to anyone who needed it.[38] Martin Bradley wrote that Mr. Black adapted to prison with grace and dignity and with no sense of entitlement or negativity.[39]

### *Perspectives from Mr. Black's relatives and friends on the outside*

Friends and relatives who visited Mr. Black at Coleman were struck by the number of inmates who came up to greet Mr. Black and to introduce their family members to him.[40] June Black, Mr. Black's sister-in-law, described her interaction with family members of other inmates who approached her when they came to learn that she was there to visit Mr. Black. A woman and her daughter told her how Mr.

---

[37]  November 16, 2010 Letter of Donald Ayers.

[38]  Letter of Charles Hoffectar, p. 1.

[39]  Letter of Martin Bradley, p. 1.

[40]  Letter of Brian Stewart, p. 1, April 11, 2011 Letter of Laura Ingraham, p. 1., April 18, 2011 Letter of June Black, p. 2.

Black's "patient, kind attention" had provided their husband/father with "hope and focus and had opened a new world for him."[41] An inmate told her about Mr. Black not only opening up the possibility of education to the inmates he taught, but affirming "their dignity and worth through his thoughtful attention to their personal issues and concerns."[42]

### *Perspectives from prison staff and others*

Mr. Black's positive interactions with his fellow inmates were also beneficial to the prison officials; in the words of Garland Hogan, Mr. Black "encouraged respect for the officials and the staff, both with in his words and with his conduct."[43] As noted by the Probation Department, a Bureau of Prisons progress report on Mr. Black, dated July 20, 2010, reveals a spotless disciplinary record and notes "a positive use of leisure time through [Mr. Black's] participation in a faith group, social and civil organizations, family time, exercise, political organizations and educational organizations."[44]

The presentence report includes a quote from a section of an April 9, 2009 memorandum about Mr. Black, authored by C. DeLaGarza, an administrator in the education department at Coleman. The memorandum describes Mr. Black as "dili-

---

[41]   April 18, 2011 Letter of June Black, p. 2.

[42]   *Id.*

[43]   Letter of Garland Hogan, p. 2.

[44]   PSR p. 24, lines 751-753.

gent," "hardworking," and "willing to help and assist whenever he is needed."[45]  In a March 15, 2011 telephone conversation between Ms. DeLaGarza and the Probation Department, Ms. DeLaGarza stated that Mr. Black was "not intimidating or condescending," "always polite and respectful" and "seemed to be genuinely interested in helping students with their educational goals."[46]

Mr. Black's numerous acts of selfless support to others at Coleman made an important difference in many lives.  Robert Jennings explained:  "In a place where hope is a rare commodity, Conrad provided at least a glimmer of it to countless inmates."[47]  This accomplishment is all the more impressive when viewed against the backdrop of the sense of devastation that Mr. Black felt about having to serve time in federal prison.  As Regan Cornelius aptly summed it up, "How a person chooses to conduct themselves while incarcerated speaks volumes about their fortitude and character."[48]  Conrad Black served his 29-month stint of incarceration with quiet dignity and an unwavering commitment to improving the lives of his fellow inmates through education, mentoring, and countless sincere expressions of personal concern that, as described in the letters, had a major impact on the lives of the individuals he encountered.

---

[45]  PSR p. 35, lines 1119-1133.

[46]  PSR p. 35, lines 1134-1138.

[47]  November 13, 2010 Letter of Robert Jennings, p. 2.

[48]  November 5, 2010 Letter of Regan Cornelius.

When asked about his efforts at Coleman during his interview with the Probation Department, Mr. Black stated, "I did what I could and may have made a bit of a difference."[49] The difference that he made is born out, not only by the outpouring of support in the letters sent to this Court, but by the fact that on July 21, 2010, the day that Mr. Black was released from prison, hundreds of inmates lined up to wish him well and embrace him before he departed.[50]

### *Mr. Black's contributions on matters of public policy while at Coleman*

In addition to his many efforts on behalf of his fellow inmates while at Coleman, Mr. Black continued to make contributions to public debate on important issues of day. By agreement of his Unit Manager, Mr. Black wrote weekly columns for the *National Post* and *National Review*. At Mr. Black's request, all payment went to his family's charitable trust.[51] Through these columns, Mr. Black built up an on-line following of between one and two million readers per week, a following that he has maintained since the Court released him on bail in July 2010. Through Mr. Black's assistant, he corresponded by email with people across the globe who wrote to him expressing their agreement or disagreement with his writings. The email exchanges between Mr. Black and members of the public who followed his columns were not limited to spirited political debate. On one occasion, for example,

---

[49] PSR p. 36, line 1176.

[50] Indeed, it was only because the facility was in a lock down at the time of his release that the hundred or so well-wishers did not get to walk Mr. Black to the front gates of the institution to wish him farewell.

[51] PSR p. 36, lines 1173-1175.

a woman who had been diagnosed with terminal cancer wrote asking Mr. Black for recommended reading. His answer came swiftly, comprehensively, and with expressions of sympathy, support, and optimism for her recovery. A focus on others— whether it be their ideas, hopes, concerns or tribulations—rather than his own very difficult situation was the defining feature of Mr. Black's public correspondence while at Coleman.

Mr. Robert Ossowski, an assembly line worker and union member at Chrysler Canada, was one of the readers of Mr. Black's weekly columns who corresponded with him during Mr. Black's time in prison. Mr. Ossowski's letter described the strong friendship he had forged with Mr. Black based on their written correspondence and shared religious faith. Mr. Ossowski offered his view that Mr. Black's exposure to prison engendered not bitterness, but compassion for and empathy with the other inmates and a deep interest in reforming the penal system.[52] Mr. Ossowski explained of Mr. Black: "His intelligence coupled with the experiences of the last few years has fuelled a passion to find a better way to punish wrong doing and better serve the need of society to punish wrong doers and make restitution."[53] Mr. Ossowski also observed: "Regardless of the public façade that Conrad may project[,] the experiences of the last few years had rendered him a changed man in many ways."[54] Robert Genini, a retired teacher from California wrote that in all of his

---

[52] Letter of Robert Ossowski, p. 1.

[53] *Id.*

[54] *Id.*, p. 2.

correspondence with Mr. Black while Mr. Black was at Coleman, he never observed Mr. Black exhibit any bitterness toward his sentence, the Court or the system, but rather witnessed Mr. Black using his time at Coleman "beautifully" to teach and assist others.[55] Donald Ayers, who was familiar with Mr. Black's approach toward his appeals in this case, explained that for Mr. Black, the fight was for the principle that the system does work, rather than a battle focused on personal vindication.[56]

### *The effect on Mr. Black of his prison experience*

While visiting Mr. Black in prison, close friends and family members were moved by Mr. Black's evident enthusiasm about his ability to help others as well as his evolving focus. Long-time friend Brian Stewart explained that Mr. Black often told him about his students' "improving marks, their hopes for the future, and their family concerns."[57] Mr. Stewart wrote:

> [Conrad] assured me that few things in life gave him a more satisfying sense of achievement than his work in helping to coach very disadvantaged and once scarcely literate inmates to their High School graduation.
>
> I found that a considerable amount of our talks in Coleman concerned not the historical and political matters we've discussed over five decades, but rather his plans for his latest English course, or prison lecture series. It was his passion, along with writing.[58]

---

[55]  November 6, 2010 Letter of Ronald Genini, p. 2.

[56]  November 16, 2010 Letter of Donald Ayers.

[57]  Letter of Brian Stewart, p. 1.

[58]  *Id.*

Mr. Black's sister-in-law June described the changes she witnessed in Mr. Black since he was incarcerated and expressed her view that Mr. Black's experiences are likely to transform his approach to the charitable foundation that she and Mr. Black jointly manage. She wrote:

> Conrad embraced the possibility that he might be able to have a real effect on the people around him. I listened to Conrad discuss at length, and with great enthusiasm, his feelings about being able to teach and open minds in this way. He was extremely excited at the graduation of his students and has been very touched since he has been out on bail at all the letters of gratitude he has received. Indeed, many of Conrad's relationships with his students have turned into friendships.
>
> The ability to change lives for the better in this way has profoundly impacted Conrad. He now has a whole new awareness about opportunities to improve the lives of those who have suffered from various disadvantages as well as the desire to commit his time and his talents to providing the needed assistance. This experience will, no doubt, add a new dimension to the formal charity work to which Conrad has long been committed.[59]

It is not merely that Mr. Black was able to improve and transform the lives of others by providing education and personal support to the inmates at Coleman; rather, Mr. Black himself has also been transformed in a meaningful way by his experience. Even Mr. Black's former critics have begun to recognize that Mr. Black underwent significant personal changes over the course of the last several years. Jonathan Kay of the National Post described an intellectual change in Mr. Black's writings based on increased empathy with the inmates he encountered at Coleman. Macleans magazine quoted Mr. Black's comments in a BBC interview as evidence of an evolution in his point of view. In the BBC interview, Mr. Black was asked about

---

[59] April 18, 2011 Letter of June Black, p. 2.

those who see him as bombastic and arrogant. Mr. Black responded; "I suppose I can see why people would think bombastic from some of the things I've written, though not recently. I regret it if I come across as you said, but if I do it's up to me to try to do better."

As noted in the presentence report, even Mr. Black's July 20, 2010 Bureau of Prisons progress report indicated a positive score for Mr. Black having "made amends for his crime."[60] The fact that no one saw Mr. Black display signs of bitterness or resentfulness over his situation (and that, to the contrary, many observed that Mr. Black counseled others against such negative emotions) should not mask the reality that he suffered greatly during the 29 months he spent in prison. That he chose to endure that suffering privately and without allowing it to corrupt his attitude or diminish his ability to assist others is a testimony to his strength of character and the profound effects of his experiences over the past four years. That his unwavering response to the personal devastation of imprisonment was to improve the lives and prospects of Coleman inmates, foster hopefulness, and broaden his appreciation of the adversity encountered by others,[61] is strong support for a sentence of time served.

---

[60]   PSR p. 24, line 754.

[61]   During his interview with the Probation Department, Mr. Black stated that getting to know inmates and their families from a variety of backgrounds has broadened his perspective. PSR p. 36, lines 1159-1160.

### b. Mr. Black's Conduct Since July 21, 2010

Since his release from prison, Mr. Black has largely remained out of the public eye. Until recently, he resided at his former home in Palm Beach, Florida. The house sold on April 21, 2011, and Mr. Black relocated to a hotel in New York (after notifying the Probation Departments in Florida and Illinois). He has spent time with family and close friends, continued writing weekly columns for the *National Post* and *National Review*, submitted book reviews to numerous publications including the *New Criterion* (a review of a book on the life of Pope John Paul II) and *The London Mail* (a review of a book about the beatification of Cardinal Newman), maintained email correspondence with the hundreds of people who follow his columns and his case, and made substantial progress on his new book.

Mr. Black has maintained his friendships with those he met at Coleman. One of Mr. Black's first questions following release was whether his bail conditions allowed him to correspond with the Coleman inmates he had come to know. When he received assurances that he could so, he began replying to the hundreds of messages he received.[62] Mr. Black has spent many hours responding to requests for continued support from individuals he met at Coleman. He has arranged for many of them to receive needed legal advice and financial assistance. And he has worked on arranging for charitable donations to legitimate foundations that these acquaintances have brought to his attention.

---

[62] Hundreds of Mr. Black's fellow inmates gave him their addresses before he departed. Mr. Black has corresponded with all of them.

Since his release, Mr. Black has also been active in helping his sister-in-law, June Black, with the charitable foundation set up by the Black family. The foundation has operated continually since 1965. In 1976, when Conrad's father George Montegu Black Jr. passed away, the foundation received a donation from the estate. Mr. Black and his brother Mont then took over its management, renaming it the Black Family Foundation. Since Mont's passing in 2002, his widow, June Black, has assisted Mr. Black in managing the fund. June assumed the presidency of the foundation while Mr. Black was incarcerated.[63] As recounted in her letter, Mr. Black did not withdraw into his own problems during the time he was at Coleman; instead he "persevered with a vital interest in the charities and causes that the Foundation supports."[64]

Mr. Black and June have had a number of meetings over the past several months to discuss the future direction of the foundation. As she explained in her letter, over the course of the last few years the foundation has provided significant donations to Princess Margaret Hospital for rapid diagnosis of breast cancer, the Toronto Sick Children's Hospital for research, the Peter Munk Cardiac Centre for funding of an artificial heart, the Sunnybrook Hospital Cancer Care Centre, the Sisters of Life Centre in support of counseling and help for pregnant teens and their babies, and the Activity Bus Charitable Organization, which helps to provide

---

[63] April 18, 2011 Letter of June Black, p. 2.

[64] *Id.*, p. 3.

transport for the disabled.[65]   June's letter goes on to explain how Mr. Black's approach to the foundation has transformed since his release from Coleman:

> Because of Conrad's experience at Coleman, he is more committed than ever to the goal of helping the under privileged.  He has seen the reality of some of the causes for the difficulties encountered by these families.  Moreover, he has seen the possibility for improving the situations of many individuals with some time, attention, and kindness. My more than 30 year association with Conrad leaves me no doubt but that he will continue to devote himself to helping others.[66]

The other project that has consumed the majority of Mr. Black's waking hours over the 10 months since his release from Coleman is work on his latest book, *The Strategic History Of the United States*, which is near completion.  As of the time of this submission, only two chapters remain.  Mr. Black came up with the idea for the book based on topics discussed in his American History class at Coleman.  The book, which will cover United States history from 1740 to the present, explores how the United States grew, in a relatively short period of time, from a group of uncoordinated colonies with no political autonomy to the greatest power in the world.  The book posits that this remarkable achievement was made possible by the strategic leadership of the fathers of the American Revolution—the Nation's first presidents and other political leaders who individually and collectively changed the course of history.

---

[65]   *Id.*

[66]   *Id.*

## 2.    Just Punishment For The Offense And Promotion Of Respect For The Law

A fair assessment of the degree of punishment needed to promote respect for the law, deter the defendant and others, and serve the interests of justice requires careful examination of all of the effects of punishment, from various sources, on the individual who stands before the Court. There are a number of ways in which Mr. Black and those close to him have suffered well beyond that experienced in the mine run of cases. These facts and circumstances amply support a sentence of time served.

*Mr. Black's added punishment from collateral consequences of his prosecution*

At the time that Mr. Black and his co-defendants were first sentenced, this Court recognized the devastating effects and future turmoil they were likely to endure as a result of their prosecutions and convictions, and the correspondingly significant deterrent effect that these experiences would have on others. At Mr. Boultbee's sentencing, for example, the Court stated:

> As I have said with the others, I also believe that there is another deterrent effect, in addition to the sentence that I am going to impose; and, that is, the fall that you have undergone for your activities. You have lost your job; having difficulty finding another one; you may not be able to find another one. You have lived in turmoil, and it does not end today with sentencing. The civil lawsuits and the fallout will continue down the road. And I do think that is, or certainly should be, a significant deterrent to other executives in your position.[67]

At the time this Court first passed judgment on Mr. Black, he had been living with a series of internal, civil, and criminal investigations for the previous five

---

[67] Boultbee Sentence Tr. 266 (Dec. 10, 2007).

years. Since then, those proceedings have occupied nearly four additional years of Mr. Black's life—29 months of which he spent in a federal prison. Even beyond his incarceration, the collateral consequences of this case have, without question, been punitive. Mr. Black has lost the business that he built and deeply loved, suffered merciless attacks on his reputation, endured the need for significant financial outlays, contended with a morass of litigation in the United States and Canada that— at the time of the original sentencing—filled four full pages of the presentence report and still has not been fully resolved, awaited the ordeal of an IRS proceeding in which the U.S. government seeks $70 million in taxes and penalties, been barred from spending his own money in Canada without permission from the Court because of a long-standing Mareva injunction, and witnessed the suffering that the case has caused his family.

In the updated interview with the Probation Department, Mr. Black's wife, Barbara, provided a candid description of the turmoil she and Mr. Black have suffered over the course of the last several years. The presentence report summarizes Mrs. Black's perspective:

> [A]lthough her husband is not one to complain, always outwardly displays the positive side of things, and 'never waivers in his faith', the past eight years have been a 'constant and severe challenge' for both of them. She advised that [Mr. Black's] punishment began with the special committee investigating him in 2003 and continues to the present day with her husband's travel being restricted and their inability to plan for the future.[68]

---

[68]  PSR p. 30, lines 955-960.

### *Personal and professional hardship for Mr. Black and his family*

As Mr. Black related to the Probation Department, his wife came to visit him in prison every week and sometimes more frequently.[69] The toll on Mrs. Black's health from eight years of investigation, punctuated by a prolonged separation from her husband, has been enormous. As described in the letter of Laura Ingraham, Mrs. Black has a "severe heart ailment, which has caused her to lose consciousness on a number of occasions, and which must be surgically repaired."[70] Mrs. Black has delayed the surgery until after the resentencing.

Close family friend Brian Stewart echoes the observations of the enormity of the pain both Mr. and Mrs. Black have quietly endured. Mr. Stewart writes of Mr. Black:

> In Coleman, however, I was aware that deep sadness inevitably lay heavy upon him, and had ever since his case exploded into public. His children were rocked by years of fierce media coverage in Canada, their privacy shredded, and their Name ridiculed in print and in electronic media. His wife, frequently unwell, faced her own media purgatory and the far sharper pain of physical separation.[71]

June Black also wrote to describe the tribulations that Mr. and Mrs. Black have suffered:

> Conrad has been through unimaginable adversity over the course of the last eight years. He has lost the business he built, has suffered damage to his finances and his reputation, has witnessed the immense personal toll this case has taken on his wife and his children, has endured many years of personal uncertainty as to whether, when, and for

---

[69] PSR p. 26, lines 842-843.

[70] April 11, 2011 Letter of Laura Ingraham, p. 2.

[71] Letter of Brian Stewart, p. 1.

what length of time he would be in prison, has lost his freedom for 29 months, has long been restricted from returning to his home in Canada, and has been unable, as yet, to embark, in any meaningful way, on the process of rebuilding his life…. I have personally observed that Conrad and Barbara have suffered physically and emotionally during the course of the last eight years. Conrad's blood pressure issues have grown more severe. Barbara has a heart condition which results in her periodically losing consciousness and for which she must have surgery. Both Conrad and Barbara have suffered gracefully but immensely.[72]

Even before the Sentencing Guidelines were made advisory as a remedy for the Sixth Amendment violation found in *Booker*, courts recognized that adverse business and personal consequences suffered by a defendant were appropriate grounds for a sentence below the applicable range. In *United States v. Redemann*, 295 F. Supp. 2d 887 (E.D. Wis. 2003), for example, the court departed downward by two levels because the defendant had been civilly prosecuted, debarred from involvement with a regulated financial institution, and subject to adverse publicity in his small town, in addition to the difficulties that his business suffered. The adversity Mr. Black has undergone over the last 8 years, which is arguably much more severe than was the case in *Redemann*, should likewise be considered in determining the just and appropriate sentence in this case.

*Immigration and citizenship consequences*

The fact that Mr. Black does not have U.S. citizenship (he is a citizen of the United Kingdom) makes his punishment more onerous than that experienced by U.S. citizens. Soon after Mr. Black arrived at FCI Coleman, the Department of Homeland Security placed an immigration detainer on him. As a result, Mr. Black

---

[72] April 18, 2011 Letter of June Black, p. 3.

30

was ineligible for designation to a less-restrictive prison camp,[73] nor could he qualify for early release or placement in home confinement or a halfway house, the latter of which can substitute for as many as 12 months of a citizen's prison term. *See, e.g.*, 18 U.S.C. §§ 3621(e) & 3624(c)(1). These restrictions result in his serving a longer period in jail, under harsher conditions, than U.S. defendants who are otherwise identically situated.

### *Mr. Black's health and age*

Additional bases for a sentence of time served in this case are the serious health issues confronted by Mr. Black as well as his age compared to most other defendants. Mr. Black is 66 years old; his wife, Barbara, is 70. Significantly, since his original sentencing in 2007 the Sentencing Commission has changed its guidance on the role of age, concluding that age is an appropriate basis for departure. In its comprehensive review of the Guidelines departure provisions in 2009, the Commission newly announced that where, as here, a defendant's age is not typical, that age is "relevant" to the decision to depart below the Guidelines range. *See* § 5H1.1 (2010) (identifying circumstances where age may now be relevant). The Commission did not reach this conclusion lightly. It revised its guidance only "after reviewing recent federal sentencing data, trial and appellate court case law, scholarly literature, public comment and testimony, and feedback in various forms from federal

---

[73]  As observed in the presentence report, "Despite the Court's recommendation to the Bureau of Prisons that the public safety factor be waived due to the Defendant Black's status as a deportable alien, Defendant Black was deemed ineligible for a camp facility, and was instead designated to a low security facility (one security level higher than a camp)." PSR p. 5, lines 131-134.

judges." *See* USSG App. C., Amendment 738. Courts have likewise recognized age as a factor that may warrant a sentence below the advisory sentencing guidelines. *See, e.g., United States v. Carter*, 538 F.3d 784 (7th Cir 2008) (sentencing 61-year-old defendant with no specified health concerns to a sentence 63 months below the advisory guideline range); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (granting 62-month departure from the advisory guideline range on the sole factor that the defendant, who was a young man at the time of the sentencing, would be middle aged when released from prison).

The age factor alone counsels for a guideline departure or variance, in the event one is needed, to reach a sentence of time served for Mr. Black. When considered in connection with Mr. Black's fragile health, the case is all the more compelling. Dr. Robert Francis of MEDCAN Health Management Inc., in Toronto, Canada, who has been Mr. Black's physician since 2006 and who communicated with Mr. Black by telephone and email during Mr. Black's incarceration, submitted a letter outlining a number of serious health conditions for which Mr. Black receives treatment including high blood pressure, cardiac arrhythmia, fluid retention, and elevated cholesterol.[74] Dr. Francis stated in his letter that Mr. Black's health issues have worsened since 2003, a development that Dr. Francis attributes to the stress of this case.[75] Significantly, Dr. Francis explained in the letter that these health issues are particularly acute when "preexisting conditions warrant ongoing attention that is

---

[74] November 15, 2010 Letter of Dr. Robert Francis M.D.C.M., p. 1.

[75] *Id.*, p. 2.

not realistic during a term of incarceration"[76] and opined that further prison time for Mr. Black would be "a direct threat to both his long term health and future quality of life."[77]

The seriousness of Dr. Francis' concerns is punctuated by the discovery and removal of a squamous carcinoma from Mr. Black's face shortly after his release from prison in July 2010. Mr. Black brought his concern about the facial lesion to the attention of the medical staff at Coleman. After a superficial examination, which included no biopsy or tests, the staff assured Mr. Black that no further treatment was required. Mrs. Black grew increasingly concerned about the lesion, which, to her untrained eye, appeared to be getting worse over the course of several months. Mrs. Black even tried to describe the lesion to Dr. Francis and other doctors to obtain a second opinion. Unfortunately, however, there was nothing these doctors could do without being able to examine Mr. Black in person. After the lesion was removed by doctors in Palm Beach and diagnosed as an aggressive form of cancer, Dr. Francis reviewed the case history and file.[78] Dr. Francis stated in his

---

[76] *Id.*

[77] *Id.*

[78] Since the time of the release of the presentence report, the defense has supplied the Probation Department with additional medical records regarding Mr. Black's skin cancer surgery, which will be the subject of a supplemental report from the Probation Department.

letter that if this cancer had been left untreated, it could have metastasized to other parts of his body and been fatal.[79]

Given Mr. Black's age and health considerations, additional prison time would be detrimental and potentially dangerous to his health. In these circumstances, imposition of any additional sentence of prison time for Mr. Black would undermine rather than promote respect for the law. As noted in *United States v. Crawford,* No. 07-CR-73, 2007 WL 2436764 (E.D. Wis. Aug. 22, 2007), even in cases which involve unquestionably serious charges,[80] imposing a sentence greater than is warranted by the circumstances "would undermine respect for the law not only by those most affected . . . but also by fair minded observers of the system who reasonably expect leniency when appropriate." *Id.* at *9.

### 3. Specific And General Deterrence

The goal of specific deterrence has clearly been met in this case. Mr. Black would not and could not ever find himself in the circumstances that gave rise to this proceeding. As a convicted felon, he will be forever barred from executive service in a public company.[81] For Mr. Black, however, that fact is very much beside the point. This case has resulted in 8 years of unmitigated agony for Mr. Black and his family. He and his wife have suffered adverse health consequences, diminution of

---

[79] November 15, 2010 Letter of Dr. Robert Francis M.D.C.M, p. 2.

[80] The defendant in *Crawford* was actively involved in a conspiracy to distribute over 50 grams of crack cocaine.

[81] PSR p. 34, lines 1092-1093.

financial position, decimation of the companies that were his life's work, judgments and restitution payments of over $30 million, stock losses exceeding $250 million, many months of uncertainty between his conviction and first sentencing (where the government sought upwards of 25 years in prison—effectively a life sentence), the experience of serving 29 months (the equivalent of a 32 months and 26 day sentence)[82] in a federal prison, and the limbo in which he has remained for nearly a year, unable to plan for the future or start to rebuild his life so long as this proceeding remains pending.

General deterrence has likewise been accomplished in this case. As noted above, when this Court pronounced sentence on Mr. Boultbee in 2007, it acknowledged the significant deterrent effect on others from the proceedings themselves and non-prison consequences. Mr. Black's case has always received an even greater amount of media coverage than that of his co-defendants. Every type of print and electronic media and endless commentators have analyzed, reveled in, and theorized about the so-called decline of Conrad Black. At the time of his conviction, critics vociferously and exuberantly postulated that Mr. Black's wife would leave him and that he would die in prison. And while neither of these dismal predictions came to pass, every time they were snidely repeated and reprinted, the general deterrent effect was augmented. Even Mr. Black's prison time was a source of press coverage with photos of him in the exercise yard in his Coleman uniform making it into the Canadian papers. Given the volume of coverage this case has received over the last

---

[82] *See* PSR p. 39, lines 1236-1238.

five-plus years, it is difficult to imagine any executive anywhere in the world who, upon hearing about this case, would not receive a loud and unambiguous deterrent message. No additional prison time is required in these circumstances.

### 4.    The Advisory Sentencing Guidelines

The advisory sentencing range recommended by the Probation Department is 33 – 41 months. If the Court grants Mr. Black's two substantive objections to that recommendation, the range will be 24 – 30 months. In either event, a sentence of time served can be imposed consistent with the advisory Guidelines with, at most, a few days of variance.

Mr. Black agrees with the Probation Department that the relevant conduct in this case is confined to the conduct encompassed by the sole fraud count of which he stands convicted—Count 7. The Court should not include the conduct or larger dollar amount that the government alleged in the two mail fraud counts that the Seventh Circuit vacated and that the government has elected not to retry. The presentence report correctly identifies some of important differences, for relevant conduct purposes, between count 7 and the separate conduct charged in counts 1 and 6. *See generally* PSR p. 20-23, lines 616-737. Among other things, the vacated counts involved non-compete agreements between the individual officers and a Hollinger International subsidiary—American Publishing Companies (APC)—as a way to take advantage of a Canadian tax ruling. Count 7, on the other hand, involved proposed non-competes with third-party purchasers of Hollinger International properties, and the Canadian tax motivation was completely absent.

This Court already noted these same types of differences when it determined at the original sentencing that the acquitted counts were not relevant conduct. *See, e.g.*, Sentence Tr. 16-18. Moreover, the Seventh Circuit, on remand from the Supreme Court, deemed significant an additional difference between count 7 and the vacated APC counts: no non-competes were drafted or signed for the payments charged in count 7. *Black*, 625 F.3d at 393.

Separate from this lack of commonality between count 7 and the vacated counts, and putting to one side the various reasons for concluding that the conduct in the vacated counts was not fraudulent,[83] the Court ruled at the initial sentencing that it would not "promote respect for the law or provide just punishment for the offense of conviction" to "impose a loss calculation that is over five times the convicted conduct, based upon a civil standard" of preponderance of the evidence. Sentence Tr. 18. Respect for the law and a goal of just punishment would suffer much more if a loss calculation of *ten times* the convicted conduct were imposed under a preponderance standard. For all of these reasons, the loss amount should be limited to count 7.

The correct loss amount is below $500,000.

The presentence report pegs the loss at $600,000. This amount is the total of payments from Hollinger International to the four officers (Mr. Black, F. David Radler, John A. Boultbee, and Peter Y. Atkinson) from proceeds of the sales to Forum and Paxton. Mr. Black personally received $285,000. The Probation Depart-

---

[83] *See* PSR, p. 22, lines 700-711.

ment notes that under the 2000 version of the Guidelines the loss table calls for an enhancement of 10 levels when the loss amount is between $500,000 and $800,000. On this record, however, the amount should be adjusted to take account of the ownership stake that the defendants had in Hollinger International. The result is a loss below $500,000 and an enhancement of 9 levels.

As Mr. Black pointed out in advance of the original sentencing (and again in the memorandum he submitted to the Probation Department on March 23, 2011), the defendants collectively held a 18% equity stake in Hollinger International—15% through Mr. Black's stock ownership in related entities, and another 3% through Mr. Radler's. (D.E. 954 at 45); *see also United States v. Black*, 530 F.3d 596, 599 (7th Cir. 2008) (noting that defendants had various levels of ownership in Hollinger International and other entities).

Count 7 charged a fraud against the other Hollinger International shareholders. Those other shareholders owned 82% of Hollinger International. When the defendants' proportion of ownership in Hollinger International is excluded, any loss to the remaining shareholders from the $600,000 in payments is no more than $492,000 (82% of $600,000).[84] Therefore, the enhancement based on loss amount should be 9 levels rather than 10. USSG § 2F1.1(b)(1)(J) (2000).

---

[84] This calculation was unnecessary at the original sentencing. With the APC count payments included, the loss would have exceeded $5 million under either approach.

<u>The abuse of trust enhancement should not apply</u>.

The Probation Department recommends a 2-level enhancement for abuse of a position of trust. PSR p. 17-18. Mr. Black does not dispute that he held a position of private trust, nor does he quarrel over whether such a position played a part in his receipt of the non-compete payments from the Forum and Paxton sales. But that position of trust was not "abused" in "a manner that significantly facilitated the commission or concealment of the offense." USSG § 3B1.3.

In light of Mr. Black's role as founder and CEO of Hollinger International, there was nothing fraudulent, in and of itself, in him receiving non-compete payments from third parties in connection with their purchases of newspaper properties from his company. The jury, in acquitting on counts involving other non-compete payments (including counts based on non-compete payments from Forum/Paxton to Hollinger Inc.), recognized as much. The main difference between count 7 and the other charges was that Mr. Black and others received payments from the proceeds of the Forum/Paxton sales despite the fact that Mr. Kipnis both neglected to draw up the non-compete agreements for the individuals and did not arrange for money to be set aside for the purpose.

As the Probation Department recognizes (PSR p. 17-18, lines 554-555), the enhancement should not be imposed unless Mr. Black's position of trust "contributed in some significant way to the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for it more difficult)." When this Court found the enhancement warranted at the original sentenc-

39

ing, Mr. Black also stood convicted on the APC counts. The Probation Department's recommendation had been closely tied to those counts. "By concealing bonuses to themselves as non-competition agreements, Conrad Black and his codefendants used their positions of trust to commit a difficult to detect offense." Original PSR p. 22, lines 710-22. And the central dispute at the hearing was whether the enhancement and the honest-services fraud instructions created a double-counting problem. Sentence Tr. 40-41.

Whatever the merits of the decision based on the record as it then existed, Mr. Black did not *use* his position of trust to trick others into cutting the checks that form the basis for count 7. Mr. Radler handled getting the checks issued; he did not need or get help from Mr. Black. *Cf. United States v. Dion*, 32 F.3d 1147, 1150 (7th Cir. 1994) (defendant's position as loan officer allowed him to misapply funds because no other employee needed to approve the loan requests that he used to conceal the thefts). Mr. Black also had no interaction with others at Hollinger International in which he used his "substantial discretionary judgment" to trick them into issuing the checks. USSG § 3B1.3, cmt. n.1. The abuse-of-trust enhancement is a defendant-specific enhancement that contrasts with other provisions where the focus is on how the offense was committed by the defendant or any others for whose conduct the defendant stands accountable. *Cf.* USSG § 2F1.1(b)(3) (if the offense "was committed through" mass-marketing). Mr. Black's interactions before the count 7 payments were confined to Mr. Radler, who as a co-defendant was not deceived by some abuse of a position of trust on the part of Mr. Black.

The government also cannot meet its burden of showing that an abuse of Mr. Black's position of trust "contributed in some significant way" to "concealment of the offense." USSG § 3B1.3 n.1. The presentence report notes no evidence that some particular misstatement by Mr. Black could have contributed in a significant way to concealment, nor is there any evidence showing that Mr. Black was responsible for the content of the documents to which the presentence report refers or indicating how an abuse of the position of trust might have contributed in a significant way to any supposed concealment. The enhancement should not be applied.

### 5.    Avoidance Of Unwarranted Sentencing Disparity

This Court properly recognized in 2007 that the extent to which others in this case—including Mr. Radler—have been punished is a highly relevant consideration due to the worthy statutory goal of avoiding unwarranted sentencing disparity. At the original sentencing, the Court explicitly recognized the need to consider Mr. Radler's plea agreement, which resulted in a 29-month sentence, when determining the appropriate sentences for the other defendants. *See, e.g.*, Atkinson Sentencing Tr. 208 (Dec. 10, 2007). This consideration is much more powerful than it was in 2007 because the Court now knows that Mr. Radler served much less than 29 months in prison. After serving 7 months in a U.S. prison, he was transferred to Canada, where 10 weeks later he was paroled. The 9 months that he served, premised on a fraud amount exceeding $30 million, is less than 1/3 of the sentence imposed (31%).

41

Mr. Black, by contrast, stands convicted of a single fraud count involving $600,000 in payments to him and three others, plus a count of obstruction, which accounts for a 2-level increase. Mr. Black's share of the payments for the convicted count, like Mr. Radler's, was less than half: $285,000. As both the Probation Department[85] and the District Court[86] recognized at the time of Mr. Black's first sentencing, Mr. Radler was the one who ran Hollinger International's U.S. operations and orchestrated the non-compete payments that were the primary subject of the criminal case. Even after accounting for Mr. Radler's cooperation, the difference between the terms served by Mr. Radler and Mr. Black is a sentencing disparity that should not be exacerbated by sending Mr. Black back to prison.

Consideration of the position of Mr. Black and Messrs. Atkinson and Boultbee likewise counsels that time served is a just and appropriate sentence for Mr. Black. The government agreed to proceed with the resentencings of Messrs. Boultbee and Atkinson with no additional prison time to be served by either. The government explained that Mr. Atkinson had already been paroled by the Canadian

---

[85]  The original presentence report quoted from page 7 of the Superseding Information (subparagraph (m)): "'Radler supervised the negotiations of the business terms of each of the transactions' involved in the United States Community newspaper sales." Original PSR p. 13, lines 401-403. The presentence report further noted that Mr. Radler issued the instructions and directives that effectuated the scheme.

[86]  The District Court stated at Mr. Black's December 2007 sentencing that the evidence at trial "supported that David Radler was the one who was running the U.S. operations . . . [a]nd the evidence also showed that Radler was the one that was ordering the money and telling others where it should be disbursed." Sentence Tr. 38.

authorities on his original sentence of 27 months, and that it expected Mr. Boultbee (sentenced to 24 months) to receive the same benefit upon his treaty transfer to Canada. As a result of the government agreeing to "time served" for these two defendants, Mr. Boultbee will have spent little less than 11 months incarcerated for his conviction (from July 11, 2008 to June 3, 2009), and Mr. Atkinson a little more than 11 months (345 days) for his.[87] Mr. Black's conduct in connection with Count 7 was similar to that of Messrs. Atkinson and Boultbee. As compared to Mr. Radler, Mr. Black was less involved. To the extent that Mr. Black differed from the others due to, for example, his conviction on count 13, the significantly greater amount of time that Mr. Black has served (more than 3 times longer than Mr. Radler, and more than 2.5 times longer than either Messrs. Boultbee or Atkinson) fully makes up for the difference and then some.

Other significant differences between the punitive consequences Mr. Black has and will continue to suffer compared to his codefendants also counsel that time served is the appropriate sentence in this case. First, Mr. Black personally paid back more than $30 million to Hollinger International in connection with the Delaware lawsuit, including restitution for substantial payments that the three *other* officers received. Second, unlike Mr. Black, all three of the co-defendants were eligible to serve portions of their sentences in Canada (and Messrs. Radler and Atkinson in fact did so). Mr. Black is ineligible for such a transfer and therefore has

---

[87] Mr. Kipnis was not incarcerated; he received 5 years of probation with 6 months home detention as a condition.

43

served (and would continue to serve) all of his prison time in a U.S. penitentiary which does not allow for the same possibility of early parole as does the Canadian system and in which the conditions of incarceration are significantly more restrictive, owing in part to Mr. Black's deportable alien status, which, as noted above, made him ineligible for a federal prison camp.

An additional collateral consequence of this case for Mr. Black is that absent a special waiver, he will not be permitted to return to the United States after he departs at the conclusion of his sentence. As noted in the presentence report, Immigration and Customs Enforcement officials informed the Probation Department that Mr. Black is "out of legal status" in the United States due to the two remaining counts of conviction.[88]

The consequence of being banned from the United States is a devastating result for Mr. Black—much more so than for his codefendants. Mr. Black has many close personal friends in the United States. His daughter, Alana, resides in New York. In addition, Mr. Black loves this country. As a publisher, historian, and author, Mr. Black has made the study, description, and defense of the United States a central theme in his life's work. Brian Stewart, who has been a close friend of Mr. Black's for over 50 years, writes that Mr. Black is well aware of the spiteful mockery he faces from critics who have derided his pro-American stance after the pain and disgrace Mr. Black has suffered in this country in connection with the prosecution of this case. Yet, Mr. Stewart explains, this awareness is secondary to Mr.

---

[88] PSR p. 27, lines 867-871.

Black's recognition that he will "have to leave the country he has so greatly loved, perhaps never to return."[89]   Based on observations that go back more than forty years, Mr. Stewart writes:

> For much of his life, Conrad was partially defined by his intense love of America.  From his early youth in Toronto, Canada he studied its history, geography and culture, revered its historical giants, and immersed himself to the hilt in its politics.  Whenever he had a chance, he got in his car and took this passion "on the road" across America.
>
> In a sweltering August 1964 he persuaded me to join him in a trip to see the nomination of Lyndon Johnson at the Democratic Convention in Atlantic City, one of the most fascinating journeys I've experienced.  Along the way, whenever we stopped he talked to the locals about their thoughts on politics, or went off walking to spot some piece of "Americana".  One evening looking down on a hillside onto Pittsburgh, with blast furnaces blazing in the night alongside the Golden Triangle of city lights, he pointed out that all this before us, and the meeting of Allegheny, Monongahela and Ohio Rivers was one of the great enduring images of American greatness.  I've never forgotten that sight, or the sentiment.[90]

When asked during his April 4, 2011 interview with the Probation Department whether he was still an ardent supporter of the United States, Mr. Black responded, as set forth in the presentence report, that "it would be a mistake to deny the greatness of the United States" based on his experiences in connection with this case and that he has been "touched by the many Americans" who have supported him over the course of the last 8 years.[91]   Evidence that neither this case, nor Mr. Black's inevitable exclusion from the United States, have destroyed his admiration

---

[89]   Letter of Brian Stewart, p. 2.

[90]   *Id.*, p. 1-2.

[91]   PSR p. 36, lines 1166-1170.

for this country is the fact, as discussed above, that the book on which Mr. Black is currently working is *A Strategic History Of The United States*. This book chronicles the accomplishments and contributions of men such as George Washington, Benjamin Franklin, Thomas Jefferson, Alexander Hamilton, John Marshall (whom he credits with establishing a strong federal form of government from the bench), John Adams, and John Jay. The deep punishment that Mr. Black will experience as a result of being excluded from the United States should be considered, then, in addition to all of the other factors set forth above, in arriving at a sentence "sufficient" but not "greater than necessary,"[92] as well as a sentence that is commensurate with those received by the similarly situated codefendants in this case. Mr. Black's enduring belief in the greatness of our Nation also explains his pursuit of the appellate process in this case, a choice that, as observed by individuals Mr. Black encountered at Coleman, is rooted not in combativeness, but rather in an abiding faith in our judicial system.[93]

## CONCLUSION

A sentence of time served is the just and appropriate result in this case. Even accepting the recommendations in the presentence report, Mr. Black has served the functional equivalent of the bottom of the advisory guidelines range.[94] Beyond these

---

[92] *See* § 3553(a)(2).

[93] *See* November 16, 2010 Letter of Donald Ayers.

[94] *Compare* PSR p. 39, lines 1236-1238 (noting that the amount of time served is 32 months, 26 days) *with id.* at 38, lines 1234-1235 (recommending a range of 33 – 41 months).

mechanical calculations, the many letters submitted to the Court in advance of re-sentencing, as well as in the detailed material gathered and presented in the updated presentence report, amply demonstrate that Mr. Black should be permitted to close the book on this chapter of his life and move on. He endeavored to serve his prison time in a positive and highly constructive manner, and he succeeded enormously in that effort. His commitment to charitable contributions and his other works for a better society have been fortified, with new attention devoted to an even larger circle of those in the greatest need. His ordeal has sent a resounding deterrent message to officers of any publicly traded company. His sentence and the collateral consequences of his conviction have already been more severe than those experienced by his codefendants in this case, all of whom have been given the chance to put these proceedings behind them. Mr. Black has been punished enough. The interests of justice call for a sentence of time served.

Respectfully submitted,

s/David Debold
David Debold

MIGUEL A. ESTRADA
DAVID DEBOLD
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 955-8500

CAROLYN GURLAND
2 North LaSalle Street
17th Floor
Chicago, Il 60614

May 13, 2011                    *Attorneys for Defendant Conrad M. Black*

47

## CERTIFICATE OF SERVICE

I, Carolyn Gurland, an attorney for Defendant Conrad M. Black, hereby certify that on this, the 13th day of May, 2011, I caused the above-described document to be filed on the CM/ECF system of the United States District Court for the Northern District of Illinois, which constitutes service of the same.

/s/ Carolyn Gurland

CAROLYN GURLAND
2 North LaSalle Street
17th Floor
Chicago, Il 60614