UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 05 CR 727-1 |
| | ) | |
| CONRAD M. BLACK | ) | Hon. Amy J. St. Eve |

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S RESENTENCING SUBMISSION**

Defendant's request for time served is unreasonable. Such a sentence would not promote respect for the law, and would not sufficiently punish the defendant for his crimes. The government has already addressed the bases for its sentencing recommendation in its May 13, 2011 submission. Here, the government responds only to new issues raised by defendant.

## I.    GUIDELINES ISSUES

### A.    Loss Amount

Defendant argues that the $600,000 loss on Count Seven should be reduced by 18%, because defendants collectively held an 18% equity stake in Hollinger International. Def.'s Br. 37-38. The Seventh Circuit has already considered and rejected this argument.

In *United States v. Mankarious*, 151 F.3d 694, 696 (7th Cir. 1998), the Court reviewed the fraud and money-laundering convictions and sentences of defendants Mankarious and Murphy, who founded a company called Delta Group, Inc. Because Mankarious and Murphy were Delta Group's founders, "[a]t first it may sound like Mankarious and Murphy stole just from themselves, but that is not true." *Id.* Mankarious and Murphy owned 59% of the

company, while a venture-capital firm owned the rest. *Id.* Defendants argued that the district court erred by holding them accountable for the entire loss to Delta Group, when they owned 59% of the company "and cannot steal from themselves." *Id.* at 709. The loss, they argued, should have been reduced by 59%. *Id.* The Seventh Circuit rejected defendants' argument, and found that the district court properly held defendants responsible for the entire loss:

> [I]t seems appropriate to hold a co-owning corporate embezzler responsible for the full amount of loss if the corporation follows formalities, if it has other active co-owners, and/or if the defendant in question receives a salary and benefits tightly controlled by the co-owners. We do not mean to require the presence of all these factors, nor do we mean to suggest that this list is exhaustive.

*Id.* Delta Group, the Court held, was not a corporation in name only that was merely an alter ego for the defendants; it was a real entity with a "fully participating co-owner" that required Delta Group to follow corporate formalities, helped direct Delta Group, and closely monitored defendants' compensation. *Id.*

As in *Mankarious*, defendant should be held fully responsible for the loss to Hollinger International, without any reduction for his (or his co-defendants') ownership interest in the company. Hollinger International plainly followed corporate formalities and had active co-owners: it was a publicly traded corporation, regulated by the United States Securities and Exchange Commission. Defendant's entitlement to salary and benefits from Hollinger International was also "tightly controlled," indeed, was spelled out in detail in Hollinger International's public SEC filings.

2

Defendant should be held responsible for the full amount of the loss, without any credit for his ownership interest in Hollinger International.

**B.      Abuse of Trust**

Defendant argues that he should not receive a two-level enhancement for abuse of trust. Def.'s Br. 39-41. To evaluate whether Guideline § 3B1.3 applies, courts determine, first, whether defendant occupied a position of trust. *United States v. Thomas*, 510 F.3d 714, 725 (7th Cir. 2007). Second, courts evaluate whether abuse of that position of trust significantly facilitated or concealed the crime. *Id.*

Defendant concedes that he occupied a position of private trust. Def.'s Br. 39. *See also United States v. Mabrook*, 301 F.3d 503, 510 (7th Cir.2002) (defendant's fiduciary duty to corporate investors placed him in a position of private trust); *United States v. Bhagavan*, 116 F.3d 189, 193 (7th Cir.1997) (president of corporation holds private position of trust toward shareholders).

He argues, however, that he did not abuse that trust, because "there was nothing fraudulent, in and of itself, in him receiving non-compete payments from third parties in connection with their purchases of newspaper properties from his company." Def.'s Br. 39. But defendant was not convicted of doing that. He was convicted of taking money that was *not* a non-compete payment, was *not* from a third party, and was *not* in connection with a purchase of newspaper properties from Hollinger International. It was Hollinger International's money that defendant and his co-schemers stole, money that had nothing to do with a newspaper sale or with non-competes. Nevertheless, defendant and his co-schemers

3

repeatedly called the money non-compete payments, including in SEC filings and defendant's statements to shareholders, in order to cover up the theft.[1]

With respect to Count Seven, defendant, using his position of trust, fraudulently caused Hollinger International to pay him and his co-schemers $600,000. He and David Radler discussed taking the money, and defendant authorized Radler to make it happen. The fact that Radler, rather than defendant, was the person who "handled getting the checks issued," Def.'s Br. 40, does not insulate defendant from his own abuse of trust in directing the theft in the first place. Likewise, for the APC payments, defendant and his co-schemers used their positions as top executives to divert $5.5 million from the company, seeking to conceal the theft by creating and signing unnecessary employment non-compete agreements.

In *United States v. Bhagavan*, 116 F.3d at 192-93, the Seventh Circuit affirmed an abuse-of-trust enhancement for a corporate president (and the company's largest shareholder) who diverted company money for himself, and failed to report the money to the IRS. By stealing from the company, the defendant "abused the trust of the other shareholders by diverting funds that could have been used to pay dividends or to improve the company's long-term prospects." *Id.* at 191; *see also United States v. Sims*, 329 F.3d 937, 946 (7th Cir. 2003) (enhancement appropriate for company president because of "the nature of his power

---

[1]Defendant characterizes his conviction on Count Seven as a side effect of Mark Kipnis's "neglect[ing] to draw up the non-compete agreements..." Def.'s Br. 39. As explained in more detail at pages 16-17 in the government's May 13, 2011 submission, this description is incorrect.

4

as the [company's] President...," his knowledge of the way the fraud worked, and his actions to further the fraud).

The same is true here. It was not just any employee of Hollinger International who was able to have checks cut from the company to himself for so-called "non-compete payments" that were not really non-compete payments and that no one had legitimately authorized; it was defendant and his co-schemers, using and abusing their positions of trust, that made this crime happen.

Moreover, defendant abused his position of trust when he signed false public disclosures to shareholders, lying to them about the money he and his co-schemers received. Defendant repeated and expanded on these lies in his 2002 personal address to shareholders. In a context where the shareholders, to whom defendant owed a fiduciary duty, were questioning the payments' propriety, defendant assured shareholders that the money he and the other top executives received was for legitimate non-compete payments in connection with newspaper sales. That was false. Defendant exploited his position of trust in an effort to conceal the crime, justifying the two-level enhancement under Guideline § 3B1.3. *Mabrook*, 301 F.3d at 510 (affirming enhancement because, as company owner, defendant was in "unique position" to conceal the fraud); *see also United States v. Waldner*, 580 F.3d 699, 706-07 (8th Cir. 2009) (affirming abuse-of-trust enhancement for corporate CEO who lied at bankruptcy creditors meeting to conceal scheme).

## II.     SECTION 3553 ISSUES

### A.     The Court Already Considered Defendant's Charitable Works

Defendant devotes much of his sentencing memorandum to describing his tutoring activities while imprisoned at Coleman, and efforts he has made in connection with his family's charitable foundation. Def.'s Br. 8-26. This kind of information is not new; it was defendant's main focus at the December 2007 sentencing. Defense counsel described at length defendant's "lifetime of charitable good works," Sent. Tr. 56, and defendant submitted dozens of letters to the court describing those efforts. Indeed, in imposing a 78-month sentence, this Court expressly noted that it was taking into account defendant's commitment to doing charitable work. Sent. Tr. 113-14. There is, therefore, nothing surprising or different about the information defendant describes in his sentencing submission. Based on his counsel's sentencing presentation in December 2007, it is conduct that this Court likely expected, and is not a basis to reduce defendant's sentence.

### B.     The Court Already Considered Collateral Consequences of Defendant's Conviction and Sentence, and Defendant's Age and Health

In support of his request for a time-served sentence, defendant argues that he has endured various collateral consequences of this case, Def.'s Br. 27-28, experienced personal and professional hardship, *id.* at 29-30, and expects immigration and citizenship consequences, *id.* at 30-31. Defendant advanced the same arguments, and this Court considered them, at the December 2007 sentencing. They are no basis to reduce the sentence the Court previously imposed.

Defendant also seeks time served based on his age and health. *Id.* at 31-34. First, this Court already considered defendant's age at the original sentencing. Of course, the Court's sentence anticipated that defendant would age as he served the six-and-a-half years this Court imposed. Defendant cites Guideline § 5H1.1, a recent amendment, for the proposition that age is relevant when "a defendant's age is not typical." *Id.* at 31. But the Guideline doesn't say that. It says:

> Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.

Guideline § 5H1.1. The Seventh Circuit, addressing the amended Guideline, determined that under § 5H1.1, a defendant's age is relevant only if the defendant is "elderly and infirm." *United States v. Washington*, 385 Fed. Appx. 570, 573 (7th Cir. 2010) (stating, in case involving 64-year-old defendant, that the "argument that advanced age is always a mitigating factor is a 'nonstarter'").[2] Defendant is neither elderly nor infirm.

Also, the government disagrees that defendant's age is atypical for a fraud defendant. There are plenty of fraud defendants in their sixties, and older, sentenced for crimes like defendant's. In *United States v. Anderson*, 517 F.3d 953, 966 (7th Cir. 2008), for example, the Seventh Circuit affirmed a six-year sentence for a 73-year-old real-estate developer who

---

[2]This is not to say that a sentencing court cannot consider age as a factor under Section 3553(a). Of course, it can.

was convicted for paying a $10,000 bribe. The Court noted that the district court "did acknowledge the defendant's advanced age but this factor also may have worked against Anderson. The judge noted that Anderson was well off financially and could have relaxed and enjoyed his golden years. While many criminals commit crimes from lack of opportunity and desperation, Anderson had acted out of greed." *Id.* Because of the defendant's age and health, the district court declined to give a high-end sentence; a Guideline sentence, though, remained appropriate. *Id.*; *see also United States v. Watkins*, 393 Fed. Appx. 392, 393 (7th Cir. 2010) (70-month within-Guideline sentence reasonable for 66-year-old fraud defendant with various medical issues, including high blood pressure).[3]

Second, as to defendant's health, he claims he receives treatment for high blood pressure, cardiac arrhythmia, fluid retention, and elevated cholesterol. Def.'s Br. 32. All of these conditions are treatable, including at the Bureau of Prisons facility where defendant served 29 months. According to Coleman medical staff, defendant received daily medication while at Coleman for high blood pressure, high cholesterol, and anxiety. Also at Coleman, defendant had an electrocardiogram that identified a cardiac arrhythmia, and he was

---

[3]The cases defendant cites on page 32 do not apply. First, in *United States v. Carter*, 538 F.3d 784 (7th Cir. 2008), the district court plainly relied upon many factors other than the defendant's age in giving a below-Guideline sentence, including its conclusion that the defendant's husband was the more culpable party. The district court considered age in evaluating defendant's recidivism risk, but the opinion doesn't suggest that age was a key factor in the 63-month downward variance. Second, in *United States v. Holt*, 486 F.3d 997 (7th Cir. 2007), the defendant received a 200-month sentence for a gun charge. He was appealing because he wanted an even lower sentence, despite the fact that the low end of his Guideline range was 262 months. The context was obviously much different than defendant's situation.

8

scheduled for further follow-up physical examination. According to Coleman medical staff, defendant did not appear for two scheduled follow-up clinics.

Defendant asserts that while on bond, he was diagnosed with skin cancer. Def.'s Br. 33. He also states that the condition has been treated. *Id.* According to Coleman medical staff, the staff is equipped to provide follow-up care for patients with this condition.[4] Defendant has no "extraordinary physical impairment" that justifies a below-Guideline sentence in this case. Guideline § 5H1.4 ("An extraordinary physical impairment may be a reason to depart downward."); *Washington*, 385 Fed. Appx. at 573.

### C.   Other Defendants' Sentences in this Case

Defendant argues that requiring him to serve additional prison time would create an unwarranted disparity in this case because his co-defendants have been released. Def.'s Br. 41-43. Although defendant casts his argument as a new one, asserting that the Court now has information it did not have at the time of the original sentencing, that is not accurate.

With respect to David Radler, this Court was well aware in December 2007 that Radler's actual time in prison would likely be less than 29 months due to the Prisoner Transfer Treaty. First, this Court accepted David Radler's Plea Agreement, which specifically referenced the Treaty. Second, both government and defense counsel questioned Radler at trial about the Treaty's expected impact. Tr. 7469-70, 8470-86. Indeed, defendant's

---

[4]According to Coleman medical staff, there is an undated reference in defendant's records to seborrheic keratosis (a noncancerous growth on the skin), but it is not clear whether this is the same lesion that defendant describes in his sentencing submission. There is no indication in defendant's records that he expressed concern about a facial lesion, or about his medical care in general. Indeed, according to Coleman legal staff, defendant filed no grievances while at Coleman.

9

trial counsel repeatedly asserted through his questions that, because of the Treaty, Radler would likely serve no more than six months in prison. *Id.* Third, at defendant's December 2007 sentencing, defendant's sentencing counsel raised the issue, asking this Court to take into account that David Radler would likely serve less than the Court's 29-month sentence. Defense counsel stated:

> I offer this perspective. This man [Radler] is set to receive a 29-month sentence. As I understand and have read his plea agreement, he also seeks the opportunity to serve that time in a Canadian facility, where I am informed he may effectively be able even to reduce that sentence further; perhaps, even a year, under a year. I don't know whether he'll be successful in that endeavor, but that opportunity lay in front of him.

Sent. Tr. 79. The Court knew and accounted for this when selecting an appropriate sentence for defendant, to avoid unwarranted disparities.

Not only does defendant complain about Radler's sentence, he also inaccurately states that the government "agreed to 'time served'" for Atkinson and Boultbee. Def.'s Br. 43. The government agreed that Atkinson's and Boultbee's amended Judgment and Commitment Orders should state "time served," because government counsel learned that that was the language the Bureau of Prisons expects to see for a defendant who has already completed his sentence, as was the case for Atkinson and Boultbee.[5] The government did not agree to reduce their sentences.

_____

[5]Although Boultbee was never actually transferred to Canada under the Treaty, the conclusion of his appeal was the event that would trigger the transfer. Given the amount of time Boultbee had already served, it was clear to both parties that Boultbee had effectively completed his sentence.

Despite defendant's protestations, he is not differently situated than his co-defendants. Just as Radler, Boultbee, and Atkinson were non-U.S. citizens, defendant is not a U.S. citizen. Just as Radler, Boultbee, and Atkinson had the opportunity to apply to be transferred to their home countries, defendant has the opportunity to apply to be transferred to his home country, under the International Prisoner Transfer Program. *See* http://www.justice.gov/criminal/oeo/iptu/.[6] Just as Radler, Boultbee, and Atkinson will not be permitted to return to the United States, defendant must endure the same consequence of committing aggravated felonies while in this country. And should defendant return to prison in the United States, just like other inmates, defendant has the opportunity to earn good-time credit that will reduce the sentence he ultimately serves.[5]

The main difference between defendant and his co-defendants is that he received a longer prison sentence, because he deserved a longer prison sentence. Although defendant was similarly culpable as Radler with respect to the fraud, Radler admitted his guilt, accepted responsibility, cooperated with the government, and voluntarily paid more than $53 million in restitution. Defendant, by contrast, falsely maintained his innocence, and refused to accept

---

[6]Radler, Boultbee, and Atkinson are Canadian citizens, and defendant is a UK citizen. That was defendant's own choice, as he voluntarily renounced his Canadian citizenship. He can still apply for transfer to the UK.

[5]Indeed, defendant tells the Court that he has "already served the equivalent of nearly 33 months (after adjusting for good time credit that he earned)...." Def.'s Br. 3. Defendant hasn't really served 33 months; he merely anticipates that his overall time will eventually be reduced based on his earned good-time credit. *Pepper v. United States*, 131 S.Ct. 1229, 1248 n.14 (2011) (award of good-time credit by BOP does not affect length of court-imposed sentence; it is an administrative reward that can be revoked any time before prisoner's release).

11

responsibility for his crimes.[6] What's more, and what separates the defendant from all of his co-defendants, defendant obstructed justice – a crime for which this Court independently sentenced him to 78 months' imprisonment. A reimposed 78-month sentence for defendant is fair and reasonable, and the disparity between this sentence and those received by the co-defendants remains warranted. *United States v. Borrasi*, —F.3d—, 2011 WL 1663373, *10 (7th Cir. May 4, 2011) (§ 3553(a)(6) permits warranted disparities among co-defendants, and district court may make individualized determination explaining why different sentences are justified); *United States v. Shamah*, 624 F.3d 449, 460 (7th Cir. 2010) (district court appropriately gave significantly different sentences to two co-conspirators who were "equally culpable," where "the court believed the difference in sentencing was appropriate given Doroniuk's guilty plea, cooperation with the government, and testimony at trial against his fellow officer").

---

[6]Although defendant refers to his payment of $30 million in restitution, Def.'s Br. 43, he did not pay that money voluntarily. He paid it because he was ordered by a court to do so. *Hollinger International Inc. v. Conrad M. Black, et al.*, Civil Action No. 183-N (Del. Ch. Ct. May 19, 2004) (Strine, J.).

12

Dated: May 27, 2011                    Respectfully submitted,
PATRICK J. FITZGERALD
United States Attorney

By:     s/ Julie B. Porter
JULIE B. PORTER
Assistant U.S. Attorney
219 South Dearborn Street, Room 500
Chicago, Illinois 60604
(312) 353-5300

13

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following document:

Government's Response to Defendant's Resentencing Submission

was served on May 27, 2011, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

s/ Julie B. Porter
JULIE B. PORTER
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois
(312) 353-5300