UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 05 CR 727-01 |
| | ) | Hon. Amy J. St. Eve |
| CONRAD M. BLACK. | ) | |

**CONRAD BLACK'S RESPONSE TO GOVERNMENT'S
SENTENCING SUBMISSION**

MIGUEL A. ESTRADA
DAVID DEBOLD
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, D.C.  20036
(202) 955-8500

CAROLYN GURLAND
2 North LaSalle Street
17th Floor
Chicago, IL  60614

*Attorneys for Defendant Conrad M. Black*

i

# TABLE OF CONTENTS

Page

I. The Court Should Adopt The Probation Department's Recommendation And Reject The Government's Effort To Multiply The Loss Amount Ten-Fold Based On Factual And Legal Positions That This Court Has Already Rejected. .................................................................................. 6

II. The Probation Department Correctly Recommended Against A "More Than Minimal Planning" Enhancement Where The Offense Conduct Is Confined To A Single Act Of Fraud With Only Nominal Planning. ........................................ 18

III. The Court Should Adopt The Probation Department's Conclusion That The Remaining Offense Conduct Was Neither Especially Complex Nor Especially Intricate. ................ 24

IV. The Remainder Of The Section 3553(a) Factors Independently Counsel A Sentence of Time Served. .................... 27

In the name of imposing a sentence "that promotes respect for the law" (Gov't Position Paper at 28),[1] the government would have this Court ignore: the jury's decisive rejection of the government's grand Kleptocracy theory; this Court's own rulings (unchallenged by the government on appeal) delineating the proper scope of relevant conduct under the facts of this case; the Supreme Court's unanimous judgment that the jury was instructed on a distinct theory of fraud that wasn't fraud at all; and the Seventh Circuit's conclusion that—as a result of the flawed instructions—the jury could very well have convicted on the APC counts solely by finding something far less than pecuniary fraud.

The government's position is astounding. It still refuses to recognize that its multi-year effort to imprison Mr. Black for the remainder of his natural life and impoverish his family has collapsed into a mere two counts of a fourth superseding charging instrument, with every one of the other 15 charges that it threatened or actually laid against Mr. Black having been abandoned by the government, rejected by the jury, or invalidated by the appellate courts. Rather than own up to any of the indisputable excesses in this prosecution, the government chastises Mr. Black for not having signed on to its demonstrably false and failed view of the case. The government claims that Mr. Black's refusal to fess up is nothing short of blatant disrespect for our rule of law as enforced through the judicial system. However, it is the government, not Mr. Black, that denigrates the courts' process with its latest

---

[1] Government's Objections to Updated PSR and Position Paper as to Sentencing Factors (D.E. 1199) May 13, 2011.

fabrication of fantastic allegations of wrongdoing, the attempted revival of debunked and rejected charges, and an invitation to the Court to reverse prior rulings that the government admits it lacks the heart (or the right) to re-litigate. All the while, it attempts to mask that agenda behind sanctimonious incantations of outrage over the harm it imagines has resulted from a litany of offenses of which Mr. Black has been exonerated, with a host of false factual assertions about the record thrown in for good measure.[2]

---

[2]    These false assertions include, but are by no means limited to, the following:

   (1)  The government insists that Mr. Black participated in a multi-year plan to slip the existence of non-compete payments past a vigilant Audit Committee. Gov't Position Paper 3. The falsity of this claim that the directors were ever left in the dark was fully exposed at trial when each admitted to signing SEC filings affirming that just the opposite was true. The government shows no interest in recognizing that these directors were informed of the agreements (falsely denying that knowledge in statements filed with the same government that accuses Mr. Black of fraud and concealment), unless somehow these highly esteemed individuals missed the disclosure of them at the approval stage (much like they claimed to have missed reference to them on as many as 11 *other* occasions so well-documented that blaming Mr. Black was not a credible option).

   (2)  The allegation that Mr. Black endeavored to conceal the true nature of the non-compete agreements from the shareholders and sought to squash the special committee investigation (*id.* at 4) is wholly unsupported and false.

   (3)  The description of Mr. Black sneaking around to avoid security cameras that were installed under his watch (*id.* at 5) is debunked by the videotape itself and further refuted by letters from Don Vale submitted in connection with this and the first sentencing proceeding.

   (4)  The effort to explain that the absence of individual non-compete agreements with Paxton and Forum was due to the fact that buyers did not want them (*id.* at 15) is nonsensical. Such agreements were conditions of closing in the transaction documents and did not depend for their validity on what the buyers later may have offered up as their personal feelings about the need for valid

Given the aggressiveness of the government's effort these past four years to punish Mr. Black as though he had properly been convicted of the full panoply of weighty charges leveled against him, and in light of the fact that the government continues in that audacious effort even *after* a jury and two appellate courts have whittled its case down to a tiny fraction of its former self, it is highly ironic that Mr. Black is the one accused of showing insufficient respect for our rule of law or a failure of trust in our courts and juries.

The government doubtless would have preferred that Mr. Black had not elected "to consume the Courts' or the parties' resources" with even *a single* trial; much better had he instead simply opted to "accept responsibility for" the spectacular range of "crimes" that the government long ago decided he surely must have committed. *See* Gov't Position Paper 2, 27. But under our criminal justice system, prosecutors do not get to decide guilt; a defendant is allowed to put the government

---

contract provisions. And, in any event, they were negotiated without the buyers ever meeting or speaking with Mr. Black.

(5) It is just plain wrong to accuse Mr. Black of making false reports to Hollinger International's attorneys and auditors, assisting in drafting false and misleading disclosures to shareholders, or ignoring and berating shareholders. *Id*. at 19. Rather than being misled, attorneys for Hollinger International were shown to have given poor advice, and when that advice changed it was promptly heeded. There is not a shred of evidence that Mr. Black had a hand in drafting disclosures for which Hollinger International employed auditors and two esteemed law firms, and his uniformly courteous responses to shareholders were incomplete only to the extent Mr. Radler supplied incomplete information about the sloppy job he did in overseeing documentation of the non-competes.

(6) Finally, the allegation that Mr. Black tried to manipulate the responsibilities and the membership of the special committee (*id.* at 19) is completely fanciful.

to its proofs by invoking our Constitution's Fifth Amendment's guarantee of due process of law, and the right, enshrined in the Sixth Amendment and Article III, to trial by a jury of one's peers. Mr. Black's continued display of respect for, and confidence in, the law through his exercise of those rights has been rewarded with acquittals and reversals on all but two counts.

In truth, it is the government—not Mr. Black—that seeks to undermine respect for the law and frustrate the goal of just punishment by imploring this Court to reimpose sentence *as if* the government had retried the two vacated counts (this time with legally defensible jury instructions) and won convictions. Anyone reading the government's submission would surely be surprised to learn that this Court already considered and rejected the government's bid the first time around to treat the jury trial right as nothing more than a nuisance. At the initial sentencing, this Court ruled that it would be "unlikely to promote respect for the law or provide just punishment for the offense of conviction" if the Court chose to multiply the severity of the loss figure five-fold by employing the same relevant conduct provision that the government invokes today. Sentence Tr. 18 (relying on *United States v. Horne*, 474 F.3d 1004, 1007 (7th Cir. 2007)). The government does not even mention that ruling, much less try to explain how it possibly could be squared with the government's current gambit, under the same Guidelines provision and the same proposed preponderance-of-evidence standard, to enhance the loss amount *ten*-fold. The Probation Department has wisely recommended against that effort.

The government's attempted end-run around the jury trial right is but one instance in which it cannot be bothered with addressing this Court's earlier rejection of today's factual and legal assertions. On the relevant conduct issue alone, the Court has already considered every one of the supposed points of similarity between the vacated APC counts and count 7. *See, e.g.*, Gov't Position Paper 10 (arguing that the victim, accomplices and purpose were the same, and that the *modus operandi* was similar enough because non-competes were involved in both instances). When the government advanced those arguments at the original sentencing as reason to choose $32 million as the measure of relevant conduct, the Court explained in detail why those arguments were wrong. Sentence Tr. 16-18; Memorandum Opinion and Order Regarding Forfeiture (D.E. 972), Dec. 10, 2007, at 19-20. With even more points of dissimilarity between the two categories of conduct at issue this time around, one would have expected the government to focus on *this* Court's earlier relevant conduct ruling, rather than recite facts from cases that are inapposite.

When it comes to other factors in 18 U.S.C. § 3553(a), the government is equally dismissive of previously established facts and law. On the need to avoid unwarranted disparity, for example, it picks nits with the technical accuracy of the Probation Department's description of the co-defendant's sentences (Gov't Position Paper 24-25) instead of addressing the *substance* of the point identified in the updated PSR, namely that David Radler served less than one-third of the sentence that this Court imposed, and John Boultbee and Peter Atkinson each served less than half of their imposed sentences. That is an extremely unusual result. Indeed,

having the sentence of every co-defendant cut short to such a great extent by external forces is almost certainly unprecedented in more than two decades of sentencing under the Sentencing Reform Act—a law that the government frequently trumpets at other sentencing proceedings as the best vehicle for "truth in sentencing." These post-sentencing developments are highly important factors for the Court to consider, along with the extensive evidence demonstrating Mr. Black's exemplary behavior these last three-and-a-half years, his serious health issues and those of his wife, his age, his lifetime of significant contributions to society, and the serious collateral consequences he has suffered as a result of this investigation and prosecution.

The bottom line is unmistakable. A full and fair consideration of the totality of sentencing factors yields one result that would be sufficient, but not greater than necessary, to serve the purposes of punishment: a sentence of time served.

## I. The Court Should Adopt The Probation Department's Recommendation And Reject The Government's Effort To Multiply The Loss Amount Ten-Fold Based On Factual And Legal Positions That This Court Has Already Rejected.

The government's relevant conduct argument rests on criticism of the Probation Department's well-reasoned conclusions as to important dissimilarities between the APC counts and count 7, a renewal of arguments that have already been rejected by the Probation Department and this Court, and a lack of respect for the rulings of a unanimous Supreme Court.

Count 7—the sole remaining mail fraud conviction—was based on payments that Mr. Radler arranged after learning that Mr. Kipnis had failed to set aside money for planned non-compete agreements between officers of Hollinger Interna-

tional and two third-party purchasers of U.S. Community newspapers (Forum and Paxton). The government itself alleged that defendants had planned for payments to individual officers from the Forum and Paxton sales that would mimic payments made to the same officers from the CNHI II third-party sale, and that these payments would be in exchange for comparable promises not to compete with the third-party purchaser as of the date each sale was completed. Superseding Information (D.E. 766) ¶¶ 13, 16-21. To that end, documents were drafted, signed, and referenced in consent resolutions duly presented for approval by the Audit Committee and the rest of the Board. PSR p. 10, lines 317-323. Mr. Kipnis revealed, two years after the charged offense, that he forgot to draft the agreements. *Id.*

The Probation Department recommends against including as "relevant conduct" different, exponentially larger, payments made pursuant to four separate agreements (which Kipnis *did* draft) in which individual officers promised not to compete with Hollinger International's subsidiary and its affiliates in the future (*i.e.*, after stepping down as officers of the company). Seeing as how the government's chief witness testified that these payments were made with money that had already been set aside for the executives who received them, crediting his testimony—as the government repeatedly urged both the jury and this Court to do—would mean that there was not a theft. Due to the multiple ways in which this conduct differed from that asserted in count 7, not to mention the realistic possibility that the jurors might not have found the conduct to be criminal at all, the conclusion from the Probation Department's careful and detailed analysis of this issue (*see* PSR

p. 20-23, lines 617-737) is that the different payments charged as counts 1 and 6 were not "part of the same course of conduct or common scheme or plan as the offense of conviction." § 1B1.3(a)(2);[3] PSR p. 9, lines 275-278.

The Court's rulings from the original sentencing more than confirm that the Probation Department got it right. First and foremost, in 2007 this Court held that it would not "'promote respect for the law or provide just punishment for the offense of conviction'" to "impose a loss calculation that is over five times the convicted conduct, based upon a civil standard" of preponderance of the evidence. Sentence Tr. 18 (quoting *Horne*, 474 F.3d at 1007). Rather than try to help the Court understand how a *ten*-fold increase could possibly survive that ruling, the government acts as though the ruling doesn't exist.[4]

In light of this unappealed ruling from the initial sentencing, the government is wrong in stating that "[a]t this procedural stage, this Court is to determine whether a preponderance of evidence supports a finding" that the APC conduct passes the relevant conduct test. Gov't Position Paper 17. It is one thing for a party to ignore an earlier ruling; it is quite another to then accuse someone else (in this case, the Probation Officer) of being the one to introduce "speculation" that "is not germane to the relevant-conduct analysis." *Id.*

---

[3] Unless otherwise specified, Guidelines Manual references are to the 2000 version.

[4] It is not as if the government forgot about the Court's earlier decision. *See* Gov't Position Paper 9 n.1 & 14 n. 3. But vowing (twice) that the government "does not seek to relitigate" a ruling (*id.*) is the polar opposite of giving this Court valid grounds on which it might base a reversal of that ruling.

The fact of the matter is that the Probation Department's review of the evidence *is* germane, because it helps demonstrate why—even *were* the government seeking to relitigate the earlier ruling—this resentencing would be a particularly inappropriate occasion for letting it do so. That is because the evidence of fraudulent intent—purposeful theft of Hollinger International's money—was contradicted by Mr. Radler's testimony that his belief at the time he arranged for the APC payments was to use money already owed as management fees.

The government has waffled on whether Mr. Radler was truthful in that testimony or, instead, committed perjury. *Compare, e.g.*, Gov't Consolidated Response to Defendants' Objections to PSR (D.E. 958), Dec. 3, 2007, at 7 (government sentencing memorandum conceding that Mr. Radler had a "mistaken belief" about the source of the money), *with* Gov't 7th Cir. Brief 36 (2008) (arguing that the evidence "amply supported" the "government's theory" that "defendants and Radler knew this money belonged to International and that they were stealing it disguised as non-compete payments"). The fact that the government felt compelled, in defending the APC guilty verdicts on appeal, to switch to a "theory" that Mr. Radler engaged in selective perjury says a lot about its true level of confidence in the strength of the pecuniary fraud case. It is especially telling, coming as it did on the heels of representations to *this* Court (under seal until two years later) that the government "ultimately determined that the information provided by Radler was accurate and complete." Gov't Sentencing Submission re Radler (D.E. 1118), unsealed Oct. 23, 2009, at 5; *see also id.* at 16 (prosecutors support their substantial assistance depar-

9

ture request by suggesting that Mr. Radler's testimony about the source of the APC payments was one of "defendants' strongest arguments" precisely *because* Radler's truthful testimony was "inconsistent with the government's theory of the case").

Given this Court's ruling that respect for the law would be undermined if an even smaller tail of unconvicted conduct were allowed to wag the dog, there is no need to decide whether the government's star witness was telling the truth in this matter (as the government has certified he was).

Even if the Court reversed its earlier ruling under *Horne*, however, and even if the government were allowed to disown its own witness whenever convenient, there still would be no basis for adding the APC amounts because those counts are not "relevant" conduct under the Guidelines.

This Court found in 2007 that the APC transactions "differ significantly" from all of the unconvicted transactions for three reasons: the APC agreements were not tied to actual sales of newspaper assets; the agreements that purportedly supported the APC payments did not involve third parties; and no aspect of the APC non-competes was presented to the Audit Committee. Sentence Tr. 17-18. Each of these differences applies to count 7 as well. The "scheme" that the government alleged in count 7 was for payments to be tied to actual sales of newspaper assets to Forum and Paxton. Superseding Information (D.E. 766) ¶¶ 16-21. As a result, the contemplated agreements were to involve the same third-party purchasers of the newspaper assets. PSR p. 9, lines 288-290. The APC non-compete agree-

ments, on the other hand, were not with a third-party; they were, as the government notes, "employment non-compete agreements." Gov't Position Paper 27.

And consistent with the government's own allegation that the agreements relating to count 7 were supposed to be like earlier non-compete agreements with third-party purchasers, the proposal to have non-compete agreements between individual officers and Forum and Paxton was included in an Executive Consent that the Audit Committee members were later asked to bless in a Board resolution (and that *every* member of the Board *did* bless only after "presented by Mr. Black to the Board for its consideration" and then "reviewed" by the Board to its satisfaction). PSR p. 10, lines 317-323; Gov't Exh Board D.

Ignoring each and every difference, the government aims its argument at such a high level of generality that it would have the Court reverse the very ruling that the government knows it has no basis for relitigating. Here is the government's argument today for why the APC conduct and count 7 are part of a "common scheme":

(1) "the victim was the same: Hollinger International and its shareholders";

(2) "the accomplices were the same: defendant schemed with Radler, Boultbee, Atkinson, and Kipnis";

(3) "there was a common purpose: to enrich defendant, Radler, Boultbee, and Atkinson"; and

(4) "there was a similar *modus operandi*: defendants took money from Hollinger International that they were not entitled to take, and tried to cover up the thefts by calling them non-compete payments."

Gov't Position Paper 10. That, of course, is the *same* argument the government made in 2007 for treating *every* non-compete agreement mentioned in counts 1 through 7 (more than $32 million worth) as relevant conduct:

> As to the Guidelines' imperative on relevant conduct, *i.e.,* that the conduct at issue be connected by 'at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*,' the U.S. community Inc. and individual non-compete payments qualify on every score. The common victim is International. The common accomplices are Black, Radler, Boultbee, Atkinson, and Kipnis. The common purpose was to enrich Black and, in the case of the individual payments, the other executives. And the non-compete device was the unique *modus operandi* of this scheme, repeated through every one of the U.S. transactions and for the APC and supplemental payments.

Gov't Consolidated Objections to PSR (D.E. 950), Nov. 27, 2007, at 4-5.[5]

This Court has already ruled unequivocally that relevant conduct does not cut so wide a swath. Sentence Tr. 17-18; *see also* D.E. 972 at 19 ("the government has not established by a preponderance of the evidence that the non-competition payments related to CNHI(II), Forum, and Paxton constitute a part of an overarching scheme to defraud"). The Government's proposal to shift relevant conduct to a "big picture" approach (Gov't Position Paper 12) is unsupported. In fact, the Seventh Circuit has consistently emphasized the limits, not the breadth, of the relevant conduct provision, stressing that courts must "be scrupulous to ensure that the government has adhered to those limits." *United States v. Beler*, 20 F.3d 1428, 1432

---

[5] *Cf. also* Gov't Position Paper at 13 (arguing that "there are more commonalities than differences in the convicted and relevant conduct: defendant and his co-schemers fraudulently took money from Hollinger International, and covered up both thefts by falsely depicting the stolen money as legitimate non-compete payments").

(7th Cir. 1994); *see also United States v. Taylor*, 272 F.3d 980, 983 (7th Cir. 2001); *United States v. Smith*, 218 F.3d 777, 783 (7th Cir. 2000); *United States v. Patel*, 131 F.3d 1195, 1204 (7th Cir. 1997); *United States v. Crockett*, 82 F.3d 722, 729 (7th Cir. 1996); *United States v. Ritsema*, 31 F.3d 559, 567 (7th Cir. 1994); *United States v. Duarte*, 950 F.2d 1255, 1263 (7th Cir. 1991).

As was the case last time around, the government's fall-back argument is that the unconvicted allegations fall within the "same course of conduct" as that charged in count 7. It argues first that "the sequences" "were very similar" because "[b]oth involved taking money styled as 'non-compete payments' that were not really non-compete payments." Gov't Position Paper 13.[6] By this the government means that, even though each officer signed a legally binding non-compete agreement with APC, defendants weren't "truly being paid for non-compete agreements"; rather, they were paid because they "simply wanted the money," and *not* "because APC needed, wanted, or had requested employment non-competes from the executives." *Id.* at 14.

That is the same argument that the Court rejected with respect to the *other* $26 million in non-compete agreements. *See, e.g.*, Gov't Motion for Preliminary Order of Forfeiture (D.E. 850), Aug. 3, 2007, at 4 (government argues that no company

---

[6] The word "sequences" newly replaces "schemes" in the government's papers. "Scheme" no longer works here, because this Court has already rejected the government's position that *it* gets to decide, at the charging stage, how broad the scheme is for relevant conduct purposes. Sentence Tr. 16; D.E. 972 at 19. To save itself from the incongruity of asserting that separate schemes (plural) in count 7 and in the APC counts are really one scheme (singular), the government now uses "sequences" to refer to each of the two schemes.

13

involved in the CNHI I or II, Forum, or Paxton purchases "requested or required non-compete agreements from or non-compete payments to Inc. as part of the deals"); *id*. at 5 ("In November 2000, in CNHI(II), Black, Radler, Boultbee, and Atkinson received a total of $9.5 million in so-called non-compete payments, even though CNHI never requested or required their non-competes as part of the deal."). That argument is wrong today for the same reasons it was wrong in 2007: The Seventh Circuit has "consistently cautioned that section 1B1.3(a)(2) must not be read to encompass any offense that is similar in kind to the offense of conviction but that does not bear the required relationship to that offense." *Patel*, 131 F.3d at 1204; *see also United States v. Ortiz*, 431 F.3d 1035, 1040 (7th Cir. 2005); *Crockett*, 82 F.3d at 730; *Beler*, 20 F.3d at 1432; *Duarte*, 950 F.2d at 1263.

The government's second point in its "same course of conduct" argument—the alleged repetitiveness of the illegal conduct—is flawed for the same reasons, and more. It should go without saying that before the Court is able to rely on an assertion that "the supplemental-payment part of the scheme and the APC conduct occurred at the tail end of a series of frauds" (Gov't Position Paper 14), it would need to find that *some* other frauds make up a "series." But this Court has already ruled that there *isn't* a prior course of conduct on which the government can pin its tail. It is no answer to say that the Court "can and should consider" the other "millions from the company in purported non-compete payments in other newspaper sales," at least not when the government prefaces that suggestion with its promise *not* to "re-litigate the Court's prior rulings"—*i.e.*, the rulings that those same transactions

14

could *not* be used to aggravate Mr. Black's sentence. *Id.* at 14 n.3. With only count 7 and the APC non-competes to work with, the government is left arguing that the "regularity of the offenses" requirement for proving the "same course of conduct" can be established simply by proving that more than one offense was committed. *Id.* at 13 & 14 ("Even if the Court considers only the APC and supplemental-payment thefts, they are repetitive for purposes of § 1B1.3."). It is anyone's guess why the Sentencing Commission would let the mere *existence* of two offenses serve as proof that the two are part of the "same course of conduct." Under the government's reading, any two instances of anything is "repetitive."

The Probation Department, after carefully considering all of the factors (including the relatively "close temporal proximity" of the two sets of payments), properly concluded that the two alleged schemes were not sufficiently similar. The government, in trying to refute the report, again resorts to arguments that failed to carry the day the last time. The Probation Department notes "the lack of any newspaper sale with regard to the APC non-competes, but the presence of non-compete agreements." PSR p. 21, lines 657-658. Count 7 alleged just the opposite: fraud due to the *absence* of non-compete agreements (*i.e.*, non-compete payments were made even though Mr. Kipnis forgot to draft the agreements), and all parties agree that the original plan was for the payments to be made through agreements wholly *contingent upon* "newspaper sale[s]." The government counters that, despite these differences, there were broad similarities: *i.e.*, that both "were part of the same scheme by the same people to steal money from the same company using the

same cover story (*i.e.*, masking the thefts as legitimate non-compete payments, when they were not)." Gov't Position Paper 15.

The government could have said the same thing about CNHI I & II, Forum, Paxton, American Trucker, and other non-competes. In fact, it *did* say the same thing in 2007 (D.E. 950 at 4-5), and this Court rejected the effort as overly expansive. Sentence Tr. 17-18.[7] In any event, the absence of *any* written agreement (a feature unique to count 7) is a crucial difference. Mr. Radler's reason for characterizing the APC payments as proceeds of employment non-competes was to obtain favorable tax treatment in Canada. PSR p. 22, lines 700-702.[8] That purpose could only be achieved if agreements were drafted and signed. Conversely, the court of appeals has credited the government's argument that the key distinguishing feature of count 7 was its lack of drafted and signed agreements. *United States v. Black*, 625 F.3d 386, 393 (7th Cir. 2010).[9]

---

[7] If anyone doubts that this is the very same way that the government described all of the other non-compete payments that this Court found insufficiently similar, the government's *current* submission should put those doubts to rest. *See* Gov't Position Paper 3 (claiming that "[i]n deal after deal," dating back to newspaper sales that began in 1998, "defendant enriched himself at the company's expense, on the false pretense that companies would not buy Hollinger International's newspapers without non-compete assurances from defendant or a Canadian company that defendant controlled, Hollinger, Inc.").

[8] Although the argument here does not turn on whether this favorable tax treatment was proper under Canadian law, the undisputed testimony at trial was that the agreements met the relevant requirements. Trial Tr. 12279-84.

[9] The presentence report highlights another important aspect of this difference: It shows that the purposes underlying each transaction were fundamentally dissimilar. While the APC transactions were aimed at tax advantages under foreign law, the supplemental payments were to "fund intended

For the government's final criticism of the presentence report's recommenda-tion, it needs to create a straw man, claiming that "[a] key problem" in the updated presentence report is the "apparent, and mistaken assumption that there were sup-posed to be non-compete agreements in the Forum and Paxton deals" and that "the absence of such agreements was a mere 'oversight.'" Gov't Position Paper 15-16. The government counters that Forum and Paxton "did not intend to enter non-compete agreements with the defendant and the other executives." *Id.* at 16. But the Probation Department's analysis does not rest on whether Forum or Paxton wanted the non-competes. As is plain from all three of the pertinent sentences in the presentence report, the Probation Department was referring to the intent of the defendants—*not* the purchasers. PSR p. 14, lines 455-457; pp. 20-21, lines 646-654; p. 21, lines 660-61. The Probation Department's point, which the government pre-fers to dodge, is that the purpose of the "scheme" charged in count 7 was the same as the purpose alleged for CNHI and the other asset sales: to obtain the same type of third-party payments that this Court held were too dissimilar from the APC payments to count as relevant conduct. *Id.* p. 21, lines 659-661 (noting "different purposes"). The government has no good answer to *that* point.

In *Ritsema*, the Seventh Circuit highlighted the serious dangers from posi-tions like that urged here. "[T]he relevant conduct provision, interpreted in an overly broad manner, has the potential of being a coarse instrument capable of causing years of serious incidental criminality to ride in at sentencing on the coat-

individual non-compete agreements." PSR p. 21, lines 659-661; *see also id.* p. 20, lines 635-637.

tails of a relatively minor conviction." 31 F.3d at 567. Although $600,000 is not minor in an absolute sense, the government seeks to accomplish here what the Seventh Circuit warned against in *Ritsema* and *Horne*, and what this Court held it would not do when the "convicted / unconvicted" ratio was only half as bad as the one the government seeks to employ today. The Court should adopt the Probation Department's recommendation to limit relevant conduct to the $600,000 in payments under count 7.

## II. The Probation Department Correctly Recommended Against A "More Than Minimal Planning" Enhancement Where The Offense Conduct Is Confined To A Single Act Of Fraud With Only Nominal Planning.

At Mr. Black's sentencing in 2007, the Court imposed the 2-level enhancement for "more than minimal planning." That enhancement applies to, among other things, "repeated acts over a period of time" that were not "purely opportune." USSG § 1B1.1, cmt. n.1(f). The Court also specifically mentioned "the amount of documentation" (Sentence Tr. 20), presumably a reference to the APC non-competes: four legally binding agreements drafted by Mr. Kipnis in accordance with Mr. Radler's decision to use them for tax-planning purposes. The sole fraud count that survives remand—a single unplanned taking of money, with no written agreements at all—does not qualify for the enhancement. The one distinguishing characteristic between the conduct in count 7 and the earlier non-competition agreements is that Mr. Kipnis did not even bother to write up, in the government's words, the "cover story." Gov't Position Paper 15. That is the antithesis of

planning, and certainly any planning that did occur was no more significant "than is typical for commission of the offense in a simple form." USSG § 1B1.1, cmt. n.1(f).

As the Probation Department correctly noted, the part of the definition of "more than minimal planning" that is "most analogous" to the government's charge (PSR p. 14, lines 438, 444) is the example for embezzlement. There, according to the definition, the main distinguishing characteristic is the amount of effort that went into the taking. Creating separate phony documents, such as "purchase orders to, and invoices from, a dummy corporation for merchandise that was never delivered" qualifies. USSG § 1B1.1, cmt. n.1(f). So do "several instances of taking money, each accompanied by false entries." *Id.* But if, instead of creating new false documentation, a taking is "accomplished by a false book entry," that will not suffice. *Id.*

The Probation Department explains that, "without the APC transactions," there is only a "single taking" (PSR p. 14, line 452, 455), which "constitutes the commission of mail fraud in simple form." *Id.* p. 15, lines 461-62. The government objects. Without specifying which part of the multi-paragraph definition might apply, the government does its best to tease multiple "steps" out of conduct that even the appellate court characterized here as "plain-vanilla." *Black*, 625 F.3d at 393. The absurdness of that effort is self-evident. The *typical* defendant who is sentenced for "devis[ing]" with others, and "execut[ing]," a "scheme or artifice to defraud" (18 U.S.C. § 1341) will have: (1) had "[d]iscussions" about the object of the scheme (a "desire to take the money"), (2) "inquir[ed]" where the money was (Mr.

19

Radler "determin[ed]" that $600,000 remained in the sale reserves), (3) made a false representation with the intent to deceive others (Mr. Radler used a "false reason" in the "memo directing the APC officer to issue checks" and caused the company's check registers to "reflect" the same false reason); and (4) taken control of the object of the scheme (the defendants "[o]btain[ed] and deposit[ed] the checks"). Gov't Position Paper 18-19.

Just about any mail fraud scheme involves something as simple as "[m]anipulating the company's check registers" (Gov't Position Paper at 19) which is why the enhancement does not apply to "a single taking accomplished by a false book entry." USSG § 1B1.1, cmt. n.1(f). And, according to the government, this taking was just "an outright theft," in which "the buyers never required Black, Radler, Boultbee and Atkinson's non-compete agreements," and where "such agreements did not even exist." D.E. 958 at 2. "As part of their scheme," argued the government, "defendants and Radler simply took $600,000 in sales proceeds from the sale of International's assets and gave it to the senior executives." *Id*. When compared to the totality of mail fraud schemes, every part of the relevant conduct as alleged here—which, in the aggregate, could not have taken more than an hour or two—would earn, at most, a mediocre grade for effort and creativity.

The Probation Department also carefully considered the part of the definition that calls for the enhancement where "significant affirmative steps were taken to conceal the offense." USSG § 1B1.1, cmt. n.1(f). As noted above, it is not uncommon for mail fraud defendants to engage in some planning of the offense itself. Under

20

the concealment prong of more-than-minimal-planning, the word "planning" likewise puts the focus on the *pre*-offense conduct. Thus, just as the enhancement can be based on unusual pre-offense planning of the offense's *commission*, it also can rest on evidence of "pre-offense planning *of the concealment*." *See United States v. Maciaga*, 965 F.2d 404, 407 (7th Cir. 1992).

As the Probation Department explains, there were no "significant affirmative efforts" at all, much less evidence supporting a finding that significant concealment efforts were pre-planned. *See* PSR p. 15, lines 481–483. The only pre-offense concealment asserted by the government was far from an "affirmative step." Under the government's honest-services fraud theory, defendants were obligated to seek prior approval of related-party transactions. Although the Executive Committee approved the negotiation of individual non-competes, with ratification in due course by the full Board, the government takes issue with some of the phraseology of the relevant documents—hardly the stuff of a criminal fraud prosecution. Regardless, a failure to "do more"—especially when the "more" implicates nothing more than state-law fiduciary duties—could hardly be labeled an affirmative step of fraudulent concealment (much less a significant affirmative step).

The same problem of non-affirmative steps also holds true for supposed post-offense concealment efforts, including failure to mention the payments in proxy questionnaires—an omission rectified just as soon as one law firm for Hollinger International corrected the advice given earlier by another—or supposedly "ignoring" questions from shareholders. Gov't Position Paper 19. Even assuming—contrary to

reality—that the record supported the government's assertion that there was such post-offense concealment, or that significant concealment was the goal of other conduct that the government alleges (*see id.*), it would show the *absence* of any real "planning" at all. Each of the remaining steps—all of which post-dated the conclusion of the count 7 scheme by at least a year—is grounded in reactive, rather than proactive, behavior. In fact, if Mr. Radler *had* engaged in more than minimal planning through pre-offense concealment—say, by having some non-compete *agreements* drafted and signed just in case someone were to come around asking about documentation justifying the non-compete *payments*—there may have been less need for even the "opportune" form of concealment that the government claims resulted from questions by attorneys, auditors, and shareholders. *See* USSG § 1B1.1, cmt. n.1(f) (even "repeated acts over a period of time" are insufficient where "purely opportune").

When it comes to concealment, the Sentencing Commission had no trouble recognizing that the typical fraud defendant does not up and confess to a federal crime just because someone starts asking questions. Whatever is said about the truthfulness of the defendants' responses to inquiries about the non-compete payments, giving even a false statement under such circumstances does not elevate planning to the next level; instead, it is nothing more than a "'logical' step [to] discourage[] an investigation." *Maciaga*, 965 F.2d at 408 (holding that bank robber's false statements to police were not evidence of more-than-minimal planning). The Commission created a different enhancement for more serious

22

unplanned concealment of investigative efforts—Section 3C1.1 (obstruction of an investigation or proceeding)—and the Probation Department has already separately recommended (without objection) that *those* two levels be added.

As with its other objections, the government ultimately rests its case on a position that it cannot and will not defend. The Probation Department includes, in its recommendation against the enhancement, the fact that the payment of $600,000 is "a single taking." PSR p. 14, line 455; *cf*. USSG § 1B1.1, cmt. n.1(f) (identifying "repeated acts over a period of time" as a factor). This is wrong, says the government, because the $600,000 payment "was not an isolated event"; rather, "[t]his was a series of events, part of a larger scheme." Gov't Position Paper 20. If the government really "does not seek to relitigate the Court's ruling" that the larger scheme set forth in the superseding information is *outside* the scope of relevant conduct (*id*. at 9 n.1), it would do well not to criticize the Probation Department for taking the government at its word.

The government compounds the problem by relying on cases that would mean something only if the government's overly broad view of relevant conduct had prevailed. In *United States v. Channapragada*, 59 F.3d 62, 65 (7th Cir. 1995), for example, the defendant was convicted on "four counts of making fraudulent and false statements," and "four counts of counterfeiting and forgery," for "four transactions [in which he] completed nearly identical paperwork," and made the same, false, representations. *Id*. at 64-65. The "additional steps" cited by the government that served "to conceal" the fraud in *Channapragada* "from

23

sophisticated victims" (Gov't Position Paper 20) were *repeated* frauds. Similarly, the defendant in *United States v. Sloan* was convicted of six counts of mail fraud and twenty-six counts of wire fraud for an elaborate scheme that used four fraudulent advertisements over a period of months to ensnare more than 90 victims. 492 F.3d 884, 886 (7th Cir. 2007). His "multiple acts" were not just "deliberate and made in such a way as to conceal the fraudulent scheme," as the government would have it (Gov't Position Paper 20), they were repeated criminal acts of fraud.

The Probation Department correctly declined to follow case law that would apply, if at all, under a theory of relevant conduct that did not prevail. The offense charged in count 7, even giving the government the benefit of the theory that it urged in the remand proceedings in the Seventh Circuit, was minimally planned, with opportune reactions to questions raised post-offense. The Court should adopt the Probation Department's recommendation.

### III. The Court Should Adopt The Probation Department's Conclusion That The Remaining Offense Conduct Was Neither Especially Complex Nor Especially Intricate.

The appropriateness of a "sophisticated means" enhancement was a close call in 2007, when the APC counts were at issue. Original PSR, p. 19, lines 595-597; Sentence Tr. 9-10 (identifying "sophisticated means" as the only Guidelines issue on which the Court needed oral argument). The Probation Department has concluded that "without the APC transactions being included as relevant conduct, the sophisticated means enhancement does not apply," noting that the Probation

24

Department is "unaware of any especially complex or intricate conduct on the part of the defendants to commit or conceal the offense." PSR p. 16, lines 504-508.

That recommendation should be adopted. The Probation Department correctly focuses on the government's need to show that the "offense conduct" was "especially complex or especially intricate." USSG § 2F1.1(b)(6)(C), cmt. n.18. In contrast to the APC transactions—in which agreements were drafted and signed— the $600,000 in payments were made without "individual non-compete agreement[s]." PSR p. 16, line 509-510. Instead, Mr. Radler "simply instructed Roland McBride to cut the checks for issuance of supplemental payments after Kipnis forgot to draft individual non-competes. The offense did not involve the use of fictitious entities, corporate shells, or offshore financial accounts." *Id.* p. 16, lines 510-513.

The government objects, despite its concession that part of this Court's rationale in 2007 for enhancing the offense level "applied solely to the APC thefts." Gov't Position Paper 22. To get around that problem, the government offers the Court a curious take on the meaning of sophistication, arguing that "[s]imply placing a telephone number on a check as an act of concealment can support a finding of sophisticated means." *Id.* It would be astounding if the Guidelines put such a pedestrian act in the same category of "sophistication" as creating "fictitious entities," employing "corporate shells," or running money through "offshore financial accounts." The Guidelines do no such thing. In the case on which the government relies, *United States v. Robinson*, 538 F.3d 605 (7th Cir. 2008), the

enhancement was imposed for running a complex, "multi-person scheme to create, pass, and cash counterfeit checks," enabling the defendant's accomplices to successfully negotiate 21 fraudulent checks. *Id.* at 606. In this particularly intricate scam the defendants manufactured counterfeit checks by printing actual bank routing numbers and the personal information of real customers. The defendant *also* added to the face of the checks the false name of a purported payor with "a telephone number that, if dialed, would direct the call to his cell phone." *Id.* at 607. On at least one occasion, he answered a call to that number from a currency exchange employee and successfully pretended that the check was the legitimately issued payment of an insurance settlement. *Id.* at 606-07. The district judge observed "that he had not encountered conduct like Robinson's during his nine-year tenure." *Id.* at 608.

This case and *Robinson* are miles apart. The supposed concealment here was that when Mr. Black made accurate representations about some of the non-compete payments (such as CNHI II, for which the jury acquitted), he included the $600,000 too. Mr. Black did not specifically mention the latter payments at the shareholder meetings, instead addressing the U.S. Community Newspaper transactions in general terms. *See generally* Gov't Exh. Shareholder 7 and 54. There were no fictitious entities—not even fictitious agreements—and no back-dated documents. *Cf.* Sentence Tr. 35 (Court describes APC conduct pertinent to sophisticated-means enhancement). These various mundane actions, which—per the government—

amounted to no more than a supposedly "brazen" "money grab," are nothing like the "especially complex or intricate" conduct for which the Guideline was drafted.[10]

## IV.    The Remainder Of The Section 3553(a) Factors Independently Counsel A Sentence of Time Served.

During the government's passing mention of some of the *other* six subsections of § 3553(a), it begins with an incomplete description of this court's role in determining the appropriate sentence; gives fleeting lip service to Mr. Black's extraordinary accomplishments and significantly changed circumstances over the 42 months since he was first sentenced; and closes with a baseless complaint that Mr. Black has refused to accept responsibility for a wide array of charged crimes, even though under our rule of law (the same one for which the government demands greater respect) his status for those charges remains *not* guilty.  The government also hopes that the Court will share in its resentment that Mr. Black might dare to voice criticisms of a system that has already required him to invest nearly a decade of his life (29 months of it in a federal prison) before getting the vast assortment of offenses that

---

[10]    The government, citing *United States v. Landwer*, No. 10–2797, 2011 WL 1585080 (7th Cir. Apr. 28, 2011), argues that the enhancement "applies when the conduct shows more planning and concealment than other frauds of the same kind." Gov't Position Paper 21-22.  That statement is correct, as far as it goes.  But while "more" is *necessary*, it isn't sufficient.  The Guideline itself requires that the conduct be "especially" intricate or complex.  *See, e.g., Landwer* at *2 (concluding that the fraud was "significantly more elaborate than usual" where the defendant perpetrated a seven-year financial scam on at least seventeen victims by assuming fake identities in communications, passing fake checks, and forging real estate records and other documents to cover up his crime); *see also United States v. Knox*, 624 F.3d 865, 871 (7th Cir. 2010) (defendant perpetrated intricate real-estate fraud deceiving 21 banks into financing over 150 fraudulent transactions through "coordination of various moving parts" of scheme).

the government once charged (including more than $60 million in alleged theft) substantially pared down to the two remaining counts for which sentence will soon be imposed. None of what the government offers up can change the fact that, as explained in our May 13, 2011 submission to this Court, the § 3553(a) factors argue powerfully for a sentence of time served.

The government begins with an unduly narrow take-away from *Gall v. United States*, 552 U.S. 38 (2007): that courts are to "adequately explain" "any variance from the Guidelines range." Gov't Position Paper 25. Although no variance of any consequence is required for the Court to impose a time-served sentence under the advisory guideline range calculated by the Probation Department, it is important to note that *Gall* stands for much more than the proposition that Courts should "show their work." Under that case and others since the Guidelines became advisory, the district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party" and, in so doing, "may not presume that the guideline range is reasonable." 552 U.S. at 49-50, *citing Rita v. United States*, 551 U.S. 338, 351 (2007). Thus, while the Court should explain the sentence that it imposes, the more important point is that it now has substantial latitude in determining the sentence in the first place; and its ultimate duty is to arrive at a sentence sufficient but not greater than necessary to satisfy the criteria set forth in §3553(a) through "an individualized assessment based on the facts presented." *Id.*

It is no surprise that district courts, rather than appellate courts, are in the best position to make the type of fact-based assessment required in a sentencing

28

proceeding. *See Gall,* 552 U.S. at 51-52 (explaining that sentencing judges are in a superior position to find facts and apply § 3553(a) factors in individual cases because they hear evidence, make credibility determinations, acquire full knowledge of the facts and insights not conveyed by the record, and enjoy the additional institutional advantage that comes from seeing many more Guidelines sentences than do appellate courts). That is especially true at Mr. Black's resentencing because, as the government agrees, "[s]entencing was not at issue in any of the appellate proceedings." Gov't Position Paper 6. This Court is particularly well-positioned to make use of its institutional advantage because of the Probation Department's thorough and careful effort in preparing the updated presentence report.

As for the various factors themselves, the government's short description of Mr. Black's work as a tutor—that he chose to "make the best of it" (Gov't Position Paper 27)—is a gross understatement. Mr. Black's contributions at FCI Coleman (which DOJ representatives in *non*-prosecutorial positions have joined in recognizing) were nothing short of extraordinary. Few indeed could take credit for guiding more than 100 GED candidates to graduation, and Mr. Black's work with his colleagues to more than double the number of graduates (including several who had been written off as hopeless causes) is truly commendable when one considers the very difficult circumstances he faced.

These contributions have continued, since his release last July, in the form of efforts to assist and support the students and others whom he met as inmates at FCI Coleman. Mr. Black has also expanded the charitable mission of his family's

foundation. Far more than simply making the best of things, Mr. Black stared into the darkest and most devastating period of his life and found the power to improve the lives and opportunities of those whom he encountered. He did so quietly, humbly, and with no effort to draw attention or praise to his accomplishments.[11] He did so with a measure of grace that, no doubt, served as a positive example for others who shared in his predicament. Mr. Black's productive activities—day after day, from December 2007 to present—in the face of what can only be described as overwhelming adversity strongly demonstrate why the Court need not subject him to additional punishment.

Rather than recognize the significance of these unusual individual circumstances, the government steers its short § 3553(a) discussion back to the case that it tried to prove and Mr. Black's reaction to it. Mr. Black has never sought a sentence reduction for acceptance of responsibility—a decision that, under the government's own calculations of the Guidelines, cost him fully 21 months in extra prison time. Not satisfied, the government takes the view that it would somehow promote respect for the law if the Court tacked more time on to that so-called "no remorse" penalty.

The government leaves no doubt that its view of the proper measure of "acceptance of responsibility" by Mr. Black is nothing short of a confession to the full

_____

[11] In fact, as the Probation Officer can attest from her recent interview of Mr. Black, it took a good deal of prodding by counsel to get him to provide details of the many accomplishments that others at FCI Coleman have chronicled in letters to the Court.

range of crimes that the government insists he committed. While the government, as noted earlier, vows not to relitigate this Court's earlier "relevant conduct" rulings, it insists on delivering an indirect rebuke to the jurors too; specifically, the government argues that "still," for purposes of increasing Mr. Black's punishment under the Guidelines, "the Court can and should consider" conduct in the counts that have been vacated, for the very curious reason that this conduct came "only *after*" the unconvicted and acquitted conduct of "obtaining millions from the company" in non-compete payments "in other newspaper sales." Gov't Position Paper 14 n.3.

The government persists in taking its unusual position, even after the Probation Department and this Court have determined (consistent with the jury's verdicts) that this earlier alleged misconduct had not been proven—not even under the civil preponderance standard.[12] *See* Original PSR, pp. 9-10, lines 293-304; Sentence Tr. 16. Having watched 90 percent of the counts that it originally lodged against Mr. Black (representing *99 percent* of the fraud that the government attributed to him) fall victim to acquittals, dismissals, and orders of appellate vacatur, it is unseemly, to say the least, for the government to continue lambasting Mr. Black for insisting that maybe, just maybe, the government got things wrong in a very serious way. And it would redefine "defiance" beyond recognition if that label could be stuck on someone who fully obeyed the terms of his release throughout the case, re-

---

[12] The government elsewhere in its submission again asks the Court to consider the "greater harm" of more than $32 million in non-compete payments (Gov't Position Paper 9 n.1), even though it has been rejected by the jury, this Court, and the Probation Department as unproven.

spected the Court's jurisdiction and the role of the jury, relied on appellate review as the correct avenue for vindicating his rights, and helped restore some semblance of rationality to the operation of a statute that had been so broadly interpreted by the government over the past two decades that it permitted widespread violations of the fundamental right to due process.

This Court has correctly ruled that it would undermine, not promote, the interests of justice to enlarge Mr. Black's punishment with these unproven allegations of fraud. It is surpassingly strange for the government now to base its request for extra time on the complaint that Mr. Black hasn't *admitted* what the government did not prove. Sentence Tr. 16-18.

For the same reasons, the Court should reject the proposal to use a threat of greater punishment to persuade Mr. Black to acknowledge a theft of $5.5 million from Hollinger International based on the APC "employment" non-compete agreements. Gov't Position Paper 27. The government elected not to retry those counts. Under our system of justice, the jury—not the prosecution—decides guilt or innocence. Based on the rulings of *two* higher courts, there is an unacceptable risk that the jury convicted on counts 1 and 6 for conduct that was not a crime. It would be wrong, plain and simple, to treat that important constitutional imperative as some sort of expendable technicality.

The government also does not explain how the purposes of punishment would be served if this Court relied on any of Mr. Black's assertions of innocence as a reason to send him back to prison, much less for a 78-month sentence. The last time

32

around, without even a passing reference to the fact that Mr. Black had waived ex-
tradition, appeared voluntarily at each and every required appearance, and scrupu-
lously adhered to the conditions of his order of pretrial release, the government em-
phasized that Mr. Black's perceived "disdain for the rule of law" was a sure sign
that he would quickly recidivate. Sentence Tr. 85-86; 91 ("disdainful and defiant").[13]
The government argued that because of his evident "disrespect for the system,"
"nothing about this process or this jury's verdict will have a deterrent effect on Mr.
Black." *Id.* at 92 (adding: "the government maintains that to the extent Mr. Black
continues to believe he did nothing wrong, he will continue with the very same con-
duct, again, if given the chance").

This Court had no trouble seeing through the government's position: "In
terms of protecting the public from further crimes of you, Mr. Black, I really do not
think this is a significant factor, given your . . . history and characteristics, given
everything that you have lost in connection with this case. Given your age, I believe
that you are at low risk for recidivism." Sentence Tr. 115. And yet, as with the is-
sues addressed earlier, the government's current position is much like the one that

---

[13] On the issue of disdain for due process of the law, the government seized the
money that Mr. Black was to receive from the sale of his New York apartment and
that had been set aside to pay his defense counsel in the criminal case. The
affidavit justifying the seizure was woefully incomplete in that it failed to make any
mention of money that Mr. Black had personally invested in the renovation of the
unit. When Mr. Black was exonerated of the crime that formed the basis for the
seizure, the government had no choice but to return the money, but it came too late
for Mr. Black to be able to use it to hire his counsel of choice. Mr. Black's legitimate
objection to this blatant effort by the government to deny him the means to defend
himself demonstrates the extent of his commitment to *submit* to the Court's pro-
cesses, not avoid them.

it unsuccessfully advanced before. *See, e.g.*, Gov't Position Paper 28 (arguing that Mr. Black's "defiance is relevant to this Court's determinations concerning the need to impose a sentence that promotes respect for the law, provides just punishment for the offense, and affords adequate deterrence to criminal conduct").

Mr. Black has written 228 columns for the Canadian *National Post* and the *National Review* since his prison sentence began, with all proceeds going to charity. He tried at times to spark public debate with his topics. The government takes offense with statements it identifies from two of these columns, and it suggests that Mr. Black has shown this Court the disrespect of publicly questioning its ethics. Inviting a judge to view herself as having a personal stake in a defendant's sentence is highly unusual. But the Court need not wade into those waters. Mr. Black has not denigrated or criticized this Court. His short allocution at the first sentencing featured his sincere expression of gratitude for this Court's thorough and fair consideration of the issues that it decided in his proceeding. *See* Sentence Tr. 111-12.[14] He has never disavowed that statement, either publicly or privately.

It would be highly unfortunate for Mr. Black to be judged based on the very narrow and selective slice that the government has culled from his extensive writings over the last three years. His 228 articles in Canada's *National Post* and the

---

[14] The article mentioned by the government, which appeared in the *National Post* the day Mr. Black reported to FCI Coleman, was written in the days immediately before his self-surrender. The article presented his disagreements with both process and substance of the rulings in multiple U.S. and Canadian tribunals. And while Mr. Black is not alone in harboring quite valid concerns about the way his prosecution was handled, neither this Court nor the AUSA currently assigned to this matter are among those to whom his column referred.

*National Review* online publication covered a rich and varied range of topics, everything from U.S. foreign affairs; domestic politics and other important developments in the United States, Canada, France, Haiti, Italy, Russia, Israel, Brazil, and Honduras; the recent American and Canadian elections; the international economic crisis; the current presidential administration; views on educating children in their families' religious traditions; the relative merits of cats and dogs as pets; zoological matters, including the status of whale species and the Canadian beaver; and recollections of Christmas holidays during his university years.

It should come as no surprise that when Mr. Black wrote the first of the articles that the government mentions (Gov't Position Paper 27 n.7), this case—which had not yet even been argued to the Seventh Circuit—weighed heavily on his mind. He wrote about the events leading up to his criminal prosecution, including factional shareholder disputes and the publication of the libelous special committee report, which accused him of presiding over a $500 million "corporate Kleptocracy." Despite his disagreement with legitimacy of the case against him, Mr. Black closed the article with this reassurance to his readers: "I have faith in American justice."[15]

The second of the two articles that the government mentions is dated May 29, 2010, less than two months before Mr. Black would be released from prison. This article mentions the facts and circumstances of his case only in passing, in the context of relating his first-hand knowledge of the subject matter of his article: correc-

---

[15] Mr. Black discussed his case from time to time in later columns, thus avoiding the misleading impression to his readership of approximately 2 million that he was looking to conceal his legal travails.

tional institutions. The more specific focus of the article, entitled *Canada's Inhumane Prison Plan*, was a three-year report on the Correctional Service of Canada that, in Mr. Black's opinion, contained measures as draconian as they were ill-advised. Mr. Black's article discussed how the Canadian report recommended investment of over $1 billion in building newer, larger prisons; a dramatic lengthening of prison terms; the abolition of prisoner programs focused on general education, substance abuse avoidance, and behavioral adaptation; a proposal of glass-segregated, no-contact visits for all prisoners; and a policy dictating that during their incarceration prisoners must earn everything beyond the bare necessities for physical survival.[16]

Mr. Black described his general his view of where the balance should be struck between the punishment of wrongdoing and the protection of prisoner rights:

> I believe, civilly and theologically, in the confession and repentance of wrongdoing; in the prosecution and punishment of crime, and in a maximum reasonable effort by the state to protect the public, especially from threats to person and property. But I also believe that everyone has rights, including the unborn, demented, incurably ill, military adversaries and the criminal, and that the rights of those whose entitlements are for any reason circumscribed, are not inferior for being narrower, and should be as great as they practically can be, without violating the rights of others.

*Canada's Inhumane Prison Plan*, NAT'L POST, May 29, 2010, at 1.

---

[16] Mr. Black's reasoned comments in this and related articles have been met with overwhelming agreement from many members of the public, including those who would not count themselves as his supporters, and have sparked a serious review of the policies that the report recommends.

Certainly, the views expressed in this article—such as the damage to families and friendships that would result from a policy of glass-segregated, no-contact visits—were informed by Mr. Black's own prison experience. Indeed, given the government's theme of disrespect for our system of justice, it should be noted that when Mr. Black made these criticisms he compared the U.S. prison system *favorably* to what the Canadians were considering. Unquestionably, others will take issue with his position. What all readers of that article could agree on, though, is that instead of dwelling on his own case (which still was pending in the Supreme Court) he wrote about the plight of others—in this instance, on the issue of humane prison reform. Even if, contrary to common sense and accepted wisdom, words speak louder than actions when it comes to measuring a person's true feelings, Mr. Black's articles do not reveal a man seething with contempt for the system or poised to embark on some streak of lawlessness. These articles, especially considered in progression, reveal instead the ways in which Mr. Black has elected to focus his intellect and energy on addressing the injustices suffered by others. When actions—the true measure of the person—are added to the mix, it cannot credibly be disputed that Mr. Black has rejected the path of looking back in anger, choosing instead to move forward with the goal of turning negative circumstances into the possibility of positive change.

### *Unwarranted Disparity*

The government tries to shrug off the substantial and unwarranted disparity that its requested sentence would create between co-defendants, as if this Court had

not made clear at the initial sentencing that the factor is one that the Court "take[s] very seriously." Sentence Tr. 115. The government's position is no different from the one rejected the first time around, when this Court took special care to explain that the government's proposed sentence for David Radler, "in particular," made "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," "a significant factor here." *Id.* The factor is no less significant today than it was in 2007, and post-sentencing developments for all four individual co-defendants now require a significantly lower sentence in order to avoid undermining the Court's previous efforts to address it.

Rather than focus on whether the Probation Department used the correct technical terminology to describe sentences to which the government has acquiesced, the government would do well to address the impact of these highly unusual outcomes. After David Radler received well less than half the sentence that the Court imposed on Mr. Black (29 months instead of 78 months), the government helped him achieve an even more dramatic reduction by agreeing with Canada to a prison transfer.[17] The Canadian authorities released Mr. Radler after he had served only 11 months total, despite this Court's conclusion that "Mr. Radler is at least as culpable as Mr. Black on the fraud. " Sentence Tr. 115. At the initial sen-

---

[17] Mr. Radler's ability to cut short so dramatically his time incarcerated is all the more remarkable given the government's post-sentencing realization that if the APC counts are pecuniary fraud then Mr. Radler must have lied on the stand (Gov't 7th Cir. Br. 36 (2008), which means he violated the most important term of the cooperation agreement that yielded him such a generous sentence reduction.

tencing, the Court expressed serious concern over "the vast discrepancy that the government has advocated" between the results for Mr. Radler and Mr. Black, explaining that cooperating defendants who "give the extent of cooperation that Mr. Radler has" will usually receive no more than "50 percent off of the low end for their efforts." Sentence Tr. 116. The 11 months that Mr. Radler served is 85 percent less than the sentence that, according to the government, would now be a "just punishment" for Mr. Black.

When it comes to the defendants who didn't cooperate, the one thing the parties can agree on is this: The government made a conscious choice not to proceed with contested resentencings for anyone else, saving its overly broad relevant conduct argument for Mr. Black alone. It is more than hypocritical, though, for the government to try to justify that decision by accusing the Probation Department of mischaracterizing what happened with the co-defendants. As explained below, the government is flat-out wrong in claiming that its relevant conduct arguments would have had no effect on the amount of time that anyone else served.[18]

---

[18] The government has done more than agree to accept substantially lower punishments than this Court previously meted out for every other *convicted* co-defendant; it also voluntarily gave up the opportunity to seek *any* criminal judgment at all against Mr. Kipnis. Unable to come up with a proposed relevant conduct rule broad enough to authorize sentencing Mr. Kipnis for *his* acquitted and unconvicted conduct, the government has decided that a final dose of punishment-by-accusation will now suffice. *See, e.g.*, Gov't Position Paper 10 (stating that Mr. Kipnis "schemed" with Mr. Black and the other "accomplices" on the APC and count 7 "sequences").

So while the government argues that Mr. Black's punishment should not change because "[t]he facts relating to defendant's crimes have not changed" (Gov't

The government's story rests on a mischaracterization of this Court's amended Judgment and Commitment Orders, which, according to the government, "us[ed] phrasing that accurately conveyed to the Bureau of Prisons that neither defendant Atkinson nor defendant Boultbee should be returned to prison, *given that they had served their sentences.*" Gov't Position Paper 25 (emphasis added). The Court released Mr. Boultbee on bail (with the government's full blessing) in 2009, soon after certiorari was granted and less than halfway through service of his 27-month sentence. The "expected impact of the prisoner transfer treaty with Canada" (*id.*) was that no transfer would even be considered by the U.S. government until his appeals

Position Paper 2), that simplistic truism apparently was invented for him alone. Otherwise, the government likely would be disappointed with the logical answer to its own rhetorical question, which it posed to the Court in 2007 as reason to send Mr. Kipnis away for *at least* 30 months: "What kind of message would it send to Mr. Kipnis, to Hollinger International, the victim, if the Court were to disregard the pivotal role that he played in the commission of his crime?" Kipnis Sentence Tr. 327; *see also id.* at 328 ("we don't think that it would properly promote respect for the law or serve the purpose of general deterrence for this Court to depart from the Guideline range [of 30 – 37 months] that your Honor has already carefully considered, in light of Mr. Kipnis' acts, in light of his conduct that brought him here today").

The government not only has found, over these last three years, a way to safeguard respect for the law and serve the purpose of general deterrence without so much as a conviction of that one co-defendant, it apparently has also learned that it *is* possible, after all, to ignore his unwillingness to admit doing something that no properly instructed jury ever found he had done. Kipnis Sentence Tr. 328 (AUSA: "The final issue that I want to address, in terms of promoting respect for the law— and *one thing that we cannot ignore; we, the government, that is*—is that even to this day, Mr. Kipnis has never once acknowledged his participation in a crime." (emphasis added)). The "respect" for the law that most prosecutors earn through its consistent and even-handed enforcement would no doubt be promoted if Mr. Black, like every other defendant who put the government to its proofs in this case, is allowed to receive a substantial decrease in punishment without first having to spend time in the government's post-trial confessional.

40

were resolved.[19]   And once he became eligible, he would have relied on the good graces of the same Department of Justice to initiate any transfer.   The process is slow enough, even *without* either of those impediments, that Mr. Boultbee plainly would have served several more months in prison had the government successfully argued in his case what it saved only to argue at the resentencing of Mr. Black.[20]

Regardless of whether the government has a credible explanation for why it singled Mr. Black out for more severe treatment, the fact remains that every one of Mr. Black's co-defendants has served substantially less time than the good-time credit statute permits.   Therefore, the Probation Department's update on the issue of unwarranted disparity raises an issue much more important than whether others served "the exact number of months" stated in their Judgment and Commitment Orders.   Gov't Position Paper 24.   Good-time credit is limited to less than 15 percent of the 78-month sentence that the government seeks for Mr. Black.   And the only means for reducing a sentence further (such as RDAP or the treaty transfer used by

---

[19]   That was the very reason Mr. Atkinson did not join in the initial petition for writ of certiorari.  Mr. Boultbee has an appeal pending in the Seventh Circuit, and the Supreme Court is not expected to resolve his related petition for writ of certiorari any sooner than May 31, 2011, three-and-a-half months after the date that this Court resentenced him.

[20]   Even for Mr. Radler, who cooperated with the government, the process took more than half a year.  Mr. Atkinson, whose situation was more comparable, did not get his transfer to Canada until June 18, 2009—more than 11 months after he started his prison term—and it took another six weeks until he was released by the Canadian authorities.  Surely the government does not expect the Court to believe that the Department of Justice would have moved Mr. Boultbee's application along any quicker than it did for Mr. Atkinson or Mr. Radler.

Mr. Radler and Mr. Atkinson) are unavailable to Mr. Black because of his United Kingdom citizenship.

In contrast, none of his co-defendants will have served even half the time that this Court imposed. And contrary to the government's suggestion, that substantial degree of disparity in punishment for co-defendants is even *more* unjustifiable—not less—when it results from the government's "established policies." *See* Gov't Position Paper 25 (arguing that the substantially reduced sentences actually served by Mr. Boultbee and Mr. Atkinson make them "no different than any other defendant who earns good-time credit or finishes his sentence in accordance with established policies of the prison where he is incarcerated").

There is no valid basis for the Court to apply a different and harsher standard to Mr. Black alone among all of the defendants in this case. The issue is not whether Mr. Black's punishment should be greater than that of the other defendants. He crossed that bridge long ago. He has spent 29 months in a federal prison. The cooperating defendant—who was entitled to no more than a 50 percent reduction under the government's own policies (Sentence Tr. 116)—served 11 months. The other co-defendants, whose imposed sentences were slightly less than Mr. Radler's, have also *served* time comparable to Mr. Radler.[21] Even assuming that the Court wishes to maintain a term of imprisonment for Mr. Black proportionately higher than those served by his co-defendants, the discrepancy between the number

---

[21]  Mr. Radler served about 11 months of a 29-month sentence.  Mr. Atkinson served about 11 months of a 24-month sentence before his transfer.  Mr. Boultbee served a little less than 11 months of a 27-month sentence.

of months he has already served and the much shorter terms served by all of the others means that time served remains a sufficient, but not greater than necessary, sentence.

## CONCLUSION

For all of the reasons stated above and in Mr. Black's May 13, 2011 memorandum, time served is the appropriate sentence.

Respectfully submitted,

s/David Debold
David Debold

MIGUEL A. ESTRADA
DAVID DEBOLD
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, D.C.  20036
(202) 955-8500

CAROLYN GURLAND
2 North LaSalle Street
17th Floor
Chicago, Il 60614

May 27, 2011                    *Attorneys for Defendant Conrad M. Black*

## CERTIFICATE OF SERVICE

I, Carolyn Gurland, an attorney for Defendant Conrad M. Black, hereby certify that on this, the 27th day of May, 2011, I caused the above-described document to be filed on the CM/ECF system of the United States District Court for the Northern District of Illinois, which constitutes service of the same.

/s/ Carolyn Gurland

CAROLYN GURLAND
2 North LaSalle Street
17th Floor
Chicago, Il 60614

44