UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 05 CR 727-01 |
| | ) | Hon. Amy J. S Eve |
| CONRAD M. BLACK. | ) | |

**CONRAD BLACK'S RESPONSE TO SUPPLEMENTAL
EXHIBITS TO GOVERNMENT'S
SENTENCING MEMORANDA**

MIGUEL A. ESTRADA
DAVID DEBOLD
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 955-8500

CAROLYN GURLAND
2 North LaSalle Street
17th Floor
Chicago, IL 60602

*Attorneys for Defendant Conrad M. Black*

Set forth in the PSR at p. 35 lines 1119-1138 are the glowing remarks about Mr. Black's tutoring made by BOP employee Carrie DeLaGarza. These statements were made by Ms. DeLaGarza at the time of her April 20, 2009 Official BOP Memorandum entitled "Memo To Central File" that was appended to a July 20, 2010 BOP Progress Report regarding Mr. Black. The sentiments were echoed in Ms. DeLaGarza's March 15, 2011 telephone interview with the probation office which contacted her as a representative of this Court for information about Mr. Black. Submitted to the Probation Office, and delivered to the government at the time of the issuance of the PSR, were 18 letters from Coleman inmates extolling the tutoring assistance Mr. Black provided them and explaining the enormous positive contributions he made in the lives of all the individuals he encountered at Coleman. The government cites to neither of these sources. Instead, purporting to be engaged in a quest for "accurate information", the government takes issue with the content of Ms. DeLaGarza's previous statements through submission of "new" material in the form of Declarations of Department of Justice employees who have clearly been accessible to the government at any time.

The government's effort is astonishing in that they included *no objection* to this clearly worded, meticulously detailed, section of the PSR until the DeLaGarza affidavit of June 2 – well outside the briefing schedule set by this Court. The result is a drive-by disparagement of Mr. Black which reveals nothing but the intensity of the government's dislike for him and the fervency of their hope that despite the remarkable 18 U.S.C. §3553 factors in this case, briefed in detail in Mr. Black's recent filings, that he will not be shown the leniency that is appropriate in connection with this resentencing proceeding. It is well-settled law that deep-seated antipathies

of government prosecutors cannot be made the basis for criminal liability. As much as the government may wish otherwise, neither can they form the basis for increased punishment.

Unit Manager Tammy Padgett adds nothing to the mix with her personal characterizations of Mr. Black's actions and a hearsay report of conversation. The evident purpose of these inherently unreliable recitations is to introduce the specter of the government's time worn references to the Mr. Black's supposed arrogance and elitism as basis to undermine Mr. Black's amply supported (by both the advisory guidelines and the applicable §3553 factors) request for a sentence of time served. These allegations have now not only been thoroughly undermined at the first sentencing proceeding, but utterly eviscerated by the gracious and exemplary fashion Mr. Black served his 29 months in prison and the undeniable effect he had upon the inmates he befriended and assisted during and after his incarceration.

I.     **The Portrayal Of Conrad Black As A Privileged Elitist Is Demonstrably False.**

The letters submitted by Coleman inmates as well as Ms. DeLaGarza's April 30, 2009 official BOP memorandum and March 15, 2011 statements could not be more clear in establishing that Mr. Black did not conduct himself with an air of superiority while at Coleman. On March 15, 2011, Ms. DeLaGarza told the Probation Officer that Mr. Black was "not intimidating or condescending" and "always polite and respectful". PSR p. 35, lines 1136-1137.

Mr. Black's fellow inmates at Coleman FCI Low agreed with Ms. DeLaGarza's assessment. Donald Ayers wrote; "It was not Lord Black here or Mr. Black but Conrad who carried no pretense he was anything but another inmate doing his time and helping without hesitation even when not asked."[1] Garland Hogan wrote that from his first meeting with Mr. Black shortly after Mr. Black arrived at Coleman, he was struck by Mr. Black's "seriousness"

---

[1] November 16, 2011 letter of Donald Ayers.

and "humility".[2] Nicholas Bachynsky wrote that Mr. Black "never condescended, embarrassed or acted hubristic toward any inmate" no matter what their race or their crime.[3] Martin Bradley explained that Mr. Black "did not display any sense of entitlement or negativity."[4] Andrew Gebrehawariat attested to the fact that Mr. Black "walked humbly"[5] and "humbly made himself available to anyone".[6] Andrew Compton related an event that took place during one of Mr. Black's classes in which Mr. Black responded to a question from an inmate that revealed some amount of geographical and political ignorance with "tact and sensitivity" and did not even permit other inmates the opportunity to disparage the individual.[7]

It was not just in the absence of attitude that Mr. Black demonstrated that he was not the condescending snob that was portrayed during the course of his criminal case, but through his affirmative actions. While at Coleman, Mr. Black gave his time and talents to anyone who came to him for help. Robert Jennings explained;

> Outside of tutoring, I witnessed people approaching [Mr. Black] daily seeking help or advice on everything from finance and business to politics and history. The people ranged from a black man who, upon his release, wants to build a community center for at-risk youth to a young white man looking for input on opening a new line of 'surfer ware'. He listened to all who sought his opinion and offered what help he could. In a place where hope is a rare commodity, Conrad provided at least a glimmer of it to countless inmates[8].

Martin Bradley echoed this observation of the time and concern Mr. Black demonstrated for everyone who sought his counsel;

---

[2] Letter of Garland Hogan, p. 1

[3] November 14, 2010 letter of Nicholas Bachynsky

[4] Letter of Martin Bradley, p. 1

[5] Letter of Andrew Gebrehawariat p. 2

[6] Id. p. 1

[7] December 7, 2010 letter of Andrew Compton at p. 1

[8] November 13, 2010 letter of Robert Jennings, p. 2

4

> Not many days would go by where I did not see various inmates walking the track, sitting in common areas or even during mealtimes in deep discussion with Conrad. He never turned anyone away regardless of race, education, or criminal conviction. Even individuals of obvious 'diminished capacity' received equal time. No one was denied his advice, support or friendship."[9]

Nichola Bachynsky's letter describes the nightly ritual in which two to four inmates would routinely interrupt whatever Mr. Black was doing and ask for his advice on business matters, legal matters, grammar usage, writing a book or other topics.[10] Mr. Bachynsky confirmed what the other inmates had stated that during these contacts, however relentless, Mr. Black was "without exception" courteous and helpful.[11] Troy Slay confirmed that Mr. Black "gave his heart totally to the needs of others from all colors, to walks of life" and ethnicity.[12] Andrew Compton wrote of his observation that Mr. Black always greeted the families of the other inmates warmly at visitation "no matter how often they interrupted his own family visits."[13]

Letters from different individuals writing separately that repeat the same facts regarding their observations of Mr. Black provide powerful evidence that his treatment of the other inmates at Coleman was not merely respectful but exemplary. That Coleman case manager Tammy Padgett was willing to sign a declaration with the gratuitous opinion that other inmates who performed some small services for Mr. Black were "acting like servants" does nothing to diminish this evidence. Indeed, the letters submitted by the Coleman inmates explaining how uniformly solicitous Mr. Black was of their and others' issues and concerns *actually explains* the other inmates' willingness to perform some small physical acts to assist Mr. Black who was one

---

[9] Letter of Milton Bradley, p. 1

[10] November 14, 2010 letter of Garland Hogan

[11] Id.

[12] November 15, 2010 letter of Troy Slay p. 2

[13] December 7, 2010 letter of Andrew Compton, p. 1

of the older inmates at Coleman and who, as outlined in the letter of his Toronto treating physician[14] and discussed in detail in the PSR[15], suffered from a number of serious health conditions.

    Although the words of the Coleman inmates sufficiently demolish the suggestion that Mr. Black conducted himself as a snob while at Coleman, these allegations have been so much a part of this proceeding from the beginning of the case that they merit brief mention. At one time, Mr. Black had a significant fortune, prominent friends and many of the trappings of success. As letter after letter submitted at the time of the original sentencing established, however, none of those facts caused Mr. Black to be haughty or to treat anyone with whom he came into contact, in whatever capacity, with anything less than the utmost of respect. Attached hereto as Exhibit A are relevant pages from Mr. Black's November 28, 2007 filing with this Court describing the sentiments expressed in letters from individuals such as the receptionist for Hollinger Inc., the young manager of corporate contributions at Hollinger Inc., an accountant at Hollinger Inc., various journalists whom Mr. Black employed, various individuals who worked for Mr. Black in a domestic capacity, individuals who struck up a friendship with Mr. Black through letters, young people whom Mr. Black mentored, and close friends with first hand observations of Mr. Black's kindness and generosity of spirit. Many of these letters took specific issue with the portrayal of Mr. Black as a snob and expressed their opinion, informed by direct experience, that nothing could be farther from the truth. The notion that Conrad Black is some sort of arrogant elitist was thoroughly debunked at the time of the original sentencing. That it should be trotted out again in the context of this resentencing proceeding as a reason for this Court to discount the

---

[14] November 15, 2010 Letter of Robert Francis

[15] PSR p. 30-31, lines 973-1019

3553 factors presented on Mr. Black's behalf – now in the form of suggestions based on innuendo and hearsay from current Justice Department employees -- is nothing less than shameful.

The remaining observations in the affidavit signed by Ms. Padgett barely merit mention. As for Ms. Padgett's unsupported offering as to what Mr. Black "expected" of his counselors regarding attorney contact, Mr. Black had numerous active legal matters during the period of his incarceration. It would stand to reason that he would need access to counsel and was active in the process of obtaining that access from counselors who have not themselves complained of Mr. Black's conduct. Ms. Padgett's claim that Mr. Black asked for prioritization of his claims over those of other inmates is curious in that she was not a unit manager for Mr. Black until the last approximately 3 months of his time (evident in the manner her affidavit provides a Coleman time frame for everything but the time she was assigned as unit manager for Mr. Black's unit). Even during the short period of time in which she was unit manager for Mr. Black, Ms. Padgett had no interaction with Mr. Black about his legal needs, which were, as set forth in her Declaration, arranged through the counselor. As for the hearsay repetition of a conversation Mr. Black supposedly had with case manager Carbone, important context has been omitted. The reality was that the statement about "Lord Black" was uttered in jest in the context of a pleasant and humorous exchange between Mr. Black and his case manager. That this was the tone of the conversation has been confirmed by an individual who witnessed it, and from whom we hope to obtain a statement. To assume that one day away from the possibility of freedom, Mr. Black would utter a condescending and disparaging remark to his own case manager would require an assumption that Mr. Black was reckless about the possibility of his release from Coleman and foolish -- assumptions that cannot withstand serious consideration.

7

**II.     The Attempt To Denigrate Mr. Black's Tutoring Contributions Is Meritless.**

The sworn Declaration of Ms. Carrie DeLaGarza is flatly inconsistent with an April 30, 2009 official BOP Memorandum[16] that was provided to the probation office in connection with this proceeding and with the statements Ms. DeLaGarza made to the probation officer when she contacted Ms. DeLaGarza, to obtain information to be used in this proceeding. This fact alone argues that Ms. DeLaGarza's June 2, 2011 Declaration should be discounted to zero as it is difficult to conceive of any possible motivation Ms. DeLaGarza, a BOP employee, could have had to falsify official BOP documents to make Mr. Black appear to be a better tutor than he actually was.

In Ms. DeLaGarza's Declaration, she claims that Mr. Black did not "go above and beyond what was expected of him as a tutor", that he was "frequently late", that he "often sat outside the classroom in the back of the department, reading newspapers, reading novels, and writing what appeared to be a book" and that a piano class caused him to miss parts of the GED classes. (DeLaGarza June 2, 2011 Declaration at ¶6). In the BOP Memorandum appended to Mr. Black's July 20, 2010 BOP progress report, however, Ms. DeLaGarza wrote:

> Mr. Black works well with others and is *always willing to help and assist whenever he is needed.  He has been diligent, hardworking and prompt when performing his duties as a tutor.*  He has demonstrated initiative and is knowledgeable in the class material.
>
> Mr. Black has also volunteered to teach inmates in the Job Search Seminar including topics like "How to handle difficult questions during your interview"; How to present yourself during the interview"; and "How to select careers in a difficult economy".  His classes were well received and generated a request from Drug Treatment Specialist, Mr. Surratt, to teach a similar class to his RDAP

---

[16] According to the probation office, the Memorandum in question was titled "Memorandum for B-1 Unite Team" and contained a line "Memo To Central File".  The probation office maintained but did not provide the undersigned with a copy of that memorandum.

class.[17]

In addition, in the telephonic statement Ms. DeLaGarza made to the probation officer assigned to this case on March 15, 2011, she averred that Mr. Black "seemed to be genuinely interested in helping students with their educational goals." PSR p. 35, lines 1134-1138.

Ms. DeLaGarza's Declaration also asserts that Mr. Black "projected an attitude that he was better than others in the class, both faculty and students" (DeLaGarza June 2, 2011 Declaration at ¶7). The comment, even if not susceptible to the vagaries of perception, flies in the face of the statement Ms. DeLaGarza made to the probation officer assigned to this case on March 15, 2011. Ms. DeLaGarza informed the probation office that Mr. Black was "not intimidating or condescending" and "always polite and respectful." PSR p. 35, lines 1136-1137.

Some contradictions are obvious; Mr. Black could not have both been "frequently late" and "prompt" ; could not have both failed to "go beyond what was expected" and have "demonstrated initiative" and been "always willing to help and assist whenever he is needed", and could not have "projected the attitude that he was better than others" and been "not intimidating or condescending" and "always polite and respectful". Beyond these problem areas, the BOP memorandum, which was made part of the July 20, 2010 progress report issued immediately prior to Mr. Black's departure from Coleman, made zero mention of any of the issues identified in Ms. DeLaGarza's Declaration. Yet if Mr. Black were to have been habitually late or had neglected his students to read or play the piano, this would have been precisely the type of information that would have been called for but was utterly absent from the BOP "Memo To Central File". Whatever the motive for Ms. DeLaGarza's current willingness to sign a Declaration that conflicts with official BOP documents she prepared and statements she

---

[17] PSR p. 35, lines 1119-1133

9

made to a representative of this Court (which have both temporal and employment related indicia of reliability), the conflict between that information and this recent affidavit renders the affidavit sufficiently unreliable that it should have no place in this proceeding.

Furthermore, even had Ms. DeLaGarza's Declaration not been so contradictory of her prior official statements as to be ridiculous, one need look no further than the 18 letters submitted by the inmates that Mr. Black tutored or who witnessed Mr. Black's tutoring efforts to know that the Declaration was false. Rufus Rochelle attests that Mr. Black both helped him to enhance his writing skills and to make positive changes to his personality.[18] Mr. Rochelle wrote that Mr. Black worked "extremely hard" while at Coleman " teaching, mentoring and showing us guys there [is] a better life outside of crime[s]."[19] He described the "countless hours" Mr. Black spent working with students on whom others had given up hope, and observed that some of those same students not only received their GEDs but achieved some of the highest GPAs in the history of Coleman.[20] Andrew Gebrehawariat provided his first hand account of Mr. Black's tutoring efforts;

> I came across Mr. Black's path while taking up educational classes in facilities Vocational Training Dept. where he was so devoted to teaching us men how to read, write, add numbers among other academic related studies. He contributed to countless men's education level improving, including myself. So many men received their GED and other achievements because of Mr. Black's guru style of teaching.[21]

Mr. Gebrehawariat also observed that Mr. Black "increased the GED's graduation list yearly."[22]

Mr. Black's fellow tutors both wrote attesting to Mr. Black's hard work, patience and

---

[18] November 15, 2010 letter of Rufus Rochelle
[19] Id.
[20] Id.
[21] November 17, 2010 letter of Andrew Gebrehawariat p. 1
[22] Id.

success as a tutor. Robert Jennings explained that Mr. Black worked with inmates to prepare them for the writing exam portion of the GED exam, which he described as the most challenging part of the test.[23] Mr. Jennings wrote that although Mr. Black was only hired to work two days, a week, he worked four, and that Mr. Black also worked with many of his students outside of class.[24] Mr. Jennings stated that in the first year Mr. Black worked, the GED graduation rate for their classes increased 67% from the year before and stated that many students would never have passed the writing exam but for Mr. Black's assistance.[25] Mr. Jennings went on to provide seven specific examples of inmates Mr. Black tutored who started as near impossible cases, but went on to pass the GED written exam with Mr. Black's help and encouragement.[26] Mr. Jennings clarified that these were just a few prime examples of Mr. Black's work.[27]

Regan Cornelius, the other tutor with whom Mr. Black worked on a daily basis in the Vocational Training Department, confirmed that Mr. Black "contributed greatly of his time and energy helping students with their writing and grammar skills."[28] Mr. Cornelius wrote that Mr. Black "volunteered his services and gave freely of himself" even when not required, that Mr. Black set an example for the other tutors with his "diligence" and "patience", and that the effects of Mr. Black's hard work in the education department were observable long after Mr. Black departed from Coleman.[29]

So pronounced was Mr. Black's influence as a tutor, that even inmates who were not tutored by Mr. Black or who did not themselves tutor with Mr. Black wrote of their observations

---

[23] November 13, 2010 letter of Robert Jennings
[24] Id.
[25] Id.
[26] Id.
[27] Id.
[28] November 5, 2010 letter of Regan Cornelius
[29] Id.

of all the people Mr. Black helped. Jeremiah Peyton described his observations that Mr. Black "unselfishly used his time and knowledge to teach, tutor, advise, and mentor"[30] inmates at Coleman, that Mr. Black was "accommodating and patient"[31] in helping individuals attain their goals, and that he appeared to exert a "truly positive"[32] influence in the lives of others. Roy Geer described his observations of Mr. Black helping "so many at vocational training on the compound" particularly those with very little education.[33]

It is no answer to this amply supported, astoundingly successful effort by Mr. Black that Ms. DeLaGarza's unsupported "best recollection" (DeLaGarza June 2, 2011 Declaration at ¶4) was that Mr. Black only tutored 18 people. It is no rejoinder to Mr. Black's demonstrated care and concern with the success and well-being of the people that he encountered at Coleman that the overall GED graduation rate – including, presumably, many who were not tutored by Mr. Black -- had not increased. It is no response to the inmates and tutors who credit Mr. Black with changing people's lives that he was occasionally late or that he sometimes read or wrote while he waited for students to finish practice exams. These statements are not reliably sourced as they are made by a woman who either lied in an official BOP memoranda for an inmates's file and to a representative of this Court or, more likely, signed a false declaration. Even if accurate, however, none of the assertions is of any significance. Indeed, given the fact that Mr. Black showed up to tutor twice as much time as he was required to be there, that he worked with students outside of tutoring hours, and that he assisted numerous inmates outside of the tutoring program with any kind of spiritual, intellectual or emotional support they needed, these assertions ring with hollow, petty, desperation.

---

[30] November 17, 2010 letter of Jeremiah Peyton
[31] Id.
[32] Id.
[33] November 15, 2010 letter of Roy Geer

There can be no serious doubt that Mr. Black had a significant, positive impact on the individuals he encountered at Coleman, that he did so against the backdrop of enormous personal devastation and a dramatic lifestyle adjustment, and that these factors are justly and appropriately considered by the Court as 3553(a) factors in the context of this resentencing proceeding. Although the government claims that it did not provide the declarations to "discount" the work of Mr. Black, that was precisely their intention. Why else would they file declarations trying to minimize the number of people Mr. Black helped, or paint him as a late, lazy elitist more concerned with his own pursuits than with his students? They did it to make an argument. That argument was that Mr. Black should not get a break at sentencing based on his work at Coleman. It is no mystery that in failing to consider prior official statements or Ms. DeLaGarza or the 18 letters from Coleman attesting, in unison, to the very facts the government tries to disclaim these Declarations fail utterly. The only open question is why the government is so infused with dislike of Conrad Black or trepidation about the possibility that he may at last experience some of the same leniency that they have agreed to and/or advocated for with respect to every other defendant in this case, that they felt compelled to make the argument at all.

## CONCLUSION

For all of the reasons stated above the Government's Supplemental Exhibits To Government's Sentencing Memoranda should be rejected.

Respectfully submitted,

s/ Carolyn Pelling Gurland
Carolyn Pelling Gurland

MIGUEL A. ESTRADA
DAVID DEBOLD
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 955-8500

CAROLYN PELLING GURLAND
2 North LaSalle Street
17th Floor
Chicago, Il 60602

June 8, 2011  *Attorneys for Defendant Conrad M. Black*

## CERTIFICATE OF SERVICE

I, Carolyn Gurland, an attorney for Defendant Conrad M. Black, hereby certify that on this, the 8th day of June, 2011, I caused the above-described document to be filed on the CM/ECF system of the United States District Court for the Northern District of Illinois, which constitutes service of the same.

/s/ Carolyn Gurland

CAROLYN GURLAND
2 North LaSalle Street
17th Floor
Chicago, Il 60614